Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 1 of 429

**VILLAGE PLACE**

09/19/22
Revised 08/01/23
Revised 08/21/23
Revised 09/13/23
Revised 10/24/23

**TABLE 18**
**AM PEAK HOUR - TEST 2**

TEST 2 - TEN YEAR ANALYSIS
2 MILE RADIUS OF DEVELOPMENT INFLUENCE
AREA WIDE GROWTH RATE =                          1.00%
TOTAL AM PEAK HOUR PROJECT TRIPS (ENTERING) =    117
TOTAL AM PEAK HOUR PROJECT TRIPS (EXITING) =     308

| ROADWAY | FROM | TO | DIRECTION | TRAFFIC COUNT YEAR | AM PEAK HOUR TRAFFIC | PROJECT DISTRIBUTION | AM PEAK HOUR PROJECT TRIPS* | LINK GROWTH | MAJOR PROJECT | 1.0% GROWTH | TOTAL BACKGROUND TRAFFIC USED | 2028 TRAFFIC WITHOUT PROJECT | 2028 TOTAL TRAFFIC | ASSURED LANES | CLASS | LOS E | 2028 WITHOUT PROJECT MEETS LOS STD. | MEETS LOS STD. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NORTHLAKE BOULEVARD[2] | ALT A1A | PROSPERITY FARMS ROAD | EB | 2022 | 1484 | 30% | 35 | 91 | 65 | 91 | 156 | 1640 | 1675 | 6D | II | 3890 | YES | YES |
|  |  |  | WB | 2022 | 1247 | 30% | 92 | 77 | 66 | 77 | 143 | 1390 | 1482 | 6D | II | 3890 | YES | YES |
| NORTHLAKE BOULEVARD | PROSPERITY FARMS ROAD | SOUTHWIND DRIVE | EB | 2023 | 1454 | 40% | 47 | 74 | 76 | 74 | 150 | 1604 | 1651 | 6D | I | 2940 | YES | YES |
|  |  |  | WB | 2023 | 984 | 40% | 123 | 50 | 90 | 50 | 140 | 1124 | 1247 | 6D | I | 2940 | YES | YES |
| NORTHLAKE BOULEVARD | SOUTHWIND DRIVE | US 1 | EB | 2022 | 1200 | 40% | 47 | 74 | 76 | 74 | 150 | 1350 | 1397 | 6D | I | 2940 | YES | YES |
|  |  |  | WB | 2022 | 936 | 40% | 123 | 58 | 90 | 58 | 148 | 1084 | 1207 | 6D | I | 2940 | YES | YES |
| US 1 | NORTHLAKE BOULEVARD | PARK AVENUE | NB | 2022 | 921 | 30% | 35 | 57 | 48 | 57 | 105 | 1026 | 1061 | 4D | II | 1870 | YES | YES |
|  |  |  | SB | 2022 | 1025 | 30% | 92 | 63 | 53 | 63 | 116 | 1141 | 1233 | 4D | II | 1870 | YES | YES |
| US 1[1] | PARK AVENUE | SILVER BEACH ROAD | NB | 2021 | 798 | 25% | 29 | 58 | 65 | 58 | 123 | 921 | 950 | 5 | II | 1870 | YES | YES |
|  |  |  | SB | 2021 | 1077 | 25% | 77 | 78 | 92 | 78 | 170 | 1247 | 1324 | 5 | II | 1870 | YES | YES |
| US 1[2] | SILVER BEACH ROAD | BLUE HERON BOULEVARD | NB | 2021 | 724 | 20% | 23 | 52 | 50 | 52 | 102 | 826 | 849 | 4D | II | 1870 | YES | YES |
|  |  |  | SB | 2021 | 1042 | 20% | 62 | 75 | 98 | 75 | 173 | 1215 | 1277 | 4D | II | 1870 | YES | YES |

Notes:
* The residential project distribution detailed in this table is for informational purposes only. The proposed project is located in a Coastal Residential Exception Area and the residential portion is therefore not required to meet the Palm Beach County Traffic Performance Standards.
1. Count data for US 1 between Park Avenue and Silver Beach based on the US 1 link volumes between Northlake Boulevard and Park Avenue (Station 2800).
2. Per the PBC 1989 Comprehensive Plan (revised 2/2/2022), Northlake Boulevard from Military Trail to Prosperity Farms Road has a CRALLS designation of 3890 on a peak hour peak direction basis.

X:\Documents\PROJECTS\2021\21-191 Village Shoppes\Village Shoppes_Mixed_Use Dev_Traffic Calcs7.xlsx
AL

**SIMMONS & WHITE**
CIVIL & TRAFFIC ENGINEERING

**VILLAGE PLACE**

09/19/22
Revised 08/01/23
Revised 08/21/23
Revised 09/13/23
Revised 10/24/23

**TABLE 19**
**PM PEAK HOUR - TEST 2**

TEST 2 - TEN YEAR ANALYSIS
2 MILE RADIUS OF DEVELOPMENT INFLUENCE
AREA WIDE GROWTH RATE =                              1.00%
TOTAL PM PEAK HOUR PROJECT TRIPS (ENTERING) =        269
TOTAL PM PEAK HOUR PROJECT TRIPS (EXITING) =         182

| ROADWAY | FROM | TO | DIRECTION | TRAFFIC COUNT YEAR | PM PEAK HOUR TRAFFIC | PROJECT DISTRIBUTION | PM PEAK HOUR PROJECT TRIPS* | LINK GROWTH | MAJOR PROJECT | 1.0% GROWTH | TOTAL BACKGROUND TRAFFIC USED | 2028 TRAFFIC WITHOUT PROJECT | 2028 TOTAL TRAFFIC | ASSURED LANES | CLASS | LOS E | 2028 WITHOUT PROJECT MEETS LOS STD. | MEETS LOS STD. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NORTHLAKE BOULEVARD | PROSPERITY FARMS ROAD | SOUTHWIND DRIVE | EB | 2023 | 1318 | 40% | 108 | 67 | 219 | 67 | 286 | 1604 | 1712 | 6D | I | 2940 | YES | YES |
|  |  |  | WB | 2023 | 1294 | 40% | 73 | 66 | 222 | 66 | 288 | 1582 | 1655 | 6D | I | 2940 | YES | YES |
| NORTHLAKE BOULEVARD | SOUTHWIND DRIVE | US 1 | EB | 2022 | 997 | 40% | 108 | 61 | 219 | 61 | 280 | 1277 | 1385 | 6D | I | 2940 | YES | YES |
|  |  |  | WB | 2022 | 1073 | 40% | 73 | 66 | 222 | 66 | 288 | 1361 | 1434 | 6D | I | 2940 | YES | YES |
| US 1 | NORTHLAKE BOULEVARD | PARK AVENUE | NB | 2022 | 1204 | 30% | 81 | 74 | 143 | 74 | 217 | 1421 | 1502 | 4D | II | 1870 | YES | YES |
|  |  |  | SB | 2022 | 1123 | 30% | 55 | 69 | 144 | 69 | 213 | 1336 | 1391 | 4D | II | 1870 | YES | YES |
| US 1[1] | PARK AVENUE | SILVER BEACH ROAD | NB | 2021 | 1033 | 25% | 67 | 75 | 154 | 75 | 229 | 1262 | 1329 | 5 | II | 1870 | YES | YES |
|  |  |  | SB | 2021 | 955 | 25% | 46 | 69 | 125 | 69 | 194 | 1149 | 1195 | 5 | II | 1870 | YES | YES |

Notes:
* The residential project distribution detailed in this table is for informational purposes only. The proposed project is located in a Coastal Residential Exception Area and the residential portion is therefore
  not required to meet the Palm Beach County Traffic Performance Standards.
1. Count data for US 1 between Park Avenue and Silver Beach based on the US 1 link volumes between Northlake Boulevard and Park Avenue (Station 2800).
2. Per the PBC 1989 Comprehensive Plan (revised 2/2/2022), Northlake Boulevard from Military Trail to Prosperity Farms Road has a CRALLS designation of 3890 on a peak hour peak direction basis.

**SIMMONS & WHITE**
CIVIL & TRAFFIC ENGINEERING



# APPENDIX G

## PBC TPS DATABASE
## 2028 VOLUME SHEETS

Input Data

| | | | | | |
|---|---|---|---|---|---|
| ROAD NAME: Northlake Blvd | | | STATION: 2821 | | Report Created |
| CURRENT YEAR: 2022 | | | FROM: Alt A1a | | 08/11/2023 |
| ANALYSIS YEAR: 2028 | | | TO: Midpoint | | |
| GROWTH RATE: 1.88% | | | COUNT DATE: 03/02/2022 | | |
| | | | PSF: 1 | | |

Link Analysis

| Time Period | AM | | | PM | | | | |
|---|---|---|---|---|---|---|---|---|
| Direction | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB | | |
| Existing Volume | 2669 | 1484 | 1247 | 2886 | 1459 | 1427 | | |
| Peak Volume | 2669 | 1484 | 1247 | 2886 | 1459 | 1427 | | |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Volume after Diversion | 2669 | 1484 | 1247 | 2886 | 1459 | 1427 | | |
| | | | | | | | | |
| Committed Developments | | | | | | | Type | % Complete |
| 10th Street Retail | 0 | 0 | 0 | 0 | 0 | 0 | NR | 0% |
| Northlake Promenade | 28 | 17 | 11 | 238 | 114 | 124 | NR | 47% |
| **Village Shoppes II** | **0** | **0** | **0** | **0** | **0** | **0** | NR | 30% |
| Palm Beach Outlets | 6 | 2 | 3 | 28 | 15 | 14 | NR | 72% |
| Briger West | 2 | 2 | 0 | 3 | 1 | 2 | Res | 40% |
| Briger East | 11 | 3 | 8 | 13 | 9 | 4 | NR | 55% |
| Avenir | 64 | 31 | 33 | 84 | 37 | 47 | Res | 1% |
| One Park Place | 4 | 2 | 2 | 9 | 5 | 5 | NR | 50% |
| NPB 7-Eleven | 27 | 14 | 14 | 37 | 19 | 19 | NR | 0% |
| Clean Sweep Depot | 4 | 2 | 3 | 4 | 2 | 2 | NR | 0% |
| Total Committed Developments | 146 | 73 | 74 | 416 | 202 | 217 | | |
| Total Committed Residential | 66 | 33 | 33 | 87 | 38 | 49 | | |
| Total Committed Non-Residential | 80 | 40 | 41 | 329 | 164 | 168 | | |
| Double Count Reduction | 16 | 8 | 8 | 22 | 10 | 12 | | |
| Total Discounted Committed Developments | 130 | 65 | 66 | 394 | 192 | 205 | | |
| | | | | | | | | |
| Historical Growth | 316 | 176 | 148 | 342 | 173 | 169 | | |
| Comm Dev+1% Growth | 294 | 156 | 143 | 572 | 282 | 293 | | |
| Growth Volume Used | 316 | 176 | 148 | 572 | 282 | 293 | | |
| Total Volume | 2985 | 1660 | 1395 | 3458 | 1741 | 1720 | | |
| | | | | | | | | |
| Lanes | | | 6LD | | | | | |
| LOS D Capacity | | | | | 3890 | 3890 | | |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES | | |
| LOS E Capacity | | | | | 3890 | 3890 | | |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES | | |

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | Input Data | | | | | |
| ROAD NAME: Northlake Blvd | | | | STATION: 2821 | | | | Report Created |
| CURRENT YEAR: 2022 | | | | FROM: Midpoint | | | | 08/11/2023 |
| ANALYSIS YEAR: 2028 | | | | TO: Prosperity Farms Rd | | | | |
| GROWTH RATE: 1.88% | | | | COUNT DATE: 03/02/2022 | | | | |
| | | | | PSF: 1 | | | | |

### Link Analysis

| Time Period | | AM | | | PM | | | |
|---|---|---|---|---|---|---|---|---|
| Direction | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB | | |
| Existing Volume | 2669 | 1484 | 1247 | 2886 | 1459 | 1427 | | |
| Peak Volume | 2669 | 1484 | 1247 | 2886 | 1459 | 1427 | | |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Volume after Diversion | 2669 | 1484 | 1247 | 2886 | 1459 | 1427 | | |

| Committed Developments | | | | | | | Type | % Complete |
|---|---|---|---|---|---|---|---|---|
| 10th Street Retail | 0 | 0 | 0 | 0 | 0 | 0 | NR | 0% |
| Northlake Promenade | 28 | 17 | 11 | 238 | 114 | 124 | NR | 47% |
| **Village Shoppes II** | **0** | **0** | **0** | **0** | **0** | **0** | NR | 30% |
| Palm Beach Outlets | 6 | 2 | 3 | 28 | 15 | 14 | NR | 72% |
| Briger West | 2 | 2 | 0 | 3 | 1 | 2 | Res | 40% |
| Briger East | 11 | 3 | 8 | 13 | 9 | 4 | NR | 55% |
| Avenir | 64 | 31 | 33 | 84 | 37 | 47 | Res | 1% |
| One Park Place | 4 | 2 | 2 | 9 | 5 | 5 | NR | 50% |
| NPB 7-Eleven | 27 | 14 | 14 | 37 | 19 | 19 | NR | 0% |
| Clean Sweep Depot | 4 | 2 | 3 | 4 | 2 | 2 | NR | 0% |
| Total Committed Developments | 146 | 73 | 74 | 416 | 202 | 217 | | |
| Total Committed Residential | 66 | 33 | 33 | 87 | 38 | 49 | | |
| Total Committed Non-Residential | 80 | 40 | 41 | 329 | 164 | 168 | | |
| Double Count Reduction | 16 | 8 | 8 | 22 | 10 | 12 | | |
| Total Discounted Committed Developments | 130 | 65 | 66 | 394 | 192 | 205 | | |
| | | | | | | | | |
| Historical Growth | 316 | 176 | 148 | 342 | 173 | 169 | | |
| Comm Dev+1% Growth | 294 | 156 | 143 | 572 | 282 | 293 | | |
| Growth Volume Used | 316 | 176 | 148 | 572 | 282 | 293 | | |
| Total Volume | 2985 | 1660 | 1395 | 3458 | 1741 | 1720 | | |

| Lanes | 6LD | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| LOS D Capacity | | | | | 3890 | 3890 | | |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES | | |
| LOS E Capacity | | | | | 3890 | 3890 | | |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES | | |

### Input Data

ROAD NAME: Northlake Blvd  STATION: 2817  Report Created
CURRENT YEAR: 2022  FROM: Prosperity Farms Rd  08/11/2023
ANALYSIS YEAR: 2028  TO: MIDPOINT
GROWTH RATE: -2.03%  COUNT DATE: 03/02/2022
PSF: 1

### Link Analysis

| Time Period | AM | | | PM | | |
|---|---|---|---|---|---|---|
| Direction | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB |
| Existing Volume | 2584 | 1477 | 1171 | 2611 | 1283 | 1339 |
| Peak Volume | 2584 | 1477 | 1171 | 2611 | 1283 | 1339 |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 |
| Volume after Diversion | 2584 | 1477 | 1171 | 2611 | 1283 | 1339 |

| Committed Developments | | | | | | | Type | % Complete |
|---|---|---|---|---|---|---|---|---|
| 10th Street Retail | 0 | 0 | 0 | 0 | 0 | 0 | NR | 0% |
| Northlake Promenade | 30 | 18 | 12 | 260 | 125 | 135 | NR | 47% |
| **Village Shoppes II** | **0** | **0** | **0** | **0** | **0** | **0** | NR | 30% |
| Palm Beach Outlets | 6 | 2 | 3 | 28 | 15 | 14 | NR | 72% |
| Briger West | 2 | 2 | 0 | 3 | 1 | 2 | Res | 40% |
| Briger East | 11 | 3 | 8 | 13 | 9 | 4 | NR | 55% |
| Avenir | 64 | 31 | 33 | 84 | 37 | 47 | Res | 1% |
| One Park Place | 0 | 0 | 0 | 1 | 0 | 0 | NR | 50% |
| NPB 7-Eleven | 27 | 14 | 14 | 37 | 19 | 19 | NR | 0% |
| Nautilus 211 | 31 | 13 | 18 | 39 | 23 | 15 | Res | 0% |
| 200 Yacht Club Drive | 9 | 0 | 9 | 10 | 7 | 3 | Res | 0% |
| Total Committed Developments | 180 | 83 | 97 | 475 | 236 | 239 | | |
| Total Committed Residential | 106 | 46 | 60 | 136 | 68 | 67 | | |
| Total Committed Non-Residential | 74 | 37 | 37 | 339 | 168 | 172 | | |
| Double Count Reduction | 15 | 7 | 7 | 34 | 17 | 17 | | |
| Total Discounted Committed Developments | 165 | 76 | 90 | 441 | 219 | 222 | | |
| Historical Growth | -299 | -171 | -136 | -302 | -149 | -155 | | |
| Comm Dev+1% Growth | 324 | 167 | 162 | 602 | 298 | 304 | | |
| Growth Volume Used | 324 | 167 | 162 | 602 | 298 | 304 | | |
| Total Volume | 2908 | 1644 | 1333 | 3213 | 1581 | 1643 | | |

| Lanes | 6LD | | | | | |
|---|---|---|---|---|---|---|
| LOS D Capacity | | | | | 2940 | 2940 |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES |
| LOS E Capacity | | | | | 2940 | 2940 |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES |

## Input Data

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|

ROAD NAME: Northlake Blvd STATION: 2819 Report Created

CURRENT YEAR: 2022 FROM: Midpoint 08/11/2023

ANALYSIS YEAR: 2028 TO: Federal Hwy

GROWTH RATE: -3.28% COUNT DATE: 03/02/2022

PSF: 1

### Link Analysis

| Time Period | | AM | | | PM | | | |
|---|---|---|---|---|---|---|---|---|
| Direction | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB | | |
| Existing Volume | 2080 | 1200 | 936 | 2070 | 997 | 1073 | | |
| Peak Volume | 2080 | 1200 | 936 | 2070 | 997 | 1073 | | |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Volume after Diversion | 2080 | 1200 | 936 | 2070 | 997 | 1073 | | |

| Committed Developments | | | | | | | Type | % Complete |
|---|---|---|---|---|---|---|---|---|
| 10th Street Retail | 0 | 0 | 0 | 0 | 0 | 0 | NR | 0% |
| Northlake Promenade | 30 | 18 | 12 | 260 | 125 | 135 | NR | 47% |
| **Village Shoppes II** | **0** | **0** | **0** | **0** | **0** | **0** | NR | 30% |
| Palm Beach Outlets | 6 | 2 | 3 | 28 | 15 | 14 | NR | 72% |
| Briger West | 2 | 2 | 0 | 3 | 1 | 2 | Res | 40% |
| Briger East | 11 | 3 | 8 | 13 | 9 | 4 | NR | 55% |
| Avenir | 64 | 31 | 33 | 84 | 37 | 47 | Res | 1% |
| One Park Place | 0 | 0 | 0 | 1 | 0 | 0 | NR | 50% |
| NPB 7-Eleven | 27 | 14 | 14 | 37 | 19 | 19 | NR | 0% |
| Nautilus 211 | 31 | 13 | 18 | 39 | 23 | 15 | Res | 0% |
| 200 Yacht Club Drive | 9 | 0 | 9 | 10 | 7 | 3 | Res | 0% |
| Total Committed Developments | 180 | 83 | 97 | 475 | 236 | 239 | | |
| Total Committed Residential | 106 | 46 | 60 | 136 | 68 | 67 | | |
| Total Committed Non-Residential | 74 | 37 | 37 | 339 | 168 | 172 | | |
| Double Count Reduction | 15 | 7 | 7 | 34 | 17 | 17 | | |
| Total Discounted Committed Developments | 165 | 76 | 90 | 441 | 219 | 222 | | |
| Historical Growth | -377 | -217 | -170 | -375 | -181 | -194 | | |
| Comm Dev+1% Growth | 293 | 150 | 148 | 568 | 280 | 288 | | |
| Growth Volume Used | 293 | 150 | 148 | 568 | 280 | 288 | | |
| Total Volume | 2373 | 1350 | 1084 | 2638 | 1277 | 1361 | | |

| Lanes | | | 6LD | | | | |
|---|---|---|---|---|---|---|---|
| LOS D Capacity | | | | | 2940 | 2940 | |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES | |
| LOS E Capacity | | | | | 2940 | 2940 | |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES | |

Input Data

| | | | | | | |
|---|---|---|---|---|---|---|
| ROAD NAME: Federal Hwy | | | STATION: 2800 | | | Report Created |
| CURRENT YEAR: 2022 | | | FROM: Northlake Blvd | | | 08/11/2023 |
| ANALYSIS YEAR: 2028 | | | TO: Northlake Blvd | | | |
| GROWTH RATE: 2.27% | | | COUNT DATE: 03/02/2022 | | | |
| | | | PSF: 1 | | | |

Link Analysis

| Time Period | AM | | | PM | | | | |
|---|---|---|---|---|---|---|---|---|
| Direction | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB | | |
| Existing Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| Peak Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Volume after Diversion | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| | | | | | | | | |
| Committed Developments | | | | | | | Type | % Complete |
| Northlake Promenade | 20 | 12 | 8 | 173 | 83 | 90 | NR | 47% |
| **Village Shoppes II** | **0** | **0** | **0** | **0** | **0** | **0** | NR | 30% |
| Palm Beach Outlets | 4 | 2 | 2 | 19 | 10 | 9 | NR | 72% |
| One Park Place | 4 | 2 | 2 | 9 | 5 | 5 | NR | 50% |
| NPB 7-Eleven | 9 | 5 | 5 | 12 | 6 | 6 | NR | 0% |
| Nautilus 211 | 46 | 28 | 19 | 58 | 23 | 35 | Res | 0% |
| 200 Yacht Club Drive | 2 | 0 | 2 | 2 | 2 | 1 | Res | 0% |
| Safe Harbor Riviera Beach | 24 | 4 | 20 | 27 | 20 | 7 | NR | 0% |
| Total Committed Developments | 109 | 53 | 58 | 300 | 149 | 153 | | |
| Total Committed Residential | 48 | 28 | 21 | 60 | 25 | 36 | | |
| Total Committed Non-Residential | 61 | 25 | 37 | 240 | 124 | 117 | | |
| Double Count Reduction | 12 | 5 | 5 | 15 | 6 | 9 | | |
| Total Discounted Committed Developments | 97 | 48 | 53 | 285 | 143 | 144 | | |
| | | | | | | | | |
| Historical Growth | 280 | 133 | 148 | 335 | 173 | 162 | | |
| Comm Dev+1% Growth | 217 | 105 | 116 | 428 | 217 | 213 | | |
| Growth Volume Used | 280 | 133 | 148 | 428 | 217 | 213 | | |
| Total Volume | 2224 | 1054 | 1173 | 2755 | 1421 | 1336 | | |

| Lanes | 4LD | | | | | |
|---|---|---|---|---|---|---|
| LOS D Capacity | 3220 | 1960 | 1960 | 3220 | 1960 | 1960 |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES |
| LOS E Capacity | 3400 | 1960 | 1960 | 3400 | 1960 | 1960 |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES |

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | Input Data | | | | | Report Created |
| ROAD NAME: Federal Hwy | | | | STATION: 2800 | | | | 08/11/2023 |
| CURRENT YEAR: 2022 | | | | FROM: Park Ave | | | | |
| ANALYSIS YEAR: 2028 | | | | TO: MIDPOINT | | | | |
| GROWTH RATE: 2.27% | | | | COUNT DATE: 03/02/2022 | | | | |
| | | | | PSF: 1 | | | | |

### Link Analysis

| Time Period | | AM | | | PM | | | |
|---|---|---|---|---|---|---|---|---|
| Direction | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB | | |
| Existing Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| Peak Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Volume after Diversion | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |

| Committed Developments | | | | | | | Type | % Complete |
|---|---|---|---|---|---|---|---|---|
| Northlake Promenade | 20 | 12 | 8 | 173 | 83 | 90 | NR | 47% |
| **Village Shoppes II** | 0 | 0 | 0 | 0 | 0 | 0 | NR | 30% |
| Palm Beach Outlets | 4 | 2 | 2 | 19 | 10 | 9 | NR | 72% |
| One Park Place | 4 | 2 | 2 | 9 | 5 | 5 | NR | 50% |
| NPB 7-Eleven | 9 | 5 | 5 | 12 | 6 | 6 | NR | 0% |
| Nautilus 211 | 46 | 28 | 19 | 58 | 23 | 35 | Res | 0% |
| 200 Yacht Club Drive | 2 | 0 | 2 | 2 | 2 | 1 | Res | 0% |
| Safe Harbor Riviera Beach | 24 | 4 | 20 | 27 | 20 | 7 | NR | 0% |
| Total Committed Developments | 109 | 53 | 58 | 300 | 149 | 153 | | |
| Total Committed Residential | 48 | 28 | 21 | 60 | 25 | 36 | | |
| Total Committed Non-Residential | 61 | 25 | 37 | 240 | 124 | 117 | | |
| Double Count Reduction | 12 | 5 | 5 | 15 | 6 | 9 | | |
| Total Discounted Committed Developments | 97 | 48 | 53 | 285 | 143 | 144 | | |
| Historical Growth | 280 | 133 | 148 | 335 | 173 | 162 | | |
| Comm Dev+1% Growth | 217 | 105 | 116 | 428 | 217 | 213 | | |
| Growth Volume Used | 280 | 133 | 148 | 428 | 217 | 213 | | |
| Total Volume | 2224 | 1054 | 1173 | 2755 | 1421 | 1336 | | |

| Lanes | | | | 5L | | | | |
|---|---|---|---|---|---|---|---|---|
| LOS D Capacity | 3220 | 1960 | 1960 | 3220 | 1960 | 1960 | | |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES | | |
| LOS E Capacity | 3400 | 1960 | 1960 | 3400 | 1960 | 1960 | | |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES | | |

### Input Data

| | | |
|---|---|---|
| ROAD NAME: Federal Hwy | STATION: 2800 | Report Created |
| CURRENT YEAR: 2022 | FROM: Midpoint | 08/11/2023 |
| ANALYSIS YEAR: 2028 | TO: Park Ave | |
| GROWTH RATE: 2.27% | COUNT DATE: 03/02/2022 | |
| | PSF: 1 | |

### Link Analysis

| Time Period | AM | | | PM | | |
|---|---|---|---|---|---|---|
| Direction | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB |
| Existing Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 |
| Peak Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 |
| Volume after Diversion | 1944 | 921 | 1025 | 2327 | 1204 | 1123 |

| Committed Developments | | | | | | | Type | % Complete |
|---|---|---|---|---|---|---|---|---|
| Northlake Promenade | 10 | 6 | 4 | 87 | 42 | 45 | NR | 47% |
| **Village Shoppes II** | **0** | **0** | **0** | **0** | **0** | **0** | NR | 30% |
| Palm Beach Outlets | 4 | 2 | 2 | 19 | 10 | 9 | NR | 72% |
| Champs Charter School | 5 | 2 | 3 | 2 | 1 | 1 | NR | 65% |
| One Park Place | 3 | 2 | 2 | 7 | 4 | 4 | NR | 50% |
| The Waterway-East | 20 | 13 | 7 | 31 | 13 | 19 | Res | 0% |
| Nautilus 211 | 62 | 37 | 25 | 77 | 31 | 46 | Res | 0% |
| Island Plaza | 2 | 1 | 1 | 14 | 7 | 7 | NR | 70% |
| Safe Harbor Riviera Beach | 30 | 5 | 25 | 34 | 25 | 9 | NR | 0% |
| Total Committed Developments | 136 | 68 | 69 | 271 | 133 | 140 | | |
| Total Committed Residential | 82 | 50 | 32 | 108 | 44 | 65 | | |
| Total Committed Non-Residential | 54 | 18 | 37 | 163 | 89 | 75 | | |
| Double Count Reduction | 11 | 4 | 7 | 27 | 11 | 15 | | |
| Total Discounted Committed Developments | 125 | 64 | 62 | 244 | 122 | 125 | | |
| Historical Growth | 280 | 133 | 148 | 335 | 173 | 162 | | |
| Comm Dev+1% Growth | 245 | 121 | 125 | 387 | 196 | 194 | | |
| Growth Volume Used | 280 | 133 | 148 | 387 | 196 | 194 | | |
| Total Volume | 2224 | 1054 | 1173 | 2714 | 1400 | 1317 | | |

| Lanes | 5L | | | | | |
|---|---|---|---|---|---|---|
| LOS D Capacity | 3220 | 1770 | 1770 | 3220 | 1770 | 1770 |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES |
| LOS E Capacity | 3400 | 1870 | 1870 | 3400 | 1870 | 1870 |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES |

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | Input Data | | | | | | |
| ROAD NAME: Federal Hwy | | | | STATION: 2800 | | | | Report Created |
| CURRENT YEAR: 2022 | | | | FROM: Silver Beach Rd | | | | 08/11/2023 |
| ANALYSIS YEAR: 2028 | | | | TO: Midpoint | | | | |
| GROWTH RATE: 2.27% | | | | COUNT DATE: 03/02/2022 | | | | |
| | | | | PSF: 1 | | | | |

| | | Link Analysis | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Time Period | | AM | | | PM | | | |
| Direction | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB | | |
| Existing Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| Peak Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Volume after Diversion | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| | | | | | | | | |
| Committed Developments | | | | | | | Type | % Complete |
| Northlake Promenade | 10 | 6 | 4 | 87 | 42 | 45 | NR | 47% |
| **Village Shoppes II** | 0 | 0 | 0 | 0 | 0 | 0 | NR | 30% |
| Palm Beach Outlets | 4 | 2 | 2 | 19 | 10 | 9 | NR | 72% |
| Champs Charter School | 5 | 2 | 3 | 2 | 1 | 1 | NR | 65% |
| One Park Place | 3 | 2 | 2 | 7 | 4 | 4 | NR | 50% |
| The Waterway-East | 20 | 13 | 7 | 31 | 13 | 19 | Res | 0% |
| Nautilus 211 | 92 | 38 | 55 | 116 | 70 | 46 | Res | 0% |
| Island Plaza | 2 | 1 | 1 | 14 | 7 | 7 | NR | 70% |
| Safe Harbor Riviera Beach | 30 | 5 | 25 | 34 | 25 | 9 | NR | 0% |
| Total Committed Developments | 166 | 69 | 99 | 310 | 172 | 140 | | |
| Total Committed Residential | 112 | 51 | 62 | 147 | 83 | 65 | | |
| Total Committed Non-Residential | 54 | 18 | 37 | 163 | 89 | 75 | | |
| Double Count Reduction | 11 | 4 | 7 | 33 | 18 | 15 | | |
| Total Discounted Committed Developments | 155 | 65 | 92 | 277 | 154 | 125 | | |
| | | | | | | | | |
| Historical Growth | 280 | 133 | 148 | 335 | 173 | 162 | | |
| Comm Dev+1% Growth | 275 | 122 | 155 | 420 | 228 | 194 | | |
| Growth Volume Used | 280 | 133 | 155 | 420 | 228 | 194 | | |
| Total Volume | 2224 | 1054 | 1180 | 2747 | 1432 | 1317 | | |
| | | | | | | | | |
| Lanes | | | | 5L | | | | |
| LOS D Capacity | 3220 | 1770 | 1770 | 3220 | 1770 | 1770 | | |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES | | |
| LOS E Capacity | 3400 | 1870 | 1870 | 3400 | 1870 | 1870 | | |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES | | |

Input Data

| | | | | | | |
|---|---|---|---|---|---|---|
| ROAD NAME: Broadway | | STATION: 2800 | | | Report Created | |
| CURRENT YEAR: 2022 | | FROM: Midpoint | | | 08/11/2023 | |
| ANALYSIS YEAR: 2028 | | TO: Silver Beach Rd | | | | |
| GROWTH RATE: 2.27% | | COUNT DATE: 03/02/2022 | | | | |
| | | PSF: 1 | | | | |

Link Analysis

| Time Period | AM | | | PM | | |
|---|---|---|---|---|---|---|
| Direction | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB |
| Existing Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 |
| Peak Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 |
| Volume after Diversion | 1944 | 921 | 1025 | 2327 | 1204 | 1123 |

| Committed Developments | | | | | | | Type | % Complete |
|---|---|---|---|---|---|---|---|---|
| Northlake Promenade | 0 | 0 | 0 | 0 | 0 | 0 | NR | 47% |
| Wellness Resort | 11 | 3 | 8 | 14 | 8 | 6 | NR | 20% |
| **Village Shoppes II** | **0** | **0** | **0** | **0** | **0** | **0** | NR | 30% |
| Palm Beach Outlets | 4 | 2 | 2 | 19 | 10 | 9 | NR | 72% |
| Australian Plaza | 1 | 0 | 1 | 6 | 3 | 3 | NR | 0% |
| Champs Charter School | 7 | 3 | 4 | 3 | 2 | 1 | NR | 65% |
| The Waterway-East | 20 | 7 | 13 | 31 | 19 | 13 | Res | 0% |
| Nautilus 211 | 69 | 28 | 41 | 87 | 52 | 35 | Res | 0% |
| Island Plaza | 8 | 5 | 3 | 68 | 35 | 34 | NR | 70% |
| Safe Harbor Riviera Beach | 41 | 6 | 35 | 47 | 35 | 13 | NR | 0% |
| Total Committed Developments | 161 | 54 | 107 | 275 | 164 | 114 | | |
| Total Committed Residential | 89 | 35 | 54 | 118 | 71 | 48 | | |
| Total Committed Non-Residential | 72 | 19 | 53 | 157 | 93 | 66 | | |
| Double Count Reduction | 14 | 4 | 11 | 30 | 18 | 12 | | |
| Total Discounted Committed Developments | 147 | 50 | 96 | 245 | 146 | 102 | | |
| | | | | | | | | |
| Historical Growth | 280 | 133 | 148 | 335 | 173 | 162 | | |
| Comm Dev+1% Growth | 267 | 107 | 159 | 388 | 220 | 171 | | |
| Growth Volume Used | 280 | 133 | 159 | 388 | 220 | 171 | | |
| Total Volume | 2224 | 1054 | 1184 | 2715 | 1424 | 1294 | | |

| Lanes | 4LD | | | | | |
|---|---|---|---|---|---|---|
| LOS D Capacity | 3220 | 1960 | 1960 | 3220 | 1960 | 1960 |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES |
| LOS E Capacity | 3400 | 1960 | 1960 | 3400 | 1960 | 1960 |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES |

## Input Data

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ROAD NAME: Broadway | | | | | STATION: 2800 | | | | Report Created |
| CURRENT YEAR: 2022 | | | | | FROM: Blue Heron Blvd W | | | | 08/11/2023 |
| ANALYSIS YEAR: 2028 | | | | | TO: Midpoint | | | | |
| GROWTH RATE: 2.27% | | | | | COUNT DATE: 03/02/2022 | | | | |
| | | | | | PSF: 1 | | | | |

## Link Analysis

| | AM | | | PM | | | | |
|---|---|---|---|---|---|---|---|---|
| Time Period | 2-way | NB/EB | SB/WB | 2-way | NB/EB | SB/WB | | |
| Direction | | | | | | | | |
| Existing Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| Peak Volume | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| Diversion(%) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Volume after Diversion | 1944 | 921 | 1025 | 2327 | 1204 | 1123 | | |
| | | | | | | | | |
| Committed Developments | | | | | | | Type | % Complete |
| Northlake Promenade | 0 | 0 | 0 | 0 | 0 | 0 | NR | 47% |
| Wellness Resort | 11 | 3 | 8 | 14 | 8 | 6 | NR | 20% |
| **Village Shoppes II** | **0** | **0** | **0** | **0** | **0** | **0** | NR | 30% |
| Palm Beach Outlets | 4 | 2 | 2 | 19 | 10 | 9 | NR | 72% |
| Australian Plaza | 1 | 0 | 1 | 6 | 3 | 3 | NR | 0% |
| Champs Charter School | 7 | 3 | 4 | 3 | 2 | 1 | NR | 65% |
| The Waterway-East | 20 | 7 | 13 | 31 | 19 | 13 | Res | 0% |
| Nautilus 211 | 69 | 28 | 41 | 87 | 52 | 35 | Res | 0% |
| Island Plaza | 8 | 3 | 5 | 68 | 34 | 35 | NR | 70% |
| Safe Harbor Riviera Beach | 41 | 6 | 35 | 47 | 35 | 13 | NR | 0% |
| Total Committed Developments | 161 | 52 | 109 | 275 | 163 | 115 | | |
| Total Committed Residential | 89 | 35 | 54 | 118 | 71 | 48 | | |
| Total Committed Non-Residential | 72 | 17 | 55 | 157 | 92 | 67 | | |
| Double Count Reduction | 14 | 3 | 11 | 30 | 18 | 12 | | |
| Total Discounted Committed Developments | 147 | 49 | 98 | 245 | 145 | 103 | | |
| | | | | | | | | |
| Historical Growth | 280 | 133 | 148 | 335 | 173 | 162 | | |
| Comm Dev+1% Growth | 267 | 106 | 161 | 388 | 219 | 172 | | |
| Growth Volume Used | 280 | 133 | 161 | 388 | 219 | 172 | | |
| Total Volume | 2224 | 1054 | 1186 | 2715 | 1423 | 1295 | | |
| | | | | | | | | |
| Lanes | 4LD | | | | | | | |
| LOS D Capacity | 3220 | 1960 | 1960 | 3220 | 1960 | 1960 | | |
| Link Meets Test 1? | YES | YES | YES | YES | YES | YES | | |
| LOS E Capacity | 3400 | 1960 | 1960 | 3400 | 1960 | 1960 | | |
| Link Meets Test 2? | YES | YES | YES | YES | YES | YES | | |

VILLAGE OF
NORTH PALM BEACH
SEP 25 2023
COMMUNITY DEVELOPMENT
RECEIVED

# FISCAL IMPACT ANALYSIS VILLAGE PLACE MIXED-USE DEVELOPMENT VILLAGE OF NORTH PALM BEACH, FL

**September 25, 2023**

**Prepared for**

**Mr. Nader Salour
Managing Partner
NP Devland Holdings LLC
3910 RCA Boulevard, Suite 1015
Palm Beach Gardens, Fl 33410**

**Fishkind Litigation Services, Inc.
3504 Lake Lynda Drive, Suite 107
Orlando, Florida 32817
407-382-3256
WWW.Fishkindls.com**

---

# Fiscal Impact Analysis
# Village Place
# Mixed-Use Development

---

## 1.0   Introduction and Summary of Results

### 1.1 Background

NP Devland Holdings, LLC ("Client") is planning the mixed-use development of 3 rental apartment buildings, a condominium building, a hotel, and a senior living facility ("Project") on 13.155 +/- acres. The Project will also incorporate (a) 100,000 square feet of community retail space within the six buildings and (b) 2,759 structure parking spaces. The property is located on US Highway One and Palmetto Drive, in the Village of North Palm Beach, Florida ("City").

### 1.2 Assignment

NP Devland Holdings, LLC retained Fishkind Litigation Services, Inc. ("FLS") to analyze the fiscal impact (the cost and revenue effects) of the proposed Project on the Village of North Palm Beach.

### 1.3 Summary of Results

The development of the Project will have very significant, positive, fiscal impacts on the City as shown in Table 1.  This analysis is based on the development plan comprising of 100,000 SF of community retail, 947 rental apartment units, 222 hotel rooms, 206 senior living facility units, and 133 condominium units estimated to be completed in two phases by 2030. The Project property values produces annual fiscal surpluses ranging from $1.7 million in 2028 to $5.7 million by 2062. As Table 2 shows, on a cumulative basis, the operating surplus is $13.5 million by 2032 (5 years) growing to $164 million by 2062 (35 years).  By 2062, the present value at 5% interest of the net fiscal impact is estimated at $69.8 million.



**Table 1**
**Summary of Fiscal Impacts**
**Village Place     Mixed -Use Development**
**Net Fiscal Impacts for Selected Years**

| Year | Assessed Values | Ad Valorem | Total Operating Revenue | Total Operating Expenditure | Net Fiscal Impact |
|---|---|---|---|---|---|
| 2028 | 218,333,946 | 1,528,338 | 2,589,617 | 850,683 | 1,738,934 |
| 2032 | 585,901,882 | 4,101,313 | 7,662,183 | 3,344,853 | 4,317,330 |
| 2037 | 615,788,767 | 4,310,521 | 7,871,392 | 3,344,853 | 4,526,538 |
| 2042 | 647,200,182 | 4,530,401 | 8,091,271 | 3,344,853 | 4,746,418 |
| 2047 | 680,213,896 | 4,761,497 | 8,322,367 | 3,344,853 | 4,977,514 |
| 2052 | 714,911,641 | 5,004,381 | 8,565,252 | 3,344,853 | 5,220,399 |
| 2057 | 751,379,320 | 5,259,655 | 8,820,525 | 3,344,853 | 5,475,672 |
| 2062 | 789,707,217 | 5,527,951 | 9,088,821 | 3,344,853 | 5,743,968 |

**Table 2**
**Summary of Fiscal Impacts**
**Village Place     Mixed -Use Development**
**Cumulative Net Fiscal Impacts**

| Year | Cumulative Impact | Interest Rate | Years | Present Values |
|---|---|---|---|---|
| 2032 | $13,482,832 | 5.0% | 5 | $11,354,062 |
| 2037 | $35,692,945 | 5.0% | 10 | $26,408,647 |
| 2042 | $58,980,901 | 5.0% | 15 | $38,776,719 |
| 2047 | $83,401,683 | 5.0% | 20 | $48,938,802 |
| 2052 | $109,013,074 | 5.0% | 25 | $57,289,235 |
| 2057 | $135,875,808 | 5.0% | 30 | $64,151,678 |
| 2062 | $164,053,717 | 5.0% | 35 | $69,791,819 |

**FISHKIND**
LITIGATION SERVICES

## 2.0    Methodology

### 2.1 Overview

The Client requested a submission of a fiscal impact report quantifying the costs and revenue impacts on the City's budget from the proposal to construct the mixed-use project consisting of 100,000 SF of retail space, 3 rental apartment buildings, a condominium building, a hotel, and a senior living facility on 13.155 +/- acres. The property is located on US Highway One and Palmetto Drive, in the Village of North Palm Beach, Florida.

The fiscal impact study is a set of statistical data and information based on new development in a jurisdiction. Its purpose is to legally justify to the Village of North Palm Beach the ability to provide capital improvement, mill levy increases, as well as impact fees. The Fiscal Impact Analysis encompasses multiple methods to demonstrate that a development will pay the full costs of all public facilities and services that are required to support the development.

The Client has requested a study as backing or support for any amendment or change to their subdivision regulations. Fiscal impact analysis seeks to connect planning and local economics by estimating the public costs and revenues that result from change in the land use. This type of analysis is required to meet the full costs of all public facilities and services that are required to support the development and that are required to meet the level of service standards adopted by the Village of North Palm Beach.

To accomplish consistency in the analysis, FLS complies with the guide standards prepared for Sarasota County by AECOM (Architecture, Engineering, Construction, Operations, and Management) in support of permitting for the Project.  Our analysis is conducted according to the 2015 report by AECOM. AECOM outlines several methodologies to conduct the fiscal impact analysis including the per capita approach.[1]  AECOM notes that the per capita methodology is the most used type of analysis. The per capita approach estimates the cost of providing services on a per unit basis.  The unit varies depending upon how the services are used and can include: per person, per employee, and per visitor. Similarly, most City and City revenues are appropriately estimated on a per capita basis again depending upon the revenues generated.

FLS uses all these factors depending upon the expenditure or revenue category involved.  For example, law enforcement and public safety are provided to all residents, visitors, and employees.  FLS measures residents, visitors, and employees on a full-time equivalent ("FTE") basis.  However, not all expenditures or all revenues are generated by residents, visitors, and employees.  State revenue

---

[1] AECOM (2015), page 2.

sharing funds are provided through a population-based formula, so for this revenue item FLS only uses population.  FLS's application of the per capita method for both revenues and expenditures is consistent with AECOM.

FLS uses all categories of revenue and expenditures included in the Village of North Palm Beach budget (but not all fund types as discussed above).  FY2021 actual reported to the State includes 49 revenue line items and 40 expenditure categories.  Not all revenues and expenditures relate to the fund types included in our analysis.  As discussed above, except for ad valorem tax revenues, each category of revenue and expenditure is included and analyzed using the modified per capita approach.  It is impractical to discuss each category. However, FLS has included our fiscal impact analysis model in excel with this report to provide a full and detailed submission of our calculations.

Ad valorem revenues are calculated directly based on the development program, product pricing, and estimates for homestead exemptions for condominium products, and assessment ratios. All other revenues are estimated via the per capita, unit, approach with the unit varying as required.
.
Capital impacts are measured by the formulae for impact fees. The Village of North Palm Beach does not have impact fee requirements. There are impact fee requirements for Palm Beach County.

## 2.2 Operating Revenues

Except for ad valorem revenues, which are discussed in more detail below, operating revenues were calculated using the modified per capita method based on the City's actual for FY2021 as reported to the State of Florida, Division of Banking.  Consistent with the AECOM parameters, FLS included the following fund types: (a) general fund; (b) special revenue fund; (c) debt service fund; (d) permanent fund; (e) internal service; (f) pension; and (g) component.   FLS excluded the following fund types: (a) debt service; (b) capital projects; and (c) enterprise.
The debt service fund relates to prior commitments and is not directly impacted by future growth or the Project.  While the Project will contribute to this fund, the impact is relatively small.  The impact of the Project on capital funds is calculated separately, so this fund is excluded to avoid double counting.  The enterprise fund is also excluded because enterprise funds are designed to be self-funding.

Ad valorem taxes generated by the Project are a function of: (a) the development program for the Project; (b) its projected valuation and absorption; and (c) the City's adopted millage rates for general revenue totaling 7.00 mills.  Concerning timing, FLS takes a stricter and more conservative approach than AECOM.  FLS recognizes that there is a 4-year lag between the time condo units and hotel rooms are permitted and consuming services, and the time that property is included in the tax roll and paying ad valorem taxes.



## 2.3 Operating Expenses

Operating expenses are correctly calculated by fund type using the modified per capita approach.  As noted above, the per capita units are carefully tailored to the type of expenditure.  We have included impacts from residents and employees measured on an FTE basis and included FTE visitors who also consume these services.

## 3.0 Development Program

The fiscal impact analysis is based exclusively on the projected development of Project (Table 3A -Development Plan & Appendix A -Site Plan) which comprises 947 apartment units ,222 hotel rooms, 206 senior living facility units, and 133 condominium units. The Project incorporates 100,000 SF of community retail space within the six buildings and 2,759 structure parking spaces. The Project has an estimated property value of $772.4 million, per Table 3.  The development program is on the tax role as provided in Table 4 and is completed in two phases, (a) phase 1 construction completed 2027, and (b) phase 2 construction completed 2030.

| TABLE 3A   VILLAGE PLACE - DEVELOPMENT PLAN | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Units | | | | | Square Feet |
| Parcel Number Per Site Plan | Acres | Number of Buildings | Stories | Multi Family- Rental Apartments | Multi Family- Condominium | Hotel | Senior Living Facility | Total Units | Community/ Retail Incorporated within the 6 Buildings |
| 1 | 2.7000 | 2 | 14 | 338 | 133 | | | 471 | 15,750 |
| 2 | 5.2700 | 2 | 10 | 609 | | | | 609 | 54,810 |
| 3 | 1.3400 | 1 | 9 | | | 222 | | 222 | 20,700 |
| 4 | 1.6100 | 1 | 9 | | | | 206 | 206 | 8,740 |
| Subtotal | 10.9200 | 6 | | 947 | 133 | 222 | 206 | 1,508 | 100,000 |
| Civic Open Space | 1.0800 | | | | | | | | |
| Road ROW | 1.1550 | | | | | | | - | |
| Total | 13.1550 | | | | | | | | |

See Appendix A- Site Plan



**Table 3**
**Village Place**
**Property Valuation**

| Category | Units | Average Property Value Per | Average Property Value Per Category |
|---|---|---|---|
| Multi Family-Rental Apartments | 947 | $ 412,999 | 391,110,016 |
| Multi Family-Condominium | 133 | 1,105,000 | 146,965,000 |
| Hotel | 222 | 533,584 | 118,455,593 |
| Senior Living Facility | 206 | 431,654 | 88,920,773 |
| **Subtotal** | 1,508 | | **745,451,381** |

| Category | Square Feet | Average Property Value Per SF | Average Property Value Per Category |
|---|---|---|---|
| Commercial/Retail -100,000 SF | 100,000 | $ 270 | **27,000,000** |
| | | | |
| **Total Project** | | | **772,451,381** |

**Table 4**
**Village Place** — **Mixed -Use Development**
**Development Scenario**

| Real Estate on Tax Roll | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Multi Family-Rental Apartments | - | - | - | - | 338 | - | - | 609 | 947 |
| Multi Family-Condominium | - | - | - | - | 133 | - | - | - | 133 |
| Hotel | - | - | - | - | - | - | - | 222 | 222 |
| Senior Living Facility | - | - | - | - | 206 | - | - | - | 206 |
| Subtotal | - | - | - | - | 677 | - | - | 831 | 1,508 |
| Commercial/Retail -100,000 SF | - | - | - | - | 50,000 | - | - | 50,000 | 100,000 |
| **Permits for Construction** | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031** | **Total** |
| Multi Family-Rental Apartments | 338 | - | - | - | 609 | - | - | - | 947 |
| Multi Family-Condominium | 133 | - | - | - | - | - | - | - | 133 |
| Hotel | - | - | - | - | 222 | - | - | - | 222 |
| Senior Living Facility | 206 | - | - | - | - | - | - | - | 206 |
| Subtotal | 677 | - | - | - | 831 | - | - | - | 1,508 |
| Commercial/Retail -100,000 SF | 50,000 | - | - | - | 50,000 | - | | | 100,000 |

## 4.0    Fiscal Impact – Operating Revenues and Expenses – Tables 5,6,7,8, and 9

Using the methodology described in Section 2, the fiscal impacts of the Project on the City's operating budget are summarized below in Table 5.  The Project produces a fiscal surplus in its first year of $1.7 million, 2028, when its value is included in the City's taxable value base determined by the property appraiser. By



2037, at 10 years, the net fiscal impact is estimated at $4.5 million with a cumulative total of nearly $35.7 million.

| Table 5 Village Place Mixed -Use Development Fiscal Impact - Operating Revenue and Expenditures | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Assessed Value | Ad Valorem | Total Operating Revenue | Total Operating Expenditure | Net Fiscal Impact | Cumulative Net Fiscal Impact | Years | Present Value of Net Fiscal Impact at 5% Interest |
| 2028 | $ 218,333,946 | $ 1,528,338 | $ 2,589,617 | $ 850,683 | $ 1,738,934 | $ 1,738,934 | | |
| 2032 | $ 585,901,882 | $ 4,101,313 | $ 7,662,183 | $ 3,344,853 | $ 4,317,330 | $ 13,482,832 | 5 | $ 11,354,062 |
| 2037 | $ 615,788,767 | $ 4,310,521 | $ 7,871,392 | $ 3,344,853 | $ 4,526,538 | $ 35,692,945 | 10 | $ 26,408,647 |
| 2042 | $ 647,200,182 | $ 4,530,401 | $ 8,091,271 | $ 3,344,853 | $ 4,746,418 | $ 58,980,901 | 15 | $ 38,776,719 |
| 2047 | $ 680,213,896 | $ 4,761,497 | $ 8,322,367 | $ 3,344,853 | $ 4,977,514 | $ 83,401,683 | 20 | $ 48,938,802 |
| 2052 | $ 714,911,641 | $ 5,004,381 | $ 8,565,252 | $ 3,344,853 | $ 5,220,399 | $ 109,013,074 | 25 | $ 57,289,235 |
| 2057 | $ 751,379,320 | $ 5,259,655 | $ 8,820,525 | $ 3,344,853 | $ 5,475,672 | $ 135,875,808 | 30 | $ 64,151,678 |
| 2062 | $ 789,707,217 | $ 5,527,951 | $ 9,088,821 | $ 3,344,853 | $ 5,743,968 | $ 164,053,717 | 35 | $ 69,791,819 |

The strong growth in net fiscal surpluses is driven by the gains in total taxable values. Table 6 displays the growth in taxable value generated by the Project for the Village of North Palm Beach. Taxable value rises from almost $218 million in 2028 to more than $616 million in 2037. Within the 13.155 acre which comprises the Project ,0.84 acres or 6.5% of the land is in the Lake Park municipality. Within the Project, the Lake Park municipality property is designated as an open space or road and does not subtract from the values in Table 6.

| Table 6 Village Place Taxable Property Values | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Residential** | | | | | | | | | | |
| Multi Family-Rental Apartments | 124,707,179 | 125,954,250 | 127,213,793 | 359,988,688 | 363,588,575 | 367,224,461 | 370,896,705 | 374,605,672 | 378,351,729 | 382,135,246 |
| Hotel | - | - | - | 109,029,868 | 110,120,166 | 111,221,368 | 112,333,582 | 113,456,918 | 114,591,487 | 115,737,402 |
| Senior Living Facility | 79,438,132 | 80,232,513 | 81,034,838 | 81,845,187 | 82,663,639 | 83,490,275 | 84,325,178 | 85,168,430 | 86,020,114 | 86,880,315 |
| Subtotal | 204,145,311 | 206,186,764 | 208,248,631 | 550,863,743 | 556,372,380 | 561,936,104 | 567,555,465 | 573,231,019 | 578,963,330 | 584,752,963 |
| Multi Family-Condominium | - | - | - | - | - | - | - | - | - | - |
| Total Residential | | | | | | | | | | |
| **Total Taxable Value -Residential** | 204,145,311 | 206,186,764 | 208,248,631 | 550,863,743 | 556,372,380 | 561,936,104 | 567,555,465 | 573,231,019 | 578,963,330 | 584,752,963 |
| Commercial/Retail | | | | | | | | | | |
| Community Retail | 14,188,636 | 14,330,522 | 14,473,827 | 29,237,131 | 29,529,502 | 29,824,797 | 30,123,045 | 30,424,276 | 30,728,519 | 31,035,804 |
| **Total Taxable Value -Commercial /Retail** | 14,188,636 | 14,330,522 | 14,473,827 | 29,237,131 | 29,529,502 | 29,824,797 | 30,123,045 | 30,424,276 | 30,728,519 | 31,035,804 |
| **Total Taxable Value** | 218,333,946 | 220,517,286 | 222,722,459 | 580,100,874 | 585,901,882 | 591,760,901 | 597,678,510 | 603,655,295 | 609,691,848 | 615,788,767 |
| Years | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |

| Table 6 Village Place Taxable Property Values | 2053 | 2054 | 2055 | 2056 | 2057 | 2058 | 2059 | 2060 | 2061 | 2062 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Residential** | | | | | | | | | | |
| Multi Family-Rental Apartments | 448,083,629 | 452,564,465 | 457,090,110 | 461,661,011 | 466,277,621 | 470,940,398 | 475,649,802 | 480,406,300 | 485,210,363 | 490,062,466 |
| Hotel | 135,711,206 | 137,068,318 | 138,439,001 | 139,823,391 | 141,221,625 | 142,633,841 | 144,060,179 | 145,500,781 | 146,955,789 | 148,425,347 |
| Senior Living Facility | 101,874,002 | 102,892,742 | 103,921,669 | 104,960,886 | 106,010,495 | 107,070,600 | 108,141,306 | 109,222,719 | 110,314,946 | 111,418,096 |
| Subtotal | 685,668,837 | 692,525,525 | 699,450,780 | 706,445,288 | 713,509,741 | 720,644,839 | 727,851,287 | 735,129,800 | 742,481,098 | 749,905,909 |
| Multi Family-Condominium | - | - | - | - | - | - | - | - | - | - |
| Total Residential | | | | | | | | | | |
| **Total Taxable Value -Residential** | 685,668,837 | 692,525,525 | 699,450,780 | 706,445,288 | 713,509,741 | 720,644,839 | 727,851,287 | 735,129,800 | 742,481,098 | 749,905,909 |
| Commercial/Retail | | | | | | | | | | |
| Community Retail | 36,391,921 | 36,755,840 | 37,123,398 | 37,494,632 | 37,869,579 | 38,248,274 | 38,630,757 | 39,017,065 | 39,407,235 | 39,801,308 |
| **Total Taxable Value -Commercial /Retail** | 36,391,921 | 36,755,840 | 37,123,398 | 37,494,632 | 37,869,579 | 38,248,274 | 38,630,757 | 39,017,065 | 39,407,235 | 39,801,308 |
| **Total Taxable Value** | 722,060,758 | 729,281,365 | 736,574,179 | 743,939,921 | 751,379,320 | 758,893,113 | 766,482,044 | 774,146,865 | 781,888,333 | 789,707,217 |
| Years | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |



FISHKIND LITIGATION SERVICES

Table 7 shown below, presents the key assumptions employed in calculating the taxable values shown previously.  Our assumptions related to the assessment ratio and percentage of homes expected to take advantage of the homestead exemption are more conservative than those of AECOM making our analysis more conservative than if we had adopted the AECOM assumptions for these parameters.

Using data from Census On-the-Map, we determined that there were 5,132 City residents who also work in the city.  Since we also included all employees, FLS weighted resident employees by 0.7619 to avoid double counting.  Non-working residents are weighed at 1.0 FTE.  Seasonal residents are at 0.3462 reflecting seasonal demands on City services.

Persons per household and total households are from Florida Population Studies.

(Intentionally Left Blank)



## Table 7
## Village Place
## Fiscal Impact Assumptions

### Real Estate Taxes

| | | | |
|---|---|---|---|
| **Taxable Assessment Ratio** | 85% | | |
| Homestead Exemption | $ 50,000 | | |
| % Single-Family  with Homestead | 90% | | |
| % Multifamily with Homestead | 60% | | |
| Annual growth rate of Residential Property Value | 1.0% | | |
| Annual growth rate of Non-Residential Property Value | 1.0% | | |
| **Taxable Assessment** | | | |
| **Millage** | | | |
| General Revenue | 7.0000 | Mills | |
| Total | 7.0000 | Mills | |

### Population & Employment

| | Amount | Equivalent Factor | Full-Time Equivalent |
|---|---|---|---|
| Population-Working Residents | 5,132 | 76.26% | 3,913 |
| Population-Non-Working Residents | 8,034 | 100.00% | 8,034 |
| Population- Seasonal | 2,876 | 34.62% | 996 |
| Total Population (peak season) | 16,042 | | 12,943 |
| Population (total) | 13,166 | | |
| Employment (total) | 4,634 | 96.7% | 4,481 |
| Full-Time Equivalent Visitors | | | 241 |
| Persons per Household - Single Family | 2.07 | | |
| Persons per Household - Multifamily | 2.23 | | |
| Total Households | 6,316 | | |
| Total Housing Units | 8,214 | | |
| **Hotel Assumptions-Visitors** | | | |
| Total Number of Rooms | 154 | CoStar | |
| Average Occupancy | 71.0% | CoStar | |
| Average Persons per Room | 2.2 | CoStar | |
| **Employment Assumptions** | | | |
| Community Retail ( 1 employee per 383 SF of retail) | 261 | | |
| Hotel (12 employees for every 10 rooms) | 266 | | |
| Senior Living Facility (1 employee  per 20 residents) | 15 | | |
| Unemployment Rate | 3.3% | Jul-23 | |

### Property Valuation

| Property Type | Average Value | | |
|---|---|---|---|
| Multi Family-Rental Apartments | $ 414,483 | Per Unit | |
| Hotel | $ 534,289 | Per Unit | |
| Senior Living Facility | $ 432,571 | Per Unit | |
| Multi Family-Condominium | $ 1,105,000 | Per Unit | |
| Commercial /Retail | $ 270 | Per Square Foot | |



Table 8 summarizes the results of the fiscal analysis for the City's operating budget for a 10-year period.
In 2031, the Project is estimated to generate a resident population of 1,382 and a seasonal population of 260 . The Hotel in the Project is estimated to generate 347 full-time equivalent visitors and 266 employees. The total employment estimated to be generated by the Project is 527 employees.

| Table 8 Village Place Mixed -Use Development Development Impact Summary | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 |
|---|---|---|---|---|---|---|---|---|---|---|
| Residential Units | 677 | 677 | 677 | 1,286 | 1,286 | 1,286 | 1,286 | 1,286 | 1,286 | 1,286 |
| Resident Households | 477 | 477 | 477 | 907 | 907 | 907 | 907 | 907 | 907 | 907 |
| **Peak Population** | | | | | | | | | | |
| Resident Population | 493 | 493 | 493 | 1,382 | 1,382 | 1,382 | 1,382 | 1,382 | 1,382 | 1,382 |
| Seasonal Population | 93 | 93 | 93 | 260 | 260 | 260 | 260 | 260 | 260 | 260 |
| **Employment** | | | | | | | | | | |
| Retail / Commercial | - | - | 261 | 261 | 261 | 261 | 261 | 261 | 261 | 261 |
| Hotel | - | - | 266 | 266 | 266 | 266 | 266 | 266 | 266 | 266 |
| Senior Living Facility | - | - | - | - | - | - | - | - | - | - |
| Total Employees | - | - | 527 | 527 | 527 | 527 | 527 | 527 | 527 | 527 |
| | - | - | - | - | - | - | - | - | - | - |
| Full-Time Equivalent Visitors | - | - | 347 | 347 | 347 | 347 | 347 | 347 | 347 | 347 |
| **Village of North Palm Beach** | | | | | | | | | | |
| Total Operating Revenues | 2,589,617 | 2,604,900 | 3,207,741 | 7,621,576 | 7,662,183 | 7,703,196 | 7,744,620 | 7,786,457 | 7,828,713 | 7,871,392 |
| Total Operating Expenditures | 850,683 | 850,683 | 1,812,113 | 3,344,853 | 3,344,853 | 3,344,853 | 3,344,853 | 3,344,853 | 3,344,853 | 3,344,853 |
| Net Fiscal Impact | 1,738,934 | 1,754,217 | 1,395,628 | 4,276,723 | 4,317,330 | 4,358,343 | 4,399,767 | 4,441,604 | 4,483,860 | 4,526,538 |
| Years | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 5 Years | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years | | | |
| Net Present Value of Operating Impact | 11,354,062 | 26,408,647 | 38,776,719 | 48,938,802 | 57,289,235 | 64,151,678 | 69,791,819 | | | |
| Operating Impact at 5% Interest | | | | | | | | | | |

Detail analysis (Table 9) is presented through 2037 which is a 10-year projection.

**Table 9**
**Village Place**
**Mixed -Use Development**
**Fiscal Impact Detail  Operating Revenue and Expenses**

| | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | |
| 311000 - Ad Valorem Taxes | 1,528,338 | 1,543,621 | 1,559,057 | 4,060,706 | 4,101,313 | 4,142,326 | 4,183,750 | 4,225,587 | 4,267,843 | 4,310,521 |
| 341900 - Other General Government Charges and Fees | 18 | 18 | 53 | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| 342100 - Service Charge - Law Enforcement Services | 3,015 | 3,015 | 8,779 | 14,210 | 14,210 | 14,210 | 14,210 | 14,210 | 14,210 | 14,210 |
| 342500 - Service Charge - Protective Inspection Fees | 7,891 | 7,891 | 22,980 | 37,198 | 37,198 | 37,198 | 37,198 | 37,198 | 37,198 | 37,198 |
| 342600 - Service Charge - Ambulance Fees | 479 | 479 | 1,394 | 2,257 | 2,257 | 2,257 | 2,257 | 2,257 | 2,257 | 2,257 |
| 342900 - Service Charge - Other Public Safety Charges and Fees | 11,844 | 11,844 | 34,490 | 55,830 | 55,830 | 55,830 | 55,830 | 55,830 | 55,830 | 55,830 |
| 343400 - Service Charge - Garbage/Solid Waste | 74 | 74 | 216 | 349 | 349 | 349 | 349 | 349 | 349 | 349 |
| 347100 - Service Charge - Libraries | 2,176 | 2,176 | 4,652 | 8,573 | 8,573 | 8,573 | 8,573 | 8,573 | 8,573 | 8,573 |
| 347200 - Service Charge - Parks and Recreation | 6,904 | 6,904 | 14,759 | 27,199 | 27,199 | 27,199 | 27,199 | 27,199 | 27,199 | 27,199 |
| 347500 - Service Charge - Special Recreation Facilities | 490 | 490 | 1,047 | 1,929 | 1,929 | 1,929 | 1,929 | 1,929 | 1,929 | 1,929 |
| 347900 - Service Charge - Other Culture/Recreation Charges | 5,002 | 5,002 | 14,567 | 23,581 | 23,581 | 23,581 | 23,581 | 23,581 | 23,581 | 23,581 |
| 312410 - First Local Option Fuel Tax | 2,278 | 2,278 | 4,870 | 8,974 | 8,974 | 8,974 | 8,974 | 8,974 | 8,974 | 8,974 |
| 312420 - Second Local Option Fuel Tax | 5,065 | 5,065 | 14,749 | 23,875 | 23,875 | 23,875 | 23,875 | 23,875 | 23,875 | 23,875 |
| 312510 - Fire Insurance Premium Tax (Firefighters' Pension) | 3,952 | 3,952 | 8,448 | 15,568 | 15,568 | 15,568 | 15,568 | 15,568 | 15,568 | 15,568 |
| 312520 - Casualty Insurance Premium Tax (Police Officers' Retirement ) | 26,003 | 26,003 | 55,591 | 102,442 | 102,442 | 102,442 | 102,442 | 102,442 | 102,442 | 102,442 |
| 312630 - Local Government Infrastructure Surtax | 34,636 | 34,636 | 74,046 | 136,453 | 136,453 | 136,453 | 136,453 | 136,453 | 136,453 | 136,453 |
| 314100 - Utility Service Tax - Electricity | 10,981 | 10,981 | 23,476 | 43,262 | 43,262 | 43,262 | 43,262 | 43,262 | 43,262 | 43,262 |
| 314300 - Utility Service Tax - Water | 2,296 | 2,296 | 4,909 | 9,047 | 9,047 | 9,047 | 9,047 | 9,047 | 9,047 | 9,047 |
| 314400 - Utility Service Tax - Gas | 17,354 | 17,354 | 37,100 | 68,367 | 68,367 | 68,367 | 68,367 | 68,367 | 68,367 | 68,367 |
| 315100 - State Communications Services Taxes | 7,532 | 7,532 | 16,103 | 29,675 | 29,675 | 29,675 | 29,675 | 29,675 | 29,675 | 29,675 |
| 316000 - Local Business Tax (Chapter 205) | 6,001 | 6,001 | 12,829 | 23,642 | 23,642 | 23,642 | 23,642 | 23,642 | 23,642 | 23,642 |
| 331900 - Federal Grant - Other | 337 | 337 | 337 | 944 | 944 | 944 | 944 | 944 | 944 | 944 |
| 334700 - State Grant - Culture/Recreation | 10,963 | 10,963 | 10,963 | 30,716 | 30,716 | 30,716 | 30,716 | 30,716 | 30,716 | 30,716 |
| 335125 - Municipal Revenue Sharing Program - Proceeds | 290 | 290 | 290 | 814 | 814 | 814 | 814 | 814 | 814 | 814 |
| 335150 - State Revenue Sharing - Alcoholic Beverage Licenses | 28,367 | 28,367 | 28,367 | 79,478 | 79,478 | 79,478 | 79,478 | 79,478 | 79,478 | 79,478 |
| 335180 - State Revenue Sharing - Local Government Half-Cent Sales Tax | 178 | 178 | 178 | 499 | 499 | 499 | 499 | 499 | 499 | 499 |
| 335480 - State Revenue Sharing - Other Transportation | 820 | 820 | 820 | 2,296 | 2,296 | 2,296 | 2,296 | 2,296 | 2,296 | 2,296 |
| 338000 - Shared Revenue From Other Local Units | 949 | 949 | 949 | 2,659 | 2,659 | 2,659 | 2,659 | 2,659 | 2,659 | 2,659 |
| 351900 - Judgments and Fines - Other Court Ordered | 0 | 0 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| 352000 - Fines - Library | 1,871 | 1,871 | 5,449 | 8,820 | 8,820 | 8,820 | 8,820 | 8,820 | 8,820 | 8,820 |
| 354000 - Fines - Local Ordinance Violation | 831 | 831 | 2,421 | 3,919 | 3,919 | 3,919 | 3,919 | 3,919 | 3,919 | 3,919 |
| 359000 - Other Judgments, Fines and Forfeits | 4,557 | 4,557 | 9,741 | 17,952 | 17,952 | 17,952 | 17,952 | 17,952 | 17,952 | 17,952 |
| 361100 - Interest | 25,394 | 25,394 | 54,288 | 100,041 | 100,041 | 100,041 | 100,041 | 100,041 | 100,041 | 100,041 |
| 361200 - Dividends | 202,322 | 202,322 | 432,534 | 797,074 | 797,074 | 797,074 | 797,074 | 797,074 | 797,074 | 797,074 |
| 361300 - Net Increase (Decrease) in Fair Value of Investments | 3,874 | 3,874 | 8,282 | 15,262 | 15,262 | 15,262 | 15,262 | 15,262 | 15,262 | 15,262 |
| 364000 - Disposition of Fixed Assets | 1,771 | 1,771 | 3,786 | 6,977 | 6,977 | 6,977 | 6,977 | 6,977 | 6,977 | 6,977 |
| 365000 - Sale of Surplus Materials and Scrap | 190 | 190 | 406 | 748 | 748 | 748 | 748 | 748 | 748 | 748 |
| 366000 - Contributions and Donations from Private Sources | 45,404 | 45,404 | 97,067 | 178,874 | 178,874 | 178,874 | 178,874 | 178,874 | 178,874 | 178,874 |
| 368000 - Pension Fund Contributions | 5,282 | 5,282 | 11,292 | 20,808 | 20,808 | 20,808 | 20,808 | 20,808 | 20,808 | 20,808 |
| 369900 - Other Miscellaneous Revenues | 2,963 | 2,963 | 6,335 | 11,674 | 11,674 | 11,674 | 11,674 | 11,674 | 11,674 | 11,674 |
| 381000 - Inter-Fund Group Transfers In | 43,235 | 43,235 | 92,430 | 170,329 | 170,329 | 170,329 | 170,329 | 170,329 | 170,329 | 170,329 |
| 384000 - Debt Proceeds | 32,420 | 32,420 | 32,420 | 90,835 | 90,835 | 90,835 | 90,835 | 90,835 | 90,835 | 90,835 |
| 322000 - Building Permits | 7,304 | 7,304 | 7,304 | 20,464 | 20,464 | 20,464 | 20,464 | 20,464 | 20,464 | 20,464 |
| 322900 - Permits - Other | 24,178 | 24,178 | 24,178 | 67,740 | 67,740 | 67,740 | 67,740 | 67,740 | 67,740 | 67,740 |
| 323100 - Franchise Fee - Electricity | 9,541 | 9,541 | 9,541 | 26,730 | 26,730 | 26,730 | 26,730 | 26,730 | 26,730 | 26,730 |
| 323300 - Franchise Fee - Water | 1,088 | 1,088 | 1,088 | 3,049 | 3,049 | 3,049 | 3,049 | 3,049 | 3,049 | 3,049 |
| 323900 - Franchise Fee - Gas | 10 | 10 | 10 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |
| 325100 - Special Assessments - Capital Improvement | 453,149 | 453,149 | 453,149 | 1,269,623 | 1,269,623 | 1,269,623 | 1,269,623 | 1,269,623 | 1,269,623 | 1,269,623 |
| **Total Revenues** | **2,589,617** | **2,604,900** | **3,207,741** | **7,621,576** | **7,662,183** | **7,703,196** | **7,744,620** | **7,786,457** | **7,828,713** | **7,871,392** |



| Table 9<br>Village Place<br>Mixed -Use Development<br>Fiscal Impact Detail  Operating Revenue and Expenses<br>Continued | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenditures** | | | | | | | | | | |
| 571.10 - Libraries - Personnel Services | 16,469 | 16,469 | 35,208 | 64,881 | 64,881 | 64,881 | 64,881 | 64,881 | 64,881 | 64,881 |
| 571.30 - Libraries - Operating Expenses | 2,340 | 2,340 | 5,002 | 9,218 | 9,218 | 9,218 | 9,218 | 9,218 | 9,218 | 9,218 |
| 571.60 - Libraries - Capital Outlay | 2,421 | 2,421 | 2,421 | 6,784 | 6,784 | 6,784 | 6,784 | 6,784 | 6,784 | 6,784 |
| 572.10 - Parks/Recreation - Personnel Services | 11,598 | 11,598 | 33,775 | 54,672 | 54,672 | 54,672 | 54,672 | 54,672 | 54,672 | 54,672 |
| 572.30 - Parks/Recreation - Operating Expenses | 9,933 | 9,933 | 28,926 | 46,823 | 46,823 | 46,823 | 46,823 | 46,823 | 46,823 | 46,823 |
| 572.60 - Parks/Recreation - Capital Outlay | 18,971 | 18,971 | 55,246 | 89,428 | 89,428 | 89,428 | 89,428 | 89,428 | 89,428 | 89,428 |
| 511.10 - Legislative - Personnel Services | 1,297 | 1,297 | 1,297 | 3,633 | 3,633 | 3,633 | 3,633 | 3,633 | 3,633 | 3,633 |
| 511.30 - Legislative - Operating Expenses | 2,009 | 2,009 | 2,009 | 5,628 | 5,628 | 5,628 | 5,628 | 5,628 | 5,628 | 5,628 |
| 512.10 - Executive - Personnel Services | 24,039 | 24,039 | 24,039 | 67,351 | 67,351 | 67,351 | 67,351 | 67,351 | 67,351 | 67,351 |
| 512.30 - Executive - Operating Expenses | 3,158 | 3,158 | 3,158 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 |
| 513.10 - Financial and Administrative - Personnel Services | 34,650 | 34,650 | 34,650 | 97,083 | 97,083 | 97,083 | 97,083 | 97,083 | 97,083 | 97,083 |
| 514.30 - Legal Counsel - Operating Expenses | 4,769.41 | 4,769.41 | 4,769.41 | 13,362.82 | 13,362.82 | 13,362.82 | 13,362.82 | 13,362.82 | 13,362.82 | 13,362.82 |
| 515.10 - Comprehensive Planning - Personnel Services | 6,728 | 6,728 | 6,728 | 18,849 | 18,849 | 18,849 | 18,849 | 18,849 | 18,849 | 18,849 |
| 515.30 - Comprehensive Planning - Operating Expenses | 2,832 | 2,832 | 2,832 | 7,936 | 7,936 | 7,936 | 7,936 | 7,936 | 7,936 | 7,936 |
| 518.30 - Pension Benefits - Operating Expenses | 50,803 | 50,803 | 50,803 | 142,337 | 142,337 | 142,337 | 142,337 | 142,337 | 142,337 | 142,337 |
| 519.30 - Other General Government - Operating Expenses | 15,671 | 15,671 | 45,635 | 73,870 | 73,870 | 73,870 | 73,870 | 73,870 | 73,870 | 73,870 |
| 519.60 - Other General Government - Capital Outlay | 43,235 | 43,235 | 43,235 | 121,135 | 121,135 | 121,135 | 121,135 | 121,135 | 121,135 | 121,135 |
| 519.70 - Other General Government - Debt Service | 41,054 | 41,054 | 41,054 | 115,024 | 115,024 | 115,024 | 115,024 | 115,024 | 115,024 | 115,024 |
| 581.90 - Interfund Transfers Out - Other Uses | 106,775 | 106,775 | 106,775 | 299,159 | 299,159 | 299,159 | 299,159 | 299,159 | 299,159 | 299,159 |
| 534.10 - Garbage/Solid Waste - Personnel Services | 33,503 | 33,503 | 97,565 | 157,930 | 157,930 | 157,930 | 157,930 | 157,930 | 157,930 | 157,930 |
| 534.30 - Garbage/Solid Waste - Operating Expenses | 6,990 | 6,990 | 20,357 | 32,952 | 32,952 | 32,952 | 32,952 | 32,952 | 32,952 | 32,952 |
| 534.60 - Garbage/Solid Waste - Capital Outlay | 1,542 | 1,542 | 1,542 | 4,321 | 4,321 | 4,321 | 4,321 | 4,321 | 4,321 | 4,321 |
| 539.10 - Other Physical Environment - Personnel Services | 24,141 | 24,141 | 70,301 | 113,798 | 113,798 | 113,798 | 113,798 | 113,798 | 113,798 | 113,798 |
| 539.60 - Other Physical Environment - Capital Outlay | 1,566 | 1,566 | 4,560 | 7,381 | 7,381 | 7,381 | 7,381 | 7,381 | 7,381 | 7,381 |
| 521.10 - Law Enforcement - Personnel Services | 147,210 | 147,210 | 428,688 | 693,927 | 693,927 | 693,927 | 693,927 | 693,927 | 693,927 | 693,927 |
| 521.30 - Law Enforcement - Operating Expenses | 25,236 | 25,236 | 73,491 | 118,961 | 118,961 | 118,961 | 118,961 | 118,961 | 118,961 | 118,961 |
| 521.60 - Law Enforcement - Capital Outlay | 1,255 | 1,255 | 3,654 | 5,914 | 5,914 | 5,914 | 5,914 | 5,914 | 5,914 | 5,914 |
| 522.10 - Fire Control - Personnel Services | 88,837 | 88,837 | 258,703 | 418,768 | 418,768 | 418,768 | 418,768 | 418,768 | 418,768 | 418,768 |
| 522.30 - Fire Control - Operating Expenses | 8,683 | 8,683 | 25,287 | 40,933 | 40,933 | 40,933 | 40,933 | 40,933 | 40,933 | 40,933 |
| 524.10 - Protective Inspections - Personnel Services | 18,559 | 18,559 | 54,046 | 87,485 | 87,485 | 87,485 | 87,485 | 87,485 | 87,485 | 87,485 |
| 524.30 - Protective Inspections - Operating Expenses | 5,069 | 5,069 | 14,762 | 23,896 | 23,896 | 23,896 | 23,896 | 23,896 | 23,896 | 23,896 |
| 541.10 - Road/Street Facilities - Personnel Services | 12,169 | 12,169 | 35,438 | 57,364 | 57,364 | 57,364 | 57,364 | 57,364 | 57,364 | 57,364 |
| 541.30 - Road/Street Facilities - Operating Expenses | 32,854 | 32,854 | 95,675 | 154,871 | 154,871 | 154,871 | 154,871 | 154,871 | 154,871 | 154,871 |
| 541.60 - Road/Street Facilities - Capital Outlay | 7,419 | 7,419 | 21,606 | 34,974 | 34,974 | 34,974 | 34,974 | 34,974 | 34,974 | 34,974 |
| **Total Expenditures** | **850,683** | **850,683** | **1,812,113** | **3,344,853** | **3,344,853** | **3,344,853** | **3,344,853** | **3,344,853** | **3,344,853** | **3,344,853** |
| | | | | | | | | | | |
| **Net Fiscal Impact** | **1,738,934** | **1,754,217** | **1,395,628** | **4,276,723** | **4,317,330** | **4,358,343** | **4,399,767** | **4,441,604** | **4,483,860** | **4,526,538** |
| **Cumulative** | **1,738,934** | **3,493,151** | **4,888,778** | **9,165,502** | **13,482,832** | **17,841,175** | **22,240,942** | **26,682,546** | **31,166,406** | **35,692,945** |
| **Years** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** |



**Appendix A Village Place -Site Plan**



FISHKIND
LITIGATION SERVICES

**IMPORTANT NOTICE CONCERNING "FISCAL IMPACT ANALYSIS REPORT"**

**1. Fiscal Impact Analysis Report ("FIAR")**
Certain portions of the FIAR have various sections of the analysis that contain forecasted financial performance based upon several current and projected market conditions. These conditions are subject to numerous risks and uncertainties that cannot be determined at this time. Each section of the FIAR contains forecasted data.  While presented with numerical specificity, projected information of the type furnished above is based on estimates and assumptions that are inherently subject to significant economic and competitive uncertainties and contingencies, all of which are difficult to predict and many of which are beyond the FLS's control.  Accordingly, there can be no assurance that such estimates and assumptions will be accurate, and the actual results may be significantly higher or lower than those set forth.

**2. Actual Results May Differ from FIAR**
Due to a variety of risks and uncertainties, actual results may be materially different from the results projected in the FIAR.  Accordingly, the FIAR is meant only to serve as a guide and is not intended to be relied upon as to the reasonableness of the underlying facts or assumptions.  This FIAR does not contain and is not to be construed as legal, business, investment, or tax advice.

**3. The Fishkind Litigation Services Inc. (FLS) Has No Duty to Update FIAR**
The FIAR is current only as of September 2023.  Following the delivery of this report, FLS expectations of results may change.  FLS may come to believe that the FIAR is no longer accurate.  FLS shall not have any obligation to update any corrections or revisions to the FIAR contained herein, even if the FLS believes the forward-looking analysis is no longer accurate.  FLS does not intend to update or otherwise revise the FIAR to reflect circumstances existing after the date when made or to reflect the occurrence of future events even if any or all the assumptions underlying the projections are shown to be in error.  FLS assumes no responsibility for the accuracy or validity of the FIAR.



*ATTACHMENT 1*
*UPDATED THROUGH 1/25/2024*

VILLAGE OF
NORTH PALM BEACH
JAN 25 2024
COMMUNITY DEVELOPMENT
RECEIVED

## Proposed Village Place Mixed-use Development

North Palm Beach, FL

# Fiscal Impact Study Peer Review



Prepared for:
Treasure Coast Regional Planning Council
Stuart, FL



On behalf of:
Village of North Palm Beach
North Palm Beach, FL



January 2024 DRAFT

**WTL** +a

Real Estate & Economic Advisors
Washington, DC—Cape Cod, MA
301.502.4171   508.214.0915

1



# General & Limiting Conditions

Every reasonable effort has been made to ensure that the data contained in this study reflect the most accurate and timely information possible. These data are believed to be reliable at the time the study was conducted. This study is based on estimates, assumptions, and other information developed by WTL +Associates (referred hereinafter as "WTL+a") from its independent research effort, general knowledge of the market and the industry, and consultations with the client and its representatives. No responsibility is assumed for inaccuracies in reporting by the client, its agent and/or representatives, or any other data source used in preparing or presenting this study.

No warranty or representation is made by WTL+a that any of the projected values or results contained in this study will be achieved. Possession of this study does not carry with it the right of publication thereof or to use the name of "WTL+a" in any manner without first obtaining the prior written consent of WTL+a. No abstracting, excerpting or summarizing of this study may be made without first obtaining the prior written consent of WTL+a. This report is not to be used in conjunction with any public or private offering of securities or other similar purpose where it may be relied upon to any degree by any person, other than the client, without first obtaining the prior written consent of WTL+a. This study may not be used for purposes other than that for which it is prepared or for which prior written consent has first been obtained from WTL+a.

This study is qualified in its entirety by, and should be considered in light of, these limitations, conditions and considerations.



# 1 Executive Summary

## Introduction

In 2021, WTL+a, a real estate and economic development consulting firm with extensive experience throughout Florida, completed a real estate market analysis of redevelopment potentials as part of a planning evaluation for the Twin City Mall site for Treasure Coast Regional Planning Council (TCRPC), on behalf of the Village of North Palm Beach (Village) and Town of Lake Park (Town).

According to data from the Village, a portion of the site (13.155 acres comprising four separate parcels) located in the Village is under contract to be purchased by NP Devland Holdings LLC (Mr. Nadir Salour), a North Palm Beach-based developer.  NP Devland Holdings is proposing to construct a mixed-use development in two phases containing the following land uses at buildout in 2031:

- 947 multi-family rental apartment units in three buildings

- 222 hotel rooms

- 133 for-sale condominium units

- 206 age-restricted/senior units in an Assisted Living Facility (ALF)

- 100,000 sq. ft. of street-level retail space distributed across the six buildings above, and

- 2,759 structured parking spaces.

NP Devland Holdings retained Fishkind Litigation Services, Inc. of Orlando, FL to prepare an analysis of possible fiscal impacts generated by the project at buildout.  A report summarizing the results of this analysis was completed in September 2023.  WTL+a does not know the extent of Fishkind's scope of services prepared on behalf of the developer.

The Village of North Palm Beach requested a peer review of the project's fiscal impact study, with a particular focus on key assumptions and inputs utilized in the impact models as a means of further understanding the likely fiscal impacts and annual revenue streams generated by each land use in the development program above as proposed by NP Devland Holdings LLC.  Under direction from TCPRC, WTL+a is leading the peer review of the study.

WTL +a

Real Estate & Economic Advisors
Washington, DC—Cape Cod, MA
301.502.4171   508.214.0915

3



Figure 1: Proposed Parcel Acquisition—Twin City Mall Site



As part of this peer review, WTL+a completed the following:

- Obtained and reviewed relevant documents pertaining to the proposed development, including concept renderings, proposed development program and other documents as necessary;

- Reviewed the fiscal impact study prepared by Fishkind Litigation Services, Inc. dated September 25, 2023 to understand key assumptions and inputs, methodology and approach, and findings; and

- Compared key assumptions and inputs to actual market-based data from various public and/or private sources, including annual net absorption of commercial space; hotel occupancy rates and other metrics; multi-family rents and annual net absorption; sales pricing of new for-sale condominium units in the local area; and other assumptions and inputs as relevant to the peer review.



# Key Findings

Key findings of this peer review are highlighted below:

Fiscal Impact Calculations & Missing Data

- Multiple calculations to determine fiscal impacts by land use are incomplete or missing from the Fishkind report.  Beyond the roll-up illustrated in several exhibits, the report does not provide any back-up to document results;

- Supporting documentation for multiple assumptions identified in the report are incomplete or missing, including:

  - Comparable Projects to Determine Average Property Values—It is not known what comparable projects—in North Palm Beach and/or nearby communities—were used to determine average property values for each land use proposed for Village Place.  Comparable projects are key in forming the basis of future values upon which ad valorem tax revenues are generated (see Table 3, p. 7);

  - Average Annual Absorption by Land Use—Information to verify/support estimated annual absorption (leasing) of specific land uses is missing.  Specifically, this includes multi-family housing (typically illustrated as average absorption/lease-up by units per month or year) and commercial retail (typically illustrated as average annual absorption in retail square feet by year).  The analysis assumes an eight-year development period in two phases (2028 and 2031), with full buildout completed by 2031;

  - Annual Municipal Costs/Operating Expenses of Commercial & Hotel Uses— The Fishkind analysis appears to exclude annual costs to the Village of North Palm Beach associated with the project's commercial retail (100,000 sq. ft.) and hotel (222 rooms) uses.  While municipal service costs generated by commercial uses are generally lower than the impacts/costs generated by residential uses, it is not clear these have been included;

  - Taxable Property Values Generated by Hotel—For purposes of the analysis the Fishkind report treats the hotel (222 rooms) as "residential".  A hotel should be



> treated as a commercial use, particularly as millage rates for commercial uses oftentimes differ from those of residential; and

> o   Impacts of Student Generation by Residential Type—Public school enrollments vary greatly across housing types.  This is missing from the Fishkind report.

- Fiscal impacts are "rolled up" without sufficient detail to evaluate/validate these impacts. The Fishkind analysis appears to estimate annual expenditures on a per capita basis (see Table 8, p. 11).  Per capita categories include full-time and seasonal residents; retail/hotel/senior living employment; and visitors (which are converted to "full-time equivalents").  However, it is unclear how expenses (and revenues) for each per capita category were calculated, as findings are displayed as an annual "roll-up" (see Table 9, pp. 12—13) over a 10-year period (2028—2037) after construction and delivery of specific uses (occurring in two phases in 2028 and 2031).

Due to this missing data and lack of back-up documentation, it is not possible to determine whether the estimates of fiscal impacts, such as annual property taxes, generated by construction of Village Place are reasonably accurate.  As a result, WTL+a assembled independent relevant market data and inputs necessary to evaluate the Fishkind findings.  These are illustrated in Table 1 through Table 6 and detailed by land use in this memorandum.

## Multi-family (Section 2)

- The Fishkind report assumes average annual unit absorption of the project's 1,286 proposed housing units of 186 units per year over eight years (2024—2031);

- Low Unit Absorption—Annual unit absorption (leasing) among three competitive rental properties delivered in 2020—2021 reveals *cumulative/combined* annual unit absorption of 148 units per year.  However, two of these three properties (Point at North Palm Beach and Point at Palm Beach Gardens) are located in close proximity to Village Place and exhibited slightly *lower* annual unit absorption of 121 units per year over the past three years (2021—2023).  Fishkind's assumptions suggest Village Place will need to *substantially outperform* the pace of unit absorption at these two properties;

- High Unit Absorption—There are another four multi-family properties located in West Palm Beach and delivered in 2023 that are experiencing a pace of *cumulative/combined* annual unit absorption of 363 units per year (between pre-leasing in 2022 to year-end 2023).  This pace is indicative of the locational benefits of downtown West Palm Beach—such as Brightline access, a growing office market and its role as a regional employment center.



- As known at the time this analysis was prepared, there are up to 3,500 units proposed in 15 residential projects in the US Highway 1 corridor with known/announced delivery dates ranging from January 2024 to June 2026. In addition, there are another 1,565 units proposed in three high-rise projects in Lake Park with no known delivery dates. Even *without* construction of Village Place this could yield development of almost 5,100 new multi-family units on the US Highway 1 corridor;

- When the proposed 1,286 units at Village Place are included, there is potential for development of up to 6,400 new multi-family units in the US Highway 1 corridor in a 12-mile zone between Donald Ross Road and Okeechobee Boulevard over the next two to eight (or more) years. This represents potentially significant market competition for multi-family residential development at Village Place that could affect absorption, timing and completion of the project (buildout);

- The 2021 WTL+a real estate market study of redevelopment potentials on the former Twin City Mall site estimated annual unit absorption of 80 units per year over a 10-year buildout (which translates into 800 market-supportable units for the North Palm Beach portion of the site); and

- As detailed in Section 2, depending on the annual pace of unit absorption/lease-up, it may take between 18 and 43 years to absorb the estimated 6,400 units proposed for construction in the US Highway 1 corridor (between Donald Ross Road and Okeechobee Boulevard). At Fishkind's assumed absorption of 186 units per year, Village Place would be required to achieve a pace of absorption well-*above* its fair share for buildout to occur in only eight years.

## Hotel/Lodging (Section 3)

- The Fishkind report estimated fiscal impacts generated by a 222-room hotel delivered in 2031—the last year of the buildout period. By comparison, the 2021 WTL+a real estate market study identified *negligible* demand for new hotel rooms, as near-term demand is likely to be met in more marketable locations (such as I-95 interchanges or on sites proximate to demand generators such as the PGA office corridor);

- The lodging industry defines a hotel containing more than roughly 125 rooms as a "full-service" property. Typically, full-service hotels contain specific amenities such as a sit-down restaurant, gift shop, gym and meeting rooms. Local examples include the Marriott, Embassy Suites and Doubletree by Hilton properties on PGA Boulevard. The proposed 222-room hotel at Village



Place would fall in the full-service category.  In our professional opinion, it is unlikely that this part of the US Highway 1 corridor could support a full-service hotel;

- Assuming room demand strengthens over time, it may be possible to support a third lodging category as part of hotel development at Village Place known as "select-service."  Local examples include Hyatt House in downtown West Palm Beach.  However, the typical select-service property contains roughly 90—120 rooms.  A smaller hotel at Village Place would lower both assessed values as well as future annual ad valorem/property tax revenues than identified in the Fishkind report;

- Fishkind utilized a market valuation of $533,584 per hotel room to estimate the fiscal impacts of a new 222-room hotel at Village Place.  As there was no documentation of hotel sales comparables to document this estimate, WTL+a cannot verify its validity.  As a result, WTL+a assembled market values based on 15 confirmed sales of hotel properties in West Palm Beach and Palm Beach Gardens as reported by CoStar, Inc. between 2021—2023.   Sales data indicate hotel values ranging from $271,506 per room in 2021 to $237,132 per room in 2023.  However, sales prices were upwardly distorted by the sale of two high-end/luxury hotel properties:

    o  Hyatt Banyan Cay Resort, a 190-room resort under construction in West Palm Beach that sold for $100.0 million in December 2023 ($526,316 per key/room), and

    o   Marriott Autograph, a 208-room "Upper Upscale" class property located in downtown West Palm Beach that sold for $106.4 million in October 2021 ($511,538 per key);

- If these two luxury properties are excluded from this analysis, the 13 remaining sales are comprised of economy/limited-service properties located on commercial corridors or at interchanges with I-95.  This significantly reduces sales values—to $127,625 per room in 2021, $103,150 per room in 2022, and $128,973 per room in 2023; and

- Fishkind utilized an average annual occupancy rate of 71% derived from performance of only one hotel comparable.  CoStar, Inc. reports that annual occupancies in this one property have declined—from 70.6% in 2021 to 64% in 2023, reflecting an overall decrease of 9.4% over the past two years.  Further, relying solely on one property to estimate the future performance of a new hotel at Village Place is not defensible.



## General Retail (Section 4)

- The Fishkind report estimated fiscal impacts generated by construction of 100,000 sq. ft. of general retail space. The distribution between general and specialty retail, consumer services and food & beverage uses within this 100,000 sq. ft. of space is not known. The variation in type of retail space has the potential to significantly affect achievable rents and, therefore, proposed values and fiscal impacts (such as ad valorem tax revenues) generated by the project's commercial uses;

- According to Fishkind, the project's proposed retail space is assumed in two 50,000 sq. ft. increments—delivered in 2028 and again in 2031. By comparison, the 2021 WTL+a real estate market study suggested more limited opportunities in the range of 22,000 to 24,000 sq. ft.;

- On average, a proposed retail program of 100,000 sq. ft. would require minimum annual absorption of 12,500 sq. ft. per year assuming a buildout period of eight years (2031);

- By comparison, between 2020—2023, annual net absorption of retail space in North Palm Beach was *negative* (-65,600 sq. ft.). That is, 65,600 sq. ft. of previously occupied retail space was vacated and not re-leased over the past four years. Between 2006—2023 the Village exhibited a net *loss* of almost 83,900 sq. ft. of previously occupied retail space (negative net absorption)—despite several years of positive absorption—over this 18-year period;

- Fishkind utilized a retail market valuation of $270 per sq. ft. to estimate the fiscal impacts of 100,000 sq. ft. of new retail space at Village Place. As there was no documentation of retail sales comparables to document this estimate, WTL+a cannot verify its validity;

- As a result, WTL+a assembled data on the sale of nine retail centers containing 75,000 sq. ft. or more of gross leasable area (GLA) between 2021—2023 and located in West Palm Beach, North Palm Beach and Palm Beach Gardens as reported by CoStar, Inc. These centers include neighborhood, community and specialty centers with more than 1.05 million sq. ft. of gross leasable area. Recorded sales prices range from $99.53 to $594.08 per sq. ft. with an all-in average of $202.38 per sq. ft.;

- It is not known how Fishkind derived its market valuation of $270 per sq. ft. Setting aside whether there is sufficient market support for 100,000 sq. ft. of retail space at Village Place, the Fishkind estimate of future value for the project's retail component appears reasonable, as the future value of $202 per sq. ft. in 2022 based on a 3% annual inflation factor yields $262 per sq. ft. by 2031; and



- The Fishkind report did not include any information on retail market vacancies. The accepted industry standard for vacancy rates in stabilized markets is 5%. In North Palm Beach, however, CoStar, Inc. reports retail vacancies jumped from 8% in 2021 and 2022 to 13.2% in 2023—an increase of almost 113%. This parallels the loss of occupied retail space (i.e., negative net absorption).



# 2 Multi-family Residential

As a result of the lack of supporting documentation of the project's multi-family uses, WTL+a prepared detailed profiles of seven new multi-family complexes built in the US Highway 1 corridor and delivered between 2020 and 2023. Among other performance metrics, this profile focuses on average annual unit absorption/lease-up achieved in each of these comparables, which are located between PGA Boulevard and Okeechobee Boulevard. Key findings indicate the following:

Unit Absorption in Competitive New Multi-family Properties

- The Fishkind report assumes average annual unit absorption of the project's 1,286 housing units of 186 units per year over eight years (2024—2031); and

- By comparison, the profile illustrated in Table 1 reveals that annual absorption of three properties delivered in 2020—2021 averaged a *cumulative/combined* 148 units per year. Two of these three properties are potentially directly comparable to Village Place due to location—with one property (Point at North Palm Beach) located on US Highway 1 in North Palm Beach and the other (Point at Palm Beach Gardens) located at the terminus of PGA Boulevard in Palm Beach Gardens and its boundary with the Village. Four additional properties delivered in 2023 and all located on the northern edge of downtown West Palm Beach and in Northwood— averaged a *cumulative/combined* unit absorption of 363 units per year.

In conclusion, Fishkind assumes that Village Place will *outperform* the pace of unit absorption of recently-delivered multi-family properties located in North Palm Beach, including Point at North Palm Beach (formerly Emara Palm Beach) and Point at Palm Beach Gardens (formerly Solara City Centre) at the boundary with the Village. Combined, these two properties exhibited average annual unit absorption of 121 units per year over the past three years (2021—2023).



## Table 1: Profile of Selected Multi-family Rental Properties

| Project/Location | Year Built Class & Height | Site Size Densities & Bldg. Area | Unit Type | No. of Units | % Dist. | Size (in SF) | Asking Rent | Rent Per SF | Effective Rent | Rent Per SF | Current 12/31/2023 | 2023 | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Delivered 2020 & 2021* | | | | | | | | | | | | | | | | |
| Overseas at Flagler Banyan Sq. | 2020 | 2.26 | Studio | 52 | 21% | 605 | $ 2,362 | $ 3.70 | $ 2,340 | $ 3.74 | 9.2% | | | | | |
| 290 N. Olive Avenue | Class A | Acres | 1 BR | 128 | 51% | 770 | 2,632 | 3.42 | 2,607 | 3.39 | 23 | | | | | |
| *Market-rate* | 9 floors | 3.16 | 2 BR | 52 | 21% | 1,190 | 4,134 | 3.47 | 4,095 | 3.44 | | | | | | |
| West Palm Beach | | FAR | 3 BR | 19 | 0% | 1,456 | 4,915 | 3.41 | 4,789 | 3.37 | | | | | | |
| | | 311,562 | | | | | | | | | | | | | | |
| True Owner: Prudential Insurance | | Gross SF | Total: | 251 | | 836 | $ 3,052 | $ 3.48 | $ 1,024 | $ 3.45 | | 9.2% | 3.7% | 6.0% | 34.7% | 99.7% |
| Developer: Novarro Lowrey, Inc. | | | | | | | | | | | | (54) | 6 | 72 | 191 | 3 |
| | | | | | | | | | | | | | | | | 229 |
| | | | Asking Rent Concessions: | | | | | | | -0.92% | 5-Year Absorption: Annual Average (2 Years): | | | | | 57 |
| Point at North Palm Beach | 2021 | 11.12 | Studio | 9 | 4% | 635 | $ 2,187 | $ 3.46 | $ 2,182 | $ 3.44 | 6.5% | | | | | |
| (Formerly Enara Palm Beach) | Class B | Acres | 1 BR | 82 | 33% | 849 | 2,692 | 3.17 | 2,672 | 3.15 | 16 | | | | | |
| *Market-rate* | 3 floors | 0.80 | 2 BR | 134 | 52% | 1,257 | 3,269 | 2.60 | 3,245 | 2.58 | | | | | | |
| 12155 US Highway 1 | | FAR | 3 BR | 25 | 11% | 1,691 | 4,143 | 2.49 | 4,103 | 2.47 | | | | | | |
| North Palm Beach | | 292,693 | | | | | | | | | | | | | | |
| True Owner: Panizar Properties, Inc. | | Gross SF | Total: | 250 | | 1,145 | $ 3,138 | $ 2.74 | $ 3,115 | $ 2.72 | | 6.5% | 4.4% | 67.4% | 100.0% | 100.0% |
| Developer: Fairway Investments | | | | | | | | | | | | (5) | 150 | 82 | - | - |
| | | | | | | | | | | | | | | | | 234 |
| | | | Asking Rent Concessions: | | | | | | | -0.73% | 5-Year Absorption: Annual Average (2 Years): | | | | | 78 |
| Point at Palm Beach Gardens | 2021 | 3.21 | 1 BR | 76 | 56% | 759 | $ 2,559 | $ 3.37 | $ 2,542 | $ 3.35 | 6.5% | | | | | |
| (Formerly Solara City Centre) | Class B | Acres | 2 BR | 52 | 38% | 1,100 | 3,053 | 2.76 | 3,033 | 2.74 | 7 | | | | | |
| *Market-rate* | 5 floors | 1.07 | 3 BR | 8 | 6% | 1,333 | 3,585 | 2.67 | 3,541 | 2.66 | | | | | | |
| 2100 PGA Boulevard | | FAR | | | | | | | | | | | | | | |
| Palm Beach Gardens | | 150,114 | | | | | | | | | | | | | | |
| True Owner: Panizar Properties, Inc. | | Gross SF | Total: | 136 | | 935 | $ 2,807 | $ 3.03 | $ 2,389 | $ 3.01 | | 6.5% | 3.1% | 15.6% | 100.0% | 100.0% |
| Developer: Eastwind Development LLC | | | | | | | | | | | | (5) | 17 | 115 | - | - |
| | | | | | | | | | | | | | | | | 129 |
| | | | Asking Rent Concessions: | | | | | | | -0.84% | 5-Year Absorption: Annual Average (2 Years): | | | | | 43 |
| **COMPARABLES ANALYSIS (Delivered 2020-2021):** | | | | | | | | | | | 47 | | | | | |
| Total/Weighted Average | | 16.59 | | 637 | | 942 | $ 3,003 | $ 3.05 | | | 7.4% | 7.1% | 3.7% | 29.7% | 79.2% | 99.6% |
| Total Unit Absorption: | | | | | | | | | | | | (22) | 180 | 269 | 191 | 3 |
| *Cumulative Annual Average (2020-2023)* | | | | | | | | | | | | | | | | 149 |

**WTL** +a

Real Estate & Economic Advisors
Washington, DC—Cape Cod, MA
301.503.4171   508.214.0915



## Table 1 (Continued): Profile of Selected Multi-family Rental Properties

| Project/Location | Year Built Class & Height | Site Size Densities & Bldg. Area | Unit Type | No. of Units | % Dist. | Size (in SF) | Asking Rent | Rent Per SF | Effective Rent | Rent Per SF | Current 2021 | 5-Year Vacancy & Absorption Analysis 2023 | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Delivered 2023** | | | | | | | | | | | | | | | | |
| Icon Marina Village | 2023 | 0.76 | Studio | 1 | 0% | 660 | $ 2,713 | $ 3.99 | $ 2,573 | $ 3.78 | 35.0% | | | | | |
| *Market-rate* | Class A | Acres | 1 BR | 104 | 46% | 636 | 2,992 | 3.57 | 2,039 | 3.38 | 140 | | | | | |
| 4444 N. Flagler Drive | 24 floors | 15.61 | 2 BR | 70 | 18% | 1,268 | 4,540 | 3.59 | 4,509 | 3.40 | | | | | | |
| West Palm Beach | | FAR | 3 BR | 64 | 21% | 3,264 | 18,227 | 5.59 | 17,297 | 5.30 | | | | | | |
| | | 516,683 | 4 BR | 60 | 15% | 2,522 | 15,030 | 5.95 | 14,235 | 5.64 | | | | | | |
| | | Gross SF | | | | | | | | | | | | | | |
| | | | **Total:** | 399 | | 1,578 | $ 8,276 | $ 4.93 | $ 7,954 | $ 4.68 | | 35.0% | 91.1% | 100.0% | 100.0% | 100.0% |
| | | | | | | | | | | | | 234 | 36 | - | - | - |
| Owner: Related Properties LLC | | | | | | | | | | | | | | | | |
| Developer: Related Properties LLC | | | | | | | | | | | 5-Year Absorption: | | | | | 259 |
| | | | **Asking Rent Concessions:** | | | | | | | -5.30% | Annual Average (2 Years): | | | | | 130 |
| The Watermark at West Palm | 2023 | 1.24 | Studio | 8 | 5% | 450 | $ 6,053 | $ 13.45 | $ 5,604 | $ 12.63 | 54.3% | | | | | |
| 445 Datura Street | Class A | Acres | 1 BR | 73 | 47% | 740 | 5,790 | 7.82 | 5,446 | 7.36 | 84 | | | | | |
| *Market-rate (Senior)* | 0 floors | 4.54 | 2 BR | 74 | 48% | 1,034 | 7,906 | 7.65 | 7,436 | 7.19 | | | | | | |
| West Palm Beach | | FAR | | | | | | | | | | | | | | |
| | | 245,000 | | | | | | | | | | | | | | |
| Owner: ZOM Senior Living/Watermark Retirement | | Gross SF | **Total:** | 155 | | 865 | $ 6,813 | $ 7.88 | $ 6,409 | $ 7.41 | | 54.3% | 81.6% | 100.0% | 100.0% | 100.0% |
| Developer: ZOM Senior Living | | | | | | | | | | | | 42 | 29 | - | - | - |
| | | | | | | | | | | | 5-Year Absorption: | | | | | 71 |
| | | | **Asking Rent Concessions:** | | | | | | | -5.00% | Annual Average (2 Years): | | | | | 35 |
| The Grand | 2023 | 3.00 | 1 BR | 156 | 50% | 677 | $ 2,383 | $ 3.52 | $ 2,300 | $ 3.41 | 18.0% | | | | | |
| *Market-rate & Rent Restricted* | Class A | Acres | 2 BR | 134 | 43% | 1,036 | 2,556 | 2.47 | 2,466 | 2.38 | 58 | | | | | |
| 609 2nd Street | 0 floors | 2.30 | 3 BR | 19 | 6% | 1,285 | 3,539 | 2.90 | 3,420 | 2.71 | | | | | | |
| West Palm Beach | | FAR | | | | | | | | | | | | | | |
| | | 300,900 | | | | | | | | | | | | | | |
| | | Gross SF | **Total:** | 309 | | 869 | $ 2,524 | $ 2.90 | $ 2,445 | $ 2.81 | | 18.0% | 71.4% | 100.0% | 100.0% | 100.0% |
| Owner: Affiliated Development | | | | | | | | | | | | 183 | 88 | - | - | - |
| Developer: Affiliated Development | | | | | | | | | | | 5-Year Absorption: | | | | | 251 |
| | | | **Asking Rent Concessions:** | | | | | | | -3.13% | Annual Average (2 Years): | | | | | 125 |

**WTL** +a

Real Estate & Economic Advisors
Washington, DC—Cape Cod, MA
301.503.4171   508.214.0915



## Table 1 (Continued): Profile of Selected Multi-family Rental Properties

| Project/Location | Year Built Class & Height | Site Size Densities & Bldg. Area | Unit Type | No. of Units | % Dist. | Size (in SF) | Asking Rent | Rent Per SF | Effective Rent | Rent Per SF | Current 2021 | 2023 | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Delivered 2023* | | | | | | | | | | | | | | | | |
| Arrya | 2023 | 1.66 | Studio | 60 | 27% | 557 | $ 2,450 | $ 4.41 | $ 2,450 | $ 4.41 | 35.0% | | | | | |
| *Market-rate* | Class A | Acres | 1 BR | 40 | 18% | 751 | 3,350 | 4.46 | 3,350 | 4.46 | 70 | | | | | |
| 345 Banyan Boulevard | 15 floors | 3.14 | 2 BR | 70 | 31% | 1,133 | 4,721 | 4.17 | 4,721 | 4.17 | | | | | | |
| West Palm Beach | | FAR | 3 BR | 53 | 24% | 1,410 | 5,689 | 4.03 | 5,689 | 4.03 | | | | | | |
| | | 227,332 | | | | | | | | | | | | | | |
| | | Gross SF | | | | | | | | | | | | | | |
| | | | **Total** | 223 | | 975 | $ 4,096 | $ 4.20 | $ 4,096 | $ 4.20 | | 35.0% | 81.4% | 100.0% | 100.0% | 100.0% |
| Owner: Woodfield Investment Co., LLC | | | | | | | | | | | | 103 | 41 | - | - | - |
| Developer: Spina O'Rourke & Partners | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | 5-Year Absorption: | | | | | 145 |
| | | | Asking Rent Concessions: | | | | | | | 0.00% | Annual Average (2 Years): | | | | | 72 |

| COMPARABLES ANALYSIS (Delivered 2023): | | | | | | | | | | 360 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Weighted Average | 1,095 | | 1,187 | $ 5,572 | $ 4.69 | | 33.1% | 35.0% | 81.4% | 100.0% | 100.0% | 100.0% |
| Total Unit Absorption: | | | | | | | | 532 | 194 | - | - | - |
| Cumulative Annual Average (2022 & 2023) | | | | | | | | | | | | 363 |

Source: CoStar, Inc.; WTL+a, December 2023.



## Proposed Multi-family Developments

As noted above, the Fishkind report contained no information on either existing or proposed comparable projects that multi-family rental and for sale units at Village Place would be competing with in the US Highway 1 corridor. As a result, WTL+a assembled a list of proposed multi-family projects in the US Highway 1 corridor—in a 12-mile zone between Donald Ross Road on the north and Okeechobee Boulevard on the south—with both known and unknown delivery dates as identified by various sources, including CoStar, Inc. (a national real estate database) and the Town of Lake Park. (This list also includes the estimated 66 unsold units at Nautilus 220 in Lake Park, which is under construction and has *reportedly* 80% of its 330 units under contract/"sold").

Key findings are highlighted in Table 2 and summarized as follows:

- As known at the time this analysis was prepared, there are up to 3,500 units proposed in 15 residential projects in the US Highway 1 corridor with known/announced delivery dates ranging from January 2024 to June 2026;

    - In North Palm Beach, this includes the proposed 147-unit project at 200 Yacht Club Drive, which has an anticipated delivery date of June 2026, and the Ritz Carlton Residences, a 106-unit project under construction on Ellison Wilson Road, which has an anticipated delivery date of March 2025; and

- In addition, there are another 1,565 units proposed in three high-rise projects in Lake Park with no known delivery dates. According to the Town of Lake Park, each of these three projects is in site plan review with the Town.

In conclusion, even *without* construction of Village Place there is potential for development of almost 5,100 new multi-family units on the US Highway 1 corridor. Approximately 69% of these units are expected to be delivered between 2024 and 2026. When the proposed 1,286 units at Village Place are included, there is potential for development of up to 6,400 new multi-family units somewhere in the US Highway 1 corridor between Donald Ross Road and Okeechobee Boulevard over the next two to eight (or more) years. This represents potentially significant market competition for multi-family residential development at Village Place that could affect absorption, timing and completion of the project (buildout).



## Table 2: Proposed Multi-family Residential Projects—Known Delivery Dates (2024—2026)

| Project/Location | Estimated Delivery Date | Product Type | No. of Units | Average Unit Size | No. of Floors | Gross Building Area |
|---|---|---|---|---|---|---|
| **Known Delivery Dates** | | | | | | |
| Broward Apartments<br>2121 Broward Avenue<br>West Palm Beach | January 2024 | Affordable MF | 105 | 952 | 4 | 100.000 |
| Rosemary Square<br>535 Hibiscus Street<br>West Palm Beach | March 2024 | Market-rate MF | 364 | 879 | 21 | 320.000 |
| Tortoise One<br>740 Dixie Highway<br>West Palm Beach | April 2024 | Market-rate MF | 261 | 1.250 | 8 | 326.250 |
| District at Northwood<br>2400 Broadway<br>West Palm Beach | August 2024 | Market-rate MF | 300 | 833 | 8 | 250.000 |
| One West Palm<br>550 S. Quadrille Boulevard<br>West Palm Beach | September 2024 | Market-rate MF | 326 | 736 | 30 | 239.936 |
| Nautilus 220<br>220 Lake Shore Drive<br>Lake Park | Fall 2024 | For sale<br>80% Sold | 66<br>20% Unsold | | 24 | |
| 2121 N. Flagler<br>2121 N. Flagler Drive<br>West Palm Beach | January 2025 | For sale | 152 | 2.500 | 32 | 380.000 |
| Vine on Clematis<br>512 Clematis Street<br>West Palm Beach | January 2025 | Market-rate MF | 88 | 776 | 5 | 68.296 |
| Soleste Palm Station<br>410-520 Rosemary Avenue<br>West Palm Beach | April 2025 | Market-rate MF | 321 | 930 | 8 | 298.371 |
| The Ritz Carleton Residences<br>11333 Ellison Wilson Road<br>North Palm Beach | March 2025 | For sale | 106 | 3.897 | 7 | 413.082 |
| Residences of Palm Beach West<br>419 Gardenia Street | December 2025 | Market-rate MF | 372 | 1.075 | 25 | 400.000 |
| Olara<br>1919 N. Flagler Drive<br>West Palm Beach | January 2026 | Market-rate MF | 275 | 1.250 | 26 | 343.750 |
| Clematis Place<br>616 Clematis Street<br>West Palm Beach | June 2026 | Market-rate MF | 200 | 901 | 12 | 180.140 |
| Marina Village<br>190 E. 13th Street<br>Riviera Beach | June 2026 | Market-rate & Affordable MF | 424 | 850 | - | 360.400 |
| 200 Yacht Club Drive<br>200 Yacht Club Drive<br>North Palm Beach | June 2026 | Market-rate MF | 147 | 1.764 | 4 | 259.254 |
| Subtotal-Known Delivery Dates: | | | 3,507 | 69% | | |

WTL +a

Real Estate & Economic Advisors
Washington, DC—Cape Cod, MA
301.502.4171   508.214.0915

16



Table 2 (Continued): Proposed Multi-family Residential Projects—Unknown Delivery Dates

| Project/Location | Estimated Delivery Date | Product Type | No. of Units | Average Unit Size | No. of Floors | Gross Building Area |
|---|---|---|---|---|---|---|
| *Unknown Delivery Dates* | | | | | | |
| Kelsey on Park Park Avenue Lake Park | Site Plan Review | | 720 | 1,000 | 16 | 720,000 |
| Northlake Promenade/Avalon Northlake Boulevard/Twin City Site Lake Park | Site Plan Review | | 250 | 1,000 | 5 | 250,000 |
| Residences @ 10th & Park Park Avenue Lake Park | Site Plan Review | | 595 | 1,000 | 16 | 595,000 |
| Subtotal-Unknown Delivery Dates: | | | 1,565 | 31% | | |
| **GRAND TOTAL (Known & Unknown Delivery Dates)** | | | 5,072 | 1,085 | | 5,504,479 |

Source: Palm Beach County Property Appraiser; Town of Lake Park; CoStar, Inc.; WTL+a, December 2023.

## Assessed Values & Property Sales—Multi-family Rental

A critical metric in any fiscal impact analysis includes estimates of assessed values of real property, which are necessary to measure annual ad valorem/property tax revenues generated by new development. These findings are illustrated in Table 3 and summarized as follows:

- As noted above, while Fishkind did not provide assessed values of comparable or competitive residential projects to support/verify its estimates, the report assumes an average assessed value for multi-family rental units of $412,999;

- By comparison, actual assessed values of multi-family rental units delivered in 2020—2021 averaged $340,299 based on property data from the Palm Beach County Property Appraiser. This includes Point at North Palm Beach and Point at Palm Beach Gardens, both delivered in 2021. WTL+a notes that assessed values of the newest comparable projects delivered in 2023 are not yet available from the Palm Beach County Property Appraiser;

WTL +a

Real Estate & Economic Advisors
Washington, DC—Cape Cod, MA
301.502.4171   508.214.0915



- WTL+a assumes the Fishkind estimate represents a *future* value, but the report does not identify the annual inflation factor used to derive that estimate. Assuming annual inflation of 3% per year, the future value of today's assessed value average of $340,299 per unit would translate into a future average assessed value of $431,081 per unit by 2031. As a result, the Fishkind estimate *appears* to be reasonable; and

- Another method of estimating values includes using actual, verifiable sales of similar uses. WTL+a notes that only one multi-family property—Point at Palm Beach Gardens—has been sold as recorded by the County's Property Appraiser. This property was sold in March 2022 for $66.5 million, or $488,970 per unit. This sale price is significantly above the Property Appraiser's 2023 assessed value of $367,545 per unit.

Table 3: Assessed Values & Property Sales—Multi-family Rental

| Property/Location | Units | SF | Assessed Values (AV) 2021 | 2022 | 2023 | CAGR % Change | 2023 AV Per Unit | SF |
|---|---|---|---|---|---|---|---|---|
| **Delivered 2020 & 2021** | | | | | | | | |
| Fishkind Report | 947 | | | | | | $ 412,999 | |
| Oversea at Flagler Banyan Sq. 290 N. Olive Avenue | 251 | 311,142 | $ 64,366,566 | $ 70,803,212 | $ 77,883,533 | 5.0% | $ 310,293 | $ 250 |
| Point at North Palm Beach 12155 US Highway 1 | 250 | 292,993 | $ - | $ 79,845,386 | $ 85,765,080 | 7.4% | $ 343,060 | $ 293 |
| Point at Palm Beach Gardens 2100 PGA Boulevard | 136 | 150,114 | $ - | $ 46,453,407 | $ 49,986,142 | 7.6% | $ 367,545 | $ 333 |
| Average: | | | | | | | $ 340,299 | |
| 2031 Value (Based on Annual % Change of Comparables 2021-2023) @ | | | | | | 6.7% | $ 570,553 | |
| 2031 Value (Based on Assumed Annual % Change) @ | | | | | | 3.0% | $ 431,081 | |
| **Delivered 2023** | | | | | | | | |
| Icon Marina Village 4444 N. Flagler Drive | 399 | 516,883 | | | | | | |
| The Watermark at West Palm 445 Datura Street | 155 | 245,000 | | | | | | |
| The Grand 609 2nd Street | 309 | 300,900 | No or Only Limited Improvement Value in Palm Beach County Property Appraiser Records | | | | | |
| Anya 345 Banyan Boulevard | 223 | 227,332 | | | | | | |
| **Sales** | | | | | | | | |
| Point at Palm Beach Gardens 2100 PGA Boulevard Palm Beach Gardens | 136 | 150,114 | | $ 66,500,000 Mar-22 | | | $ 488,971 | $ 443.00 |

*Source: Palm Beach County Property Appraiser; CoStar, Inc.; WTL+a, December 2023.*

**WTL** +a

Real Estate & Economic Advisors
Washington, DC—Cape Cod, MA
301.502.4171  508.214.0915



## Comparison of Fishkind Absorption to Actual Trends

WTL+a prepared an analysis that compares annual unit absorption for Village Place as estimated by Fishkind against actual/verifiable absorption in new or recently-built multi-family properties in the US Highway 1 corridor.  This analysis, which is illustrated in Table 4, reveals the following:

- As noted previously, 1,286 housing units proposed as part of Village Place over an 8-year buildout period would require annual unit absorption of 186 units per year;

- By comparison, the 2021 WTL+a real estate market study of redevelopment potentials for the former Twin City Mall site estimates annual unit absorption of 80 units per year over a 10-year buildout (which translates into 800 market-supportable units for the North Palm Beach portion of the site); and

- The analysis examines two absorption scenarios—low and high—based on market comparables (Table 1) as affected by construction of almost 5,100 proposed/potential units in 18 projects in the US Highway 1 corridor (Table 2).  As noted, including the 1,286 units proposed at Village Place could potentially result in construction of almost 6,400 new multi-family units on the US Highway 1 corridor over the next two to eight (or more) years between 2024—2031. Market/economic uncertainties—such as increasing interest rates and construction costs, materials costs/supply chain issues and the availability of capital—are likely to affect how many units will actually be delivered during this period.

Low Absorption Scenario

- The three multi-family properties built in 2020 and 2021 (one each in North Palm Beach/Palm Beach Gardens) collectively experienced *cumulative/combined* average annual unit absorption of 148 units per year over three years (2021—2023).  If this pace continues during buildout of Village Place, it necessitates that Village Place *capture* fully 126% of annual unit absorption on the US Highway 1 corridor to achieve buildout in eight years.  Given the magnitude of potential competition on the US Highway 1 corridor, this is highly unlikely;

- Moreover, if this annual pace of 148 units per year is sustained over time with full construction of all announced projects (6,400 units), it would require 43 years to achieve buildout/full occupancy; and

- If Village Place achieved only its *fair share* of the total, it would result in average annual absorption of only 30 units per year if the corridor's pace of 148 units per year is sustained over



the long-term.  In other words, this finding would require that Village Place achieve a pace of absorption *well-above* its fair share for buildout to occur in only eight years.

Table 4: Comparison of Unit Absorption—Fishkind to Market Comparables

| | 2024-2028 | 2029-2031 | Total Units | Buildout Period (Years) | Required Annual Absorption |
|---|---|---|---|---|---|
| **Proposed Development Program** | | | | | |
| **Fishkind Report** | | | | | |
| Multi-family Rental | 338 | 609 | 947 | 8 | 118 |
| For sale Condominiums | 133 | - | 133 | 5 | 27 |
| Senior Living Facility | 206 | - | 206 | 5 | 41 |
| Total: | 677 | 609 | 1,296 | | 186 |
| | | | | | Units/Year |

| 2021 Market Study | | | 800 On NPB Portion Only | | 80 Units/Year |
|---|---|---|---|---|---|

| *Proposed Projects-US Route 1 Corridor* | | |
|---|---|---|
| Competitive Units | 5,072 | 80% |
| Village Place Units | 1,286 | 20%  "Fair Share" |
| Total Units If Full Buildout Achieved: | 6,358 | |

**Absorption Scenarios**

**Low Growth (From Table 1)**

| | | |
|---|---|---|
| Cumulative Average Annual Absorption | 148 | Units/Year |
| Years to Full Buildout-All Projects | | |
| Total Units (Including Village Place) | 6,358 | |
| Average Annual Absorption | 148 | |
| Required Years to Full Buildout: | 43 | |

| Village Place Annual Absorption @ Fair Share | | |
|---|---|---|
| Fair Share (of Total Projects) | 20% | |
| Annual Unit Absorption: | 30 | |
| Required Village Place Capture @ 186 Units/Year | 126% | |

**High Growth (From Table 1)**

| | | |
|---|---|---|
| Cumulative Average Annual Absorption | 363 | Units/Year |
| Years to Full Buildout | | |
| Total Units (Including Village Place) | 6,358 | |
| Average Annual Absorption | 363 | |
| Required Years to Full Buildout: | 18 | |

| Village Place Annual Absorption @ Fair Share | | |
|---|---|---|
| Fair Share (of Total Projects) | 20% | |
| Annual Unit Absorption: | 73 | |
| Required Village Place Capture @ 186 Units/Year | 51% | |

Source: Palm Beach County Property Appraiser; CoStar, Inc.; WTL+a, January 2024.

WTL +a

Real Estate & Economic Advisors
Washington, DC—Cape Cod, MA
301.502.4171   508.214.0915



## High Absorption Scenario

- The four multi-family properties delivered in downtown West Palm Beach/Northwood in 2023 are experiencing a pace of *cumulative/combined* annual unit absorption of 363 units per year (between pre-leasing in 2022 to year-end 2023).  If this stronger pace continues during buildout of Village Place, it necessitates that Village Place capture a minimum of 51% of annual absorption to achieve buildout in eight years—even after accounting for full construction of 6,400 units identified in proposed/potential projects.  Given the magnitude of potential competition on the US Highway 1 corridor, this is highly unlikely;

- By comparison, Village Place's *fair share* (of total proposed units) is 20%.  If this annual pace of 363 units per year is sustained over time with full construction of 6,400 units, it would require a more reasonable 18 years to achieve buildout/full occupancy; and

- If Village Place achieved only its *fair share* of the total, it would result in average annual absorption of 73 units per year if the corridor's pace of 363 units per year is sustained over the long-term.  In other words, even in the High Absorption Scenario it would require that Village Place achieve a pace of absorption *above* its fair share for buildout to occur in only eight years.



# 3 Hotel/Lodging

As a result of only limited supporting documentation of the project's proposed hotel use, WTL+a examined market trends in four hotel/lodging properties that reportedly sold on/near the US Highway 1 corridor between 2021—2023.  This section focuses on three specific performance metrics necessary to evaluate fiscal impacts, including market valuation (i.e., sales price or value per room), average annual occupancy, and capitalization rates.  A capitalization ("cap") rate converts annual income into an "asset value" at the end of a holding period.  The higher the cap rate, the greater the degree of "risk" (and lower investment returns) in a specific property.  Conversely, the lower the cap rate, the lower the risk (and higher investment returns).  The Fishkind report refers to the cap rate as an "interest rate."  Key findings indicate the following:

Potential Market Demand for Full-service Hotel

- The Fishkind report estimated fiscal impacts generated by a 222-room hotel delivered in 2031—the last year of the buildout period.  By comparison, the 2021 WTL+a real estate market study identified negligible near-term demand for new hotel rooms, as near-term demand is likely to be met in more marketable locations (such as I-95 interchanges or proximity to demand generators such as the PGA office corridor).  In fact, WTL+a notes that a 174-room hotel is planned as part of expansion/repurposing of Downtown at the Gardens on PGA Boulevard; and

- The lodging industry defines a hotel containing more than roughly 125 rooms as a "full-service" property.  Typically, full-service hotels contain specific amenities such as a sit-down restaurant, gift shop, gym and meeting rooms.  Local examples include the Marriott, Embassy Suites and Doubletree by Hilton properties on PGA Boulevard.  These properties benefit from the cluster of employment in Class A/B office buildings as well as an immediate interchange with I-95.  The proposed 222-room hotel at Village Place would fall in the full-service category.  In our professional opinion, it is unlikely that this part of the US Highway 1 corridor could support a full-service hotel, as the predominant class of hotels in/near North Palm Beach fall in the limited-service/economy levels.  Area examples (i.e., competitive supply) include the nearby



Super 8, Extended Stay America in Northpoint Corporate Park and Travelodge in Riviera Beach; and

- Assuming room demand strengthens over time, it *may* be possible to support a third lodging category as part of hotel development at Village Place known as "select-service." Local examples include Hyatt House in downtown West Palm Beach. However, the typical select-service property contains roughly 90—120 rooms. A smaller hotel at Village Place would lower both assessed values as well as future annual ad valorem/property tax revenues than those identified in the Fishkind report.

Table 5: Comparison of Hotel Performance Metrics—Fishkind to Market Comparables

| Metric | Fishkind Report | Market Sales Comparables 2021 | 2022 | 2023 | % Change 2021-2023 | Estimated Market Valuation 2031 |
|---|---|---|---|---|---|---|
| *Fiscal Impact* | | | | | | |
| Market Valuation Per Room | $ 533,584 | $ 271,506 | $ 103,150 | $ 237,132 | -12.7% | $ 300,392 |
| *% Annual Change* | | - | -62.0% | 129.9% | | @ 3%/Year |
| *Value/Room If Fishkind Comparable Sold* | | $ 40,996 | $ 43,197 | $ 46,916 | 14.4% | |
| | | - | 5.4% | 8.6% | | |
| Average Annual Occupancy | 71% | 63.1% | 74.6% | 75.7% | 20.0% | |
| *% Annual Change* | | - | 18.3% | 1.4% | | |
| *Estimated Annual Occupancy of Fishkind Comparable* | | 70.6% | 69.9% | 64.0% | -9.4% | |
| | | - | -1.0% | -8.5% | | |
| Capitalization ("Interest") Rate | 5% | 7.4% | 7.1% | 7.2% | -2.5% | |
| *% Annual Change* | | - | -3.1% | 0.6% | | |
| *Cap Rate If Fishkind Comparable Sold* | | 8.9% | 8.7% | 8.8% | | |
| | | - | -1.8% | 1.1% | | |
| No. of Properties | 2 | 3 | 3 | 4 | | |
| No. of Rooms | 154 | 480 | 480 | 695 | | |
| | Only 1 Hotel w/ 102 Rooms Reports to STR | | | | | |
| *Proposed Development Program* | | | | | | |
| | 222 Rooms | | | | | |
| 2021 Market Study | - Rooms | Opportunities for hotel roomnight demand captured in more marketable locations for the near-term (5+ years). Example: 174-room property proposed as part of expansion & repurposing of Downtown at the Gardens. | | | | |

*Source: CoStar, Inc.; STR Global; WTL+a, January 2024.*



## Market Valuation (Value) Per Room

- Fishkind utilized a market valuation of $533,584 per hotel room to estimate the fiscal impacts of a new 222-room hotel at Village Place.  As there is no documentation of hotel sales comparables to document this estimate, WTL+a cannot verify its validity;

- As a result, WTL+a assembled market values based on 15 confirmed sales of hotel properties in West Palm Beach and Palm Beach Gardens as reported by CoStar, Inc. between 2021—2023.  Sales data indicate hotel values ranging from $271,506 per room in 2021 to $237,132 per room in 2023.  However, sales prices were upwardly distorted by the sale of two high-end/luxury hotel properties:

    o  Hyatt Banyan Cay Resort, a 190-room resort under construction in West Palm Beach that sold for $100.0 million in December 2023 ($526,316 per key/room), and

    o   Marriott Autograph, a 208-room "Upper Upscale" class property located in downtown West Palm Beach that sold for $106.4 million in October 2021 ($511,538 per key);

- If these two luxury properties are excluded from this analysis, the 13 remaining sales are comprised of economy/limited-service properties located on commercial corridors or at interchanges with I-95.  This significantly reduces sales values—to $127,625 per room in 2021, $103,150 per room in 2022, and $128,973 per room in 2023;

- These findings suggest that hotel values remain well below the valuation estimates in the Fishkind report.  Even the benefit of a sustained annual increase in value of 3% per year (i.e., the accepted industry standard rate of inflation) through 2031 would only increase potential sales valuation to $300,390 per room by 2031 (the year a proposed hotel would be delivered);

- In our professional opinion, unless the developer of Village Place has secured a hotel operator to open a luxury property (or another class such as "Upper Upscale" similar to Marriott Autograph) at Village Place, it is unlikely that the project will be able to secure a hotel at these class levels; and

- It is notable that Fishkind used only one comparable property in its analysis (the property name has been withheld to protect its proprietary performance data).  CoStar, Inc. estimates that if this property were sold, its valuation is estimated at a limited $49,916 per room (2023 dollars).  This is a vivid example of limited market opportunity for new hotel development in this part of the US Highway 1 corridor, although values at this level also reflect opportunities for redevelopment of this property.



## Table 6: Area Hotel Property Sales, 2021—2023

| Property | Rooms | Sale Date | Property Class | Sale Price | Price Per Key (Room) | Cap Rate |
|---|---|---|---|---|---|---|
| Hyatt Banyan Cay Resort 2020 Banyan Resort Way West Palm Beach | 190 | Dec-23 | Luxury | $ 100,000,000 | $ 526,316 | N/A |
| Holiday Inn WPB Airport 1301 Belvedere Road West Palm Beach | 199 | Dec-23 | Upper Midscale | $ 16,460,000 | $ 82,714 Bankruptcy Sale | N/A |
| Courtyard WPB Airport 1800 Centerpark Drive E West Palm Beach | 103 | Nov-23 | Upscale | $ 20,500,000 | $ 199,029 | 7.1% |
| Courtyard WPB Airport 1800 Centerpark Drive E West Palm Beach | 103 | Jun-23 | Upscale | $ 15,300,000 | $ 148,544 | 7.6% |
| LaQuinta Inn 1910 Palm Beach Lakes Blvd. West Palm Beach | 103 | Feb-23 | Upper Midscale | $ 13,258,400 | $ 128,722 | N/A |
| Subtotal-2023 Sales: | | | | | | |
| W/O Hyatt Resort | 508 | | | $ 65,518,400 | $ 128,973 | |
| With Hyatt Resort | 698 | | | $ 165,518,400 | $ 237,132 | |
| Residence Inn 2461 Metrocentre Boulevard E West Palm Beach | 78 | Nov-22 | Upscale | $ 11,558,159 | $ 148,182 | N/A |
| LaQuinta Inn 5981 Okeechobee Boulevard West Palm Beach | 114 | Nov-22 | Upper Midscale | $ 12,950,000 | $ 113,596 | N/A |
| Best Western Plus 11360 US Highway 1 Palm Beach Gardens | 83 | Sep-22 | Upper Midscale | $ 12,030,000 | $ 144,940 | 8.0% |
| Quality Inn-PBI Airport 1505 Belvedere Road West Palm Beach | 135 | Aug-22 | Midscale | $ 9,487,528 | $ 70,278 | N/A |
| Inn of America 4123 Northlake Boulevard Palm Beach Gardens | 95 | Jul-22 | Midscale | $ 5,700,000 | $ 60,000 | N/A |
| Studio 6 1535 Centerpark Drive N West Palm Beach | 138 | Jun-22 | Economy | $ 14,600,000 | $ 105,797 | N/A |
| Subtotal-2022 Sales: | 643 | | | $ 66,325,687 | $ 103,150 | |



Table 6 (Continued): Area Hotel Property Sales, 2021—2023

| Property | Rooms | Sale Date | Property Class | Sale Price | Price Per Key (Room) | Cap Rate |
|---|---|---|---|---|---|---|
| Spring Hill Suites 2437 Metrocenter Boulevard E West Palm Beach | 130 | Dec-21 | Upscale | $ 16,003,000 | $ 123,100 | N/A |
| Homewood Suites 2455 Metrocenter Boulevard E West Palm Beach | 114 | Dec-21 | Upscale | $ 15,435,000 | $ 135,395 | N/A |
| Marriott Autograph Collection 251 S. Narcissus Avenue West Palm Beach | 208 | Oct-21 | Upper Upscale | $ 106,400,000 | $ 511,538 | N/A |
| Courtyard WPB Airport 1800 Centerpark Drive E West Palm Beach | 103 | Sep-21 | Upscale | $ 12,848,000 | $ 124,738 | N/A |
| **Subtotal-2021 Sales:** | | | | | | |
| W/O Marriott Autograph | 347 | | | $ 44,296,000 | $ 127,625 | |
| With Marriott Autograph | 555 | | | $ 150,696,000 | $ 271,506 | |
| **TOTAL:** | | | | | | |
| W/O Marriott/Hyatt Resort | 1,498 | | | $ 176,130,087 | $ 117,577 | |
| With Marriott/Hyatt Resort | 1,896 | | | $ 382,530,087 | $ 201,756 | |

*Source: CoStar, Inc.; WTL+a, January 2024.*

## Annual Hotel Occupancy

- Fishkind utilized an average annual occupancy rate of 71% derived from performance of only one hotel comparable (one of North Palm Beach's two limited-service hotels).  However, CoStar, Inc. reports that annual occupancies in this one property have *declined*—from 70.6% in 2021 to 64% in 2023, reflecting an overall decline of 9.4% over the past two years.  WTL+a notes that relying solely on one property to estimate the future performance of a new hotel at Village Place is not defensible; and

- As a result, WTL+a assembled market performance metrics of four nearby hotels, which reveal annual occupancies ranging from 63% to 76% between 2021—2023.  If this performance can be



*sustained* over the next eight years, this suggests the 71% metric utilized by Fishkind may be reasonable.

## Market Capitalization (Cap) Rate

- Fishkind also utilized a 5% capitalization ("interest") rate. As noted above, a capitalization ("cap") rate converts annual income into an "asset value" at the end of a holding period. The commercial real estate industry considers a cap rate as the most effective measure through which real estate investments are assessed for their profitability and return potential. That is, the higher the cap rate, the greater the degree of "risk" to an investor of a specific property (lower return-on-investment). Conversely, the lower the cap rate, the lower the risk to an investor (higher return-on-investment);

- Cap rates are based on projections of future income and, therefore, are subject to high variance. Moreover, cap rates are affected by a range of different metrics, such as building age/condition/quality, location/proximity to demand generators, annual net operating income, market competition and other factors. It is not clear why Fishkind refers to the cap rate as an "interest rate;"

- A 5% cap rate reflects reasonably strong performance of real estate assets in stabilized markets (i.e., lower risk/higher returns). Notably, the hotel comparables identified by CoStar, Inc. exhibited cap rates generally ranging from 7.1% to 8.0%. These higher cap rates reflect *greater* risk, thereby lowering values;

- If the comparable property utilized in the Fishkind report were sold between 2021—2023, CoStar, Inc. estimates the cap rate would have been in the range of 8.7% to 8.9% This finding parallels the low valuation per room and reinforces the higher degree of risk (and lower return-on-investment) generated by a potential sale of this property. This also reinforces the probability that this site would be a candidate for redevelopment; and

- In conclusion, a cap rate based on actual recent sales of several area hotels in the range of 7% (as opposed to 5% as utilized by Fishkind) would translate into a *lower* valuation for the proposed hotel at Village Place, and therefore lower tax revenues.



# 4 General Retail

As a result of only limited supporting documentation of the project's proposed retail uses in the Fishkind report, WTL+a examined market trends of recent retail properties that reportedly sold in North Palm Beach between 2021—2023.  This section focuses on four performance metrics necessary to evaluate fiscal impacts, including annual absorption (i.e., lease-up of new or previously vacant retail space); market valuation (i.e., sales price or value per sq. ft.); market vacancy rates; and capitalization rates.

The Fishkind report estimated fiscal impacts generated by construction of 100,000 sq. ft. of general retail space.  The distribution between general and specialty retail, consumer services, and food & beverage uses within this 100,000 sq. ft. of space is not known.  The variation in type of retail space has the potential to *significantly* affect achievable rents and, therefore, proposed values (and fiscal impacts such as ad valorem tax revenues) generated by the project's commercial uses.

## Potential Market Demand for Retail

- According to the Fishkind report, the project's proposed retail space is assumed in two 50,000 sq. ft. increments—delivered in 2028 and again in 2031.  By comparison, the 2021 WTL+a real estate market study suggested more limited market opportunities in the range of 22,000 to 24,000 sq. ft.  This estimate was based in part on fluctuating performance of retail space in the Village of North Palm Beach;

- On average, a proposed retail program of 100,000 sq. ft. would require minimum annual absorption of 12,500 sq. ft. per year assuming a buildout period of eight years (2031);

- By comparison, between 2020—2023, annual net absorption of retail space in North Palm Beach was *negative* (-65,600 sq. ft.).  That is, 65,600 sq. ft. of previously occupied retail space was vacated and not re-leased over the past four years.  Moreover, between 2006—2023 the Village exhibited a net *loss* of almost 83,900 sq. ft. of previously occupied retail space (negative net absorption)—despite several years of positive absorption—over this 18-year period; and



- This suggests that the 100,000 sq. ft. of commercial retail space proposed for Village Place is *not* market-supportable.

Table 7: Comparison of Retail Metrics—Fishkind to Market Comparables

| | 2024-2028 | 2029-2031 | Total SF | Buildout Period (Years) | Required Annual Absorption |
|---|---|---|---|---|---|
| **Proposed Development Program** | | | | | |
| Fishkind Report | 50,000 | 50,000 | 100,000 | 8 | 12,500 |
| | | | | | |
| 2021 Market Study | | | 22,000 to 24,000 SF | | |

| Metric | Fishkind Report | West Palm/North Palm/Palm Beach Gardens 2021 | 2022 | 2023 | % Change 2021-2023 | Estimated Market Valuation 2031 |
|---|---|---|---|---|---|---|
| **Fiscal Impact** | | | | | | |
| Market Valuation Per SF | $ 270 | $ 328 | $ 201 | $ - | N/A | $ 262 |
| % Annual Change | | - | -38.8% | | | @ 3%/Year |
| | | | | | | |
| Market Vacancy Rate | Unknown | 6.2% | 8.0% | 8.0% | 13.2% | 112.9% |
| % Annual Change | | - | 29.0% | 0.0% | 65.0% | |
| | | | | | | |
| Capitalization ("Interest") Rate | 5% | | 5.9% | 5.7% | 5.6% | -5.9% |
| % Annual Change | | | - | -2.9% | -3.1% | |
| | | | | | | |
| Average Annual Absorption | 12,500 | | (28,026) | 3,981 | (41,564) | (65,609) |
| Total 2006-2023 (18 Years) | | | | | | (83,872) |

*Source: CoStar, Inc.; STR Global; WTL+a, January 2024.*

## Market Valuation (Value) Per Retail SF

- Fishkind utilized a market valuation of $270 per sq. ft. to estimate the fiscal impacts of 100,000 sq. ft. of new retail space at Village Place. As there is no documentation of retail sales comparables provided to document this estimate, WTL+a cannot verify its validity;

- As a result, WTL+a assembled data on the sale of nine retail centers containing 75,000 sq. ft. or more of gross leasable area (GLA) between 2021—2023 and located in West Palm Beach, North Palm Beach and Palm Beach Gardens as reported by CoStar, Inc. These centers include neighborhood, community and specialty centers with more than 1.05 million sq. ft. of gross



leasable area.  Recorded sales prices range from $99.53 to $594.08 per sq. ft. with an all-in average of $202.38 per sq. ft.; and

Table 8: Retail Property Sales— 75,000 SF or Greater, 2021—2023

| Property | Size (SF) | Sale Date | Property Type | Sale Price | Price Per SF | Cap Rate |
|---|---|---|---|---|---|---|
| Northlake Commons 3896-3980 Northlake Boulevard Palm Beach Gardens | 118,439 | Jul-22 | Community Center Anchored by Ross Dress for Less & Joann Fabric | $ 28,370,481 | $ 239.54 | 6.9% |
| Polo Grounds Mall 818-992 S. Military Trail West Palm Beach | 107,498 | Jun-22 | Community Center Anchored by Publix | $ 24,705,899 | $ 229.83 | N/A |
| Shoppes at City Center 11233 US Highway 1 North Palm Beach | 78,519 | May-22 | Neighborhood Center Anchored by West Marine | $ 29,121,858 | $ 370.89 | N/A |
| Village Shoppes 101-137 US Highway 1 North Palm Beach (Subject Property) | 125,000 | Apr-22 | Community Center Anchored by Cars of Dreams | $ 19,000,000 | $ 152.00 | N/A |
| Shoppes at Palm Coast 7591-7915 S. Dixie Highway West Palm Beach | 215,379 | Mar-22 | Community Center Anchored by Winn Dixie | $ 21,436,728 | $ 99.53 | N/A |
| Shops at Cresthaven 2601-2675 S. Military Trail West Palm Beach | 172,364 | Feb-22 | Community Center Anchored by Presidente Supermarket | $ 19,588,324 | $ 113.65 | N/A |
| Crystal Cove Commons 1201 US Highway 1 North Palm Beach | 60,993 | Nov-21 | Neighborhood Center Anchored by Wellness Jar | $ 36,235,000 | $ 594.08 | N/A |
| Legacy Place 11201-11231 Legacy Avenue Palm Beach Gardens | 96,000 | Oct-21 | Specialty Center | $ 22,017,694 | $ 229.35 | 6.0% |
| Legacy Place 11230-11260 Legacy Avenue Palm Beach Gardens | 81,624 | Oct-21 | Power Center Anchored by Best Buy | $ 13,204,766 | $ 161.78 | 6.0% |
| TOTAL: | 1,055,816 | | | $ 213,680,750 | $ 202.38 | |

Source: CoStar, Inc.; WTL+a, January 2024.

WTL +a



- The sale of Crystal Cove Commons, a 60,993 sq. ft. neighborhood center in North Palm Beach, which sold in November 2021 for $36.2 million—or $594 per sq. ft.—distorts the overall average. Assuming a sustained increase in value of 3% per year (i.e., the accepted industry standard rate of inflation) through 2031 suggests a future potential sales value of $262 per sq. ft. by 2031 (the buildout year). It is not known how Fishkind derived its market valuation of $270 per sq. ft. Setting aside whether there is sufficient market support for 100,000 sq. ft. of retail space at Village Place, the Fishkind estimate of future value for the project's retail component appears reasonable.

## Market Vacancy Rate

- The Fishkind report did not include any information on market vacancies. The accepted industry standard for vacancy rates in stabilized markets is 5%. In North Palm Beach, however, retail vacancies jumped from 8% in 2021 and 2022 to 13.2% in 2023—an increase of almost 113%. This parallels the loss of occupied retail space (i.e., negative net absorption). In fact, as detailed in the 2021 market study, retail vacancies in North Palm Beach fluctuated from a low of 2.2% in 2017 to a high of 14.3% in 2010 as recovery from the national economic recession of 2007—2009 gained momentum.

## Market Capitalization (Cap) Rate

- Similar to the project's hotel component, Fishkind also utilized a 5% capitalization ("interest") rate in its analysis of fiscal impacts of the project's retail uses. As noted above, a 5% cap rate reflects reasonably strong performance of real estate assets in stabilized markets (i.e., lower risks/higher returns). The retail comparables identified by CoStar, Inc. exhibited generally similar cap rates in the range of 6%. It is notable that cap rates in the range of 5% to 6% would reflect generally solid investment values (i.e., lower risk/higher ROI) even with increasing retail vacancy rates and negative net absorption in North Palm Beach. This may reflect the sale of well-located retail centers in/near North Palm Beach with low vacancy rates and a stable mix of creditworthy tenants.

VILLAGE OF
NORTH PALM BEACH
FEB 22 2024
COMMUNITY DEVELOPMENT
RECEIVED

**NP Devland Holdings, LLC**
c/o Cypress Realty of Fla LLC
3910 RCA Blvd., Suite 1015
Palm Beach Gardens, Florida 33410

February 22, 2024

Mr. Chuck Huff
Village Manager
Village of North Palm Beach
501 US Highway 1
North Palm Beach, Florida 33408

Re: PUD 2023-06 – Village Place

Dear Chuck:

As you know, based on a Village request we previously submitted a third-party Fiscal Impact Study as an add-on to our Request for Master Plan Approval for our planned Village Place mixed-use development. Please find attached the revised Fiscal Impact Study which includes the sensitivity analysis that staff requested in our 2/1/2024 conference call. I would also like to address three additional questions that staff had during our discussions.

Absorption

Village Place will be a true mixed-use development, with a variety of housing types and price levels targeting both the sale and rental markets. It will also include a hotel product and vibrant retail component, along with a large open space designed to attract the general public. In other words, we will be creating a true community. There is no other development similar to ours in the local area. We are aware of the competitive single-phased projects being discussed and/or planned in the surrounding area, however we believe that we will be at a competitive advantage and are confident that we will be creating our own market. While it is impossible to project the future demand, we (and our investors) will continue to analyze the competitive market environment at the appropriate time for each phase.

Hotel

We are currently in early discussions with multiple hotel development groups. The initial feedback has been positive, but there is significant due diligence to be done. As I mentioned during our meeting, our interest lies only in a quality hotel that will have a positive impact on the overall development. If we are unable to attract a high-quality hotel, the site allocated to the hotel would be developed as another use, that most likely being residential. We would not anticipate this materially changing the positive fiscal impact of the development on the Village.

Retail

There is no other retail center that exists as part of a true mixed-use community such as Village Place in the surrounding area. While we do plan to introduce the retail in phases over the life of the development, we believe that the sum of the new internal residential communities, other planned external surrounding projects and the existing local residential base will result in sufficient demand for 100,000 square feet of new quality retail space. Again, the market environment will continue to be analyzed at the appropriate time of each future development phase.

In closing, this is a multi-phased development of a very significant size. Therefore, it will be long term project with a development program/timing that will be modified to address ever-changing market conditions (that are impossible to predict). While our Fiscal Impact Study projects an amount of fiscal impact resulting from the planned development, it is obviously subject to much future uncertainty. It is impossible to predict exactly what the final outcome will be over an 8-12 year period, however, the one fact we can be sure of is the development will not only pay for itself, but will have a significant positive fiscal impact on the Village.

**NP-Devland Holdings, LLC**
By: Cypress VII GPREIT, LLC,
   its General Partner

By: Nader Salour
   Vice President

# FISCAL IMPACT ANALYSIS VILLAGE PLACE MIXED-USE DEVELOPMENT VILLAGE OF NORTH PALM BEACH, FL

February 15, 2024

Prepared for

Mr. Nader Salour
Managing Partner
NP Devland Holdings LLC
3910 RCA Boulevard, Suite 1015
Palm Beach Gardens, Fl 33410

Fishkind Litigation Services, Inc.
3504 Lake Lynda Drive, Suite 107
Orlando, Florida 32817
407-382-3256
WWW.Fishkindls.com

# Fiscal Impact Analysis
# Village Place
# Mixed-Use Development

## 1.0 Introduction and Summary of Results

### 1.1 Background

NP Devland Holdings, LLC ("Client") is planning the mixed-use development of 3 rental apartment buildings, a condominium building, a hotel, and a senior living facility ("Project") on 13.155 +/- acres. The Project will also incorporate (a) 100,000 square feet of community retail space within the six buildings and (b) 2,759 structure parking spaces. The property is on US Highway One and Palmetto Drive in the Village of North Palm Beach, Florida ("City").

### 1.2 Assignment

NP Devland Holdings, LLC retained Fishkind Litigation Services, Inc. ("FLS") to analyze the fiscal impact (the cost and revenue effects) of the proposed Project on the Village of North Palm Beach.

### 1.3 Summary of Results

The development of the Project will have very significant, positive fiscal impacts on the City, as shown in Table 1. This analysis is based on the development plan comprising 100,000 SF of community retail, 947 rental apartment units, 222 hotel rooms, 206 senior living facility units, and 133 condominium units, estimated to be completed in two phases by 2030. The Project property values produce annual fiscal surpluses ranging from $1.7 million in 2028 to $5.7 million by 2062. As Table 2 shows, on a cumulative basis, the operating surplus will be $13.5 million by 2032 (5 years), growing to $164 million by 2062 (35 years). By 2062, the present value at 5% interest of the net fiscal impact is estimated at $69.8 million.

**Table 1**
**Summary of Fiscal Impacts**
**Village Place     Mixed-Use Development**
**Net Fiscal Impacts for Selected Years**

| Year | Assessed Values | Ad Valorem | Total Operating Revenue | Total Operating Expenditure | Net Fiscal Impact |
|---|---|---|---|---|---|
| 2028 | 218,333,946 | 1,528,338 | 2,589,617 | 850,683 | 1,738,934 |
| 2032 | 585,901,882 | 4,101,313 | 7,662,183 | 3,344,853 | 4,317,330 |
| 2037 | 615,788,767 | 4,310,521 | 7,871,392 | 3,344,853 | 4,526,538 |
| 2042 | 647,200,182 | 4,530,401 | 8,091,271 | 3,344,853 | 4,746,418 |
| 2047 | 680,213,896 | 4,761,497 | 8,322,367 | 3,344,853 | 4,977,514 |
| 2052 | 714,911,641 | 5,004,381 | 8,565,252 | 3,344,853 | 5,220,399 |
| 2057 | 751,379,320 | 5,259,655 | 8,820,525 | 3,344,853 | 5,475,672 |
| 2062 | 789,707,217 | 5,527,951 | 9,088,821 | 3,344,853 | 5,743,968 |

**Table 2**
**Summary of Fiscal Impacts**
**Village Place     Mixed-Use Development**
**Cumulative Net Fiscal Impacts**

| Year | Cumulative Impact | Interest Rate | Years | Present Values |
|---|---|---|---|---|
| 2032 | $13,482,832 | 5.0% | 5 | $11,354,062 |
| 2037 | $35,692,945 | 5.0% | 10 | $26,408,647 |
| 2042 | $58,980,901 | 5.0% | 15 | $38,776,719 |
| 2047 | $83,401,683 | 5.0% | 20 | $48,938,802 |
| 2052 | $109,013,074 | 5.0% | 25 | $57,289,235 |
| 2057 | $135,875,808 | 5.0% | 30 | $64,151,678 |
| 2062 | $164,053,717 | 5.0% | 35 | $69,791,819 |

## 2.0    Methodology

### 2.1 Overview

The Client requested the submission of a fiscal impact report quantifying the costs and revenue impacts on the City's budget from the proposal to construct the mixed-use project consisting of 100,000 SF of retail space, three rental apartment buildings, a condominium building, a hotel, and a senior living facility on 13.155 +/- acres. The property is on US Highway One and Palmetto Drive in North Palm Beach, Florida.

The fiscal impact study is a set of statistical data and information based on new developments in a jurisdiction. Its purpose is to legally justify to the Village of North Palm Beach the ability to provide capital improvement, mill levy increases, and impact fees. The Fiscal Impact Analysis encompasses multiple methods to demonstrate that development will pay the total costs of all public facilities and services required to support the growth.

The Client has requested a study to support any amendment or change to their subdivision regulations. Fiscal impact analysis connects planning and local economics by estimating the public costs and revenues from land use changes. This type of analysis is required to determine the total costs of all public facilities and services needed to support the development and that are necessary to meet the level of service standards adopted by the Village of North Palm Beach

To accomplish consistency in the analysis, FLS complies with the guide standards prepared for Sarasota County by AECOM (Architecture, Engineering, Construction, Operations, and Management) in support of permitting for the Project.  Our analysis is conducted according to the 2015 report by AECOM. AECOM outlines several fiscal impact analysis methodologies, including the per capita approach.[1]  AECOM notes that the per capita methodology is the most used type of analysis. The per capita approach estimates the cost of providing services per unit.  The unit varies depending on the services used and can include per person, employee, and visitor.  Similarly, most City and City revenues are appropriately estimated per capita, again depending upon the revenues generated.

FLS uses all these factors depending on the expenditure or revenue category involved.  For example, law enforcement and public safety are provided to all residents, visitors, and employees.  FLS measures residents visitors, and employees on a full-time equivalent ("FTE") basis.  However, not all expenditures or revenues are generated by residents, visitors, and employees.  State revenue-sharing funds are provided through a population-based formula, so for this revenue

---

[1] AECOM (2015), page 2.

item, FLS only uses population. FLS's per capita method application for revenues and expenditures is consistent with AECOM.

FLS uses all categories of revenue and expenditures included in the Vilage of North Palm Beach budget (but not all fund types as discussed above). FY2021 reported to the state consists of 49 revenue line items and 40 expenditure categories. Not all revenues and expenditures relate to the fund types included in our analysis. As discussed above, except for ad valorem tax revenues, each revenue and expenditure category is included and analyzed using the modified per capita approach. It is impractical to discuss each category. However, FLS has included our fiscal impact analysis model in Excel with this report to provide a complete and detailed submission of our calculations.

Ad valorem revenues are calculated directly based on the development program, product pricing, estimates for homestead exemptions for condominium products, and assessment ratios. All other revenues are estimated via the per capita unit approach, with the unit varying as required.

Capital impacts are measured by the formulae for impact fees. The Village of North Palm Beach does not have impact fee requirements. There are impact fee requirements for Palm Beach County.

### 2.2 Operating Revenues

Except for ad valorem revenues, discussed in more detail below, operating revenues were calculated using the modified per capita method based on the City's actual for FY2021 as reported to the State of Florida, Division of Banking. Consistent with the AECOM parameters, FLS included the following fund types: (a) general fund, (b) special revenue fund, (c) debt service fund, (d) permanent fund, (e) internal service, (f) pension; and (g) component. FLS excluded the following fund types: (a) debt service, (b) capital projects, and (c) enterprise. The debt service fund relates to prior commitments and is not directly impacted by future growth or the Project. While the Project will contribute to this fund, the impact is relatively small. The effect of the Project on capital funds is calculated separately, so this fund is excluded to avoid double counting. The enterprise fund is also excluded because enterprise funds are designed to be self-funding

Ad valorem taxes generated by the Project are a function of (a) the development program for the Project, (b) its projected valuation and absorption, and (c) the City's adopted millage rates for general revenue totaling 7.00 mills. Concerning timing, FLS takes a stricter and more conservative approach than AECOM. FLS recognizes a 4-year lag between the time condo units and hotel rooms are permitted and consumed services and the time that property is included in the tax roll and paying ad valorem taxes.

## 2.3 Operating Expenses

The modified per capita approach correctly calculates operating expenses by fund type.  As noted above, the per capita units are carefully tailored to the kind of expenditure.  We have included impacts from residents and employees measured on an FTE basis and included FTE visitors who also consume these services.

## 3.0 Development Program

The fiscal impact analysis is based exclusively on the projected development of the Project (Table 3A -Development Plan & Appendix A -Site Plan), which comprises 947 apartment units,222 hotel rooms, 206 senior living facility units, and 133 condominium units. The project incorporates 100,000 square feet of community retail space within the six buildings and 2,759 structure parking spaces. The Project has an estimated property value of $772.4 million, per Table 3.  The development program is on the tax roll as provided in Table 4 and is completed in two phases: (a) phase 1 construction, completed in 2027, and (b) phase 2 construction, completed in 2030.

### TABLE 3A  VILLAGE PLACE - DEVELOPMENT PLAN

| | | | | units | | | | | Square Feet |
| Parcel Number Per Site Plan | Acres | Number of Buildings | Stories | Multi Family- Rental Apartments | Multi Family- Condominium | Hotel | Senior Living Facility | Total Units | Community/ Retail Incorporated within the 6 Buildings |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | 2.7000 | 2 | 14 | 338 | 133 | | | 471 | 15,750 |
| 2 | 5.2700 | 2 | 10 | 609 | | | | 609 | 54,810 |
| 3 | 1.3400 | 1 | 9 | | | 222 | | 222 | 20,700 |
| 4 | 1.6100 | 1 | 9 | | | | 206 | 206 | 8,740 |
| Subtotal | 10.9200 | 6 | | 947 | 133 | 222 | 206 | 1,508 | 100,000 |
| Civic Open Space | 1.0800 | | | | | | | | |
| Road ROW | 1.1550 | | | | | | | - | |
| Total | 13.1550 | | | | | | | | |

See Appendix A- Site Plan
See Appendix B-Sensitivity Analysis



**Table 3**
**Village Place**
**Property Valuation**

| Category | Units | Average Property Value Per | Average Property Value Per Category |
|---|---|---|---|
| Multi Family-Rental Apartments | 947 | $  412,999 | 391,110,016 |
| Multi Family-Condominium | 133 | 1,105,000 | 146,965,000 |
| Hotel | 222 | 533,584 | 118,455,593 |
| Senior Living Facility | 206 | 431,654 | 88,920,773 |
| **Subtotal** | 1,508 | | 745,451,381 |

| Category | Square Feet | Average Property Value Per SF | Average Property Value Per Category |
|---|---|---|---|
| Commercial/Retail -100,000 SF | 100,000 | $  270 | 27,000,000 |
| **Total Project** | | | 772,451,381 |

**Table 4**
**Village Place**    **Mixed -Use Development**
**Development Scenario**

| Real Estate on Tax Roll | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Multi Family-Rental Apartments | - | - | - | - | 338 | - | - | 609 | 947 |
| Multi Family-Condominium | - | - | - | - | 133 | - | - | - | 133 |
| Hotel | - | - | - | - | - | - | - | 222 | 222 |
| Senior Living Facility | - | - | - | - | 206 | - | - | - | 206 |
| Subtotal | - | - | - | - | 677 | - | - | 831 | 1,508 |
| Commercial/Retail -100,000 SF | - | - | - | - | 50,000 | - | - | 50,000 | 100,000 |

| Permits for Construction | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Multi Family-Rental Apartments | 338 | - | - | - | 609 | - | - | - | 947 |
| Multi Family-Condominium | 133 | - | - | - | - | - | - | - | 133 |
| Hotel | - | - | - | - | 222 | - | - | - | 222 |
| Senior Living Facility | 206 | - | - | - | - | - | - | - | 206 |
| Subtotal | 677 | - | - | - | 831 | - | - | - | 1,508 |
| Commercial/Retail -100,000 SF | 50,000 | - | - | - | 50,000 | - | - | - | 100,000 |

**4.0    Fiscal Impact – Operating Revenues and Expenses – Tables 5,6,7,8, and 9**

Using the methodology described in Section 2, the fiscal impacts of the Project on the City's operating budget are summarized below in Table 5.  The Project produces a budgetary surplus in its first year of $1.7 million in 2028, when its value is included in the City's taxable value base determined by the property appraiser.

FISHKIND

By 2037, at ten years, the net fiscal impact is estimated at $4.5 million, with a cumulative total of nearly $35.7 million.

**Table 5**
**Village Place Mixed-Use Development**
**Fiscal Impact - Operating Revenue and Expenditures**

| Year | Assessed Value | Ad Valorem | Total Operating Revenue | Total Operating Expenditure | Net Fiscal Impact | Cumulative Net Fiscal Impact | Years | Present Value of Net Fiscal Impact at 5% Interest |
|---|---|---|---|---|---|---|---|---|
| 2028 | $ 218,333,946 | $ 1,528,338 | $ 2,589,617 | $ 850,683 | $ 1,738,934 | $ 1,738,934 | | $ |
| 2032 | $ 585,901,882 | $ 4,101,313 | $ 7,662,181 | $ 3,344,853 | $ 4,317,330 | $ 13,482,832 | 5 | $ 11,354,062 |
| 2037 | $ 615,788,767 | $ 4,310,521 | $ 7,871,390 | $ 3,344,853 | $ 4,526,538 | $ 35,892,945 | 10 | $ 26,408,647 |
| 2042 | $ 647,200,182 | $ 4,530,401 | $ 8,091,271 | $ 3,344,853 | $ 4,746,418 | $ 58,380,901 | 15 | $ 38,776,719 |
| 2047 | $ 680,213,896 | $ 4,761,497 | $ 8,322,367 | $ 3,344,853 | $ 4,977,514 | $ 83,401,683 | 20 | $ 48,938,802 |
| 2052 | $ 714,911,641 | $ 5,004,181 | $ 8,565,252 | $ 3,344,853 | $ 5,220,399 | $ 108,613,674 | 25 | $ 57,289,235 |
| 2057 | $ 751,379,310 | $ 5,259,655 | $ 8,820,521 | $ 3,344,853 | $ 5,475,672 | $ 135,875,808 | 30 | $ 64,151,676 |
| 2062 | $ 789,707,217 | $ 5,527,951 | $ 9,088,821 | $ 3,344,853 | $ 5,743,968 | $ 164,053,717 | 35 | $ 69,791,819 |

The gains n total taxable values drive the strong growth in net fiscal surpluses. Table 6 displays the increase in taxable value generated by the Project for the Village of North Palm Beach. Taxable value rises from almost $218 million in 2028 to over $613 million in 2037. Within the 13.155 acres that comprise the Project, 0.84 acres or 6.5% of the land is in the Lake Park municipality. Within the Project, the Lake Park municipality property is designated as an open space or road ard does not subtract from the values in Table 6.

**Table 6**
**Village Place**
**Taxable Property Values**

| | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Residential** | | | | | | | | | | |
| Multi-Family Rental Apartments | 124,707,179 | 125,354,250 | 127,113,700 | | | | | | | |
| Hotel | | | | | | | | | | |
| Senior Living Facility | | | | | | | | | | |
| Subtotal | | | | | | | | | | |
| Multi-Family Condominium | | | | | | | | | | |
| Total Residential | | | | | | | | | | |
| Total Taxable Value - Residential | | | | | | | | | | |
| **Commercial/Retail** | | | | | | | | | | |
| Community Retail | | | | | | | | | | |
| Total Taxable Value - Commercial/Retail | | | | | | | | | | |
| Total Taxable Value | | | | | | | | | | |
| Years | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |

**Table 6**
**Village Place**
**Taxable Property Values**

| | 2053 | 2054 | 2055 | 2056 | 2057 | 2058 | 2059 | 2060 | 2061 | 2062 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Residential** | | | | | | | | | | |
| Multi-Family Rental Apartments | | | | | | | | | | |
| Hotel | | | | | | | | | | |
| Senior Living Facility | | | | | | | | | | |
| Subtotal | | | | | | | | | | |
| Multi-Family Condominium | | | | | | | | | | |
| Total Residential | | | | | | | | | | |
| Total Taxable Value - Residential | | | | | | | | | | |
| **Commercial/Retail** | | | | | | | | | | |
| Community Retail | | | | | | | | | | |
| Total Taxable Value - Commercial/Retail | | | | | | | | | | |
| Total Taxable Value | | | | | | | | | | |
| Years | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |

**FISHKIND**
LITIGATION SERVICES

Table 7, shown below, presents the critical assumptions employed in calculating the taxable values shown previously. Our assumptions about the assessment ratio and percentage of homes expected to take advantage of the homestead exemption are more conservative than AECOM's, making our analysis more conservative than if we had adopted the AECOM assumptions for these parameters.

Using data from Census On-the-Map, we determined that 5,132 city residents also worked there. Since we also included all employees, FLS weighted resident employees by 0.7619 to avoid double counting. Non-working residents are weighed at 1.0 FTE. Seasonal residents are at 0.3462, reflecting seasonal demands on City services.

Persons per household and total households are from Florida Population Studies.

(Intentionally Left Blank)

**Table 7**
**Village Place**
**Fiscal Impact Assumptions**

### Real Estate Taxes

| | | |
|---|---|---|
| Taxable Assessment Ratio | 85% | |
| Homestead Exemption | $ 50,000 | |
| % Single-Family with Homestead | 90% | |
| % Multifamily with Homestead | 60% | |
| Annual growth rate of Residential Property Value | 1.0% | |
| Annual growth rate of Non-Residential Property Value | 1.0% | |
| Taxable Assessment | | |
| Millage | | |
| General Revenue | 7.0000 | Mills |
| Total | 7.0000 | Mills |

### Population & Employment

| | Amount | Equivalent Factor | Full-Time Equivalent |
|---|---|---|---|
| Population-Working Residents | 5,132 | 76.26% | 3,913 |
| Population-Non-Working Residents | 8,034 | 100.00% | 8,034 |
| Population- Seasonal | 2,876 | 34.62% | 996 |
| Total Population (peak season) | 16,042 | | 12,943 |
| Population (total) | 13,166 | | |
| Employment (total) | 4,634 | 96.7% | 4,481 |
| Full-Time Equivalent Visitors | | | 241 |
| Persons per Household - Single Family | 2.07 | | |
| Persons per Household - Multifamily | 2.23 | | |
| Total Households | 6,316 | | |
| Total Housing Units | 8,214 | | |
| Hotel Assumptions Visitors | | | |
| Total Number of Rooms | 154 | CoStar | |
| Average Occupancy | 71.0% | CoStar | |
| Average Persons per Room | 2.2 | CoStar | |
| Employment Assumptions | | | |
| Community Retail ( 1 employee per 383 SF of retail) | 261 | | |
| Hotel (12 employees for every 10 rooms) | 266 | | |
| Senior Living Facility (1 employee per 20 residents) | 15 | | |
| Unemployment Rate | 3.3% | Jul-23 | |

### Property Valuation

| Property Type | Average Value | |
|---|---|---|
| Multi Family-Rental Apartments | $ 414,483 | Per Unit |
| Hotel | $ 534,289 | Per Unit |
| Senior Living Facility | $ 432,571 | Per Unit |
| Multi Family-Condominium | $ 1,105,000 | Per Unit |
| Commercial /Retail | $ 270 | Per Square Foot |

Table 8 summarizes the results of the fiscal analysis for the City's operating budget for ten years.

In 2031, the Project is estimated to generate a resident population of 1,382 and a seasonal population of 260. The Hotel in the Project is estimated to create 347 full-time equivalent visitors and 266 employees. The total employment estimated to be generated by the Project is 527 employees.

**Table 8**
**Village Place**
**Mixed-Use Development**
**Development Impact Summary**

| | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 |
|---|---|---|---|---|---|---|---|---|---|---|
| Residential Units | 677 | 677 | 677 | 1,286 | 1,286 | 1,286 | 1,286 | 1,286 | 1,286 | 1,286 |
| Resident Households | 477 | 477 | 477 | 907 | 907 | 907 | 907 | 907 | 907 | 907 |
| **Peak Population** | | | | | | | | | | |
| Resident Population | 493 | 493 | 493 | 1,382 | 1,382 | 1,382 | 1,382 | 1,382 | 1,382 | 1,382 |
| Seasonal Population | 93 | 93 | 93 | 260 | 260 | 260 | 260 | 260 | 260 | 260 |
| **Employment** | | | | | | | | | | |
| Retail / Commercial | - | - | 261 | 261 | 261 | 261 | 261 | 261 | 261 | 261 |
| Hotel | - | - | 266 | 266 | 266 | 266 | 266 | 266 | 266 | 266 |
| Senior Living Facility | - | - | - | - | - | - | - | - | - | - |
| Total Employees | - | - | 527 | 527 | 527 | 527 | 527 | 527 | 527 | 527 |
| | - | - | - | - | - | - | - | - | - | - |
| Full-Time Equivalent Visitors | - | - | 347 | 347 | 347 | 347 | 347 | 347 | 347 | 347 |
| **Village of North Palm Beach** | | | | | | | | | | |
| Total Operating Revenues | 2,589,617 | 2,604,300 | 5,207,741 | 7,621,578 | 7,662,183 | 7,703,196 | 7,744,620 | 7,786,457 | 7,828,713 | 7,871,392 |
| Total Operating Expenditures | 850,683 | 850,383 | 1,812,113 | 3,344,853 | 3,344,853 | 3,344,853 | 3,344,853 | 3,344,853 | 3,344,853 | 3,344,853 |
| Net Fiscal Impact | 1,738,934 | 1,754,717 | 1,395,628 | 4,276,725 | 4,317,330 | 4,358,343 | 4,399,767 | 4,441,604 | 4,483,860 | 4,526,538 |
| Years | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 5 Years | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years | | | |
| Net Present Value of Operating Impact | 11,354,062 | 26,408,647 | 38,776,719 | 48,988,800 | 57,289,235 | 64,151,678 | 69,791,819 | | | |
| Operating Impact at 5% Interest | | | | | | | | | | |

FISHKIND
LITIGATION SERVICES

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 72 of 429

Detailed analysis (Table 9) is presented through 2037, a 10-year projection.

Table 9
Village Place
Mixed-Use Development
Fiscal Impact Detail Operating Revenue and Expenses

| | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | |
| 311900 - Ad Valorem Taxes | 1,328,355 | 1,343,825 | 1,359,057 | 4,060,706 | 4,105,111 | 4,141,306 | 4,168,760 | 4,205,687 | 4,167,831 | 4,310,815 |
| 341900 - Other General Government Charges and Fees | 58 | 16 | 50 | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| 342100 - Service Charge - Law Enforcement Services | 3,015 | 1,015 | 8,779 | 14,210 | 14,210 | 14,210 | 14,210 | 14,210 | 14,210 | 14,210 |
| 342500 - Service Charge - Protective Inspection Fees | 7,891 | 7,896 | 11,840 | 17,108 | 17,188 | 37,169 | 37,188 | 37,188 | 37,188 | 37,188 |
| 342600 - Service Charge - Ambulance Fees | 473 | 479 | 1,594 | 2,257 | 2,151 | 1,267 | 2,267 | 2,167 | 2,267 | 2,267 |
| 342900 - Service Charge - Other Public Safety Charges and Fees | 11,844 | 11,844 | 34,490 | 55,850 | 55,850 | 55,850 | 55,850 | 55,850 | 55,850 | 55,850 |
| 343400 - Service Charge - Garbage/Solid Waste | 74 | 74 | 116 | 149 | 149 | 149 | 149 | 149 | 149 | 149 |
| 347100 - Service Charge - Libraries | 2,176 | 1,176 | 4,852 | 8,573 | 8,573 | 8,573 | 8,573 | 8,573 | 8,573 | 8,573 |
| 347200 - Service Charge - Parks and Recreation | 6,804 | 6,804 | 14,759 | 27,199 | 27,199 | 27,199 | 27,199 | 27,199 | 27,199 | 27,199 |
| 347500 - Service Charge - Special Recreation Facilities | 180 | 180 | 1,047 | 1,929 | 1,919 | 1,929 | 1,929 | 1,929 | 1,919 | 1,929 |
| 347900 - Service Charge - Other Cultural/Recreation Charges | 5,001 | 5,000 | 14,567 | 19,581 | 20,581 | 20,581 | 14,581 | 20,581 | 20,581 | 20,581 |
| 312410 - First Local Option Fuel Tax | 2,274 | 1,275 | 4,850 | 8,904 | 18,874 | 8,974 | 8,974 | 8,974 | 8,974 | 8,974 |
| 312420 - Second Local Option Fuel Tax | 5,365 | 5,365 | 14,749 | 18,875 | 20,875 | 20,875 | 20,875 | 20,875 | 20,875 | 20,875 |
| 312510 - First Insurance Premium Tax (Firefighters' Pension) | 5,952 | 1,950 | 8,448 | 15,568 | 15,568 | 15,568 | 15,568 | 15,568 | 15,568 | 15,568 |
| 412510 - Casualty Insurance Premium Tax (Police Officers' Retirement) | 26,002 | 26,002 | 55,591 | 102,442 | 102,442 | 102,442 | 102,442 | 102,442 | 102,442 | 102,442 |
| 312630 - Local Government Infrastructure Surtax | 64,616 | 64,616 | 74,046 | 136,453 | 136,453 | 136,453 | 136,453 | 136,453 | 136,453 | 136,453 |
| 314100 - Utility Service Tax - Electricity | 10,981 | 10,981 | 13,879 | 44,262 | 44,262 | 43,261 | 43,261 | 43,262 | 43,262 | 43,262 |
| 314100 - Utility Service Tax - Water | 2,296 | 2,296 | 4,909 | 9,047 | 9,047 | 9,047 | 9,047 | 9,047 | 9,047 | 9,047 |
| 314400 - Utility Service Tax - Gas | 17,354 | 17,354 | 17,100 | 68,367 | 68,367 | 68,367 | 68,367 | 68,367 | 68,367 | 68,367 |
| 315100 - State Communications Services Taxes | 7,513 | 7,513 | 16,100 | 19,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 |
| 316000 - Local Business Tax (Chapter 205) | 6,001 | 6,001 | 12,829 | 15,642 | 20,642 | 20,642 | 20,642 | 20,642 | 20,642 | 20,642 |
| 331900 - Federal Grant - Other | 357 | 357 | 357 | 944 | 944 | 944 | 944 | 944 | 944 | 944 |
| 334700 - State Grant - Culture/Recreation | 10,863 | 10,863 | 16,961 | 20,716 | 20,716 | 20,716 | 20,716 | 20,716 | 20,716 | 20,716 |
| 335121 - Municipal Revenue Sharing Program - Proceeds | 190 | 190 | 290 | 814 | 814 | 814 | 814 | 814 | 814 | 814 |
| 335150 - State Revenue Sharing - Alcohol & Beverage Licenses | 28,367 | 28,367 | 28,367 | 79,478 | 79,478 | 79,478 | 79,478 | 79,478 | 79,478 | 79,478 |
| 335180 - State Revenue Sharing - Local Government Half-Cent Sales Tax | 179 | 179 | 179 | 499 | 499 | 499 | 499 | 499 | 499 | 499 |
| 335480 - State Revenue Sharing - Other Transportation | 820 | 820 | 820 | 2,296 | 2,296 | 2,296 | 2,296 | 2,296 | 2,296 | 2,296 |
| 338000 - Shared Revenue From Other Local Units | 640 | 640 | 949 | 2,659 | 2,659 | 2,659 | 2,659 | 2,659 | 2,659 | 2,659 |
| 351900 - Judgments and Fines - Other Court Ordered | 0 | 0 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| 351000 - Fines - Library | 1,851 | 1,871 | 5,449 | 8,820 | 8,820 | 8,820 | 8,820 | 8,820 | 8,820 | 8,820 |
| 354000 - Fines - Local Ordinance Violation | 801 | 801 | 1,421 | 3,319 | 3,319 | 3,319 | 3,319 | 3,319 | 3,319 | 3,319 |
| 359000 - Other Judgments, Fines and Forfeits | 4,557 | 4,557 | 9,741 | 17,952 | 17,952 | 17,952 | 17,952 | 17,952 | 17,952 | 17,952 |
| 361000 - Interest | 15,594 | 15,594 | 56,168 | 100,041 | 100,041 | 100,041 | 100,041 | 100,041 | 100,041 | 100,041 |
| 361300 - Dividends | 202,312 | 202,312 | 412,534 | 797,074 | 797,074 | 792,074 | 797,074 | 797,004 | 797,074 | 797,074 |
| 361300 - Net Increase (Decrease) in Fair Value of Investments | 3,074 | 3,074 | 4,280 | 35,262 | 15,262 | 15,262 | 15,262 | 15,262 | 15,262 | 15,262 |
| 364000 - Disposition of Fixed Assets | 1,731 | 1,171 | 1,786 | 6,977 | 6,977 | 6,977 | 6,977 | 6,977 | 6,977 | 6,977 |
| 365000 - Sale of Surplus Materials and Scrap | 190 | 190 | 406 | 746 | 746 | 746 | 712 | 746 | 746 | 746 |
| 366000 - Contributions and Donations from Private Sources | 45,404 | 45,404 | 57,067 | 176,874 | 176,874 | 176,874 | 176,874 | 176,874 | 176,874 | 176,874 |
| 368000 - Pension Fund Contributions | 9,282 | 9,282 | 11,292 | 20,808 | 20,808 | 20,808 | 20,808 | 20,808 | 20,808 | 20,808 |
| 369000 - Other Miscellaneous Revenues | 2,963 | 2,963 | 6,395 | 11,675 | 11,675 | 11,675 | 11,674 | 11,675 | 11,675 | 11,674 |
| 380000 - Interfund Group Transfers In | 48,295 | 48,205 | 92,416 | 170,329 | 170,329 | 170,329 | 170,329 | 170,329 | 170,328 | 170,329 |
| 384000 - Debt Proceeds | 92,420 | 92,420 | 92,416 | 90,835 | 90,835 | 90,835 | 90,835 | 90,835 | 90,835 | 90,835 |
| 322000 - Building Permits | 7,304 | 7,304 | 7,306 | 20,464 | 20,464 | 20,464 | 20,464 | 20,464 | 20,464 | 20,464 |
| 322900 - Permits - Other | 24,170 | 24,170 | 24,178 | 67,740 | 67,740 | 67,740 | 67,740 | 67,740 | 67,740 | 67,740 |
| 323100 - Franchise Fee - Electricity | 9,565 | 9,565 | 9,541 | 26,730 | 26,730 | 26,730 | 26,730 | 26,730 | 26,730 | 26,730 |
| 323200 - Franchise Fee - Water | 1,088 | 1,088 | 1,088 | 3,049 | 3,049 | 3,049 | 3,049 | 3,049 | 3,049 | 3,049 |
| 323600 - Franchise Fee - Gas | 10 | 10 | 20 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |
| 325100 - Special Assessment - Capital Improvement | 451,145 | 451,145 | 451,144 | 1,249,623 | 1,250,615 | 1,288,623 | 1,199,603 | 1,199,623 | 1,169,623 | 1,169,624 |
| **Total Revenues** | **3,589,657** | **2,605,000** | **5,207,741** | **7,621,579** | **7,640,183** | **7,201,199** | **7,144,616** | **7,716,857** | **7,829,758** | **7,871,302** |

Table 9
Village Place
Mixed-Use Development
Fiscal Impact Detail: Operating Revenue and Expenses
Continued

| | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenditures** | | | | | | | | | | |
| 571.10 - Libraries - Personnel Services | 16,469 | 16,469 | 35,108 | 64,881 | 64,881 | 64,881 | 64,881 | 64,881 | 64,881 | 64,881 |
| 571.30 - Libraries - Operating Expenses | 2,440 | 2,440 | 5,002 | 9,218 | 9,218 | 9,218 | 9,218 | 9,218 | 9,218 | 9,218 |
| 571.60 - Libraries - Capital Outlay | 2,631 | 3,631 | 3,431 | 6,784 | 6,784 | 6,784 | 6,784 | 6,784 | 6,784 | 6,784 |
| 572.10 - Parks/Recreation - Personnel Services | 11,598 | 11,598 | 35,775 | 54,672 | 54,672 | 54,672 | 54,672 | 54,672 | 54,672 | 54,672 |
| 572.30 - Parks/Recreation - Operating Expenses | 5,933 | 5,933 | 36,929 | 46,823 | 46,823 | 46,823 | 46,823 | 46,823 | 46,823 | 46,823 |
| 572.60 - Parks/Recreation - Capital Outlay | 18,971 | 18,971 | 55,144 | 89,428 | 89,428 | 85,428 | 85,428 | 85,428 | 89,428 | 89,428 |
| 511.10 - Legislative - Personnel Services | 1,197 | 1,197 | 1,397 | 3,633 | 3,633 | 3,633 | 3,633 | 3,633 | 3,633 | 3,633 |
| 511.30 - Legislative - Operating Expenses | 2,069 | 2,069 | 3,009 | 5,638 | 5,638 | 5,638 | 5,638 | 5,638 | 5,638 | 5,638 |
| 512.10 - Executive - Personnel Services | 24,039 | 24,039 | 34,009 | 67,351 | 67,351 | 67,351 | 67,351 | 67,351 | 67,351 | 67,351 |
| 512.30 - Executive - Operating Expenses | 3,158 | 3,158 | 1,259 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 |
| 513.10 - Financial and Administrative - Personnel Services | 54,650 | 54,650 | 34,460 | 97,088 | 97,088 | 97,080 | 97,080 | 97,080 | 97,088 | 97,088 |
| 514.30 - Legal Counsel - Operating Expenses | 4,769.41 | 4,769.41 | 4,769.41 | 13,562.82 | 13,562.82 | 13,362.82 | 13,162.82 | 13,862.82 | 13,862.82 | 13,862.82 |
| 515.10 - Comprehensive Planning - Personnel Services | 6,728 | 6,728 | 6,728 | 36,849 | 16,849 | 18,849 | 18,849 | 18,849 | 18,849 | 18,849 |
| 515.30 - Comprehensive Planning - Operating Expenses | 2,442 | 2,442 | 2,892 | 7,306 | 7,306 | 7,306 | 7,306 | 7,306 | 7,306 | 7,306 |
| 518.30 - Pension Benefits - Operating Expenses | 50,805 | 50,805 | 50,805 | 142,887 | 142,887 | 142,887 | 142,887 | 141,887 | 142,387 | 142,017 |
| 519.30 - Other General Government - Operating Expenses | 15,671 | 15,671 | 45,605 | 73,870 | 73,870 | 73,870 | 73,870 | 73,870 | 74,800 | 74,800 |
| 519.60 - Other General Government - Capital Outlay | 44,255 | 44,255 | 45,155 | 131,135 | 131,135 | 121,135 | 121,135 | 121,135 | 121,135 | 121,135 |
| 519.70 - Other General Government - Debt Service | 40,054 | 40,054 | 41,054 | 115,024 | 115,024 | 115,024 | 115,024 | 114,024 | 115,024 | 115,024 |
| 581.98 - Interfund Transfers Out - Other Uses | 106,775 | 106,775 | 206,775 | 299,159 | 299,159 | 299,159 | 399,159 | 399,159 | 299,159 | 299,159 |
| 534.10 - Garbage/Solid Waste - Personnel Services | 99,569 | 99,569 | 97,849 | 147,890 | 489,890 | 484,890 | 157,890 | 157,890 | 157,890 | 157,890 |
| 534.30 - Garbage/Solid Waste - Operating Expenses | 6,990 | 6,990 | 20,357 | 32,843 | 32,862 | 32,982 | 32,982 | 32,962 | 32,962 | 32,962 |
| 534.60 - Garbage/Solid Waste - Capital Outlay | 1,542 | 1,542 | 1,940 | 4,521 | 4,521 | 4,121 | 4,321 | 4,321 | 4,321 | 4,321 |
| 539.10 - Other Physical Environment - Personnel Services | 24,141 | 24,141 | 70,301 | 115,798 | 115,798 | 113,798 | 113,798 | 113,798 | 113,798 | 113,798 |
| 539.60 - Other Physical Environment - Capital Outlay | 1,566 | 1,566 | 4,563 | 7,381 | 7,281 | 7,381 | 7,381 | 7,381 | 7,381 | 7,381 |
| 521.10 - Law Enforcement - Personnel Services | 147,210 | 147,210 | 418,688 | 691,827 | 680,827 | 680,827 | 680,827 | 691,827 | 691,827 | 691,827 |
| 521.30 - Law Enforcement - Operating Expenses | 25,236 | 25,236 | 78,491 | 116,961 | 116,961 | 116,961 | 116,961 | 116,961 | 118,961 | 118,961 |
| 521.60 - Law Enforcement - Capital Outlay | 1,255 | 1,255 | 3,834 | 5,314 | 5,314 | 5,314 | 5,314 | 5,314 | 5,314 | 5,314 |
| 522.10 - Fire Control - Personnel Services | 88,697 | 88,697 | 256,701 | 418,768 | 418,768 | 418,768 | 418,768 | 418,768 | 418,768 | 418,768 |
| 522.30 - Fire Control - Operating Expenses | 5,665 | 5,665 | 25,187 | 40,833 | 10,833 | 40,833 | 40,833 | 40,833 | 40,833 | 40,833 |
| 524.10 - Protective Inspections - Personnel Services | 18,359 | 18,559 | 54,046 | 87,485 | 87,485 | 87,485 | 87,685 | 87,485 | 87,485 | 87,485 |
| 524.30 - Protective Inspections - Operating Expenses | 5,069 | 5,069 | 54,762 | 23,896 | 18,896 | 23,896 | 23,896 | 23,896 | 23,896 | 23,896 |
| 541.10 - Road/Street Facilities - Personnel Services | 12,169 | 12,169 | 35,418 | 57,364 | 57,364 | 57,364 | 57,364 | 57,364 | 57,364 | 57,364 |
| 541.30 - Road/Street Facilities - Operating Expenses | 10,456 | 10,456 | 49,419 | 154,871 | 154,871 | 154,871 | 154,871 | 154,871 | 154,871 | 154,871 |
| 541.60 - Road/Street Facilities - Capital Outlay | 7,416 | 7,416 | 21,606 | 34,974 | 34,974 | 34,974 | 34,974 | 34,974 | 34,974 | 34,974 |
| **Total Expenditures** | 850,683 | 850,683 | 1,812,111 | 3,144,803 | 3,148,813 | 3,144,450 | 3,144,453 | 3,144,853 | 3,144,853 | 3,144,853 |
| | | | | | | | | | | |
| **Net Fiscal Impact** | 1,798,936 | 1,794,217 | 3,086,626 | 4,374,729 | 4,617,390 | 4,398,040 | 4,398,747 | 4,441,804 | 4,483,860 | 4,520,558 |
| Cumulative | 1,798,934 | 3,499,151 | 4,886,778 | 9,161,502 | 13,448,812 | 17,841,175 | 22,240,942 | 26,862,346 | 31,208,608 | 35,887,965 |
| Years | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |



Village Place
Mixed-Use Development

FISHKIND

## Appendix B Sensitivity Analysis of the Development Program

A sensitivity analysis is required as part of the fiscal impact assessment. FLS conducted a sensitivity analysis by slowing the absorption from eight to twelve years. (see Table 10) With reference to Table 10, all development is completed one year before the tax roll date. The Project maintains its performance. generating substantial net fiscal surpluses after its initial launch in 2025. By 2028, the net budgetary impact to the City will be $1.7 million, and by 2037, when the Project is 100% on the City's tax roll, the net fiscal impact will be $4.5 million. As Table 11 shows, on a cumulative basis, the operating surplus will be $23.3 million by 2037, growing to $151 million by 2062 (35 years).  By 2062, the present value at 5% interest of the net fiscal impact is estimated at $60,418 million.

On a present value basis at a 5% interest rate, Table 12 presents the variance between the Project being absorbed over eight years compared to twelve years.

**Table 10**
**Village Place** — Sensitivity Analysis
**Development Scenario**

| Real Estate on Tax Roll | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2034 | 2034 | 2035 | 2036 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Multi Family-Rental Apartments | - | - | - | 338 | - | - | - | - | - | 209 | - | 300 | 547 |
| Multi Family-Condominium | - | - | - | 133 | - | - | - | - | - | - | - | - | 133 |
| Hotel | - | - | - | - | - | - | - | - | - | - | - | 222 | 222 |
| Senior Living Facility | - | - | - | 206 | - | - | - | - | - | - | - | - | 206 |
| Subtotal | - | - | - | 677 | - | - | - | - | - | 209 | - | 522 | 1,508 |
| Commercial/Retail -100,000 SF | | | | 50,000 | - | - | - | - | - | 25,000 | - | 25,000 | 100,000 |

| Permits for Construction | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2032 | 2034 | 2035 | 2036 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Multi Family-Rental Apartments | 338 | - | - | - | - | - | 309 | - | 300 | - | - | - | 547 |
| Multi Family-Condominium | 133 | - | - | - | - | - | - | - | - | - | - | - | 133 |
| Hotel | - | - | - | - | - | - | - | - | 222 | - | - | - | 222 |
| Senior Living Facility | 206 | - | - | - | - | - | - | - | - | - | - | - | 206 |
| Subtotal | 677 | - | - | - | - | - | 309 | - | 522 | - | - | - | 1,508 |
| Commercial/Retail -100,000 SF | 50,000 | - | - | - | - | - | 25,000 | - | 25,000 | - | - | - | 100,000 |

**Table 11**
**Village Place Mixed-Use Development** — Sensitivity Analysis
**Fiscal Impact - Operating Revenue and Expenditures**

| Year | Assessed Value | Ad Valorem | Total Operating Revenue | Total Operating Expenditure | Net Fiscal Impact | Cumulative Net Fiscal Impact | Years | Present Value of Net Fiscal Impact at 5% Interest |
|---|---|---|---|---|---|---|---|---|
| 2028 | $ 218,333,906 | $ 1,528,338 | $ 2,389,617 | $ 850,683 | $ 1,738,934 | $ 1,738,934 | | |
| 2032 | $ 227,199,180 | $ 1,590,394 | $ 3,239,078 | $ 1,812,113 | $ 1,426,965 | $ 7,726,961 | 5 | $ 6,731,926 |
| 2037 | $ 615,788,767 | $ 4,310,521 | $ 7,871,392 | $ 3,344,853 | $ 4,526,538 | $ 23,308,096 | 10 | $ 17,034,940 |
| 2042 | $ 647,200,182 | $ 4,530,401 | $ 8,091,271 | $ 3,344,853 | $ 4,746,418 | $ 46,596,053 | 15 | $ 29,403,011 |
| 2047 | $ 680,213,896 | $ 4,761,497 | $ 8,322,367 | $ 3,344,853 | $ 4,977,514 | $ 71,016,834 | 20 | $ 39,565,094 |
| 2052 | $ 714,031,644 | $ 5,004,361 | $ 8,565,252 | $ 3,344,853 | $ 5,220,399 | $ 96,628,225 | 25 | $ 47,915,548 |
| 2057 | $ 751,379,120 | $ 5,259,655 | $ 8,820,525 | $ 3,344,853 | $ 5,475,672 | $ 123,490,960 | 30 | $ 54,777,970 |
| 2062 | $ 789,707,217 | $ 5,527,951 | $ 9,088,821 | $ 3,344,853 | $ 5,743,568 | $ 151,668,868 | 35 | $ 60,418,112 |

**FISHKIND**
Litigation Services

## Table 12

### Comparison of Present Value of Net Fiscal Impacts - 8 Years Absorption v. 12 Years Absortion

| Years | 8 Year Absorption Present Value @ 5% Interest of Net Fiscal Impact | 12 Years Absorption Present Value @ 5% Interest of Net Fiscal Impact |
|---|---|---|
| 5 | $ 11,354,062 | $ 6,731,926 |
| 10 | $ 26,408,647 | $ 17,034,940 |
| 15 | $ 38,776,719 | $ 29,403,011 |
| 20 | $ 48,938,802 | $ 39,565,094 |
| 25 | $ 57,289,235 | $ 47,915,528 |
| 30 | $ 64,151,678 | $ 54,777,970 |
| 35 | $ 69,791,819 | $ 60,418,112 |

**FISHKIND**
LITIGATION SERVICES®

**IMPORTANT NOTICE CONCERNING "FISCAL IMPACT ANALYSIS REPORT"**

**1. Fiscal Impact Analysis Report ("FIAR")**
Certain portions of the FIAR have various sections of the analysis that contain forecasted financial performance based upon several current and projected market conditions. These conditions are subject to numerous risks and uncertainties that cannot be determined now. Each section of the FIAR contains forecasted data. While presented with numerical specificity, projected information of the type furnished above is based on estimates and assumptions that are inherently subject to significant economic and competitive uncertainties and contingencies, which are difficult to predict, many of which are beyond the FLS's control. Accordingly, there can be no assurance that such estimates and assumptions will be accurate, and the actual results may be significantly higher or lower than those set forth.

**2. Actual Results May Differ from FIAR**
Due to various risks and uncertainties, actual results may differ from those projected in the FIAR. Accordingly, the FIAR is meant only to serve as a guide and is not intended to be relied upon as to the reasonableness of the underlying facts or assumptions. This FIAR does not contain and is not to be construed as legal, business, investment, or tax advice.

**3. The Fishkind Litigation Services Inc. (FLS) Has No Duty to Update FIAR**
The FIAR is current only as of September 2023. Following the delivery of this report, FLS expectations of results may change. FLS may come to believe that the FIAR is no longer accurate. FLS shall not have any obligation to update any corrections or revisions to the FIAR contained herein, even if the FLS believes the forward-looking analysis is no longer accurate. FLS does not intend to update or otherwise revise the FIAR to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even if any or all the assumptions underlying the projections are shown to be in error. FLS assumes no responsibility for the accuracy or validity of the FIAR.

This instrument prepared by and
should be returned to:

Charles J. Abrams, Esquire
GREENBERG TRAURIG, P.A.
777 S. Flagler Dr., Suite 300E
West Palm Beach, Florida 33401

Folio Nos.: 68-43-42-21-29-007-0020
and 36-43-42-21-29-007-0030

CFN 20230435389
OR BK 34744 PG 191
RECORDED 12/27/2023 3:01 PM
Deed Consideration Amt.: $10.00
DEED DOC $0.70
Palm Beach County, Florida
Joseph Abruzzo, Clerk
Pgs: 191- 194; (4pgs)

*Note to Examiner: The real property being conveyed by this instrument is unencumbered by any mortgage. Both Grantor and Grantee are entities that are 100% owned by the same member (the "Common Owner"). This conveyance from Grantor to Grantee is being reflected on the books and records of the Grantor, the Grantee and the Common Owner, under generally accepted accounting principles, as a series of transfers, as follows: (1) a distribution of the property from Grantor to the Common Owner, without any consideration received by the Grantor, followed by (2) a transfer by the Common Owner to Grantee, as an additional contribution to capital, without any consideration received by Common Owner. The books and records of the Grantor, Grantee and Common Owner do not reflect any loan receivable created as a result of this series of transfers. Accordingly, this deed is subject only to nominal State of Florida documentary stamp tax. See Technical Assistance Advisement 96(B)4-005 dated June 4, 2000.*

## SPECIAL WARRANTY DEED

This **SPECIAL WARRANTY DEED** is made on December 31 , 2023, by NP-DEVLAND HOLDINGS, LLC, a Delaware limited liability company ("**Grantor**"), whose address is 1601 South Mopac Expressway, Suite D-175, Austin, Texas 78746, in favor of NP-DEVLAND NORTH, LLC, a Delaware limited liability company ("**Grantee**"), whose address is 1601 South Mopac Expressway, Suite D-175, Austin, Texas 78746.

### WITNESSETH THAT:

Grantor, for and in consideration of the sum of Ten U.S. Dollars ($10.00), and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain and sell to Grantee and its successors and assigns forever, the parcel of land in Palm Beach County, Florida described on **Exhibit "A"** attached (the "**Property**").

TOGETHER with (i) all and singular, the benefits, rights, privileges, easements, tenements, hereditaments, and other appurtenances pertaining to the Property, if any, and (ii) all improvements of whatever kind, character, or description to or on the Property, if any.

TO HAVE AND TO HOLD the same in fee simple forever.

AND, Grantor hereby specially covenants with the Grantee that the Grantor is lawfully seized of the Property in fee simple and hereby specially warrants the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other; and the Property is free and clear of all liens and encumbrances, except the Property is being conveyed to Grantee subject to all zoning and governmental regulations, all restrictions, reservations and easements of record, provided that this reference shall not serve to reimpose the same, and taxes and assessments for 2023 and subsequent years, which are not yet due and payable.

ACTIVE 690325208v2

IN WITNESS WHEREOF, Grantor has caused this Special Warranty Deed to be executed on the date above.

Signed, sealed and delivered in the presence of:

Print Name: Emily Leidolf

Print Name: Denise Rangel

**GRANTOR:**

**NP-DEVLAND HOLDINGS, LLC,** a Delaware limited liability company

By: RESCAP GP, LLC, a Texas limited liability company, its Manager

By: _____
    M. Timothy Clark, President

STATE OF __Texas__ )
                    ) ss:
COUNTY OF __Travis__ )

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization this __7th__ day of __December__, 2023, by M. Timothy Clark, as President of RESCAP GP, LLC, a Texas limited liability company, the Manager of **NP-DEVLAND HOLDINGS, LLC,** a Delaware limited liability company, on behalf of the company, who ☒ is personally known to me or ☐ produced _____ for identification.

[NOTARIAL SEAL]

Notary: _____
Print Name: Jessica Villarreal
Notary Public, State of __Texas__
My commission expires: 12/29/2026

2

EXHIBIT A

**DESCRIPTION & SKETCH
PREPARED FOR:
CYPRESS REALTY OF FLORIDA, LLC**

**LOT 1**

## LEGAL DESCRIPTION - LOT 1:

A PARCEL OF LAND BEING A PORTION OF PARCEL 7 ACCORDING TO THE PLAT OF NORTHAKE PROMENADE SHOPPES, A PUD, AS RECORDED IN PLAT BOOK 102, PAGES 130 AND 131, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, TOWN OF LAKE PARK AND VILLAGE OF NORTH PALM BEACH, PALM BEACH COUNTY, FLORIDA. LYING IN A SECTION 21, TOWNSHIP 42 EAST, RANGE 43 EAST AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF PARCEL 1B, AS SHOWN ON SAID PLAT OF NORTHLAKE PROMENADE SHOPPES, A PUD; THENCE ALONG THE NORTH LINE OF SAID PARCEL 1B AND ITS WESTERLY PROLONGATION, SOUTH 84°09'54" WEST, A DISTANCE OF 197.10 FEET; THENCE NORTH 08°50'35" WEST, A DISTANCE OF 29.20 FEET TO THE POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL OF LAND;

THENCE NORTH 89°59'59" WEST, A DISTANCE OF 489.69 FEET; THENCE NORTH 00°09'32 EAST, A DISTANCE OF 186.80 FEET TO A POINT ON THE SOUTH LINE OF PARCEL R-1, AS SHOWN ON SAID PLAT OF PROMENADE SHOPPES, A PUD; THENCE ALONG SAID SOUTH LINE OF PARCEL R-1, THENCE NORTH 90°00'00" EAST, A DISTANCE OF 176.69 FEET TO THE SOUTHEAST CORNER OF SAID PARCEL R-1; THENCE ALONG THE EAST LINE OF SAID PARCEL R-1, NORTH 00°00'00" EAST, A DISTANCE OF 155.63 FEET TO THE NORTHEAST CORNER OF SAID PARCEL R-1; THENCE DEPARTING SAID EAST LINE OF PARCEL R-1; NORTH 90°00'00" EAST, A DISTANCE OF 117.05 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE SOUTHERLY, HAVING A RADIUS OF 80.00 FEET; THENCE EASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 34°25'35", A DISTANCE OF 48.07 FEET TO A POINT OF TANGENCY; THENCE SOUTH 55°34'25" EAST, A DISTANCE OF 99.93 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF 80.00 FEET; THENCE SOUTHEASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 46°43'50", A DISTANCE OF 65.25 FEET TO A POINT OF TANGENCY; THENCE SOUTH 08°50'35" EAST, A DISTANCE OF 220.85 FEET TO THE POINT OF BEGINNING.

CONTAINING 125,434 SQUARE FEET OR 2.880 ACRES MORE OR LESS.

SURVEYOR'S NOTES:
1. THIS DRAWING IS NOT A SURVEY.
2. NO SEARCH OF THE PUBLIC RECORDS HAS BEEN MADE BY THIS OFFICE.
3. THE DESCRIPTION SKETCH AND THE DESCRIPTION TEXT COMPRISE THE COMPLETE LEGAL DESCRIPTION. THE LEGAL DESCRIPTION IS NOT VALID UNLESS BOTH ACCOMPANY EACH OTHER
4. THIS LEGAL DESCRIPTION IS NOT VALID WITHOUT THE SIGNATURE AND THE ORIGINAL RAISED SEAL OR DIGITAL SIGNATURE OF A FLORIDA LICENSED SURVEYOR AND MAPPER EMPLOYED BY LIDBERG LAND SURVEYING, INC.
5. DATE OF LEGAL DESCRIPTION: JUNE 10, 2023

LIDBERG LAND SURVEYING, INC.

Digitally signed by David C Lidberg
DN: c=US, o=LIDBERG LAND SURVEYING,
dnQualifier=A01410D0000018
8JD35965000529CN,
cn=David C Lidberg
Date: 2023.09.22 15:06:17
-04'00'

ABBREVIATIONS:
P.B. = PLAT BOOK
PGS. = PAGES

BY: DAVID C. LIDBERG
PROFESSIONAL SURVEYOR AND MAPPER
FLORIDA CERTIFICATE NO. 3613

| 09/22/23 | | CORRECT LEGAL | R.J.V. |
| --- | --- | --- | --- |
| CAD. | K:\UST \ 21-243 \ 102-130 \ 15-095-303.5 \ 15-095-303.IGN | | |
| REF. | | | |
| FLD. | — | FB. | PG. | JOB | 15-095-303 |
| OFF. | CAGASUS | | | DATE | JUNE 10, 2023 |
| CKD. | B.C.L. | SHEET | 1 OF 2 | DWG. | A15-095 |



**LIDBERG LAND SURVEYING, INC.**

LB4431   675 West Indiantown Road, Suite 200,
Jupiter, Florida 33458 TEL. 561-746-8454

3

K:\UST\214243\102-130\15-095-303\15-095-303.DGN 9/22/2023 1:04:12 PM

EXHIBIT A



DESCRIPTION & SKETCH
PREPARED FOR:
CYPRESS REALTY OF FLORIDA, LLC

LOT 1

GRAPHIC SCALE IN FEET
SCALE: 1" = 100'

NORTHLAKE BOULEVARD

PARCEL 4

PARCEL 7

PARCEL 5

PARCEL ECKERD

NORTHLAKE PROMENADE SHOPPES, A PUD
(P.B. 102, PGS. 130-131)

R=80.00'
D=34°25'35"
L=48.07'

N.E. CORNER OF
PARCEL R-1

N90°00'00"E
117.05'

N00°00'00"E
155.63'

EAST LINE OF PARCEL R-1
(P.B 102, PGS. 130-131)

S55°34'25"E
99.93'

R=80.00'
D=46°43'50"
L=65.25'

PARCEL 7

PARCEL R-1

N90°00'00"E
176.69'

SOUTH LINE OF PARCEL R-1
(P.B 102, PGS. 130-131)

S.E. CORNER OF
PARCEL R-1

PARCEL 6

S08°50'35"E 220.85'

POINT OF
COMMENCEMENT
LOT 1
N.E. CORNER OF
PARCEL 1B
(P.B. 102,
PGS. 130-131)

N00°09'32"E
186.80'

LOT 1

PORTION OF PARCEL 7
(P.B. 102, PGS. 130-131)

POINT OF
BEGINNING
LOT 1

N89°59'59"W 489.69'

N84°09'54"E 197.10'

NORTH LINE OF PARCEL 1B
AND ITS WESTERLY PROLONGATION

N08°50'35"W
29.20'

PARCEL 7

PARCEL 7

NORTHLAKE PROMENADE SHOPPES, A PUD
(P.B. 102, PGS. 130-131)

PARCEL 1B

U.S. HIGHWAY No. 1

LIDBERG LAND
SURVEYING, INC.

LB4431    675 West Indiantown Road, Suite 200,
Jupiter, Florida 33458 TEL. 561-746-8454

| CAD. | K:\UST \ 214243 \ 102-130 \ 15-095-303 \ 15-095-303.DGN | | | | |
| REF. | | | | | |
| FLE. | | FB. | PC. | JOB | 15-095-303 |
| OFF. | CASH/SUS | | | DATE | JUNE 10, 2023 |
| CKD. | D.CL. | SHEET | 2 OF 2 | DWG. | A15-095 |

K:\UST\214243\102-130\15-095-303\15-095-303.DGN 9/22/2023 1:04:45 PM

CFN 20230435800
OR BK 34744 PG 195
RECORDED 12/27/2023 5:01 PM
Deed Consideration Amt: $10.00
DEED DOC $0.70
Palm Beach County, Florida
Joseph Abruzzo, Clerk
Pgs: 195 - 199; (5pgs)

This instrument prepared by and
should be returned to:

Charles J. Abrams, Esquire
GREENBERG TRAURIG, P.A.
777 S. Flagler Dr., Suite 300E
West Palm Beach, Florida 33401

Folio Nos.: 68-43-42-21-29-001-0020,
68-43-42-21-29-007-0020, and
68-43-42-21-00-061-0010

*Note to Examiner: The real property being conveyed by this instrument is unencumbered by any mortgage. Both Grantor and Grantee are entities that are 100% owned by the same member (the "Common Owner"). This conveyance from Grantor to Grantee is being reflected on the books and records of the Grantor, the Grantee and the Common Owner, under generally accepted accounting principles, as a series of transfers, as follows: (1) a distribution of the property from Grantor to the Common Owner, without any consideration received by the Grantor followed by (2) a transfer by the Common Owner to Grantee, as an additional contribution to capital, without any consideration received by Common Owner. The books and records of the Grantor, Grantee and Common Owner do not reflect any loan receivable created as a result of this series of transfers. Accordingly, this deed is subject only to nominal State of Florida documentary stamp tax. See Technical Assistance Advisement 06(B)4-005 dated June 4, 2006.*

## SPECIAL WARRANTY DEED

This **SPECIAL WARRANTY DEED** is made on December 31, 2023, by **NP-DEVLAND HOLDINGS, LLC**, a Delaware limited liability company ("**Grantor**"), whose address is 1601 South Mopac Expressway, Suite D-175, Austin, Texas 78746, in favor of **NP-DEVLAND EAST, LLC**, a Delaware limited liability company ("**Grantee**"), whose address is 1601 South Mopac Expressway, Suite D-175, Austin, Texas 78746.

### WITNESSETH THAT:

Grantor, for and in consideration of the sum of Ten U.S. Dollars ($10.00), and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain and sell to Grantee and its successors and assigns forever, the parcel of land in Palm Beach County, Florida described on **Exhibit "A"** attached (the "**Property**").

TOGETHER with (i) all and singular, the benefits, rights, privileges, easements, tenements, hereditaments, and other appurtenances pertaining to the Property, if any, and (ii) all improvements of whatever kind, character, or description to or on the Property, if any.

TO HAVE AND TO HOLD the same in fee simple forever.

AND, Grantor hereby specially covenants with the Grantee that the Grantor is lawfully seized of the Property in fee simple and hereby specially warrants the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other; and the Property is free and clear of all liens and encumbrances, except the Property is being conveyed to Grantee subject to all zoning and governmental regulations, all restrictions, reservations and easements of record, provided that this reference shall not serve to reimpose the same, and taxes and assessments for 2023 and subsequent years, which are not yet due and payable.

ACTIVE 690326057v2

IN WITNESS WHEREOF, Grantor has caused this Special Warranty Deed to be executed on the date above.

Signed, sealed and delivered in the presence of:

**GRANTOR:**

**NP-DEVLAND HOLDINGS, LLC**, a Delaware limited liability company

Print Name: _Emily Verdolt_

Print Name: _Daniel Rangel_

By: RESCAP GP, LLC, a Texas limited liability company, its Manager

By: _____
M. Timothy Clark, President

STATE OF _Texas_ )
                               ) ss:
COUNTY OF _Travis_ )

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization this __7th__ day of _December_ , 2023, by M. Timothy Clark, as President of RESCAP GP, LLC, a Texas limited liability company, the Manager of **NP-DEVLAND HOLDINGS, LLC**, a Delaware limited liability company, on behalf of the company, who ☒ is personally known to me or ☐ produced _____ for identification.

[NOTARIAL SEAL]

Notary: _____
Print Name: _Jessica Villarreal_
Notary Public, State of _Texas_
My commission expires: _12/29/2026_

2

## EXHIBIT A

**DESCRIPTION & SKETCH
PREPARED FOR:
CYPRESS REALTY OF FLORIDA, LLC**

**LOT 3**

SURVEYOR'S NOTES:
1. THIS DRAWING IS NOT A SURVEY.
2. NO SEARCH OF THE PUBLIC RECORDS HAS BEEN MADE BY THIS OFFICE.
3. THE DESCRIPTION SKETCH AND THE DESCRIPTION TEXT COMPRISE THE COMPLETE LEGAL DESCRIPTION.
   THE LEGAL DESCRIPTION IS NOT VALID UNLESS BOTH ACCOMPANY EACH OTHER.
4. THIS LEGAL DESCRIPTION IS NOT VALID WITHOUT THE SIGNATURE AND THE ORIGINAL RAISED SEAL OR DIGITAL
   SIGNATURE OF A FLORIDA LICENSED SURVEYOR AND MAPPER EMPLOYED BY LIDBERG LAND SURVEYING, INC.
5. DATE OF LEGAL DESCRIPTION: JUNE 10, 2023

LIDBERG LAND SURVEYING, INC.



Digitally signed by David C
Lidberg
DN: c=US, o=LIDBERG LAND
SURVEYING,
dnQualifier=A01410200000182
035965900525C6, cn=David C
Lidberg
Date: 2023.07.31 16:16:19 -04'00'

BY: DAVID C. LIDBERG
PROFESSIONAL SURVEYOR AND MAPPER
FLORIDA CERTIFICATE NO. 3613

ABBREVIATIONS:
P.B.    = PLAT BOOK
P.O.B. = POINT OF BEGINNING
PG.     = PAGE
PGS.   = PAGES
R.B.    = RADIAL BEARING
R/W    = RIGHT OF WAY



# LIDBERG LAND SURVEYING, INC.

LB4431    675 West Indiantown Road, Suite 200,
Jupiter, Florida 33458 TEL. 561-746-8454

| CAD. | K:\UST \ 21-243 \ 102-130 \ 15-095-303 \ 15-095-303.IGN | | | | | | |
|---|---|---|---|---|---|---|---|
| RD. | | | | | | | |
| FLD. | — | | FB. | PG. | | JOB | 15-095-303 |
| DSF. | C/SACUS | | | | | DATE | JUNE 10, 2023 |
| CKD. | D.C.L. | | SHEET | 1 | OF | 3 | DWG. A15-0958 |

K:\UST\214243\102-130\15-095-303\15-095-303.DGN 7/31/2023 4:48:40 PM

3

## EXHIBIT A

**DESCRIPTION & SKETCH
PREPARED FOR:
CYPRESS REALTY OF FLORIDA, LLC**

**LOT 3**

## LEGAL DESCRIPTION - LOT 3:

A PARCEL OF LAND BEING ALL OF PARCEL 1B AND A PORTION OF PARCEL 7 ACCORDING TO THE PLAT OF NORTHAKE PROMENADE SHOPPES, A PUD, AS RECORDED IN PLAT BOOK 102, PAGES 130 AND 131, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA AND A PORTION OF SECTION 21, TOWNSHIP 42 EAST, RANGE 43 EAST, LYING IN THE VILLAGE OF NORTH PALM BEACH, PALM BEACH COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID PARCEL 1B, AS SHOWN ON THE PLAT OF PROMENADE SHOPPES, A PUD, SAID POINT ALSO BEING A POINT ON A NON-TANGENT CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 11394.22 FEET AND A RADIAL BEARING OF NORTH 80°31'26" EAST; THENCE SOUTHERLY ALONG THE EAST LINE OF SAID PARCEL 1B AND ALONG THE EXISTING WEST RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 1 (STATE ROAD 5), A PUBLIC ROAD, AS SHOWN OF FLORIDA DEPARTMENT OF TRANSPORTATION RIGHT OF WAY MAP SECTION 93040-2510 AND ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 00°34'45", A DISTANCE OF 115.18 FEET TO THE SOUTHEAST CORNER OF SAID PARCEL 1B; THENCE CONTINUE SOUTHERLY ALONG THE ARC SAID CURVE CONCAVE WESTERLY HAVING A RADIUS OF 11394.22 FEET AND ALONG SAID WESTERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 1 (STATE ROAD 5), THROUGH A CENTRAL ANGLE OF 01°48'14", A DISTANCE OF 358.75 FEET TO THE END OF SAID CURVE; THENCE SOUTH 82°54'25" WEST ALONG A LINE RADIAL TO THE JUST DESCRIBED CURVE AND RADIAL TO THE NEXT DESCRIBED CURVE AND CONTINUING ALONG SAID WESTERLY RIGHT OF WAY LINE, A DISTANCE OF 5.00 FEET TO A POINT ON A NON-TANGENT CURVE CONCAVE WESTERLY BEING CONCENTRIC WITH THE LAST DESCRIBED CURVE AND HAVING A RADIUS OF 11389.22 FEET AND A CHORD BEARING OF SOUTH 06°52'57" EAST; THENCE CONTINUE SOUTHERLY ALONG THE ARC OF SAID CURVE AND CONTINUE ALONG SAID WESTERLY RIGHT OF WAY LINE, THROUGH A CENTRAL ANGLE OF 00°25'15", A DISTANCE OF 83.65 FEET TO A POINT OF TANGENCY; THENCE CONTINUE ALONG SAID WEST RIGHT OF WAY LINE, SOUTH 06°40'20" EAST, A DISTANCE OF 91.49 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF PALMETTO ROAD, A 60 FOOT PLATTED PUBLIC RIGHT-OF-WAY LINE, AS SHOWN ON THE PLAT FOR KELSEY CITY, RECORDED IN PLAT BOOK 8, PAGE 35, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA; THENCE ALONG SAID NORTH RIGHT OF WAY LINE OF PALMETTO ROAD, NORTH 88°39'20" WEST, A DISTANCE OF 280.90 FEET; THENCE DEPARTING SAID NORTH RIGHT OF WAY LINE, NORTH 00°09'52" EAST, A DISTANCE OF 616.96 FEET TO A POINT ON THE WESTERLY PROLONGATION OF THE NORTH LINE OF THE AFOREMENTIONED PARCEL 1B, NORTHAKE PROMENADE SHOPPES, A PUD; THENCE ALONG SAID NORTH LINE OF PARCEL 1B AND ITS WESTERLY PROLONGATION, NORTH 84°09'54" EAST, A DISTANCE OF 196.15 FEET TO THE POINT OF BEGINNING.

CONTAINING 152,890 SQUARE FEET OR 3.510 ACRES MORE OR LESS.

**LIDBERG LAND SURVEYING, INC.**

LB4431

575 West Indiantown Road, Suite 200,
Jupiter, Florida 33458 TEL. 561-746-8454

| CAD. | K:\IST \ 214243 \ 102-130 \ 15-095-303 \ 15-095-303.DGN | | | | | |
|---|---|---|---|---|---|---|
| REF. | | | | | | |
| FLD. | _ | FB. | PG. | | JOB | 15-095-303 |
| OFF. | CASASUS | _ | _ | | DATE | JUNE 10, 2023 |
| CKD. | D.C.L. | SHEET | 2 | OF | 3 | DWG. A15-095B |

K:\UST\214243\102-130\15-095-303\15-095-303.DGN 7/31/2023 4:49:03 PM

4

EXHIBIT A



# CONCURRENCY APPROVALS



| THE SCHOOL DISTRICT OF PALM BEACH COUNTY., FL | KRISTIN K. GARRISON Director | JOSEPH M. SANCHES, MBA Chief Operating Officer |
|---|---|---|

PLANNING AND INTERGOVERNMENTAL RELATIONS
3661 INTERSTATE PARK RD. N., STE 200
RIVIERA BEACH, FL. 33404

PHONE: 561-434-8020 / FAX: 561-357-1193
WWW.PALMBEACHSCHOOLS.ORG/PLANNING

# SCHOOL CAPACITY AVAILABILITY DETERMINATION (SCAD)

| | Submittal Date | 10/09/2023 |
|---|---|---|
| **Application** | SCAD No. | 23100602D – D. O. |
| | FLU /Rezoning/D.O. No. | Not Provided – Village of North Palm Beach |
| | Property Control Number | 68-43-42-21-29-007-0020; 36-43-42-21-29-007-0030; 68-43-42-21-29-001-0020; 68-43-42-21-00-001-0010; 36-43-42-21-00-000-3040 |
| | Development Name | Village Place |
| | Owner / Agent Name | NP-Devland Holdings, LLC / 2GHO, Inc. |
| | SAC No. | 074 |
| | Proposed D. O. | 1080 Residential Units (947 Multi-Family and 133 High-Rise Apt/Condo Units) |

| | | The Conservatory School at N. Palm Beach Elementary School | H. L. Watkins Middle School | Palm Beach Gardens High School |
|---|---|---|---|---|
| **Impact Review** | New Students Generated | 110 | 53 | 70 |
| | Capacity Available | -372 | 378 | 7 |
| | Utilization Percentage | 152% | 70% | 100% |

| **School District Staff's Recommendation** | Based on the findings and evaluation of the proposed development, there will be a negative impact on the public-school system. Given the recent increases in school impact fees, effective January 1, 2023, much of these impacts will be mitigated. The impact fees, however, will not fully cover impacts to the school system. Therefore, if the proposed development is approved by Village Council and if the Developer voluntarily agrees, School District staff recommends the following condition to mitigate such impacts. In order to address the school capacity deficiency generated by this proposed development at the District elementary school level, the property owner shall contribute $159,060.00 to the School District of Palm Beach County prior to the issuance of first building permit. This voluntary school capacity contribution is intended to supplement the required school impact fee (impact fee credit has already been applied). Please note that the school impact fee credit is calculated based on the Net Impact Cost per Student, as calculated in the County's latest Impact Fee Ordinance, which was adopted on September 13, 2022. |
|---|---|
| **Validation Period** | 1) This determination is valid from 10/19/2023 to 10/18/2024 or the expiration date of the site-specific development order approved during the validation period. 2) A copy of the approved D.O. must be submitted to the School District Planning Dept. prior to 10/18/2024 or this determination will expire automatically on 10/18/2024. |
| **Notice** | School age children may not necessarily be assigned to the public school closest to their residences. Students in Palm Beach County are assigned annually to schools under the authority of the School Board and by direction of the Superintendent, public school attendance zones are subject to change. |

*Joyce Cai*
_____
School District Representative Signature

Joyce C. Cai, Senior Planner
_____
Print Name & Title

October 19, 2023
_____
Date

joyce.cai@palmbeachschools.org
_____
Email Address

CC: Caryn Garnder-Young, Director, Village of N. Palm Beach
Joyell Shaw, PIR Manager, School District of Palm Beach County

The School District of Palm Beach County, Florida
**A Top High-Performing A Rated School District**
*An Equal Education Opportunity Provider and Employer*

DocuSign Envelope ID: 29E3A5CD-DB03-4F37-A2EB-FF054110A29E



Comcast Business

789 International Parkway Sunrise FL 33325



Comcast Cable Communication Management, LLC
c/o Market Development, Comcast Business

> RE:   Will Serve request for availability of Comcast communication services
>
> Property Address: 68-43-42-21-29-001-0020;68-43-42-21-00-001-0010;36-43-42-21-00-000-3040;36
> Date of Issue: 10/6/2023

Attention Josh Gibson

In response to your request for service, we have determined that based on our initial investigation, Comcast Cable Communication Management LLC has the ability to construct and install certain wires, cables and other equipment over, under, across and along the property located at

68-43-42-21-29-007-0020;36-43-42-21-29-007-0030;36-43-42-21-00-000-3040;68-43-42

A preliminary plan, if available, may be provided with this "Will Serve," letter. Notwithstanding the determination that Comcast may provide services at the Property, this letter does not represent any binding agreement for service. Additionally, this letter is non-transferrable and expires one hundred and eighty (180) days from issue date.

If you have any questions or need more information, feel free to contact us.

B ___Rich Rollins_____
Name: _____
Title: VP, Business Services_____

[Comcast rev. Oct 2019]



**SEACOAST UTILITY AUTHORITY**

4200 Hood Road
Palm Beach Gardens, FL
33410-2174

August 3, 2023

Josh Gibson, E.I.
Simmons & White, Inc.
2581 Metrocentre Blvd., Suite 3
WPB, FL 33407

Re:     Village Shoppes

Dear Mr. Gibson:

This letter is in response to your request for capacity availability. The referenced project lies within the water and sewer service area of Seacoast Utility Authority. The following calculations are based on the proposed 1,080 MFU's, 222 hotel rooms and 260 assisted living beds.

This will confirm the current status of water and wastewater capacity and commitments for Seacoast Utility Authority (Million Gallons Per Day):

|  | Capacity | Committed and In Use | This Project | Balance |
|---|---|---|---|---|
| Water | 21.09 | 18.36 | 0.33124 | 2.40 |
| Sewer | 12.00 | 8.19 | 0.31847 | 3.49 |

Please note that this statement reflects conditions as of this date; no guarantee of capacity availability in the future is expressed or implied, and no capacity has been reserved for the referenced project.

This project will require the replacement of the existing 8" gravity sewer main from the sanitary manhole on the SW corner of Palmetto Dr., crossing Palmetto Dr., heading east on Palmetto Dr., and into the project with a 10" minimum gravity sewer main.

Sincerely,

SEACOAST UTILITY AUTHORITY

*Jennifer Millette*

Jennifer Millette
Engineering Services Specialist



**AT&T**
**Palm Beach**

**Vincent Lim**
120 N K St
Lake Worth, FL 33460
561-540-2639
Email: vl4396@att.com

August 4, 2023

**SIMMONS & WHITE**
2581 METROCENTRE BLVD
West Palm Beach, FL 33407
Attn: Josh Gibson
P (561)478-7848 x 130

RE:  Village Shoppes – Service Utility Letter
PCN: 68-43-42-21-29-007-0020,36-43-42-21-29-007-0030, 36-43-42-21-00-000-3040,
68-43-42-21- 00-001-0010, 68-43-42-21-29-001-0020

To Whom It May Concern:

This letter is in response to your request for information on the availability of service at the above Parcel numbers.
This letter acknowledges that the above referenced Parcel numbers are in an area served by AT&T.  Any service arrangements for the Parcel numbers will be subject to later discussions and agreements between the developer and AT&T.

Please be advised that this letter is not a commitment by AT&T to provide service to Parcel numbers.

Please contact me at the phone number or e-mail included in this letter with any questions.

Thank you for contacting AT&T.

Sincerely,

Vincent Lim
OSPE-AT&T



**Department of Engineering and Public Works**

P.O. Box 21229

West Palm Beach, FL 35416-1229

(561) 684-4000

FAX: (561) 684-4050

www.pbcgov.com



**Palm Beach County Board of County Commissioners**

Gregg K. Weiss, Mayor

Maria Sachs, Vice Mayor

Maria G. Marino

Michael A. Barnett

Marci Woodward

Sara Baxter

Mack Bernard

**County Administrator**

Verdenia C. Baker

*"An Equal Opportunity Affirmative Action Employer"*

printed on sustainable and recycled paper

November 15, 2023

Bryan G. Kelley, P.E.
Simmons & White, Inc.
2581 Metrocentre Blvd, Suite 3
West Palm Beach, FL 33407

RE:     **Village Place**
         **Project #: 230813**
         **Traffic Performance Standards (TPS) Review**

Dear Mr. Kelley:

The Palm Beach County Traffic Division has reviewed the above referenced project Traffic Impact Study, revised October 27, 2023, pursuant to the Traffic Performance Standards in Article 12 of the Palm Beach County (PBC) Unified Land Development Code (ULDC). The project is summarized as follows:

| | |
|---|---|
| **Municipality:** | North Palm Beach |
| **Location:** | SWC of Northlake Blvd and US-1 |
| **PCN:** | 68-43-42-21-29-007-0020 and others on file |
| **Access:** | Two right-in/right-out and one full access driveway connections onto Northlake Blvd, one directional and two right-in/right-out access driveway connections onto US-1, and four full access driveway connections onto Palmetto Drive <u>(As used in the study and is NOT necessarily an approval by the County through this TPS letter)</u> |
| **Existing/Vested Uses:** | Gen. Commercial = 126,330 SF<br>Pharmacy w/ DT = 9,790 SF<br>Drive-In Bank = 5,000 SF<br>Fast Food Restaurant w/ DT = 3,028 SF<br>Gas Station = 12 FP<br>Convenience Store = 2,410 SF |
| **Proposed Uses:** | Adding:<br>Multi-Family Residential = 1,080 DUs<br>Senior Multi-Family Residential (55+) = 206 DUs<br>Hotel = 222 Rooms; **OR** Multi-Family Residential = 275 DUs<br>Gen. Commercial = 4,770 SF (for a total of 131,100 SF) |
| **New Daily Trips:** | 5,484 |
| **New Peak Hour Trips:** | 425 (117/308) AM; 451 (269/182) PM |
| **Build-out:** | December 31, 2033 |

The proposed development is within the Coastal Residential Exception Area and, therefore, the residential portion of the proposed development is exempt from the TPS of Palm Beach County. Based on our review, the Traffic Division has determined the proposed development meets the TPS of Palm Beach County.



Bryan G. Kelley, P.E.
November 15, 2023
Page 2

The following conditions should be added to the Development Order of this project:

1. No Building Permits for the site may be issued after December 31, 2033.

2. The Property Owner shall extend the northbound left turn lane on US-1 at the project entrance to the maximum extent feasible, as approved by the County Engineer or FDOT, as appropriate. This modification shall be completed prior to building permits resulting in 113 (25% of total) net new peak hour trips.

3. The Property Owner shall extend the eastbound left turn lane on Palmetto Drive at US-1 to the maximum extent feasible, as approved by the County Engineer or the Village, as appropriate. This, modification shall be completed prior to building permits resulting in 113 (25% of total) net new peak hour trips.

4. The Property Owner/Developer shall fund the cost of signal installation, if warranted as determined by the County Engineer, on Northlake Blvd at Project's western main entrance. Signalization shall be a mast arm structure installation. The cost of signalization shall also include all design costs and any required utility relocation and right of way or easement acquisition.

   a. Vertical Building Permits shall not be issued until the developer provides acceptable surety to the Traffic Division in an amount as determined by the Director of the Traffic Division.

   b. In order to request release of the surety for the traffic signal at the above intersection, the Property Owner/Developer shall provide written notice to the Traffic Division stating that the final certificate of occupancy has been issued for this development and requesting that a signal warrant study be conducted at the intersection. The Traffic Division shall have 24 months from receipt of this notice to either draw upon the monies to construct the traffic signal or release the monies. In the event that the property is sold, the surety may be returned once the Traffic Division receives written documentation of the sale and a replacement surety has been provided to the Traffic Division by the new Property Owner.

5. The Property Owner shall close the easterly median opening on Northlake Blvd and subsequently extend the eastbound dual left turn lanes at US-1 intersection to the maximum extent feasible, as approved by the County Engineer or FDOT, as appropriate. This modification shall be completed before issuance of any new Certificates of Occupancy.



Bryan G. Kelley, P.E.
November 15, 2023
Page 3

6. The Property Owner shall extend the existing eastbound "drop through lane/right turn lane" on Northlake Blvd at US-1, westerly to the east edge of the Project's westernmost driveway connection. This modification shall be completed before issuance of any new Certificates of Occupancy.

The municipality shall transmit an official, recorded copy of the Development Order with the above conditions to the County Engineer no later than ten calendar days after approval of the Development Order. In the event: 1) the municipal Development Order is not received by the County Engineer within fifteen calendar days after approval of same; or 2) the official, recorded Development Order does not contain conditions 1 thru 6 exactly as set forth above, then the Traffic Division's conditional finding that this proposed development meets the TPS of Palm Beach County shall be deemed rescinded and rendered void.

Please note the receipt of a TPS approval letter does not constitute the review and issuance of a Palm Beach County Right-of-Way (R/W) Construction Permit nor does it eliminate any requirements that may be deemed as site related. For work within Palm Beach County R/W, a detailed review of the project will be provided upon submittal for a R/W permit application. The project is required to comply with all Palm Beach County standards and may include R/W dedication.

The County traffic concurrency approval is subject to the Project Aggregation Rules set forth in the Traffic Performance Standards Ordinance.

The approval letter shall be valid no longer than one year from date of issuance, unless an application for a Site Specific Development Order has been approved, an application for a Site Specific Development Order has been submitted, or the approval letter has been superseded by another approval letter for the same property.

If you have any questions regarding this determination, please contact me at 561-684-4030 or email HAkif@pbcgov.org.

Sincerely,

Hanane Akif, P.E.
Professional Engineer
Traffic Division

QB:HA:jb
ec:   Addressee
      Jeremy Hubsch, AICP, Director, Community Development Department, Planning & Zoning Division, Village of North Palm Beach
      Quazi Bari, P.E., PTOE, Manager – Growth Management, Traffic Division
      Alberto Lopez, Technical Assistant III, Traffic Division



Bryan G. Kelley, P.E.
November 15, 2023
Page 4

File:   General - TPS - Mun - Traffic Study Review
F:\TRAFFIC\HA\MUNICIPALITIES\APPROVALS\2023\230813 - VILLAGE PLACE (CREA).DOCX;



August 17, 2023

RE:  Letter of Service Availability
     Village Shoppes- Mixed-Use Development

Dear Josh Gibson,

Per your request Florida Public Utilities Company has reviewed the project referenced above and the information provided and it has been determined that the project is within our service area. In addition to FPU being capable of serving this site with Natural Gas there are existing Natural Gas facilities on the site.

If you have any questions please do not hesitate to contact me at igibbs@fpuc.com or 561-723-3459

Sincerely,

Ivan Gibbs
Engineering Technician

208 North Sapodilla Avenue, West Palm Beach, Florida 33401 | 800.427.7712 | www.fpuc.com

A Subsidiary of





Florida Power & Light Company

October 10, 2023

Josh Gibson
2581 Metrocentre Blvd, Suite 3
West Palm Beach, FL, 33407

Re:  101 US Highway 1, North Palm Beach, FL

Dear Mr.Gibson:

This is to confirm that, at the present time, FPL has sufficient capacity to provide electric service to the above captioned property. This service will be furnished in accordance with applicable rates, rules and regulations. Preliminary analysis of your request has indicated that a line extension will be required and will most likely require a Contribution in Aid of Construction to be paid in order to provide service.

Please provide the final site plan, site survey and electrical load data as soon as possible so the necessary engineering can begin.

Early contact with FPL is essential so that resources may be scheduled to facilitate availability of service when required.

Sincerely,

Nicolas Geraci
Engineer II



## Florida Department of Transportation

**RON DESANTIS**
**GOVERNOR**

605 Suwannee Street
Tallahassee, FL  32399-0450
October 31, 2023

**JARED W. PERDUE, P.E.**
**SECRETARY**

---

**THIS PRE-APPLICATION LETTER IS VALID UNTIL – October 31, 2024**
**THIS LETTER IS NOT A PERMIT APPROVAL**

---

Bryan Kelley, P.E.
Simmons and White
2581 Metrocentre Blvd, Suite 3, West Palm Beach, FL, 33407

Dear Bryan Kelley:
RE: Pre-application Review for Category F Driveway, Pre-application Meeting Date: October 12, 2023
Palm Beach County - North Palm Beach;    SR 5;    Sec. # 93040000;    MP: 0.5;    Access Class - 5;
Posted Speed - 35;    SIS - No;    FDOT Ref. Project: FM 438386.4-Thuc  Le-PUBLIC TRANSPORTATION SHELTER

Request:
- Driveway 1: Maintain existing right-in/right-out access on the west side of US-1, approximately 642 feet north of the southern property line.
- Maintain existing northbound directional median opening on US-1 and extend existing northbound left turn lane.
- Driveway 2: Close existing right-in/right-out access on the west side of US-1, approximately 218 feet north of the southern property line.

---

**SITE SPECIFIC INFORMATION**

Project Name & Address: Village Place – 101 US Highway One, North Palm Beach
Property Owner: NP Devland Holdings LLC;    Parcel Size: 13.16 Acres
Development Size:
Proposed: 1080 Multifamily DU, 206 55+ Multifamily DU, 222-room Hotel, 131,100 SF Retail, 9790 SF Pharmacy, 5000 SF Bank, 3028 SF Fast Food Restaurant with DT, Gas Station with 12 Fuel Positions and 2410 SF Convenience Store.

---

**REQUEST APPROVED**

This decision is based on your presentation of the facts, site plan and survey - please see the conditions and comments below. You may choose to review this concept further with the District Access Management Review Committee (AMRC).

Conditions:
- A minimum driveway length of 150 feet, as measured from the ultimate right-of-way line to the first conflict point shall be provided.
- If a gate is proposed, a minimum driveway length of 100 feet to the call box and/or gate house, and a turnaround area before the gate are required.
- The northbound left turn lane on US-1 at the project entrance shall be extended and shall meet the minimum requirements in the Florida Design Manual (FDM).
- The revised site plan including the entire development (master plan phasing) shall be submitted to the Department for review at the time of Permit.

Comments:
- All driveways not approved in this letter must be fully removed and the area restored.
- A Drainage Permit is required for any stormwater impacts within FDOT right-of-way (i.e. increased runoff or reduction of existing storage).
- The applicant shall donate property to the Department if right-of-way dedication is required to implement the improvements.
- Dimensions between driveways are measured from the near edge of pavement to near edge of pavement and for median openings are measured from centerline to centerline unless otherwise indicated.

The purpose of this Pre-Application letter is to document the conceptual review of the approximate location of driveway(s) to the State Highway System and to note required improvements, if any. This letter shall be submitted with any further reviews and for permitting. The Department's personnel shall review permit plans for compliance with this letter as well as current Department standards and/or specifications. Final design must consider the existing roadway profile and any impacts to the existing drainage system. Note, this letter does not guarantee permit approval. The permit may be denied based on the review of the submitted engineering plans. Be aware that any approved median openings may be modified (or closed) in the future, at the sole discretion of the Department. For right-of-way dedication requirements go to: https://osp.fdot.gov; click on Statewide Permit News; Scroll down to District 4; Scroll down to Additional Information and Examples and choose Right-of-way Donations/Dedications.
Please contact the Access Management Manager - Tel. # 954-777-4363 or e-mail: D4AccessManagement@dot.state.fl.us with any questions regarding the Pre-Approval Letter.

Sincerely,
Carina Harvey
District Access Management Manager

cc:    Patricia Moore
File:    S:\Transportation Operations\Traffic Operations\Access Management\1. Pre-Apps and Variance\2023-10-12\2. 93040000 MP 0.5 SR 5_Village Place\2. 93040000 MP 0.5 SR 5_Village Place.docx

South Florida Water Management District

# BEG. PERMIT NUMBER 50-04324-P

## APPLICATION NO.
990113-13

50-04324-P

# SOUTH FLORIDA WATER MANAGEMENT DISTRICT
## ENVIRONMENTAL RESOURCE
## STANDARD GENERAL PERMIT NO. 50-04324-P

Form #0941
08/96

DATE ISSUED: June 4, 1999

PERMITTEE: NORTHLAKE EQUITIES INC & TWIN CITIES DEVEL INC
3265 MERIDIAN PARKWAY
WESTON, FL 33331

PROJECT DESCRIPTION: A SURFACE WATER MANAGEMENT SYSTEM SERVING 28.96 ACRE(S) OF
COMMERCIAL DEVELOPMENT KNOWN AS NORTHLAKE PROMENADE SHOPPES.

PROJECT LOCATION: PALM BEACH COUNTY, SECTION 21 TWP 42S RGE 43E

PERMIT DURATION: Five years from the date issued to complete construction of the
surface water management system as authorized herein. See attached
Rule 40E-4.321, Florida Administrative Code.

This is to notify you of the District's agency action concerning Notice of Intent for
Permit Application No. 990113-13, dated January 13, 1999. This action is taken
pursuant to Rule 40E-1.603 and Chapter 40E-40 , Florida Administrative Code (F.A.C.).

Based on the information provided, District rules have been adhered to and an
Environmental Resource General Permit is in effect for this project subject to:

1. Not receiving a filed request for a Chapter 120, Florida Statutes, administrative
hearing.

2. the attached General Conditions,

3. the attached 11 Special Conditions, and

4. the attached 9 Exhibit(s).

Should you object to these conditions, please refer to the attached "Notice of
Rights" which addresses the procedures to be followed if you desire a public hearing
or other review of the proposed agency action. Please contact this office if you
have any questions concerning this matter. If we do not hear from you in accordance
with the "Notice of Rights," we will assume that you concur with the District's
action.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a "Notice of Rights" has been mailed to the Permittee (and the
persons listed in the attached distribution list) no later than 5:00 p.m. on this 4th
day of June, 1999, in accordance with Section 120.60(3), Florida Statutes.

BY:

Anthony M. Waterhouse, P.E.
Director - Surface Water Management
West Palm Beach Service Center

Certified Mail No.   Z 532 992 685

res

 

**ENVIRONMENTAL RESOURCE PERMIT**     **CHAPTER 40E-4 (10/95)**

**40E-4.321     Duration of Permits**

(1)     Unless revoked or otherwise modified the duration of an environmental resource permit issued under this chapter or Chapter 40E-40, F.A.C. is as follows:

(a)     For a conceptual approval, two years from the date of issuance or the date specified as a condition of the permit, unless within that period an application for an individual or standard general permit is filed for any portion of the project.  If an application for an environmental resource permit is filed, then the conceptual approval remains valid until final action is taken on the environmental resource permit application.  If the application is granted, then the conceptual approval is valid for an additional two years from the date of issuance of the permit.  Conceptual approvals which have no individual or standard general environmental resource permit applications filed for a period of two years shall expire automatically at the end of the two year period.

(b)     For a conceptual approval filed concurrently with a development of regional impact (DRI) application for development approval (ADA) and a local government comprehensive plan amendment, the duration of the conceptual approval shall be two years from whichever one of the following occurs at the latest date:

1.     the effective date of the local government's comprehensive plan amendment.
2.     the effective date of the local government development order.
3.     the date on which the District issues the conceptual approval, or
4.     the latest date of the resolution of any Chapter 120.57, F.A.C., administrative proceeding or other legal appeals.

(c)     For an individual or standard general environmental resource permit, five years from the date of issuance or such amount of time as made a condition of the permit.

(d)     For a noticed general permit issued pursuant to Chapter 40-E-400, F.A.C., five years from the date the notice of intent to use the permit is provided to the District.

(2)(a)     Unless prescribed by special permit condition, permits expire automatically according to the timeframes indicated in this rule.  If application for extension is made in writing pursuant to subsection (3), the permit shall remain in full force and effect until:

1.     the Governing Board takes action on an application for extension of an individual permit, or

2.     staff takes action on an application for extension of a standard general permit.

(b)     Installation of the project outfall structure shall not constitute a vesting of the permit.

(3)     The permit extension shall be issued provided that a permittee files a written request with the District showing good cause prior to the expiration of the permit.  For the purpose of this rule, good cause shall mean a set of extenuating circumstances outside of the control of the permittee.  Requests for extensions, which shall include documentation of the extenuating circumstances and how they have delayed this project, will not be accepted more than 180 days prior to the expiration date.

(4)     Substantial modifications to Conceptual Approvals will extend the duration of the Conceptual Approval for two years from the date of issuance of the modification.  For the purposes of this section, the term "substantial modification" shall mean a modification which is reasonably expected to lead to substantially different water resource or environmental impacts which require a detailed review.

(5)     Substantial modifications to individual or standard general environmental resource permits issued pursuant to a permit application extend the duration of the permit for three years from the date of issuance of the modification.  Individual or standard general environmental resource permit modifications do not extend the duration of a conceptual approval.

(6)     Permit modifications issued pursuant to subsection 40E-4.331(2)(b), F.A.C. (letter modifications) do not extend the duration of a permit.

(7)     Failure to complete construction or alteration of the surface water management system and obtain operation phase approval from the District within the permit duration shall require a new permit authorization in order to continue construction unless a permit extension is granted.

Specific authority 373.044, 373.113 F.S. Law Implemented 373.413, 373.416, 373.419, 373.426 F.S. History—New 9-3-81, Amended 1-31-82, 12-1-82, Formerly 16K-4.07(4), Amended 7-1-86, 4/20/94, 10-3-95

## NOTICE OF RIGHTS

Section 120.569(1), Fla. Stat. (1997), requires that "each notice shall inform the recipient of any administrative hearing or judicial review that is available under this section, s. 120.57, or s. 120.68; shall indicate the procedure which must be followed to obtain the hearing or judicial review, and shall state the time limits which apply." Please note that this Notice of Rights is not intended to provide legal advice. Not all the legal proceedings detailed below may be applicable or appropriate remedy. You may wish to consult an attorney regarding your legal rights.

**Petition for Administrative Proceedings**

1. A person whose substantial interests are affected by the South Florida Water Management District's (SFWMD) action has the right to request an administrative hearing on that action. The affected person may request either a formal or an informal hearing, as set forth below. A point of entry into administrative proceedings is governed by Rules 28-106.111 and 40E-1.511, Fla. Admin. Code, (also published as an exception to the Uniform Rules of Procedure as Rule 40E-0.109), as set forth below. Petitions are deemed filed upon receipt of the original documents by the SFWMD Clerk.

a. Formal Administrative Hearing: If a genuine issue(s) of material fact is in dispute, the affected person seeking a formal hearing on a SFWMD decision which does or may determine their substantial interests shall file a petition for hearing pursuant to Sections 120.569 and 120.57(1), Fla. Stat. or for mediation pursuant to Section 120.573, Fla. Stat. within 21 days, except as provided in subsections c. and d. below, of either written notice through mail or posting or publication of notice that the SFWMD has or intends to take final agency action. Petitions must substantially comply with the requirements of Rule 28-106.201(2), Fla. Admin. Code, a copy of which is attached to this Notice of Rights.

b. Informal Administrative Hearing: If there are no issues of material fact in dispute, the affected person seeking an informal hearing on a SFWMD decision which does or may determine their substantial interests shall file a petition for hearing pursuant to Sections 120.569 and 120.57(2), Fla. Stat. or for mediation pursuant to Section 120.573, Fla. Stat. within 21 days, except as provided in subsections c. and d. below, of either written notice through mail or posting or publication of notice that the SFWMD has or intends to take final agency action. Petitions must substantially comply with the requirements of Rule 28-106.301(2), Fla. Admin. Code, a copy of which is attached to this Notice of Rights.

c. Administrative Complaint and Order: If a Respondent objects to a SFWMD Administrative Complaint and Order, pursuant to Section 373.119, Fla. Stat. (1997), the person named in the Administrative Complaint and Order may file a petition for a hearing no later than 14 days after the date such order is served. Petitions must substantially comply with the requirements of either subsection a. or b. above.

d. State Lands Environmental Resource Permit: Pursuant to Section 373.427, Fla. Stat., and F.A.C. 40E-1.511(3), Fla. Admin. Code (also published as an exception to the Uniform Rules of Procedure as Rule 40E-0.109(2)(c)), a petition objecting to the SFWMD's agency action regarding consolidated applications for Environmental Resource Permits and Use of Sovereign Submerged Lands (SLERPs), must be filed within 14 days of the notice of consolidated intent to grant or deny the SLERP. Petitions must substantially comply with the requirements of either subsection a. or b. above.

e. Emergency Authorization and Order: A person whose substantial interests are affected by SFWMD Emergency Authorization and Order, has a right to file a petition under Sections 120.569, 120.57(1), and 120.57(2), Fla. Stat., as provided in subsections a. and b. above. However, the person, or the agent of the person responsible for causing or contributing to the emergency conditions shall take whatever action necessary to cause immediate compliance with the terms of the Emergency Authorization and Order.

f. Order for Emergency Action: A person whose substantial interests are affected by a SFWMD Order for Emergency Action has a right to file a petition pursuant to Rules 28-107.005 and 40E-1.611, Fla. Admin. Code, copies of which are attached to this Notice of Rights and Section 373.119(3), Fla. Stat., for a hearing on the Order. Any subsequent agency action or proposed agency action to initiate a formal revocation proceeding shall be separately noticed pursuant to section g. below.

g. Permit Suspension, Revocation, Annulment, and Withdrawal: If the SFWMD issues administrative complaint to suspend, revoke, annul, withdraw a permit, the permittee may request a hearing be conducted in accordance with Sections 120.569 and 120.57, Fla. Stat., within 21 days of either written notice through mail or posting or publication of notice that SFWMD has or intends to take final agency action. Petitions must substantially comply with the requirements of Rule 28-107.004(3), Fla. Admin. Code, a copy of which is attached to this Notice of Rights.

2. Because the administrative hearing process is designed to formulate final agency action, the filing of a petition means that the SFWMD's final action may be different from the position taken by it previously. Persons whose substantial interests may be affected

1

 

any such final decision of the SFWMD shall have, pursuant to Rule 40E-1.511(2), Fla. Admin. Code (also published as an exception to the Uniform Rules of Procedure as Rule 40E-0.109(2)(c)), an additional 21 days from the date of receipt of notice of said decision to request an administrative hearing. However, the scope of the administrative hearing shall be limited to the substantial deviation.

3.   Pursuant to Rule 40E-1.511(4), Fla. Admin. Code, substantially affected persons entitled to a hearing pursuant to Section 120.57(1), Fla. Stat., may waive their right to such a hearing and request an informal hearing before the Governing Board pursuant to Section 120.57(2), Fla. Stat., which may be granted at the option of the Governing Board.

4.   Pursuant to Rule 28-106.111(3), Fla. Admin. Code, persons may file with the SFWMD a request for extension of time for filing a petition. The SFWMD, for good cause shown, may grant the extension. The request for extension must contain a certificate that the petitioner has consulted with all other parties, if any, concerning the extension and that the SFWMD and all other parties agree to the extension.

### CIRCUIT COURT

5.   Pursuant to Section 373.617, Fla. Stat., any substantially affected person who claims that final agency action of the SFWMD relating to permit decisions constitutes an unconstitutional taking of property without just compensation may seek judicial review of the action in circuit court by filing a civil action in the circuit court in the judicial circuit in which the affected property is located within 90 days of the rendering of the SFWMD's final agency action.

6.   Pursuant to Section 403.412, Fla. Stat., any citizen of Florida may bring an action for injunctive relief against the SFWMD to compel the SFWMD to enforce the laws of Chapter 373, Fla. Stat., and Title 40E, Fla. Admin. Code. The complaining party must file with the SFWMD Clerk a verified complaint setting forth the facts upon which the complaint is based and the manner in which the complaining party is affected. If the SFWMD does not take appropriate action on the complaint within 30 days of receipt, the complaining party may then file a civil suit for injunctive relief in the 15th Judicial Circuit in and for Palm Beach County or circuit court in the county where the cause of action allegedly occurred.

7.   Pursuant to Section 373.433, Fla. Stat., a private citizen of Florida may file suit in circuit court to require the abatement of any stormwater management system, dam, impoundment, reservoir, appurtenant work or works that violate the provisions of Chapter 373, Fla. Stat.

### DISTRICT COURT OF APPEAL

8.   Pursuant to Section 120.68, Fla. Stat., a party who is adversely affected by final SFWMD action may seek judicial review of the SFWMD's final decision by filing a notice of appeal pursuant to Florida Rule of Appellate Procedure 9.110 in the Fourth District Court of Appeal or in the appellate district where a party resides and filing a second copy of the notice with the SFWMD Clerk within 30 days of rendering of the final SFWMD action.

### LAND AND WATER ADJUDICATORY COMMISSION

9.   A party to a "proceeding below" may seek review by the Land and Water Adjudicatory Commission (LAWAC) of SFWMD's final agency action to determine if such action is consistent with the provisions and purposes of Chapter 373, Fla. Stat. Pursuant to Section 373.114, Fla. Stat., and Rules 42-2.013 and 42-2.0132, Fla. Admin. Code, a request for review of (a) an order or rule of the SFWMD must be filed with LAWAC within 20 days after rendition of the order or adoption of the rule sought to be reviewed; (b) an order of the Department of Environmental Protection (DEP) requiring amendment or repeal of a SFWMD rule must be filed with LAWAC within 30 days of rendition of the DEP's order, and (c) a SFWMD order entered pursuant to a formal administrative hearing under Section 120.57(1), Fla. Stat., must be filed no later than 20 days after rendition of the SFWMD's final order. Simultaneous with filing, a copy of the request for review must be served on the DEP Secretary, any person named in the SFWMD or DEP final order, and all parties to the proceeding below. A copy of Rule 42-2.013, Fla. Admin. Code is attached to this Notice of Rights.

### PRIVATE PROPERTY RIGHTS PROTECTION ACT

10.   A property owner who alleges a specific action of the SFWMD has inordinately burdened an existing use of the real property, or a vested right to a specific use of the real property, may file a claim in the circuit court where the real property is located within 1 year of the SFWMD action pursuant to the procedures set forth in Subsection 70.001(4)(a), Fla. Stat.

### LAND USE AND ENVIRONMENTAL DISPUTE RESOLUTION

11.   A property owner who alleges that a SFWMD development order (as that term is defined in Section 70.51(2)(a), Fla. Stat. to include permits) or SFWMD enforcement action is unreasonable, or unfairly burdens the use of the real property, may file a request for relief with the SFWMD within 30 days of receipt of the SFWMD's order or notice of agency action pursuant to the procedures set forth in Subsections 70.51(4) and (6), Fla. Stat.

### MEDIATION

12.   A person whose substantial interests are, or may be, affected by the SFWMD's action may choose mediation as an alternative remedy under Section 120.573, Fla. Stat. Pursuant to Rule 28-106.111(2), Fla. Admin. Code, the petition for mediation shall be filed within 21 days of either written notice through mail or posting or

2



publication of notice that the SFWMD has or intends to take final agency action. Choosing mediation will not adversely affect the right to an administrative hearing if mediation does not result in settlement.

Pursuant to Rule 28-106.402, Fla. Admin. Code, the contents of the petition for mediation shall contain the following information:

(1)    the name, address, and telephone number of the person requesting mediation and that person's representative, if any;

(2)    a statement of the preliminary agency action;

(3)    an explanation of how the person's substantial interests will be affected by the agency determination; and

(4)    a statement of relief sought.

As provided in Section 120.573, Fla. Stat. (1997), the timely agreement of all the parties to mediate will toll the time limitations imposed by Sections 120.569 and 120.57, Fla. Stat., for requesting and holding an administrative hearing. Unless otherwise agreed by the parties, the mediation must be concluded within 60 days of the execution of the agreement. If mediation results in settlement of the dispute, the SFWMD must enter a final order incorporating the agreement of the parties. Persons whose substantial interest will be affected by such a modified agency decision have a right to petition for hearing within 21 days of receipt of the final order in accordance with the requirements of Sections 120.569 and 120.57, Fla. Stat., and SFWMD Rule 28-106.201(2), Fla. Admin. Code. If mediation terminates without settlement of the dispute, the SFWMD shall notify all parties in writing that the administrative hearing process under Sections 120.569 and 120.57, Fla. Stat., remain available for disposition of the dispute, and the notice will specify the deadlines that then will apply for challenging the agency action.

**VARIANCES AND WAIVERS**

13.    A person who is subject to regulation pursuant to a SFWMD rule and believes the application of that rule will create a substantial hardship or will violate principles of fairness (as those terms are defined in Subsection 120.542(2), Fla. Stat.) and can demonstrate that the purpose of the underlying statute will be or has been achieved by other means, may file a petition with the SFWMD Clerk requesting a variance from or waiver of the SFWMD rule. Applying for a variance or waiver does not substitute or extend the time for filing a petition for an administrative hearing or exercising any other right that a person may have concerning the SFWMD's action. Pursuant to Rule 28-104.002(2), Fla. Admin. Code, the petition must include the following information:

(a)    the caption shall read:
Petition for (Variance from) or (Waiver of) Rule (Citation)

(b)    The name, address, telephone number and any facsimile number of the petitioner;

(c)    The name, address telephone number and any facsimile number of the attorney or qualified representative of the petitioner, (if any);

(d)    the applicable rule or portion of the rule;

(e)    the citation to the statue the rule is implementing;

(f)    the type of action requested;

(g)    the specific facts that demonstrate a substantial hardship or violation of principals of fairness that would justify a waiver or variance for the petitioner;

(h)    the reason why the variance or the waiver requested would serve the purposes of the underlying statute; and

(i)    a statement of whether the variance or waiver is permanent or temporary. If the variance or waiver is temporary, the petition shall include the dates indicating the duration of the requested variance or waiver.

A person requesting an emergency variance from or waiver of a SFWMD rule must clearly so state in the caption of the petition. In addition to the requirements of Section 120.542(5), Fla. Stat. pursuant to Rule 28-104.004(2), Fla. Admin. Code, the petition must also include:

a) the specific facts that make the situation an emergency; and

b) the specific facts to show that the petitioner will suffer immediate adverse effect unless the variance or waiver is issued by the SFWMD more expeditiously than the applicable timeframes set forth in Section 120.542, Fla. Stat.

**WAIVER OF RIGHTS**

14.    Failure to observe the relevant time frames prescribed above will constitute a waiver of such right.

**28-106.201    INITIATION OF PROCEEDINGS**
(INVOLVING DISPUTED ISSUES OF MATERIAL FACT)

(2)    All petitions filed under these rules shall contain:

(a) The name and address of each agency affected and each agency's file or identification number, if known;

(b) The name, address, and telephone number of the petitioner; the name, address, and telephone number of the petitioner's representative, if any, which shall be the address for service purposes during the course of the proceeding, and an explanation of how the petitioner's substantial interests will be affected by the agency determination;

(c) A statement of when and how the petitioner received notice of the agency decision;

(d) A statement of all disputed issues of material fact. If there are none, the petition must so indicate;

(e) A concise statement of the ultimate facts alleged, as well as the rules and statutes which entitle the petitioner to relief; and

(f) A demand for relief.

3

Revised July 1, 1998

 

**28-106.301  INITIATION OF PROCEEDINGS**
(NOT INVOLVING DISPUTED ISSUES OF MATERIAL FACT)

(2)    All petitions filed under these rules shall contain:
(a)  The name and address of each agency affected and each agency's file or identification number, if known;
(b)  The name, address, and telephone number of the petitioner; the name, address, and telephone number of the petitioner's representative, if any, which shall be the address for service purposes during the course of the proceeding, and an explanation of how the petitioner's substantial interests will be affected by the agency determination;
(c)  A statement of when and how the petitioner received notice of the agency decision;
(d)  A concise statement of the ultimate facts alleged, as well as the rules and statutes which entitle the petitioner to relief; and
(e)  A demand for relief.

**28-107.004  SUSPENSION, REVOCATION, ANNULMENT, OR WITHDRAWAL**
(3)    Requests for hearing filed in accordance with this rule shall include:
(a)  The name and address of the party making the request, for purposes of service;
(b)  A statement that the party is requesting a hearing involving disputed issues of material fact, or a hearing not involving disputed issues of material fact; and
(c)  A reference to the notice, order to show cause, administrative complaint, or other communication that the party has received from the agency.

**42-2.013  REQUEST FOR REVIEW PURSUANT TO SECTION 373.114 OR 373.217**
(1) In any proceeding arising under Chapter 373, F.S., review by the Florida Land and Water Adjudicatory Commission may be initiated by the Department or a party by filing a request for such review with the Secretary of the Commission and serving a copy on any person named in the rule or order, and on all parties to the proceeding which resulted in the order sought to be reviewed. A certificate of service showing completion of service as required by this subsection shall be a requirement for a determination of sufficiency under Rule 42-2.0132. Failure to file the request with the Commission within the time period provided in Rule 42-2.0132 shall result in dismissal of the request for review.

(2) The request for review shall identify the rule or order requested to be reviewed, the proceeding in which the rule or order was entered and the nature of the rule or order. A copy of the rule or order sought to be reviewed shall be attached.  The request for review shall state with particularity:
(a)  How the order or rule conflicts with the requirements, provisions and purposes of Chapter 373, F.S., or rules duly adopted thereunder;

(b)  How the rule or order sought to be reviewed affects the interests of the party seeking review;
(c)  The oral or written statement, sworn or unsworn, which was submitted to the agency concerning the matter to be reviewed and the date and location of the statement, if the individual or entity requesting the review has not participated in a proceeding previously instituted pursuant to Chapter 120, F.S., on the order for which review is sought;
(d)  If review of an order is being sought, whether and how the activity authorized by the order would substantially affect natural resources of statewide or regional significance, or whether the order raises issues of policy, statutory interpretation, or rule interpretation that have regional or statewide significance from a standpoint of agency precedent, and all the factual bases in the record which the petitioner claims support such determination(s); and
(e)  The action requested to be taken by the Commission as a result of the review, whether to rescind or modify the order, or remand the proceeding to the water management district for further action, or to require the water management district to initiate rulemaking to adopt, amend or repeal a rule.

**28-107.005  EMERGENCY ACTION**
(1)    If the agency finds that immediate serious danger to the public health, safety, or welfare requires emergency action, the agency shall summarily suspend, limit, or restrict a license.
(2)    the 14-day notice requirement of Section 120.569(2)(b), F. S., does not apply and shall not be construed to prevent a hearing at the earliest time practicable upon request of an aggrieved party.

(3)    Unless otherwise provided by law, within 20 days after emergency action taken pursuant to paragraph (1) of this rule, the agency shall initiate a formal suspension or revocation proceeding in compliance with Sections 120.569, 120.57, and 120.60, F.S.

**40E-1.611  EMERGENCY ACTION**
(1)    An emergency exists when immediate action is necessary to protect public health, safety or welfare; the health of animals, fish or aquatic life; the works of the District; a public water supply, or recreational, commercial, industrial, agricultural or other reasonable uses of land and water resources.
(2)    The Executive Director may employ the resources of the District to take whatever remedial action necessary to alleviate the emergency condition without the issuance of an emergency order, or in the event an emergency order has been issued, after the expiration of the requisite time for compliance with that order.

4



## GENERAL CONDITIONS

1. ALL ACTIVITIES AUTHORIZED BY THIS PERMIT SHALL BE IMPLEMENTED AS SET FORTH IN THE PLANS, SPECIFICATIONS AND PERFORMANCE CRITERIA AS APPROVED BY THIS PERMIT. ANY DEVIATION FROM THE PERMITTED ACTIVITY AND THE CONDITIONS FOR UNDERTAKING THAT ACTIVITY SHALL CONSTITUTE A VIOLATION OF THIS PERMIT AND PART IV, CHAPTER 373, F.S.

2. THIS PERMIT OR A COPY THEREOF, COMPLETE WITH ALL CONDITIONS, ATTACHMENTS, EXHIBITS, AND MODIFICATIONS SHALL BE KEPT AT THE WORK SITE OF THE PERMITTED ACTIVITY. THE COMPLETE PERMIT SHALL BE AVAILABLE FOR REVIEW AT THE WORK SITE UPON REQUEST BY THE DISTRICT STAFF.  THE PERMITTEE SHALL REQUIRE THE CONTRACTOR TO REVIEW THE COMPLETE PERMIT PRIOR TO COMMENCEMENT OF THE ACTIVITY AUTHORIZED BY THIS PERMIT.

3. ACTIVITIES APPROVED BY THIS PERMIT SHALL BE CONDUCTED IN A MANNER WHICH DOES NOT CAUSE VIOLATIONS OF STATE WATER QUALITY STANDARDS. THE PERMITTEE SHALL IMPLEMENT BEST MANAGEMENT PRACTICES FOR EROSION AND POLLUTION CONTROL TO PREVENT VIOLATION OF STATE WATER QUALITY STANDARDS.  TEMPORARY EROSION CONTROL SHALL BE IMPLEMENTED PRIOR TO AND DURING CONSTRUCTION, AND PERMANENT CONTROL MEASURES SHALL BE COMPLETED WITHIN 7 DAYS OF ANY CONSTRUCTION ACTIVITY.  TURBIDITY BARRIERS SHALL BE INSTALLED AND MAINTAINED AT ALL LOCATIONS WHERE THE POSSIBILITY OF TRANSFERRING SUSPENDED SOLIDS INTO THE RECEIVING WATERBODY EXISTS DUE TO THE PERMITTED WORK.  TURBIDITY BARRIERS SHALL REMAIN IN PLACE AT ALL LOCATIONS UNTIL CONSTRUCTION IS COMPLETED AND SOILS ARE STABILIZED AND VEGETATION HAS BEEN ESTABLISHED. ALL PRACTICES SHALL BE IN ACCORDANCE WITH THE GUIDELINES AND SPECIFICATIONS DESCRIBED IN CHAPTER 6 OF THE FLORIDA LAND DEVELOPMENT MANUAL: A GUIDE TO SOUND LAND AND WATER MANAGEMENT (DEPARTMENT OF ENVIRONMENTAL REGULATION, 1988), INCORPORATED BY REFERENCE IN RULE 40E-4.091, F.A.C. UNLESS A PROJECT-SPECIFIC EROSION AND SEDIMENT CONTROL PLAN IS APPROVED AS PART OF THE PERMIT.  THEREAFTER THE PERMITTEE SHALL BE RESPONSIBLE FOR THE REMOVAL OF THE BARRIERS. THE PERMITTEE SHALL CORRECT ANY EROSION OR SHOALING THAT CAUSES ADVERSE IMPACTS TO THE WATER RESOURCES.

4. THE PERMITTEE SHALL NOTIFY THE DISTRICT OF THE ANTICIPATED CONSTRUCTION START DATE WITHIN 30 DAYS OF THE DATE THAT THIS PERMIT IS ISSUED.  AT LEAST 48 HOURS PRIOR TO COMMENCEMENT OF ACTIVITY AUTHORIZED BY THIS PERMIT, THE PERMITTEE SHALL SUBMIT TO THE DISTRICT AN ENVIRONMENTAL RESOURCE PERMIT CONSTRUCTION COMMENCEMENT NOTICE FORM NO. 0960 INDICATING THE ACTUAL START DATE AND THE EXPECTED COMPLETION DATE.

5. WHEN THE DURATION OF CONSTRUCTION WILL EXCEED ONE YEAR, THE PERMITTEE SHALL SUBMIT CONSTRUCTION STATUS REPORTS TO THE DISTRICT ON AN ANNUAL BASIS UTILIZING AN ANNUAL STATUS REPORT FORM. STATUS REPORT FORMS SHALL BE SUBMITTED THE FOLLOWING JUNE OF EACH YEAR.

6. WITHIN 30 DAYS AFTER COMPLETION OF CONSTRUCTION OF THE PERMITTED ACTIVITY, THE PERMITTEE SHALL SUBMIT A WRITTEN STATEMENT OF COMPLETION AND CERTIFICATION BY A REGISTERED PROFESSIONAL ENGINEER OR OTHER APPROPRIATE INDIVIDUAL AS AUTHORIZED BY LAW, UTILIZING THE SUPPLIED ENVIRONMENTAL RESOURCE PERMIT CONSTRUCTION COMPLETION/CONSTRUCTION CERTIFICATION FORM NO.0881. THE STATEMENT OF COMPLETION AND CERTIFICATION SHALL BE BASED ON ONSITE OBSERVATION OF CONSTRUCTION OR REVIEW OF ASBUILT DRAWINGS FOR THE PURPOSE OF DETERMINING IF THE WORK WAS COMPLETED IN COMPLIANCE WITH PERMITTED PLANS AND SPECIFICATIONS. THIS SUBMITTAL SHALL SERVE TO NOTIFY THE DISTRICT THAT THE SYSTEM IS READY FOR INSPECTION. ADDITIONALLY, IF DEVIATION FROM THE APPROVED DRAWINGS ARE DISCOVERED DURING THE CERTIFICATION PROCESS, THE CERTIFICATION MUST BE ACCOMPANIED BY A COPY OF THE APPROVED PERMIT DRAWINGS WITH DEVIATIONS NOTED. BOTH THE ORIGINAL AND REVISED SPECIFICATIONS MUST BE CLEARLY SHOWN. THE PLANS MUST BE CLEARLY LABELED AS "ASBUILT" OR "RECORD" DRAWING. ALL SURVEYED DIMENSIONS AND ELEVATIONS SHALL BE CERTIFIED BY A REGISTERED SURVEYOR.

7. THE OPERATION PHASE OF THIS PERMIT SHALL NOT BECOME EFFECTIVE: UNTIL THE PERMITTEE HAS COMPLIED WITH THE REQUIREMENTS OF CONDITION (6) ABOVE, HAS SUBMITTED A REQUEST FOR CONVERSION OF ENVIRONMENTAL RESOURCE PERMIT FROM CONSTRUCTION PHASE TO OPERATION PHASE, FORM NO.0920: THE DISTRICT DETERMINES THE SYSTEM TO BE IN COMPLIANCE WITH THE PERMITTED PLANS AND SPECIFICATIONS: AND THE ENTITY APPROVED BY THE DISTRICT IN ACCORDANCE WITH SECTIONS 9.0 AND 10.0 OF THE BASIS OF REVIEW FOR ENVIRONMENTAL RESOURCE PERMIT APPLICATIONS WITHIN THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT - AUGUST 1995, ACCEPTS RESPONSIBILITY FOR OPERATION AND MAINTENANCE OF THE SYSTEM. THE PERMIT SHALL NOT BE TRANSFERRED TO SUCH APPROVED OPERATION AND MAINTENANCE ENTITY UNTIL THE OPERATION PHASE OF THE PERMIT BECOMES EFFECTIVE. FOLLOWING INSPECTION AND APPROVAL OF THE PERMITTED SYSTEM BY THE DISTRICT, THE PERMITTEE SHALL INITIATE TRANSFER OF THE PERMIT TO THE APPROVED RESPONSIBLE OPERATING ENTITY IF DIFFERENT FROM THE PERMITTEE. UNTIL THE PERMIT IS TRANSFERRED PURSUANT TO SECTION 40E-1.6107, F.A.C., THE PERMITTEE SHALL BE LIABLE FOR COMPLIANCE WITH THE TERMS OF THE PERMIT.

8. EACH PHASE OR INDEPENDENT PORTION OF THE PERMITTED SYSTEM MUST BE COMPLETED IN ACCORDANCE WITH THE PERMITTED PLANS AND PERMIT CONDITIONS PRIOR TO THE INITIATION OF THE PERMITTED USE OF SITE INFRASTRUCTURE LOCATED WITHIN THE AREA SERVED BY THAT PORTION OR PHASE OF THE SYSTEM. EACH PHASE OR INDEPENDENT PORTION OF THE SYSTEM MUST BE COMPLETED IN ACCORDANCE WITH THE PERMITTED PLANS AND PERMIT CONDITIONS PRIOR TO TRANSFER OF RESPONSIBILITY FOR OPERATION AND MAINTENANCE OF THE PHASE OR PORTION OF THE SYSTEM TO A LOCAL GOVERNMENT OR OTHER RESPONSIBLE ENTITY.

9. FOR THOSE SYSTEMS THAT WILL BE OPERATED OR MAINTAINED BY AN ENTITY THAT WILL REQUIRE AN EASEMENT OR DEED RESTRICTION IN ORDER TO ENABLE THAT ENTITY TO OPERATE OR MAINTAIN THE SYSTEM IN CONFORMANCE WITH THIS PERMIT, SUCH EASEMENT OR DEED RESTRICTION MUST BE RECORDED IN THE PUBLIC RECORDS AND SUBMITTED TO THE DISTRICT ALONG WITH ANY OTHER FINAL OPERATION AND MAINTENANCE DOCUMENTS REQUIRED BY SECTIONS 9.0 AND 10.0 OF THE BASIS OF REVIEW FOR ENVIRONMENTAL RESOURCE PERMIT APPLICATIONS WITHIN THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT - AUGUST 1995, PRIOR TO LOT OR UNIT SALES OR PRIOR TO THE COMPLETION OF THE SYSTEM, WHICHEVER OCCURS FIRST. OTHER DOCUMENTS CONCERNING THE ESTABLISHMENT AND AUTHORITY OF THE OPERATING ENTITY MUST BE FILED WITH THE SECRETARY OF STATE WHERE APPROPRIATE. FOR THOSE SYSTEMS WHICH ARE PROPOSED TO BE MAINTAINED BY THE COUNTY OR MUNICIPAL ENTITIES, FINAL OPERATION AND MAINTENANCE DOCUMENTS MUST BE RECEIVED BY THE DISTRICT WHEN MAINTENANCE AND OPERATION OF THE SYSTEM IS ACCEPTED BY THE LOCAL GOVERNMENT ENTITY. FAILURE TO SUBMIT THE APPROPRIATE FINAL DOCUMENTS WILL RESULT IN THE PERMITTEE REMAINING LIABLE FOR CARRYING OUT MAINTENANCE AND OPERATION OF THE PERMITTED SYSTEM AND ANY OTHER PERMIT CONDITIONS

10. SHOULD ANY OTHER REGULATORY AGENCY REQUIRE CHANGES TO THE PERMITTED SYSTEM, THE PERMITTEE SHALL NOTIFY THE DISTRICT IN WRITING OF THE CHANGES PRIOR TO IMPLEMENTATION SO THAT A DETERMINATION CAN BE MADE WHETHER A PERMIT MODIFICATION IS REQUIRED.

11. THIS PERMIT DOES NOT ELIMINATE THE NECESSITY TO OBTAIN ANY REQUIRED FEDERAL, STATE, LOCAL AND SPECIAL DISTRICT AUTHORIZATIONS PRIOR TO THE START OF ANY ACTIVITY APPROVED BY THIS PERMIT.  THIS PERMIT DOES NOT CONVEY TO THE PERMITTEE OR CREATE IN THE PERMITTEE ANY PROPERTY RIGHT, OR ANY INTEREST IN REAL PROPERTY, NOR DOES IT AUTHORIZE ANY ENTRANCE UPON OR ACTIVITIES ON PROPERTY WHICH IS NOT OWNED OR CONTROLLED BY THE PERMITTEE, OR CONVEY ANY RIGHTS OR PRIVILEGES OTHER THAN THOSE SPECIFIED IN THE PERMIT AND CHAPTER 40E-4 OR CHAPTER 40E-40, F.A.C.

12 THE PERMITTEE IS HEREBY ADVISED THAT SECTION 253.77, F.S. STATES THAT A PERSON MAY NOT COMMENCE ANY EXCAVATION, CONSTRUCTION, OR OTHER ACTIVITY INVOLVING THE USE OF SOVEREIGN OR OTHER LANDS OF THE STATE, THE TITLE TO WHICH IS VESTED IN THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND WITHOUT OBTAINING THE REQUIRED LEASE, LICENSE, EASEMENT, OR OTHER FORM OF CONSENT AUTHORIZING THE PROPOSED USE.  THEREFORE, THE PERMITTEE IS RESPONSIBLE FOR OBTAINING ANY NECESSARY AUTHORIZATIONS FROM THE BOARD OF TRUSTEES PRIOR TO COMMENCING ACTIVITY ON SOVEREIGNTY LANDS OR OTHER STATE-OWNED LANDS.

13. THE PERMITTEE MUST OBTAIN A WATER USE PERMIT PRIOR TO CONSTRUCTION DEWATERING, UNLESS THE WORK QUALIFIES FOR A GENERAL PERMIT PURSUANT TO SUBSECTION 40E-20.302(4), F.A.C., ALSO KNOWN AS THE "NO NOTICE" RULE.

14. THE PERMITTEE SHALL HOLD AND SAVE THE DISTRICT HARMLESS FROM ANY AND ALL DAMAGES, CLAIMS, OR LIABILITIES WHICH MAY ARISE BY REASON OF THE CONSTRUCTION, ALTERATION, OPERATION, MAINTENANCE, REMOVAL, ABANDONMENT OR USE OF ANY SYSTEM AUTHORIZED BY THE PERMIT.

15. ANY DELINEATION OF THE EXTENT OF A WETLAND OR OTHER SURFACE WATER SUBMITTED AS PART OF THE PERMIT APPLICATION, INCLUDING PLANS OR OTHER SUPPORTING DOCUMENTATION, SHALL NOT BE CONSIDERED BINDING UNLESS A SPECIFIC CONDITION OF THIS PERMIT OR A FORMAL DETERMINATION UNDER SECTION 373.421(2), F.S., PROVIDES OTHERWISE.

16. THE PERMITTEE SHALL NOTIFY THE DISTRICT IN WRITING WITHIN 30 DAYS OF ANY SALE, CONVEYANCE, OR OTHER TRANSFER OF OWNERSHIP OR CONTROL OF A PERMITTED SYSTEM OR THE REAL PROPERTY ON WHICH THE PERMITTED SYSTEM IS LOCATED.  ALL TRANSFERS OF OWNERSHIP OR TRANSFERS OF A PERMIT ARE SUBJECT TO THE REQUIREMENTS OF RULES 40E-1.6105 AND 40E-1.6107, F.A.C. THE PERMITTEE TRANSFERRING THE PERMIT SHALL REMAIN LIABLE FOR CORRECTIVE ACTIONS THAT MAY BE REQUIRED AS A RESULT OF ANY VIOLATIONS PRIOR TO THE SALE, CONVEYANCE OR OTHER TRANSFER OF THE SYSTEM.

17. UPON REASONABLE NOTICE TO THE PERMITTEE, DISTRICT AUTHORIZED STAFF WITH PROPER IDENTIFICATION SHALL HAVE PERMISSION TO ENTER, INSPECT, SAMPLE AND TEST THE SYSTEM TO INSURE CONFORMITY WITH THE PLANS AND SPECIFICATIONS APPROVED BY THE PERMIT.

18. IF HISTORICAL OR ARCHAEOLOGICAL ARTIFACTS ARE DISCOVERED AT ANY TIME ON THE PROJECT SITE, THE PERMITTEE SHALL IMMEDIATELY NOTIFY THE APPROPRIATE DISTRICT SERVICE CENTER.

19. THE PERMITTEE SHALL IMMEDIATELY NOTIFY THE DISTRICT IN WRITING OF ANY PREVIOUSLY SUBMITTED INFORMATION THAT IS LATER DISCOVERED TO BE INACCURATE.

10. SHOULD ANY OTHER REGULATORY AGENCY REQUIRE CHANGES TO THE PERMITTED SYSTEM, THE PERMITTEE SHALL NOTIFY THE DISTRICT IN WRITING OF THE CHANGES PRIOR TO IMPLEMENTATION SO THAT A DETERMINATION CAN BE MADE WHETHER A PERMIT MODIFICATION IS REQUIRED.

11. THIS PERMIT DOES NOT ELIMINATE THE NECESSITY TO OBTAIN ANY REQUIRED FEDERAL, STATE, LOCAL AND SPECIAL DISTRICT AUTHORIZATIONS PRIOR TO THE START OF ANY ACTIVITY APPROVED BY THIS PERMIT. THIS PERMIT DOES NOT CONVEY TO THE PERMITTEE OR CREATE IN THE PERMITTEE ANY PROPERTY RIGHT, OR ANY INTEREST IN REAL PROPERTY, NOR DOES IT AUTHORIZE ANY ENTRANCE UPON OR ACTIVITIES ON PROPERTY WHICH IS NOT OWNED OR CONTROLLED BY THE PERMITTEE, OR CONVEY ANY RIGHTS OR PRIVILEGES OTHER THAN THOSE SPECIFIED IN THE PERMIT AND CHAPTER 40E-4 OR CHAPTER 40E-40, F.A.C.

12. THE PERMITTEE IS HEREBY ADVISED THAT SECTION 253.77, F.S. STATES THAT A PERSON MAY NOT COMMENCE ANY EXCAVATION, CONSTRUCTION, OR OTHER ACTIVITY INVOLVING THE USE OF SOVEREIGN OR OTHER LANDS OF THE STATE, THE TITLE TO WHICH IS VESTED IN THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND WITHOUT OBTAINING THE REQUIRED LEASE, LICENSE, EASEMENT, OR OTHER FORM OF CONSENT AUTHORIZING THE PROPOSED USE. THEREFORE, THE PERMITTEE IS RESPONSIBLE FOR OBTAINING ANY NECESSARY AUTHORIZATIONS FROM THE BOARD OF TRUSTEES PRIOR TO COMMENCING ACTIVITY ON SOVEREIGNTY LANDS OR OTHER STATE-OWNED LANDS.

13. THE PERMITTEE MUST OBTAIN A WATER USE PERMIT PRIOR TO CONSTRUCTION DEWATERING, UNLESS THE WORK QUALIFIES FOR A GENERAL PERMIT PURSUANT TO SUBSECTION 40E-20.302(4), F.A.C., ALSO KNOWN AS THE "NO NOTICE" RULE.

14. THE PERMITTEE SHALL HOLD AND SAVE THE DISTRICT HARMLESS FROM ANY AND ALL DAMAGES, CLAIMS, OR LIABILITIES WHICH MAY ARISE BY REASON OF THE CONSTRUCTION, ALTERATION, OPERATION, MAINTENANCE, REMOVAL, ABANDONMENT OR USE OF ANY SYSTEM AUTHORIZED BY THE PERMIT.

15. ANY DELINEATION OF THE EXTENT OF A WETLAND OR OTHER SURFACE WATER SUBMITTED AS PART OF THE PERMIT APPLICATION, INCLUDING PLANS OR OTHER SUPPORTING DOCUMENTATION, SHALL NOT BE CONSIDERED BINDING UNLESS A SPECIFIC CONDITION OF THIS PERMIT OR A FORMAL DETERMINATION UNDER SECTION 373.421(2), F.S., PROVIDES OTHERWISE.

16. THE PERMITTEE SHALL NOTIFY THE DISTRICT IN WRITING WITHIN 30 DAYS OF ANY SALE, CONVEYANCE, OR OTHER TRANSFER OF OWNERSHIP OR CONTROL OF A PERMITTED SYSTEM OR THE REAL PROPERTY ON WHICH THE PERMITTED SYSTEM IS LOCATED. ALL TRANSFERS OF OWNERSHIP OR TRANSFERS OF A PERMIT ARE SUBJECT TO THE REQUIREMENTS OF RULES 40E-1.6105 AND 40E-1.6107, F.A.C. THE PERMITTEE TRANSFERRING THE PERMIT SHALL REMAIN LIABLE FOR CORRECTIVE ACTIONS THAT MAY BE REQUIRED AS A RESULT OF ANY VIOLATIONS PRIOR TO THE SALE, CONVEYANCE OR OTHER TRANSFER OF THE SYSTEM.

17. UPON REASONABLE NOTICE TO THE PERMITTEE, DISTRICT AUTHORIZED STAFF WITH PROPER IDENTIFICATION SHALL HAVE PERMISSION TO ENTER, INSPECT, SAMPLE AND TEST THE SYSTEM TO INSURE CONFORMITY WITH THE PLANS AND SPECIFICATIONS APPROVED BY THE PERMIT.

18. IF HISTORICAL OR ARCHAEOLOGICAL ARTIFACTS ARE DISCOVERED AT ANY TIME ON THE PROJECT SITE, THE PERMITTEE SHALL IMMEDIATELY NOTIFY THE APPROPRIATE DISTRICT SERVICE CENTER.

19. THE PERMITTEE SHALL IMMEDIATELY NOTIFY THE DISTRICT IN WRITING OF ANY PREVIOUSLY SUBMITTED INFORMATION THAT IS LATER DISCOVERED TO BE INACCURATE.



## SPECIAL CONDITIONS

1. MINIMUM BUILDING FLOOR ELEVATION: 14 FEET NGVD.

2. MINIMUM ROAD CROWN ELEVATION: 10.5 FEET NGVD.

3. DISCHARGE FACILITIES:   TOTAL ON-SITE RETENTION.

4. THE PERMITTEE SHALL BE RESPONSIBLE FOR THE CORRECTION OF ANY EROSION, SHOALING OR WATER QUALITY PROBLEMS THAT RESULT FROM THE CONSTRUCTION OR OPERATION OF THE SURFACE WATER MANAGEMENT SYSTEM.

5. MEASURES SHALL BE TAKEN DURING CONSTRUCTION TO INSURE THAT SEDIMENTATION AND/OR TURBIDITY PROBLEMS ARE NOT CREATED IN THE RECEIVING WATER.

6. THE DISTRICT RESERVES THE RIGHT TO REQUIRE THAT ADDITIONAL WATER QUALITY TREATMENT METHODS BE INCORPORATED INTO THE DRAINAGE SYSTEM IF SUCH MEASURES ARE SHOWN TO BE NECESSARY.

7. LAKE SIDE SLOPES SHALL BE NO STEEPER THAN 4:1 (HORIZONTAL:VERTICAL) TO A DEPTH OF TWO FEET BELOW THE CONTROL ELEVATION.  SIDE SLOPES SHALL BE NURTURED OR PLANTED FROM 2 FEET BELOW TO 1 FOOT ABOVE CONTROL ELEVATION TO INSURE VEGETATIVE GROWTH.

8. FACILITIES OTHER THAN THOSE STATED HEREIN SHALL NOT BE CONSTRUCTED WITHOUT AN APPROVED MODIFICATION OF THIS PERMIT.

9. OPERATION OF THE SURFACE WATER MANAGEMENT SYSTEM SHALL BE THE RESPONSIBILITY OF THE PERMITTEE.  PRIOR TO TRANSFER OF TITLE FOR ANY PORTION OF THE PROJECT TO A THIRD PARTY, MODIFICATION OF THE PERMIT WILL BE REQUIRED.

10. ANY PARTITIONING OF THIS PROPERTY OR SALE TO A THIRD PARTY SHALL REQUIRE THE FORMATION OF A PROPERTY OWNERS ASSOCIATION AND SUBMITTAL OF THE DOCUMENTS TO THE DISTRICT FOR REVIEW AND APPROVAL.  ALSO, EACH PARCEL SHALL BE REQUIRED TO PROVIDE FULL WATER QUALITY ON-SITE.

11. A GENERAL PERMIT MODIFICATION SHALL BE REQUIRED PRIOR TO CONSTRUCTION OF ANY OF THE OUT PARCELS.



# LOCATION MAP
### NTS

# EXHIBIT 1

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 113 of 429



EXHIBIT 2

EXHIBIT 3

PALMETTO ROAD

NOT IN CONTRACT

MATCHLINE A-A SEE SHEET 5 OF 16

NORTHLAKE BLVD.

NORTHLAKE PROMENADE SHOPPES
PALM BEACH COUNTY, FLORIDA

PAVING GRADING & DRAINAGE PLAN (WEST)

NORTHLAKE EQUITIES, INC.

1031
PGD



EXHIBIT "4"

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 116 of 429

# EXHIBIT 5



Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 117 of 429

# EXHIBIT i6



NORTHLAKE PROMENADE SHOPPES
PALM BEACH COUNTY, FLORIDA
TYPICAL SECTIONS

NORTHLAKE EQUITIES, INC.

CV Consultants, Inc.

SHEET 1031
12

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 118 of 429

# EXHIBIT 7.



 

PROJECT: NORTHLAKE PROMENADE SHOPPES

PERMIT SUMMARY SHEET

**APPLICATION NUMBER:** 990113-13
**LOCATION:** PALM BEACH COUNTY, S21/T42S/R43E

**OWNER:** NORTHLAKE EQUITIES INC & TWIN CITIES DEVEL INC

**ENGINEER:** LOUIS R CAMPANILE JR PA

**PROJECT AREA:**    28.96 ACRES    **DRAINAGE AREA:**    28.96 ACRES

**PROJECT USE:** COMMERCIAL

**FACILITIES:**

1. EXISTING: The existing site was previously developed as part of the Twin City Mall. Portions of the site are paved and there is an existing building on the northwest corner to be removed. Runoff historically sheetflowed into the Northlake Boulevard and U.S. Hwy. 1 systems.

2. PROPOSED: Proposed is the construction and operation of a surface water management system to serve 28.96 acres of commercial development known as Northlake Promenade Shoppes. The surface water management system shall consist of inlets, culverts, dry retention and exfiltration trench. No outfall is proposed for the site, the design storm will be retained within the site boundaries.

   The existing outparcel south of Eckerd's on the west side of U.S. Hwy. 1, which was previously permitted under 50-03618-P, will be incorporated into the proposed drainage system. The existing outparcel to the west of Eckerd's on Northlake Boulevard will remain part of the previously permitted system.

   The project is owned jointly by Northlake Developers, Inc. and Twin Cities Developers, Inc. The proposed water quality system is exfiltration trench to be maintained by the permittee. Should this property be sold or partitioned, a property owners association must be formed and each parcel must provide full water quality.

**PROJECT LEVEL:**

**DRAINAGE BASIN:** INTRACOASTAL

**RECEIVING BODY:** ON SITE RETENTION

**LOCAL ROAD CRITERIA:** 10YR-1DAY STORM

Exhibit Ba

APPLICATION NUMBER: 990113-13
LOCATION: PALM BEACH COUNTY. S21/T42S/R43E

BASIN DESIGN FREQUENCY: 25YR-3DAY STORM

WATER QUALITY:

Water quality will be provided by retention of 2.5"x %impervious in the
exfiltration trench and the proposed dry detention area prior to discharge to
the proposed lakes.  The proposed lakes are for asthetic value and flood
attenuation only.

Any partitioning of this property by sale to third parties will require the
  formation of a property owners association and submittal of these documents to
the District.  Also. each parcel will be required to provide full water quality
on-site.

| Basin | Method | Vol Req'd. (ac-ft) | Vol Prov'd (ac-ft) |
|-------|--------|--------------------|--------------------|
| SITE  | 1482 LF EXFILTRATION TRENCH | 2.97 | 2.97 |
| SITE  | .2 acres DRY DETENTION | | |

ENVIRONMENTAL ASSESSMENT:

PROJECT SITE DESCRIPTION:

The project site consists of an existing shopping center   There are no
wetlands on the site.

ENVIRONMENTAL SUMMARY:

The applicant is proposing to demolish an existing shopping center in order to
construct a new shopping center and a surface water management system.  There
are no wetlands on the project site.  Therefore. no adverse impacts to
wetlands are anticipated as a result of construction proposed in this
application.

The proposed activities have been evaluated for potential secondary and
cumulative impacts and to determine if the project is contrary to the public
interest.  Based upon the proposed project design. the District has determined
that the project will not cause adverse secondary or cumulative impacts to the
water resources and is not contrary to the public interest.

EXHIBIT 8b

APPLICATION NUMBER: 990113-13
LOCATION: PALM BEACH COUNTY, S21/T42S/R43E

APPLICABLE LAND USE:

The following Land Use Table is an acreage breakdown of the proposed development.

|  | TOTAL PROJECT | PREVIOUSLY PERMITTED | THIS PHASE |  |
|---|---|---|---|---|
| TOTAL ACRES | 28.96 |  | 28.96 | acres |
| WTRM ACREAGE | .94 |  | .94 | acres |
| PAVEMENT | 15.85 |  | 15.85 | acres |
| BUILD COVERAGE | 4.42 |  | 4.42 | acres |
| PERVIOUS | 7.75 |  | 7.75 | acres |

BASIN LEVEL BREAKDOWN AND FLOOD PROTECTION:

Basin Name: SITE

FLOOD PROTECTION:

LOCAL ROAD CRITERIA
FLOOD CONTOUR          10.31 FEET NGVD
MINIMUM ROAD GRADE   10.50 FEET NGVD
100 YEAR FLOOD
FLOOD CONTOUR                   13.16 FEET NGVD
MINIMUM FLOOR ELEVATION   14.00 FEET NGVD
FEMA FLOOD ELEVATION              FEET NGVD

DIVISIONAL APPROVAL:

NATURAL RESOURCE MANAGEMENT

_Donald L. Medellin_                           DATE: 6/2/99
Donald L. Medellin

SURFACE WATER MANAGEMENT

_Maria Clemente_                              DATE: 6/1/99
Maria C. Clemente, P.E.

Exhibit 8a



## STAFF REPORT DISTRIBUTION LIST

NORTHLAKE PROMENADE SHOPPES
APPLICATION NUMBER: 990113-13
PERMIT MODIFICATION NUMBER: 50-04324-P

### INTERNAL DISTRIBUTION

Reviewer:
X Julia M. Lacy, P.E.
X Kristina K. Serbesoff
X Donald L. Medellin
X Maria C. Clemente, P.E.
  J. Giddings - LEC
  J. Golden - REG
X J. Gronborg - REG
  F. Lund - LEC
  R. Robbins - NRM
X P. Walker - GPA
  A. Waterhouse - REG
X P. Bell - LEG
  Enforcement
X Environmental PPC Reviewer
X Environmental Resource Compliance
X Permit File

### DEPT. OF ENVIRONMENTAL PROTECTION

### EXTERNAL DISTRIBUTION

X Applicant:
NORTHLAKE EQUITIES INC & TWIN CITIES
DEVEL INC

X Applicant's Consultant
LOUIS R CAMPANILE JR PA

X Engineer, County of:
PALM BEACH

X Engineer, City of:
North Palm Beach/Lake Park

Local Drainage District:

### COUNTY
X Palm Beach -Building Division
          -Environmental Res Mgmt.
          -Health Dept.
          -Land Development Div.
          -School Brd., Growth Mgt.

### BUILDING AND ZONING

### OTHER
X David Sinclair
  F.G.F.W.F.C.
  FDEP
  Florida Audubon - Charles Lee
  Mr. Ed Dailey, President

EXHIBIT 9

From: Yash Nagal
To: Alec Dickerson
Cc: George Gentile; Ira Dengleben X.; Brooke Petere; Bruce Gupton A.; Elijah Brown
Subject: RE: Concurrency Letter
Date: Wednesday, October 4, 2023 5:16:41 PM
Attachments: Image002.png
Image002.png

Hi Alec,

My apologies for the delay. We would be requesting a bus shelter 60 feet south of the NE corner of Parcel 3. Thanks.



Yash Nagal, PMP
Director Of Transit Planning
Tel: 561 841-4238
ynagal@pbcgov.org
http://www.palmtran.org

From: Alec Dickerson [mailto:alec@2gho.com]
Sent: Wednesday, October 4, 2023 9:26 AM
To: Yash Nagal <cYNagal@pbcgov.org>
Cc: George Gentile <george@2gho.com>
Subject: RE: Concurrency Letter

**This Message Is From an External Sender**
This message came from outside your organization.

Hi Yash –

I wanted to follow up on the email below.
Please advise.

Thanks,
**Alec Dickerson**
Senior Planner
Office# 561-575-9557 x104
Alec@2gho.com
www.2gho.com [2gho.com]



Landscape Architects ■ Planners ■ Environmental Consultants
1907 Commerce Lane, Suite 101 | Jupiter, Florida 33458 | 561-575-9557 | 561-575-5260 Fax | www.2gho.com [2gho.com]

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

All attached drawings, specifications and other documents, including those in electronic form, prepared by the consultant and the Consultants Sub-consultants are Instruments of Service for use exclusively to this Project. The Consultant and the Consultants Sub-consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights.

From: Alec Dickerson
Sent: Monday, October 2, 2023 1:11 PM
To: ynagel@pbcgov.org
Cc: George Gentile <george@2gho.com>
Subject: Concurrency Letter

Hi Yash –

I hope you are well.
The Village of North Palm is requesting that Palm Tran send us a letter for our proposed Master Plan stating that you all have reviewed, and determined that there is either a need (or no need) for the placement of a bus shelter, along our project frontage.
I have attached the proposed Master Plan as reference, as well as a letter request.

If this letter, should be addressed to someone else at Palm Tran, please let me know the contact info, and we will get it routed accordingly.

Thank you for your time.

**Thanks,**
**Alec Dickerson**
Senior Planner
Office# 561-575-9557 x104
Alec@2gho.com
www.2gho.com [2gho.com]



Landscape Architects ■ Planners ■ Environmental Consultants
1907 Commerce Lane, Suite 101 | Jupiter, Florida 33458 | 561-575-9557 | 561-575-5280 Fax | www.2gho.com [2gho.com]

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

All attached drawings, specifications and other documents, including those in electronic form, prepared by the consultant and the Consultants Sub-consultants are Instruments of Service for use exclusively to this Project. The Consultant and the Consultants Sub-consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights.

Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing.

ADDITIONAL DOCUMENTS
RECEIVED MAY 3, 2024



Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 126 of
429

VILLAGE
NORTH PALM BEACH
MAY 3 2024
COMMUNITY DEVELOPMENT
RECEIVED

U.S. Highway One

Parking
Below

Palmetto Drive

■ Residential, Retail & Hotel Use

□ Multi-Level Parking Areas

■ Open Space & Pedestrian Areas



LANDSCAPE ARCHITECTURE
& PLANNING

# Village Place
## Building & Parking Exhibit



NORTH
5/2/24

ORDINANCE NO. 2025-06

EXHIBIT

Exhibit "B"
Legal Description



**JOSEPH ABRUZZO**

# RECEIPT

5786995

CLERK OF THE CIRCUIT COURT & COMPTROLLER

PALM BEACH COUNTY, FLORIDA

Printed On:
05/13/2025 02:36
Page 1 of 1

| Receipt Number: 5786995 - Date 05/13/2025  Time 2:36PM | | | |
|---|---|---|---|
| **Received of:** | Bartlett, Loeb, Hinds Thompson<br>100 North Tampa Street<br>Tampa, FL 33602 | | |
| **Cashier Name:** ADMIN | | **Balance Owed:** | 411.00 |
| **Cashier Location:** E-Filing | | **Total Amount Paid:** | 411.00 |
| **Receipt ID:** 12233331 | | **Remaining Balance:** | 0.00 |
| **Division:** AK: Circuit Civil Central - AK(Civil) | | | |

| Case# 50-2025-CA-004670-XXXA-MB -- PLAINTIFF/PETITIONER: NP DEVLAND HOLDINGS LLC | | | |
|---|---|---|---|
| **Item** | **Balance** | **Paid** | **Bal Remaining** |
| Fees | 411.00 | 411.00 | 0.00 |
| **Case Total** | **411.00** | **411.00** | **0.00** |

| Payments | | |
|---|---|---|
| **Type** | **Ref#** | **Amount** |
| EFiling_ACH | 14993349 | **411.00** |
| **Total Received** | | **411.00** |
| **Total Paid** | | **411.00** |

**How was your service today?**  Please visit www.mypalmbeachclerk.com/survey or send your feedback to clerkweb@mypalmbeachclerk.com.
**For office locations and information about Clerk & Comptroller services:**
Visit www.mypalmbeachclerk.com or call (561) 355-2996.

Filing # 223063426 E-Filed 05/14/2025 07:02:03 AM

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AK"
CASE NO.: 502025CA004670XXXAMB

NP DEVLAND HOLDINGS LLC,
NP DEVLAND NORTH LLC,
NP DEVLAND EAST LLC,
    Plaintiff/Petitioners
vs.
VILLAGE OF NORTH PALM BEACH FLORIDA,
    Defendant/Respondent.
_____/

## UNIFORM DIFFERENTIATED CASE MANAGEMENT ORDER
## AND ORDER SETTING TRIAL
(DCMSNT)

    **THIS MATTER** is a Circuit Civil case calling for a non-jury trial (or streamlined jury by stipulation or court order). Pursuant to Fla. R. Gen. Prac. & Jud. Admin. 2.250(a)(1)(B) and 2.545(b), and Fifteenth Judicial Circuit Administrative Order 3.110 (as amended), **Plaintiff/Petitioner is directed to serve this Order upon each Defendant/Respondent with the initial Complaint/Petition and Summons**.

    It is hereby **ORDERED AND ADJUDGED** that this case is designated to the **STREAMLINED TRACK** for time to disposition. The deadlines and procedures set forth in this Order will be strictly enforced unless changed by court order.

Consistent with the Professionalism Expectations of the Florida Supreme Court and the Florida Bar, the parties and counsel are expected to govern themselves at all times with a spirit of cooperation, professionalism and civility. They are expected to accommodate each other whenever reasonably possible and eliminate disputes by reasonable agreements. Self-Represented/*Pro Se* Litigants (i.e., those without counsel) are held to the same procedural and legal obligations as are imposed upon counsel.

## I. SCHEDULING

### A. Calendar Call

    **YOU MUST APPEAR FOR A MANDATORY CALENDAR CALL on July 24, 2026 at 9:00 am**. The parties must be ready to try the case by that date. The actual trial period begins on the docket associated with this Calendar Call date as provided in Divisional Instructions or by court order.

    Calendar Call may be conducted in person, via Zoom or by e-calendar. All parties are instructed to review the Court's Divisional Instructions for specific procedures at www.15thcircuit.com/divisions.

Page **1** of **11**

Case No. 50-2025-CA-004670-XXXA-MB

At the Calendar Call, the Court may conduct a final case management conference. Attorneys who appear for Calendar Call must be prepared on all pending matters and have authority to make representations to the Court and enter into binding agreements concerning motions, issues, and scheduling. These include issues raised by the parties' Pre-Trial Stipulation; trial procedures; jury selection procedures; jury instructions and objections; and the need for any special equipment, courtroom facilities, or interpreters. An appearing attorney must be prepared to advise the Court of all attorneys' availability for trial and future hearings as necessary.

**This Order serves as notice to the parties that failure to attend Calendar Call will result in an Order of Dismissal without prejudice, or entry of default, without further notice or hearing.** *See* **Fla. R. Civ. P. 1.200(j)(6).**

B. **Case Management Deadlines**

The following deadlines strictly apply unless otherwise modified by the Court:

| | EVENTS | COMPLETION DEADLINE |
|---|---|---|
| 1. | Service of Complaint | September 9, 2025; service under extension is only by court order. |
| 2. | Answer and/or initial motions/objections directed to the pleadings (i.e. to dismiss or strike) | 20 days after service |
| 3. | Initial Discovery Disclosures | 60 days after service |
| 4. | Amendment of pleadings/Adding parties | October 19, 2025 |
| 5. | Resolution of all motions/ objections directed to the pleadings and pleadings closed | November 8, 2025 |
| 6. | Disclosure of Expert Witness(es) | March 26, 2026 |
| 7. | Disclosure of Rebuttal Experts | April 15, 2026 |
| 8. | Inspections, Expert Witness Depositions and Compulsory Examinations completed | May 5, 2026 |
| 9. | File Witness & Exhibit Lists | May 25, 2026 |
| 10. | Completion of Discovery relating to Summary Judgment and *Daubert* Motions | May 5, 2026 |
| 11. | File and Serve Motion(s) for Summary Judgment and *Daubert* Motions | May 15, 2026 |
| 12. | File Rebuttal Witness Lists | June 4, 2026 |
| 13. | Completion of All Discovery | June 14, 2026 |
| 14. | Pre-Trial Meet & Confer | June 24, 2026 |
| 15. | File all Pre-Trial Motions (i.e. Motions in Limine) | June 24, 2026 |
| 16. | Deadline for Mediation | July 14, 2026 |
| 17. | Deposition Designations | July 14, 2026 |

Case No. 50-2025-CA-004670-XXXA-MB

| 18. | File Joint Pre-Trial Stipulation | July 14, 2026 |
|---|---|---|
| 19. | Deadline to hear ALL Motions | July 19, 2026 |
| 20. | Jury Instructions and Verdict Form | July 21, 2026 |
| 21. | Calendar Call/Trial Ready Date | July 24, 2026 |
| 22. | Trial Period | Begins on the docket associated with the above Calendar Call date, as provided in Divisional Instructions or by court order. |

**Note: If the above deadlines fall on a weekend or holiday, please refer to Fla. R. Gen. Prac. & Jud. Admin. 2.514.**

The parties are expected to actively manage the case and to confer early and often to ensure compliance with the Florida Rules of Civil Procedure and this order in timely resolving this case. **The parties are encouraged to file, meet, and make disclosures prior to the deadlines imposed above, in order to ensure compliance with the Rules requiring timely disposition of cases**.

The Court may, at any time, modify this Order by entry of: 1) an Amended Trial Order, 2) an Amended Case Management Order; or 3) any other Order intended to establish a modified case resolution schedule, any of which shall supersede the deadlines set forth in this Order. The Court reserves the authority to expedite the trial setting and amend pretrial deadlines accordingly. The Court further retains its discretion to modify any provision herein.

C. **Motions**

Unless court approval is required to set a particular motion for hearing, the parties must expeditiously set all contested motions for hearing. All non-dispositive motions, including motions directed to the pleadings, must be scheduled for hearing within **five (5) days** of filing. Parties shall schedule the hearing for the first vacancy on the Court's docket when all parties are available. **Failure to schedule a hearing within five (5) days may result in the Court deeming the motion(s) abandoned without further notice or hearing**.

The moving party shall be the party responsible for securing the presence of a court reporter. The moving party shall advise all parties in writing in advance of the hearing or trial of the arrangements made, if any, for the presence of a court reporter, or shall advise all parties in advance of the hearing or trial that the moving party has chosen not to obtain a court reporter.

Before filing a non-dispositive motion, the movant must follow Rule 1.202 and Local Rule 4. Failure to comply with the requirements of Rule 1.202 and Local Rule 4 may result in sanctions against the non-compliant party.

The requirements of Rule 1.202 do not apply when the movant or the nonmovant is

Page **3** of **11**

unrepresented by counsel (*pro se*).

D. **Extensions, Modifications and Continuances**

**Extensions of Deadlines Other than Trial/Calendar Call: All motions to extend deadlines must be filed prior to the deadline.** Untimely motions will be denied absent compelling circumstances and a showing of good cause.

The parties must strictly follow Rule 1.200(e) and Administrative Order 3.110 (as amended) when filing motions for extension or modification. If the parties agree, and the extension will not prevent the case from being trial ready by the original Calendar Call date, the parties may file a motion and submit for the Court's consideration an agreed order or proposed Amended DCMO, as applicable under Rule 1.200(e)(1). The motion shall identify which deadlines are requested to be extended and the basis for the request. Each agreed order or Amended DCMO must contain agreed-upon dates for all remaining deadlines and confirm that the Calendar Call date remains as previously set. The Court will accept the amendment or direct the parties to set a DCM Conference. **Agreements to extend the dates for the filing of Summary Judgment and *Daubert* motions, and for completion of discovery, must be set for hearing, and the parties must be prepared to address how the proposed extension will not affect the Calendar Call date.**

**Motions to Continue Trial:** Motions to continue trial must strictly comply with Rule 1.460. **Motions to continue are disfavored and will rarely be granted and then only upon good cause shown. Successive continuances are highly disfavored. Lack of due diligence in preparing for trial is not grounds to continue the case**. Failure to timely complete discovery and/or file a motion for summary judgment shall not be grounds to continue the trial.

E. **DCM Conferences**

If any party is unable to meet the deadlines set forth in this Order for any reason, including unavailability of hearing time, the affected party must promptly set a DCM conference as described in Administrative Order 3.110 (as amended), identifying the hearing time requested and the pending motion(s). DCM conferences shall be scheduled through online scheduling (OLS) on either the Court's: 1) DCM - Case Management Conference docket; or 2) Uniform Motion Calendar, in accordance with Divisional Instructions.

II. **UNIFORM PRE-TRIAL PROCEDURE**

A. TIMELY SERVICE AND DEFAULTS

Parties must make reasonable efforts to ensure speedy service. Each return of service must be separately filed for each defendant. If service is not completed within ninety (90) days, an Order will be issued directing service by the **ONE-HUNDRED TWENTY (120) DAY DEADLINE**. Failure to comply will result in dismissal of the

case or party for lack of service. Any motions to extend the deadline for service must specify why service could not have been effectuated, what has and is being done to effectuate service and request only that amount of additional time necessary.

If all defendants become defaulted, a Motion for Default Final Judgment along with supporting documentation must be filed within **thirty (30) days** of the last default and set for hearing at the next available hearing time.

B.  INITIAL DISCLOSURES

Within **sixty (60) days after service** on a defendant, and except as exempted by Rule 1.280(a)(2) or as ordered by the court, each party must, without awaiting a discovery request, provide to the other parties initial discovery disclosures in compliance with Rule 1.280(a), unless privileged or protected from disclosure.

C.  EXHIBITS AND WITNESSES

No later than **sixty (60) days before Calendar Call**, each party shall file and exchange lists of all trial exhibits, names, and addresses of all trial witnesses. Each party's witness list must include a brief description of the substance and scope of the testimony to be elicited from each witness. Both sides must cooperate in the scheduling of all witness depositions.

Each party's exhibit list shall include each exhibit separately numbered and identified. Generic or prospective designations are not allowed (e.g. insurer's file, documents to be produced, etc.). Each party shall provide for a reasonable time and place for the other parties to review and copy the exhibits.

D.  EXPERT WITNESS DISCLOSURES

In addition to the names and addresses of each expert retained to formulate an expert opinion, as well as any hybrid fact/expert witnesses, no later than **one-hundred and twenty (120) days before Calendar Call**, the parties must provide:

1. The subject matter about which the expert will testify;
2. The opinions to which the expert will testify;
3. A summary of the grounds and facts for each opinion; and
4. A copy of the expert's curriculum vitae.

**Each expert will be limited to testifying only about those matters which have been fully disclosed.**

Parties shall furnish opposing counsel with two (2) alternative dates of availability of all expert witnesses for the purpose of taking their deposition. All parties shall cooperate in the scheduling of expert depositions.

The parties shall also provide answers to standard form expert interrogatories. All reports or other data compiled by each disclosed expert which are intended to be used by the expert and/or referred to during his/her deposition testimony shall be provided electronically to all opposing parties at least 72 hours prior to the date of the scheduled deposition.

**Rebuttal/Responsive Experts**

No later than **one-hundred (100) days before Calendar Call**, the parties shall provide opposing counsel with a written list with the names and addresses of all rebuttal/responsive expert witnesses intended to be called at trial and only those rebuttal/responsive expert witnesses listed shall be permitted to testify. The parties shall also furnish opposing counsel with expert reports or summaries of all rebuttal/responsive expert witnesses' anticipated testimony to the same extent as the expert disclosure requirement above.

Within **twenty (20) days** following this disclosure, the parties shall make their rebuttal/responsive experts available for deposition. The experts' depositions may be conducted without further court order.

E.  REBUTTAL FACT WITNESSES AND EXHIBITS

No later than **fifty (50) days before Calendar Call**, the parties must file and exchange lists of names and addresses of all rebuttal fact witnesses and lists of any rebuttal exhibits.

F.  ADDITIONAL EXHIBITS, WITNESSES OR OBJECTIONS

At trial, the parties will be strictly limited to exhibits and witnesses previously disclosed absent agreement of the parties or order of the Court upon good cause shown. A party desiring to use an exhibit or witness discovered after counsel have conferred must immediately furnish the Court and other counsel with a description of the exhibit or with the witness' name and address and the expected subject matter of the witness' testimony, together with the reason for the late discovery of the exhibit or witness. Failure to reserve objections constitutes a waiver. Use of the exhibit or witness may be allowed by the Court for good cause shown.

G.  DEPOSITION DESIGNATIONS

No later than **ten (10) days prior to Calendar Call**, each party must serve deposition designations, or portions of depositions, each intends to offer as testimony. No later than **eight (8) days prior to Calendar Call**, each opposing party is to serve any counter (or "fairness") designations, together with objections to the depositions, or portions thereof, originally designated. No later than **five (5) days before Calendar Call**, each party must serve any objections to counter-designations served by an opposing party.

Case No. 50-2025-CA-004670-XXXA-MB

H.   DISCOVERY COMPLETION

All discovery relating to Summary Judgment and *Daubert* motions must be completed no later than **eighty (80) days prior to Calendar Call**.

All discovery must be completed no later than **forty (40) days prior to Calendar Call**.

Rulings as to admission on late discovery will be made on a case by case basis. Absent unforeseeable, exigent circumstances, the failure to complete discovery is not grounds for a continuance.

I.   COUNSEL MEETING AND PRE-TRIAL STIPULATION

Counsel or the parties, if not represented by counsel, shall meet in person at a mutually convenient time and place no later than **thirty (30) days before Calendar Call** to discuss settlement, simplify the issues, and stipulate to as many facts and issues as possible, and prepare a Pre-Trial Stipulation in accordance with this paragraph.

It shall be the duty of Plaintiff's counsel to see that the Pre-Trial Stipulation is drawn, executed by counsel for all parties, and filed with the Clerk no later than **ten (10) days prior to Calendar Call. UNILATERAL PRE-TRIAL STIPULATIONS ARE DISALLOWED, UNLESS APPROVED BY THE COURT AFTER NOTICE AND HEARING**. If a party does not receive a substantive response to a proposed Pre-Trial Stipulation after good faith effort, such party shall file a unilateral Pre-Trial Stipulation with a certification of all efforts that were made to confer with the opposing party. Counsel for all parties are charged with good faith cooperation in preparing the Pre-Trial Stipulation, and the parties shall make exhibits available for inspection and copying. Failure to cooperate in preparing the Pre-Trial Stipulation may result in striking pleadings, witnesses, or exhibits.

The Pre-Trial Stipulation must contain the following in separately numbered paragraphs:

1.   Names and contact information of attorneys to try case.
2.   A list of all pending motions requiring action by the Court. **Motions not listed are deemed abandoned or waived**.
3.   A statement of estimated trial time, including the total number of trial days anticipated, and the time needed per side for (1) jury selection, (2) opening arguments, (3) each case in chief, and (4) closing arguments.
4.   **Statement of the Facts:** A concise statement of the facts in an impartial, easily understandable manner which may be read to the jury.
5.   **Statement Facts and Agreed Rules of Law:** A list of any stipulated facts requiring no proof at trial and any agreed rules of law.
6.   **Statements of Disputed Law & Fact:** A statement of disputed issues of law

and fact that are to be tried.

7. **Witness Lists:** Parties must attach their previously filed Witness Lists, including rebuttal or impeachment witnesses. If any party objects to any witness, such objections must be stated in the Stipulation, setting forth the grounds with specificity. At trial, all parties will be strictly limited to witnesses properly and timely disclosed. Only those witnesses listed by NAME will be permitted to testify at trial.

8. **Exhibit Lists:** Parties must attach their previously filed Exhibit Lists. All exhibits to be offered in evidence at trial must have been made available to opposing counsel for examination. Only those exhibits listed may be offered in evidence. If any party objects to the introduction of any such exhibit, such objection must be stated in the Pre-Trial Stipulation, setting forth the grounds with specificity. Demonstrative exhibits (e.g. PowerPoints, charts, enlargements of exhibits) to be used at a Jury Trial must be displayed to all counsel before being shown to the jury. All exhibits must be pre-marked and numbered consistent with Clerk guidelines.

9. **Jury Instructions:** Counsel must identify all agreed-upon standard jury instructions and all special instructions. Any objections or disputed jury instructions must be attached and identified as to the party that proposed the instruction [indicated in redline/track changes]. Copies of all agreed-upon instructions or disputed instructions must be attached to the Stipulation as one document, redlined as necessary, along with copies of supporting statutory citations and/or case law.

10. **Verdict Forms:** The jury verdict form must be attached and designated as agreed to or disputed.

11. **Peremptory Challenges:** State the number of peremptory challenges for each party.

12. Other agreements or issues for trial, if any.

Failure to file a Joint Pre-Trial Stipulation as provided above may result in Court-imposed sanctions, including dismissal or default without further notice of the Court.

J. <u>MOTIONS</u>

**Summary Judgment and *Daubert* Motions** must be filed at least **seventy (70) days before Calendar Call**. The parties shall confer regarding summary judgment motions to ensure discovery necessary for those motions is completed in advance of their filing.

**ALL MOTIONS** (including dispositive motions and motions in limine), deposition objections, and expert challenges must be filed, served and heard at least **five (5) days before Calendar Call**.

K. <u>PRE-MARKING EXHIBITS</u>

Prior to trial, each party is to mark for identification all exhibits in accordance with the guidelines of the Clerk of Court. Instructions and templates may be found at:

www.mypalmbeachclerk.com/departments/courts/evidence-guidelines/civil-evidence).

L. ENLARGED JURY PANELS

Local Rules require advance approval of the Chief Judge and Jury Office for jury panels exceeding 31 jurors. **To ensure enough jurors are available, requests for enlarged jury panels must be resolved at least six (6) months before Calendar Call**. Failure to timely request an enlarged panel may result in Court-ordered sanctions, including a limitation on peremptory challenges.

M. INTERPRETERS

Unless otherwise ordered by the Court, it shall be the responsibility of the party who needs the services of an interpreter, whether for a litigant or for a witness, to have a competent interpreter present in court.

N. JURY INSTRUCTIONS AND VERDICT FORM

A joint set of proposed jury instructions and a proposed verdict form must be provided to the court no less than **three (3) days before Calendar Call** in a printed form appropriate for submission to the jury and in Microsoft Word format.

If there is an objection to a proposed instruction, the instruction should be followed by the specific objection, a brief explanation, and a citation to legal authority. If an alternative or modified instruction is proposed, it should follow the instruction it is intended to replace.

O. UNIQUE QUESTIONS OF LAW

Prior to calendar call, counsel for the parties are directed to exchange and simultaneously submit to the Court appropriate memoranda with citations to legal authority in support of any unique legal questions that may reasonably be anticipated to arise during the trial.

III. **MEDIATION**

A. MEDIATION REQUIRED

1. All parties are required to participate in mediation.
2. The attendance of counsel who will try the case and representatives of each party with full authority to enter into a complete compromise and settlement is mandatory. If insurance is involved, an adjuster with authority up to the policy limits must attend.
3. At least one week prior to a scheduled mediation conference, all parties are to file with the mediator a brief, written summary of the case containing a list of issues as to each party.

4. All communications at the mediation conference are privileged consistent with Florida Statutes sections 44.102 and 90.408.

5. The mediator has no power to compel or enforce a settlement agreement. If a settlement is reached, it is a responsibility of the attorneys or parties to reduce the agreement to writing and to comply with Florida Rule of Civil Procedure 1.730(b), unless waived.

B. MEDIATION SCHEDULING

**The Plaintiff's attorney is responsible for scheduling mediation**. The parties should agree on a mediator. If they are unable to agree, any party may apply to the Court for appointment of a mediator in conformity with Rule 1.720 (j), Fla. R. Civ. P. The lead attorney or party must file and serve on all parties and the mediator a Notice of Mediation giving the time, place, and date of the mediation and the mediator's name.

C. COMPLETION OF MEDIATION BEFORE CALENDAR CALL

Completion of mediation prior to calendar call is a prerequisite to trial and must be completed no later than **ten (10) days prior to Calendar Call**. If mediation is not conducted, or if a party fails to participate in mediation, the Court may impose sanctions, including monetary sanctions, striking pleadings and witnesses, and dismissal or default without further notice of the Court.

D. OPPOSITION TO MEDIATION

Any party opposing mediation may proceed under Florida Rule of Civil Procedure 1.700(b).

IV. **NON-COMPLIANCE**

**NON-COMPLIANCE WITH ANY PORTION OF THIS ORDER MAY RESULT IN THE STRIKING OF THE PLEADINGS, WITNESSES, OR EXHIBITS, ENTRY OF DEFAULT OR DISMISSAL WITHOUT FURTHER NOTICE OF THE COURT, OR IMPOSITION OF SUCH OTHER SANCTIONS AS IS JUST AND PROPER.**

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida.

50-2025-CA-004670-XXXA-MB   05/14/2025
James Sherman   Judge

50-2025-CA-004670-XXXA-MB   05/14/2025
James Sherman
Judge

Case No. 50-2025-CA-004670-XXXA-MB

A copy of this Order has been furnished to the Plaintiff. The Plaintiff shall serve this Order to the Defendant(s) in compliance with Administrative Order 3.110 (amended).

# ADA NOTICE

This notice is provided pursuant to Administrative Order No. 2.207-7/22

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

Page **11** of **11**

Filing # 223065819 E-Filed 05/14/2025 08:19:05 AM

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

      Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant / Respondent.

_____/

Case No.:  25-CA-004670

## NOTICE OF COMPLIANCE WITH
## SECTION 86.091, FLORIDA STATUTES

THE UNDERSIGNED HEREBY GIVES NOTICE of compliance with Fla. R. Civ. P. 1.071, with respect to Plaintiffs' constitutional challenge to Village of North Palm Beach Ordinance 2025-06, set forth in Count II of Plaintiffs' Complaint in the captioned action. The undersigned complied with the Rule on May 14, 2025, by serving the Attorney General for the State of Florida with a copy of the Complaint challenging the constitutionality of Ordinance 2025-06 via (a) certified mail and (b) email at oag.civil.eserve@myfloridalegal.com, pursuant to the Attorney General's standing eservice instructions.

      DATED:     May 14, 2025.

                     /s/ Ethan J. Loeb
                     **ETHAN J. LOEB**
                     Florida Bar No. 0668338
                     EthanL@BLHTLaw.com
                     Eservice@BLHTLaw.com
                     KerriR@BLHTLaw.com
                     HeatherW@BLHTLaw.com

{00095215:1}

1

**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariC@BLHTLaw.com
**BARTLETT LOEB HINDS
THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

## RETURN OF SERVICE

State of Florida                County of Palm Beach          Circuit Court-Civil Division Court

Case Number: 502025CA004670XXXAMB DIV: AK

Plaintiff: **NP-DEVLAND HOLDINGS, LLC,**
**a Delaware limited liability company;**
**NP-DEVLAND NORTH, LLC,**
**a Delaware limited liability company; and**
**NP-DEVLAND EAST, LLC,**
**a Delaware limited liability company,**
vs.
Defendant: **VILLAGE OF NORTH PALM BEACH,**
**FLORIDA, a Florida municipal corporation,**

For:
Ethan J. Loeb, Esq.
Bartlett Loeb Hinds Thompson & Angelos
100 North Tampa St., Suite 2050
Tampa, FL 33602

Received by BARRY A. WOLF on the 19th day of May, 2025 at 12:14 pm to be served on **Village Of North Palm Beach, Florida c/o Deborah Searcy, Mayor, 501 U.S. Highway 1, North Palm Beach, FL 33408-4906**.

I, BARRY A. WOLF, do hereby affirm that on the **19th day of May, 2025** at **1:05 pm, I:**

served a **GOVERNMENT OR PUBLIC AGENCY** by delivering a true copy of the **SUMMONS, COMPLAINT AND EXHIBITS AND UNIFORM DIFFERENTIATED CASE MANAGEMENT ORDER AND ORDER SETTING TRIAL (DCMSNT)** with the date and hour of service endorsed thereon by me, to: **Chuck Huff** as **Village Manager** for **Village Of North Palm Beach, Florida c/o Deborah Searcy, Mayor, 501 U.S. Highway 1, North Palm Beach, Palm Beach County, FL 33408-4906** and informed said person of the contents therein, in compliance with State Statute 48.111.

**Description** of Person Served: Age: 59, Sex: M, Race/Skin Color: Caucasian, Height: 5'10", Weight: 210, Hair: Grey, Glasses: Y

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server in good standing in the county or judicial circuit in which the process was affected in accordance with State Statutes. Under penalties of perjury, I declare that I have read the forgoing Affidavit/Verified Return of service and the facts stated in it are true and correct. Pursuant to F.S. 92.525(2).

BARRY A. WOLF
CPS#826

**COASTAL COURT SERVICES, LLC**
**P.O. Box 273725**
**Tampa, FL 33688**
**(813) 871-2412**

Our Job Serial Number: GBA-2025001479
Ref: NP-DEVLAND-VILLAGE OF NORTH PALM BEACH,

Filing # 222913027 E-Filed 05/12/2025 02:30:53 PM

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

    Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

    Defendant / Respondent.

_____/

Case No.:

DATE: 5/19/25
TIME: 1:05pm
SERVER: B.W
ID# CPS826

**SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of the State:

    YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint in this action upon the Defendant:

**Village of North Palm Beach, Florida**
**c/o Deborah Searcy, Mayor**
**501 U.S. Highway 1**
**North Palm Beach, Florida 33408-4906**

    Each Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney, whose name and address is:

**Ethan J. Loeb, Esquire**
**Bartlett Loeb Hinds Thompson & Angelos**
**1001 Water Street, Suite 475**
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com

Within **20** days after service of this Summons on that Defendant, exclusive of the date of service, and to file the original of the defenses with the clerk of this court either before service on the

{00095124:1}

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 05/12/2025 02:30:53 PM

attorneys or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

Dated on _____**MAY 13**_____, 2025.



JOSEPH ABRUZZO
Clerk of the Court

By: _____

As Deputy Clerk
SARAH MYRTHIL

**IMPORTANT**

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this Court.  A phone call will not protect you.  Your written response, including the above case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court.  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the Plaintiff's Attorney whose address is:  **Ethan J. Loeb, Esquire, Bartlett Loeb Hinds Thompson & Angelos, 1001 Water Street, Suite 475, Tampa, Florida 33602, (813) 223-3888.**

**IMPORTANTE**

Usted ha sido demandado legalmente.  Tiene viente (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentaria ante este tribunal.  Una llamada telefonica no lo protegers; si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatamente.  Si no conce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la quia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney." (Demandate/Abogado del Demanadante).

**IMPORTANT**

{00095124:1}

Das poursuites judiciaries ont ete entreprises contre vous. vous avez 20 jours consecutifa a partir de la date de llassignation de cette citation pour deposer une reponse ecrita a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nominees ici, si vous souhaitez que le Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du Tribunal.  Il y a dlautres obligations juridiques et vous pouvez requerir les services immediata d'un avocat.  Si vous ne connaissez pas dlavocat, vous pourriez telephoner a un service de reference dlavocats ou a un bureau dlassistance juridique (figurant a llannuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra eqalement, en meme tamps que cette formalite, faire parvenir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

Si usted es una persona minusvalida que necesita algun acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; telefono numero (561) 355-4380, por lo menos 7 dias antes de la cita fijada para su comparecencia en Ios tribunales, o inmediatamente despues de recibir esta notificacion si el tiempo antes de Ia comparecencia que se ha programado es menos de 7 dias; si usted tiene discapacitacion del oido o de Ia voz, llame al 711.

Si ou se yon moon ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn Iajan pou w peye, gen pwovizyon pou jwen kek ed. Tanpri kontakte William Hutchings, Jr., koodonate pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach Ia ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefon Ii se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou paret nan tribinal Ia, oubyen imedyatman apre ou fin resevwa konvokasyon an si le ou gen pou w paret nan tribinal la mwens ke 7 jou; si ou gen pwoblem pou w tande oubyen pale, rele

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 155 of 429

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

Case No.:  25-CA-004670

## MOTION FOR CLERK'S DEFAULT

Plaintiffs/Petitioners NP-Devland Holdings, LLC, NP-Devland North, LLC, and NP Devland East, LLC (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby respectfully requests the entry of a default by the Clerk against Defendant, Village of North Palm Beach, Florida ("Defendant"), for failure to serve any paper on the undersigned or file any written defenses to the Complaint as required by law.

As of filing this motion, Defendant has not served a response or paper in response to the Complaint.  Accordingly, pursuant to Florida Rule of Civil Procedure 1.500, Plaintiffs are entitled to a clerk's default against Defendant.

{00081750:1}

1

WHEREFORE, Plaintiffs/Petitioners NP-Devland Holdings, LLC, NP-Devland North, LLC, and NP Devland East, LLC, respectfully requests the Clerk to enter a default against Defendant, Village of North Palm Beach and for such other relief as is deemed just and proper.

Dated this 10th day of June, 2025.

/s/ Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariC@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

Case No.:  25-CA-004670

## CLERKS DEFAULT

A default is entered in this action against Defendant, Village of North Palm Beach, Florida,

named in the Motion for Clerk Default filed on June 10, 2025, for failure to serve or file any paper

as required by law.

        Dated on this ___ day of June, 2025.

                                   Joseph Abruzzo
                                   As Clerk of the Court

                                   By:_____
                                     As Deputy Clerk

{00081750:1}                3

Case 9:26-cv-80304-AMC Document 1-3 Entered on FLSD Docket 03/20/2026 Page 158 of 429

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION
CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

      Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant/Respondent

_____/

## NOTICE OF APPEARANCE

PLEASE TAKE NOTICE, that the undersigned counsel appears as counsel of record for the Defendant, **VILLAGE OF NORTH PALM BEACH**. The undersigned requests that a copy of all Court filings, pleadings, records, correspondence and other documents be served on the undersigned.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on June 12, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By: /s/ Eric L. Stettin
   ERIC L. STETTIN
   Florida Bar No. 831697

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 159 of 429

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC,  a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

      Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant/Respondent

_____/

## DESIGNATION OF E-MAIL ADDRESSES

COMES NOW, Eric Stettin, Esq., counsel for Defendant, VILLAGE OF NORTH PALM

BEACH, and hereby gives this notice that the following e-mail addresses are to be used for

mandatory electronic service pursuant to Florida Rules of Judicial Administration, Rule 2.515:

      Primary e-mail address:
      Eric L. Stettin, Esq.            estettin@wsh-law.com

      Secondary e-mail address:
      Legal Assistant              cmcgee@wsh-law.com

*(THIS PORTION OF PAGE INTENTIONALLY LEFT BLANK)*

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on June 12, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone:  (954) 763-4242

By:   /s/  Eric L. Stettin
    ERIC L. STETTIN
    Florida Bar No. 831697

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC,  a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

      Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant/Respondent

_____/

## MOTION FOR ENLARGEMENT OF TIME

Defendant, **VILLAGE OF NORTH PALM BEACH**, by the undersigned counsel, and

pursuant to Fla.R.Civ.P. 1.090 (b), files this Motion for Enlargement of time to file its responsive

pleading to the summons and Complaint, and states as follows:

1. Per the Court record, this lawsuit was recently filed on May 12, 2025.

2. Undersigned has been retained by the Village of North Palm Beach through its insurance carrier to defend the Village in this matter.

3. Currently, undersigned is out of state and will be returning Wednesday, June 18, 2025.

4. Undersigned has not yet had an opportunity to review the 330 page complaint together with its exhibits nor the client files necessary to properly answer and defend this matter.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

5. Undersigned requests an additional 10 days to serve its answer and defenses to the complaint. Prior to filing this motion and after hours, Undersigned emailed Plaintiff counsel advising of my representation and that a motion for extension is being filed. The undersigned will confer with counsel regarding the contents of this motion to avoid the necessity of hearing and to avoid the entry of a clerk's default.

6. This motion is filed in good faith and not for the purposes of delay.

7. No parties will be prejudiced by the relief requested herein.

8. Pursuant to Fla.R.Civ.P. 1.090 (b), Defendant requests a 10 day enlargement of time to file its responsive pleading to the Complaint.

WHEREFORE, Plaintiff, VILLAGE OF NORTH PALM BEACH, respectfully requests that the court grant this motion for enlargement of time to respond to the complaint, and for such other and further relief that this court deems just and proper.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on June 12, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone:  (954) 763-4242

By:  /s/  Eric L. Stettin
   ERIC L. STETTIN
   Florida Bar No. 831697

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY, FLORIDA

Case Number:  50-2025-CA-004670-XXXA-MB
Division: AK: Circuit Civil Central - AK (Civil)

NP DEVLAND HOLDINGS LLC
      Plaintiff(s),

      vs.

VILLAGE OF NORTH PALM BEACH FLORIDA
      Defendant(s).

### NOTICE OF DEFAULT NOT ENTERED

A motion for default was submitted against:

**VILLAGE OF NORTH PALM BEACH FLORIDA**

A default will NOT BE ENTERED by the Clerk against this defendant(s) for one or more of the following reasons:

☐ Clerk must have full name of unknown party.

☐ Clerk must have full name of the person on whom process was executed;

☐ Clerk must have Military Status;

☐ Original summons with proper return of service is required;

☐ Original proof of publication is required for Notice of Action;

☒ **Pleading or other document was filed; DOCKETS 10, 11 & 12 FILED ON 06/12/2025**

☐ Name on motion for default does not match complaint;

☐ Other

Dated on:  16th of June, 2025.

JOSEPH ABRUZZO

**Clerk of the Circuit Court & Comptroller**



By:
    Chaney, Shuntel as Deputy Clerk

☐ Copies not furnished – no envelopes provided.
☒ Copies furnished to: ethanl@blhtlaw.com

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK. 06/16/2025 01:04:13 PM

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Case No.: 50-2025-CA-004670-XXXA-MB

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.
_____/

**NOTICE OF APPEARANCE, REQUEST FOR NOTICES AND**
**NOTICE OF DESIGNATION OF ELECTRONIC MAIL ADDRESSES**

PLEASE TAKE NOTICE that Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North,

LLC, and NP-Devland East, LLC (collectively "Plaintiffs"), hereby gives notice of the appearance

of additional counsel on their behalf and request that copies of all pleadings, motions, notices,

orders, and other documents in this case be served upon the undersigned:

**Steven Gieseler, Esquire**
**Bartlett Loeb Hinds Thompson & Angelos**
**819 SW Federal Hwy., Suite 300**
**Stuart, FL 34994**
**Tel. (772) 252-3000**

Pursuant to Fla. R. Jud. Admin 2.516(b)(1)(A), counsel designates the following e-mail

addresses for electronic service:

        Primary:      StevenG@BLHTLaw.com

        Secondaries:  MariaC@BLHTLaw.com

{00096721:1}

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on June 24, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:  Eric L. Stettin, Esq., estettin@wsh-law.com, cmcgee@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

Respectfully submitted,

*/s/ Steven Gieseler*
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

{00096721:1}

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

      Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant/Respondent

_____/

## ANSWER AND AFFIRMATIVE DEFENSES

Defendant, **VILLAGE OF NORTH PALM BEACH**, by the undersigned counsel, files

this Answer and Affirmative Defenses, and states as follows:

1. Without knowledge, therefore denied.

2. Without knowledge, therefore denied.

3. Without knowledge, therefore denied.

4. Defendant is without knowledge of when and on what dates the Plaintiffs purchased the subject property, but admit Plaintiffs represented their ownership during the time of the application referenced in the Complaint.

5. Admit.

6. Denied.

7. Denied.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

8. Denied.

9. Defendant admits only that venue is proper in Palm Beach County. Defendant denies the remainder of the allegations in this paragraph and demands strict proof thereof.

10. Denied.

11. Admit.

12. Admit.

13. Admit.

14. Denied as phrased.

15. Without knowledge, therefore denied.

16. Without knowledge, therefore denied.

17. Denied as phrased. However, admit Defendant collaborated with NP-Devland regarding the newly created C-3 zoning district referred to as Exhibit B to the Complaint.

18. Denied.

19. Denied as phrased. Without knowledge of NP-Devland's initial conception. Admit the PUD application referred to as Exhibit D to the Complaint.

20. Denied. However, Defendant admits the language in its Code.

21. Denied.

22. Denied.

23. Denied.

24. Denied.

25. Denied.

26. Admit.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

27. Denied.

28. Denied.

29. Denied as phrased. However, Defendant admits the quoted portion starting with "subject to additional findings…."

30. Denied as phrased.

31. Denied as phrased.

32. Denied.

33. Denied.

34. Denied.

35. Denied.

36. Denied. However, Defendant admits the quoted portion starting with "All ordinances … "

## COUNT I
## Declaratory and Injunctive Relief

37. Defendant incorporates its prior responses to each of the preceding paragraphs as if set forth fully herein.

38. Without knowledge, therefore denied.

39. Denied.

40. Without knowledge, therefore denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Denied.

47. Denied as phrased.

## COUNT II
## Declaratory and Injunctive Relief

48. Defendant incorporates its prior responses to each of the preceding paragraphs as if set forth fully herein.

49. Without knowledge, therefore denied.

50. Without knowledge, therefore denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied as phrased.

## COUNT III
## Petition for Writ of Mandamus

59. Defendant incorporates its prior responses to each of the preceding paragraphs as if set forth fully herein.

60. Without knowledge, therefore denied.

61. Denied.

62. Denied.

63. Denied.

64. Denied.

65. Denied.

66. Denied.

67. Without knowledge, therefore denied.

68. Denied.

69. Denied.

70. Denied.

71. All allegations not specifically admitted are expressly denied.

## AFFIRMATIVE DEFENSES

72. As and for its first affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, alleges the Court lacks subject matter jurisdiction because Ordinance 2025-06, that is the subject matter before the Court, was quasi-judicial, and Plaintiffs failed to seek certiorari review within the time permitted by law. See 9.100(c)(2); *Grace v. Town of Palm Beach*, 656 So.2d 945 (Fla.4th DCA 1995).

73. As and for its second affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, states the Plaintiff's claims are barred and/or limited by the doctrine of separation of powers. Specifically, "under the constitutional doctrine of separation of powers, the judicial branch must not interfere with the discretionary functions of the legislative or executive branches of government absent a violation of constitutional or statutory rights." Trianon Park Condo. Ass'n, Inc., 468 So. 2d at 918. See also Detournay v. City of Coral Gables, 127 So. 3d 869, 873 (Fla. 3d DCA 2013) ("[t]o hold otherwise . . . would require the judicial branch to second guess the

political and police power decisions of the other branches of government and would violate the separation of powers doctrine").

74. As and for its third affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, states the Complaint fails to state a claim because Plaintiffs do not yet have a "vested right" or an ability "as of right" to build consistent with the building regulations of the Defendant.

75. As and for its fourth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, states the Court lacks subject matter jurisdiction because the claims are not ripe.

76. As and for its fifth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, states the Plaintiff's claims are barred and/or limited because there was competent and substantial evidence to support the Ordinance from the April 2025 quasi-judicial hearing at the Village Council meeting.

77. As and for its sixth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, states the Plaintiff's claims are barred and/or limited based on the doctrines of waiver and/or estoppel. Plaintiffs had notice and an opportunity to be heard at the April 2025 quasi-judicial hearing at the Village Council meeting and chose not to present any evidence in opposition to the ultimate ordinance that was passed. Plaintiff further failed to object and otherwise consented to the alleged terms and conditions at the prior Planning & Zoning Hearing related to its application, which is the subject of this lawsuit.

78. As and for its seventh affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, states that, to the extent the Court finds the subject 2025 Ordinance

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

was a legislative action as opposed to quasi-judicial, the Court is required to give deference to the policy-making function of the Defendant and further any challenge is barred because there is a rationale basis for its validity. Plaintiffs cannot sustain their "very heavy burden" to show a lack of rational basis.

79. As and for its eighth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, states alleges Count II of the Complaint fails to state a claim and otherwise fails to satisfy required conditions precedent by failing to allege or show proof as set forth in 1.975 that Plaintiffs have given notice to Attorney General or the state attorney of the judicial circuit in which the action is pending was served with a copy of the complaint and be entitled to be heard. See Fla.R.Civ.P. 1.071; Fla.Stat. §86.091.

80. As and for its ninth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, alleges Count I of the Complaint fails to state a claim because it is an improper collateral attack on Ordinance 2025-06, a quasi-judicial ordinance, which is limited to certiorari review.

81. As and for its tenth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, alleges the claims are barred alleges the claims are barred by waiver and/or estoppel.

82. As and for its eleventh affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, alleges that any challenge to Ordinance 2025-06 is barred because Plaintiffs were afforded procedural due process and the decision was supported by competent substantial evidence.

83. As and for its twelfth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, denies that mandamus is available or proper because the PUD Ordinance and subsequent 2025 Ordinance include various terms and conditions along with a future site plan application requirement all of which involve the exercise of professional, discretionary decision-making.

84. As and for its thirteenth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, denies that mandamus is available or proper because mandamus is available only to enforce an established legal right, not to establish that right.

85. As and for its fourteenth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH,** Defendant denies that mandamus is available or proper based on waiver and estoppel by virtue of Plaintiffs either consenting to the terms and conditions and/or not raising objections nor presenting evidence at the quasi-judicial hearing.

86. As and for its fifteenth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, Defendant denies asserts all discretionary and planning level decisions are subject to sovereign immunity.

87. As and for its sixteenth affirmative defense, Defendant, **VILLAGE OF NORTH PALM BEACH**, Plaintiffs are not entitled to any relief on constitutional grounds as set forth in Count II. Plaintiffs' constitutional challenge does not impinge on any fundamental rights or involve suspect classifications and the ordinance bears a rational relationship to a legitimate governmental purpose. This is the most relaxed form of judicial scrutiny and is often applied to zoning ordinances and other regulations that affect property use. Here, Plaintiffs cannot demonstrate that the

subject ordinance does not bear a rational relationship to a legitimate governmental purpose. Further, Plaintiffs cannot meet their burden of proving that there is no conceivable factual predicate which would rationally support the law. Moreover, the ordinance is not void for vagueness because it provides fair and reasonable notice to Plaintiffs of what is and what is not allowed based on common understanding and practice. Further, Plaintiffs' facial challenge fails because they cannot establish that the law is incapable of any valid application. Finally, Plaintiffs have waived any as applied challenges by failing to raise timely objections at either the prior P & Z Hearing, and neither the hearings in August 2024 nor quasi- judicial hearing at the April 2025 Village Council Meeting.

88. Defendant reserves the right to allege any further affirmative defenses.

WHEREFORE, Defendant, **VILLAGE OF NORTH PALM BEACH**, respectfully requests the Complaint be dismissed with all costs taxed against the Plaintiffs, and for such other and further relief that this Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on June 24, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By: /s/ Eric L. Stettin
ERIC L. STETTIN
Florida Bar No. 831697

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

                                Case No.: 50-2025-CA-004670-XXXA-MB

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

**PLAINTIFFS' MOTION TO STRIKE**
**DEFENDANT'S AFFIRMATIVE DEFENSES**

Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North, LLC, and NP-Devland East, LLC (collectively "**NP-Devland**"), through their undersigned counsel and pursuant to Fla. R. Civ. P. 1.110(d), 1.140(f), and 1.190(a), move to strike the Affirmative Defenses of The Village of North Palm Beach, Florida's (the "**Village**") and state in support as follows:

**Introduction**

On May 12, 2025, NP-Devland filed its Complaint against the Village seeking declaratory and injunctive relief, and a writ of mandamus related to a Planned Unit Development application. On June 24, 2025, the Village filed its Answer and Affirmative Defenses. Included in this filing are 16 individual affirmative defenses. Most of these defenses are not proper or cognizable affirmative defenses at all and/or contain no statement of the facts that support the defenses. As such, the Court should strike those affirmative defenses as improper under Florida law.

1

**Argument**

Florida's general rules of pleading prescribe that an answer "shall state in short and plain terms the pleader's defenses to each claim asserted and shall admit or deny the averments on which the adverse party relies." Fla. R. Civ. P. 1.110(c). Denials are confined to the body of the answer and affirmative defenses are reserved only for confession and avoidance. *Pearson v. Sindelar*, 75 So. 2d 295, 297 (Fla. 1954). A proper affirmative defense "is a defense which admits the cause of action, but avoids liability, in whole or in part, by alleging an excuse, justification, or other matter negating or limiting liability." *St. Paul Mercury Ins. Co. v. Coucher*, 837 So. 2d 483, 487 (Fla. 5th DCA 2002). Furthermore, when a proper affirmative defense is pled, it must be accompanied by "a short and plain statement of the ultimate facts supporting the avoidance or affirmative defense." Fla R. Civ. P. 1.110(d).

### *Affirmative Defenses 3, 5, 7, 9, 11, 12, 13, and 16 are not Affirmative Defenses*

The Village's affirmative defenses fail, nearly uniformly, to satisfy the standards recounted above. Affirmative defenses 3, 5, 7, 9, 11, 12, 13, and 16 are all simply denials of the merits of the allegations made in NP-Devland's Complaint.  These defenses are repetitive arguments related to whether NP-Devland has a "vested right," whether NP-Devland's land use application was supported by "competent substantial evidence," or whether the Village's denial should be given "deference."  All eight affirmative defenses are mere denials of NP-Devland's allegations, which are only appropriate for the body of an answer. Denials of facts and allegations contained in a complaint that do not raise new matters to defeat the complaint are properly stricken upon a valid motion to strike. *Gatt v. Keyes Corp*, 446 So. 2d 211 (Fla. 3rd DCA 1984). Florida case law further supports striking affirmative defenses that are not in the form of confession and avoidance. *BPS Guard Services, Inc. v. Gulf Power Co.*, 488 So. 2d 638, 641 (Fla. 1st DCA 1986). These eight

2

affirmative defenses of the Village clearly violate settled Florida law and should be stricken from the Village's pleading.

*Affirmative Defenses 2, 4, 10, 14, and 15 Violate Fla. R. Civ. P. 1.110(d)*

Fla R. Civ. P. 1.110(d) requires an affirmative defense to include "a short and plain statement of the ultimate facts supporting the avoidance or affirmative defense." Affirmative defenses 2, 4, 10, 14, and 15 fail to even attempt to comport with this requirement. These purported affirmative defenses amount to claims of a violation of separation of powers, lack of subject matter jurisdiction, multiple allegations of waiver and estoppel, and a claim of sovereign immunity. None of the paragraphs comprising these defenses contain any supporting facts that would allow NP-Devland to formulate a response. Simply alleging an affirmative defense without providing any factual basis for the defense violates Fla. R. Civ. P. 1.110(d) and should be stricken from the Village's pleading.

*The Village's Reservation Paragraph is Improper*

Paragraph 88 of the Village's Answer and Affirmative Defenses is a lone sentence attempting to "reserve(s) the right to allege any further affirmative defense." No provision of the Florida Rules of Civil Procedure allows for such a reservation. Instead, Fla. R. Civ. P. 1.190(a) prescribes the detailed procedure for amending affirmative defenses upon discovery of new facts by leave of court. The Village cannot usurp this established procedure with a unilateral reservation sentence, and Paragraph 88 should be stricken.

WHEREFORE, Plaintiffs respectfully requests that this Court enter an Order:

A.      Striking Affirmative Defenses 2, 3, 4, 5, 7, 9, 10, 11, 12, 13, 14, 15, and 16; and

B.      Striking Paragraph 88 of Defendant's Answer and Affirmative Defenses; and

3

C. Granting all other and further relief this Court deems appropriate in the circumstances.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 8, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on: Eric L. Stettin, Esq., estettin@wsh-law.com, cmcgee@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

Respectfully submitted,

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

4

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

Case No.: 50-2025-CA-004670-XXXA-MB

### NOTICE OF APPEARANCE, REQUEST FOR NOTICES AND
### NOTICE OF DESIGNATION OF ELECTRONIC MAIL ADDRESSES

PLEASE TAKE NOTICE that Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North, LLC, and NP-Devland East, LLC (collectively "Plaintiffs"), hereby gives notice of the appearance of additional counsel on their behalf and request that copies of all pleadings, motions, notices, orders, and other documents in this case be served upon the undersigned:

**Nicholas Gieseler, Esquire**
**Bartlett Loeb Hinds Thompson & Angelos**
**819 SW Federal Hwy., Suite 300**
**Stuart, FL 34994**
**Tel. (772) 252-3000**

Pursuant to Fla. R. Jud. Admin 2.516(b)(1)(A), counsel designates the following e-mail addresses for electronic service:

        Primary:      NicholasG@BLHTLaw.com

        Secondaries:  MariaC@BLHTLaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 17, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:  Eric L. Stettin, Esq., estettin@wsh-law.com, cmcgee@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants*.

Respectfully submitted,

*/s/ Nicholas Gieseler*
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**NICHOLAS GIESELER**
Florida Bar No. 0043979
NicholasG@BLHTLaw.com
MariaC@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar No. 1018829
ElliotH@BLHTLaw.com
MarjorieP@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

Case 9:26-cv-80304-AMC Document 1-3 Entered on FLSD Docket 03/20/2026 Page 181 of 429

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

Case No.: 50-2025-CA-004670-XXXA-MB

      Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant / Respondent.

_____/

### NOTICE OF APPEARANCE, REQUEST FOR NOTICES AND
### NOTICE OF DESIGNATION OF ELECTRONIC MAIL ADDRESSES

PLEASE TAKE NOTICE that Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North, LLC, and NP-Devland East, LLC (collectively "Plaintiffs"), hereby gives notice of the appearance of additional counsel on their behalf and request that copies of all pleadings, motions, notices, orders, and other documents in this case be served upon the undersigned:

**Elliot P. Haney, Esquire**
**Bartlett Loeb Hinds Thompson & Angelos**
**1001 Water Street, Suite 475**
**Tampa, Florida 33602**
**(813_ 223-3888**

Pursuant to Fla. R. Jud. Admin 2.516(b)(1)(A), counsel designates the following e-mail addresses for electronic service:

      Primary:      ElliotH@BLHTLaw.com

      Secondaries:      MarjorieP@BLHTLaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 17, 2025, a true and correct copy of the foregoing was

filed with the Florida Courts E-Filing Portal and served on: Eric L. Stettin, Esq., estettin@wsh-

law.com, cmcgee@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200

East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants*.

Respectfully submitted,

*/s/ Elliot P. Haney*
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**NICHOLAS GIESELER**
Florida Bar No. 0043979
NicholasG@BLHTLaw.com
MariaC@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar No. 1018829
ElliotH@BLHTLaw.com
MarjorieP@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

      Plaintiffs / Petitioners,

Case No.: 50-2025-CA-004670-XXXA-MB

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant / Respondent.

_____/

## NOTICE OF COMPLIANCE WITH RULE 1.280(a) INITIAL DISCLOSURES

Plaintiffs / Petitioners NP-Devland Holdings, LLC, NP-Devland North, LLC, and NP Devland East, LLC (collectively, "**NP-Devland**"), by and through their undersigned counsel, hereby gives notice of serving their Rule 1.280(a) initial disclosures upon Defendant in compliance with Fla.R.Civ.P 1.280(a).

Respectfully submitted,

*/s Ehtan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**NICHOLAS GIESELER**
Florida Bar No. 0043979
NicholasG@BLHTLaw.com

MariaC@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar No. 1018829
ElliotH@BLHTLaw.com
MarjorieP@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
*Counsel for Plaintiffs / Petitioners*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 18, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:  Eric L. Stettin, Esq., estettin@wsh-law.com, cmcgee@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants*.

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338

Filing # 227719974 E-Filed 07/21/2025 04:10:55 PM

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

      Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant/Respondent

_____/

## DEFENDANT'S INITIAL DISCLOSURES

Defendant, **VILLAGE OF NORTH PALM BEACH**, through counsel and pursuant to

Florida Rule of Civil Procedure 1.280, submits its initial discovery disclosures. These initial

discovery disclosures are based on the information reasonably available to Defendant at this time

and are made without waiving any objections as to relevance, materiality, privilege, or

admissibility of evidence in the action. Defendant reserves the right to revise, correct,

supplement, or clarify the disclosures at any time, consistent with Florida Rule of Civil

Procedure 1.280.

    **A.**    **Individuals Likely To Have Discoverable Information/Disclosures Pursuant to Fla. R. Civ. P. 1.280(a)(1)(A)**

The following individuals are likely to have discoverable information that Defendant may

use to support its claims or defenses in this action:

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

| Name | Contact Information | Description |
|---|---|---|
| Plaintiff's corporate representatives | c/o Plaintiff counsel | Plaintiff |
| Chuck Huff, Village Manager | c/o Defense counsel | Negotiations between the parties |
| Len Rubin | c/o Defense counsel | Negotiations between the parties |
|  |  |  |
|  |  |  |

In addition, Defendant anticipates that other currently unknown individuals may have discoverable information that Defendant may use to support its defenses. Defendant incorporates by reference any other individuals disclosed by other parties in this matter and reserves the right to supplement this disclosure.

Defendant also reserves the right to obtain discovery in support of its defenses from any witness identified in any other party's disclosures.

B.     **Documents Relevant to Defendant's Claims or Defenses/Disclosures Pursuant to Fla. R. Civ. P. 1.280(a)(1)(B)**

1.  Village of North Palm Beach "VNPB" April 10, 2025, Agenda Item 14 and all attached documents.
2.  VNPB Minutes of the April 10, 2025 public meeting.
3.  VNPB August 8, 2024 Agenda Item 11 and all attached documents attached.
4.  VNPB Minutes of the August 8, 2024 public meeting.
5.  VNPB August 8, 2024 Agenda Item 11 and all attached documents attached.
6.  VNPB Minutes of the August 8, 2024 public meeting.
7.  VNPB Planning, Zoning and Adjustment Board and Town of Lake Park Planning and Zoning Board, Revised Agenda for Wednesday, May 8, 2024 and all attached documents.
8.  VNPB Minutes from the Planning, Zoning and Adjustment Board and Town of Lake Park Planning and Zoning Board, Revised Agenda for Wednesday, May 8, 2024.
9.  VNPB Ordinance No. 2023-06 and No. 2025-06.
10. VNPB Agenda for the March 9, 2023 public meeting.
11. VNPB Minutes of the March 9, 2023 public meeting.
12. PRM Coverage Document.

Defendant incorporates by reference any documents disclosed by other parties in this matter and reserves the right to supplement this disclosure. Defendant also reserves the right to

obtain discovery in support of its defenses from any documents identified in any other party's disclosures.

**C.** **Computation of Damages/Disclosures Pursuant to Fla. R. Civ. P. 1.280(a)(1)(C)**

At this time, Defendant is not seeking any damages in this action. Defendant, however, reserves its right to assert counter-claims, third party claims and/or otherwise seek damages from other parties or non-parties as the facts of the case develop and the case proceeds.

**D.** **Insurance Agreements/Disclosures Pursuant to Fla. R. Civ. P. 1.280(a)(1)(D)**

The Village of North Palm Beach is a member of Public Risk Management of Florida which is a Florida Self- Insured Intergovernmental Risk Management Program, organized under Florida Statute §768.28(16) and Chapter 163, Florida Statutes.

## CERTIFICATE OF SERVICE

HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on July 21, 2025.

> WEISS SEROTA HELFMAN
> COLE & BIERMAN, P.L.
> Attorneys for Defendant
> 200 East Broward Boulevard, Suite 1900
> Fort Lauderdale, Florida 33301
> Telephone: (954) 763-4242
>
> By: _/s/ Eric L. Stettin_
>    ERIC L. STETTIN
>    Florida Bar No. 831697

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 188 of 429

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

       Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

       Defendant / Respondent.

_____/

Case No.: 50-2025-CA-004670-XXXA-MB

**PLAINTIFFS' AMENDED MOTION TO STRIKE
DEFENDANT'S AFFIRMATIVE DEFENSES**

Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North, LLC, and NP-Devland East, LLC (collectively "**NP-Devland**"), through their undersigned counsel and pursuant to Fla. R. Civ. P. 1.110(d), 1.140(f), and 1.190(a), move to strike the Affirmative Defenses of The Village of North Palm Beach, Florida's (the "**Village**") and state in support as follows:

**Introduction**

On May 12, 2025, NP-Devland filed its Complaint against the Village seeking declaratory and injunctive relief, and a writ of mandamus related to a Planned Unit Development application. On June 24, 2025, the Village filed its Answer and Affirmative Defenses. Included in this filing are 16 individual affirmative defenses. Most of these defenses are not proper or cognizable affirmative defenses at all and/or contain no statement of the facts that support the defenses. As such, the Court should strike those affirmative defenses as improper under Florida law.

1

*** FILED: PALM BEACH COUNTY, FL  JOSEPH ABRUZZO, CLERK. 07/28/2025 02:16:45 PM ***

**Argument**

Florida's general rules of pleading prescribe that an answer "shall state in short and plain terms the pleader's defenses to each claim asserted and shall admit or deny the averments on which the adverse party relies." Fla. R. Civ. P. 1.110(c). Denials are confined to the body of the answer and affirmative defenses are reserved only for confession and avoidance. *Pearson v. Sindelar*, 75 So. 2d 295, 297 (Fla. 1954). A proper affirmative defense "is a defense which admits the cause of action, but avoids liability, in whole or in part, by alleging an excuse, justification, or other matter negating or limiting liability." *St. Paul Mercury Ins. Co. v. Coucher*, 837 So. 2d 483, 487 (Fla. 5th DCA 2002). Furthermore, when a proper affirmative defense is pled, it must be accompanied by "a short and plain statement of the ultimate facts supporting the avoidance or affirmative defense." Fla R. Civ. P. 1.110(d).

*Affirmative Defenses 3, 5, 7, 9, 11, 12, 13, and 16 are not Affirmative Defenses*

The Village's affirmative defenses fail, nearly uniformly, to satisfy the standards recounted above. Affirmative defenses 3, 5, 7, 9, 11, 12, 13, and 16 are all simply denials of the merits of the allegations made in NP-Devland's Complaint.  These defenses are repetitive arguments related to whether NP-Devland has a "vested right," whether NP-Devland's land use application was supported by "competent substantial evidence," or whether the Village's denial should be given "deference."  All eight affirmative defenses are mere denials of NP-Devland's allegations, which are only appropriate for the body of an answer. Denials of facts and allegations contained in a complaint that do not raise new matters to defeat the complaint are properly stricken upon a valid motion to strike. *Gatt v. Keyes Corp*, 446 So. 2d 211 (Fla. 3rd DCA 1984). Florida case law further supports striking affirmative defenses that are not in the form of confession and avoidance. *BPS Guard Services, Inc. v. Gulf Power Co.*, 488 So. 2d 638, 641 (Fla. 1st DCA 1986). These eight

2

affirmative defenses of the Village clearly violate settled Florida law and should be stricken from the Village's pleading.

### *Affirmative Defenses 2, 4, 10, 14, and 15 Violate Fla. R. Civ. P. 1.110(d)*

Fla R. Civ. P. 1.110(d) requires an affirmative defense to include "a short and plain statement of the ultimate facts supporting the avoidance or affirmative defense." Affirmative defenses 2, 4, 10, 14, and 15 fail to even attempt to comport with this requirement. These purported affirmative defenses amount to claims of a violation of separation of powers, lack of subject matter jurisdiction, multiple allegations of waiver and estoppel, and a claim of sovereign immunity. None of the paragraphs comprising these defenses contain any supporting facts that would allow NP-Devland to formulate a response. Simply alleging an affirmative defense without providing any factual basis for the defense violates Fla. R. Civ. P. 1.110(d) and should be stricken from the Village's pleading.

### *The Village's Reservation Paragraph is Improper*

Paragraph 88 of the Village's Answer and Affirmative Defenses is a lone sentence attempting to "reserve(s) the right to allege any further affirmative defense." No provision of the Florida Rules of Civil Procedure allows for such a reservation. Instead, Fla. R. Civ. P. 1.190(a) prescribes the detailed procedure for amending affirmative defenses upon discovery of new facts by leave of court. The Village cannot usurp this established procedure with a unilateral reservation sentence, and Paragraph 88 should be stricken.

WHEREFORE, Plaintiffs respectfully requests that this Court enter an Order:

A.  Striking Affirmative Defenses 2, 3, 4, 5, 7, 9, 10, 11, 12, 13, 14, 15, and 16; and

B.  Striking Paragraph 88 of Defendant's Answer and Affirmative Defenses; and

C.     Granting all other and further relief this Court deems appropriate in the circumstances.

## CERTIFICATE OF CONFERRAL

I certify that prior to the filing of this motion, Nicholas Gieseler discussed the relief requested in this motion with counsel for the Defendant via telephone on July 14, 2025, along with a follow up email on July 28th.  Final follow-up calls from Mr. Gieseler to counsel for the Defendant were made on July 25th and 28th, 2025 and did not lead to a resolution of the issues contained in this Motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 28th, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:  Eric L. Stettin, Esq., estettin@wsh-law.com, cmcgee@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants*.

Respectfully submitted,

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

4

Filing # 229552572 E-Filed 08/15/2025 04:04:15 PM

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Case No.: 50-2025-CA-004670-XXXA-MB

      Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant / Respondent.
_____/

**PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT, VILLAGE OF NORTH PALM BEACH**

Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC (collectively "NP Devland"), by and through their undersigned counsel, and in accordance with Rule 1.350 of the Florida Rules of Civil Procedure, hereby requests Defendant Village of North Palm Beach, Florida (the "Village"), produce within thirty (30) days from the date of service at the office of Bartlett Loeb Hinds Thompson & Angelos, 1001 Water Street, Suite 475, Tampa, Florida 33602, the following documents:

**DEFINITIONS AND INSTRUCTIONS**

1.     The term "NP-Devland" means, the Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC collectively.

2.     The term "Subject Property" means the property described in Paragraph 4 of the Complaint filed on May 12, 2025.

3.     The term "Village," refers to Defendant, Village of North Palm Beach, Florida,

1

including all employees, owners, officers, members, managing members, directors, affiliates, agents, and any other person or entity acting for or on its behalf.

4.      The term "You" and/or "Your" means the party or parties to whom these requests are addressed, including the party or parties or any other agent(s), attorney(s), and all other persons acting or purporting to act on their behalf.

5.      As used herein, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

6.      The terms "document" or "documents" mean any written, typed, printed, recorded or graphic material, however produced, reproduced or stored, including, but not limited to, all Electronic Data, notes, e-mails, memoranda, reports, correspondence, communications, contracts, bills, agreements, letters, messages, minutes, telegrams, memorandums, memorandums of conferences or telephone conversations, study list, compliance of data, papers, books, records, pictures, photographs, tapes and all other tangible things upon which are handwriting, typing, printing, drawing, representative, photostatic or other copies, magnetic or electronic impulse or other forms of communication is recorded or reproduced and all copies (except for identical copies) and drafts thereof. Any copy containing these, or any other alterations, notes or comments not included on any original shall not be deemed an identical copy but shall be deemed a separate document within the foregoing definition.

7.      The terms "communication," "communications," and "correspondence," which are included within the broader terms "document" and "documents" above, mean any statement or utterance, whether written or oral, made by one person to another or in the presence of another, or any document delivered or sent from one person to another, including, but not limited to, notes, electronic messages, e-mails, voice mail messages, text messages, instant/direct messaging or IM, (e.g., iMessages, Slack messages, Skype Messenger, FaceBook Messenger, etc.), tweets, social media posts, information stored on web pages or web servers, and database records.

8.      The term "Electronic Data," which is included within the broader terms "document" and "documents" above, means any information, including files, documents, correspondence, communications, images, videos, metadata or any combination thereof stored, created, or used on any Electronic Storage Device, disk, tape (including backup tapes and other backup media), or other computer or digital storage medium, microfilm, microfiche, floppy, or any other storage or recording medium.

9.      The word "Electronic Storage Device" means any disk, including hard disks and floppy disks, CD-ROM's, DVD's, network servers, shared servers, computers, magnetic tape, back-up tape, voicemail, temporary files, and PDA's, whether currently on your premises or otherwise.

10.     The word "produce" means to make available the documents requested herein—**in their native format, including all meta-data**—for inspection and copying and to separate such documents into the categories set forth in this request.

2

11.     The term "relating to" means concerning, respecting, referring to, summarizing, digesting, embodying, demonstrating, reflecting, establishing, tending to establish, tending not to establish, evidencing, comprising, connected with, commenting on, responding to, disagreeing with, showing, describing, analyzing, representing, constituting or including.

12.     If you decline to produce any documents requested hereinafter on the basis of any privilege known in the law, you shall, at the time of production designated herein, as to each such document, provide Plaintiff with the following written information pertaining to such document:

(a)     its date or, if not dated, the date it was prepared or received;

(b)     the type of document (e.g., letter, memorandum, telegram, chart, photograph, reproduction);

(c)     the author and addressee;

(d)     its present location;

(e)     the identity and address of the individual or person presently custodian thereof;

(f)     a general description of its contents;

(g)     the number of pages thereof;

(h)     the identity of each person who received a copy of such document and the relationship of such person to you;

(i)     whether such document contains or relates to facts or opinions, or both; and

(j)     the exact nature of the privilege that you claim with respect to such document.

13.     The words "And," "or" as well as "and/or" shall be interpreted in the most inclusive sense possible.

## DOCUMENTS TO BE PRODUCED

1.     All documents and communications from January 1, 2022 to present related to the Subject Property.

2.     All documents and communications from January 1, 2022 to present discussing or referencing Nader Salour.

3.     All documents listed in Your Initial Disclosures filed on July 21, 2025.

3

4.      All documents and communications from January 1, 2019 to December 31, 2022 related to the adoption of the C-3 PUD regulations described in Paragraph 17 of the Complaint filed on May 12, 2025.

5.      All documents and communications from January 1, 2024 to present related to Ordinance 2025-06.

6.      All documents You refer to as "competent and substantial evidence" in Paragraph 76 of Your Answer and Affirmative Defenses filed on June 24, 2025.

7.      All Ordinances from January 1, 2022 to present approving a Planned Unit Development in the Village of North Palm Beach.

8.      All documents and communications related to the "oral and written representations" referenced in Condition II of Ordinance 2025-06.

9.      All communications from January 1, 2022 to present between you and the Town of Lake Park related to the Subject Property.

10.      All documents and communications related to any other applications for a C-3 PUD submitted to You since the adoption of the C-3 PUD Regulations.

11.      All documents and communications related to guidance or training of staff processing C-3 PUD applications.

12.      All documents that support the contention made in Paragraph 87 of your Answer and Affirmative Defenses that Ordinance 2025-06 "bears a rational relationship to a legitimate governmental purpose."

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 15, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:   Eric L. Stettin, Esq.,

4

estettin@wsh-law.com, DJones@wsh-law.com, WEISS SEROTA HELFMAN COLE &
BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for
Defendants*.

/s/ Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829
ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS
THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

Filing # 229532572 E-Filed 08/15/2025 04:04:15 PM

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Case No.: 50-2025-CA-004670-XXXA-MB

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

### PLAINTIFFS' NOTICE OF SERVICE OF FIRST SET OF INTERROGATORIES TO DEFENDANT, VILLAGE OF NORTH PALM BEACH

Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC, by and through their undersigned counsel, pursuant to Florida Rules of Civil Procedure 1.340, hereby gives notice of serving Plaintiffs' First Set of Interrogatories, numbered 1 through 13, upon Defendant, Village of North Palm Beach, Florida.

/s/ Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829

ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS
THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 15, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on: Eric L. Stettin, Esq., estettin@wsh-law.com, DJones@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

/s/ Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

Case No.: 50-2025-CA-004670-XXXA-MB

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

## PLAINTIFFS' FIRST  SET OF INTERROGATORIES
## TO DEFENDANT, VILLAGE OF NORTH PALM BEACH

Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC, by and through their undersigned counsel, pursuant to Florida Rule of Civil Procedure 1.340, hereby propounds their First Set of Interrogatories numbered 1 through ____ to Defendant, Village of North Palm Beach, Florida, to be responded to, separately and fully in writing, within thirty (30) days from the date of service hereof.

### DEFINITIONS AND INSTRUCTIONS

1.     The term "NP-Devland" means, the Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC collectively.

2.     The term "Village," refers to Defendant, Village of North Palm Beach, Florida, including all employees, owners, officers, members, managing members, directors, affiliates, agents, and any other person or entity acting for or on its behalf.

3.     As used herein, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

4.      The terms "regarding," "related to" and "relating to" mean concerning, respecting, referring to, summarizing, digesting, embodying, reflecting, establishing, tending to establish, evidencing, comprising, connected with, commenting on, responding to, showing, describing, analyzing, representing, constituting or including.

5.      The words "and," "or" as well as "and/or" shall be interpreted in the most inclusive sense possible.

6.      The words "communication," "communications," and "correspondence" mean any statement or utterance, whether written or oral, made by one person to another or in the presence of another, or any document delivered or sent from one person to another, including notes, electronic messages, e-mails, voice mail messages, text messages, instant/direct messaging or IM, (e.g., iMessages, Slack messages, Skype Messenger, FaceBook Messenger, etc.), tweets, social media posts, information stored on web pages or web servers, and database records.

7.      "Each," "any," and "all" are both singular and plural.

8.      As used herein, to "identify" a person shall mean to state the full name and the present or last known business and residence address.

9.      As used herein, "facts" shall refer to and shall include, without limitation and in the singular as well as in the plural, all circumstances, occurrences, occasions, events, incidents, oral communications, writings, episodes, experiences, happenings, transactions, and all kinds of other affairs, matters, or things.

10.      Where any of the Interrogatories set forth below cannot be answered in full, state, in detail, the reasons for such inability to answer.

11.      If you object to any Interrogatories or any portion thereof, on the ground that it requests information that is privileged or falls within the work-product doctrine, provide the following information:

 a.  Identify all persons known to you to have seen the communication.

 b.  State the nature of the privilege or doctrine you claim.

 c.  If a document:
  1)      Identify it; and
  2)      Identify all persons known to you to have seen the document;

 d.  If an oral communication:
  1)      Identify it;
  2)      Identify all persons known to you to whom the substance of the oral communication has been disclosed.

e. If an electronic communication:
   1) Identify it; and
   2) Identify all persons known to you to have seen the communication.

## MODE AND DETAIL OF ANSWERS

In answering each Interrogatory:

a) Identify each writing

    1. Relied upon in the preparation of each answer; or

    2. Which forms all or part of the basis for the answer; or

    3. Which corroborates the answer; or

    4. The substance of which forms all or part of the answer.

b) If all the information furnished in answer to all or any part of an Interrogatory is not within the personal knowledge of the affiant, identify each person to whom all or any part of the information furnished is a matter of personal knowledge, and identify each person who communicated to the affiant any part of the information furnished.

## INTERROGATORIES

1. Identify the name(s) of the person answering these Interrogatories and anyone who assisted in formulating the responses.

**RESPONSE:**

2. Identify each person with knowledge of the PUD Application described in Paragraph 19 of the Complaint filed on May 12, 2025, and describe the general knowledge each person has of the PUD Application.

**RESPONSE:**

3. For each Condition listed in Section 4 of Ordinance 2025-06 identify the specific provision of the Village of North Palm Beach Town Code that authorizes the Condition.

**RESPONSE:**

4.      Identify the "building regulations" referenced in Paragraph 74 of Your Answer and Affirmative Defenses that preclude NP-Devland from having a vested right to build.

**RESPONSE:**

5.      Identify the "competent and substantial evidence" referenced in Paragraph 76 of Your Answer and Affirmative Defenses that support the Conditions listed in Section 4 of Ordinance 2025-06

**RESPONSE:**

6.      Identify each fact that supports the allegation made in Paragraph 77 of Your Answer and Affirmative Defenses that NP-Devland "consented" to the Conditions listed in Section 4 of Ordinance 2025-06.

**RESPONSE:**

7.      Identify each person who participated in drafting the C-3 PUD Regulations referenced in Paragraph 17 of the Complaint filed on May 12, 2025, and provide a general description of the person's role in drafting the regulation.

**RESPONSE:**

8.      Identify each fact that supports Your denial of the allegation made in Paragraph 21 of the Complaint filed on May 12, 2025 that NP-Devland's PUD application satisfied the "threshold criteria" set forth in the Village's C-3 PUD Regulations.

**RESPONSE:**

9.       Identify each fact that supports Your denial of the allegation made in Paragraph 21 of the Complaint filed on May 12, 2025 that NP-Devland's PUD application is consistent with the Village's Comprehensive Plan.

**RESPONSE:**

10. Identify each fact that supports the contention made in Paragraph 87 of your Answer and Affirmative Defenses that the Conditions listed in Section 4 of Ordinance 2025-06 "bear[s] a rational relationship to a legitimate governmental purpose."

**RESPONSE:**

11. Identify which Conditions listed in Section 4 of Ordinance 2025-06 "involve the exercise of professional, discretionary decision-making" as contended in Paragraph 83 of your Answer and Affirmative Defenses.

**RESPONSE:**

12. Identify which of the four "threshold criteria," as defined in Paragraph 21 of the Complaint filed on May 12, 2025 require "discretionary decision-making."

**RESPONSE:**

13. Identify all oral or written statements made by NP-Devland that you contend constitute waiver or estoppel.

**RESPONSE:**

## **<u>VERIFICATION</u>**

I have read the foregoing Answers to Plaintiffs' First Set of Interrogatories and do swear that they are true and correct to the best of my knowledge, information and belief.


BY: _____


STATE OF _____

COUNTY OF _____


BEFORE ME, personally appeared _____ who, upon being first duly sworn according to law, depose(s) and say(s) that he executed the foregoing Answers to the First Set of Interrogatories are true and correct to the best of his knowledge and belief.

SWORN AND SUBSCRIBED before me on _____, _____.


_____
Notary Public
My Commission Expires:

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION AK

CASE NO. 50-2025-CA-004670-XXXA-MB

NP DEVLAND HOLDINGS LLC,
NP DEVLAND NORTH LLC,
NP DEVLAND EAST LLC,
  Plaintiff/Petitioners
vs.
VILLAGE OF NORTH PALM BEACH FLORIDA,
  Defendant/Respondent.
_____/

### ORDER SPECIALLY SETTING REMOTE HEARING
[Scheduling Order and Notice of Hearing]
[*a copy of the motion/s must be attached when submitted to the Court*]

    **THIS MATTER** is specially set for REMOTE hearing before **JUDGE JAMES SHERMAN** as follows:

    **DATE OF HEARING: Thursday, October 16, 2025**

    **TIME OF HEARING: 1:30 PM**

    **TIME RESERVED FOR HEARING: 15 minutes**

    **MATTER(s) TO BE HEARD: Motion to Strike**

### IMPORTANT ZOOM INFORMATION:

Join Zoom Meeting
https://us02web.zoom.us/j/89696185484

Meeting ID: 89696185484

Dial-in Information
    877 853 5257 US Toll-Free
    888 475 4499 US Toll-Free

    **THIS MATTER HAS BEEN SPECIALLY SET BY COURT ORDER AND CANNOT BE CANCELED OR RESET EXCEPT BY FURTHER ORDER OF THE COURT.** It is further

FILED: PALM BEACH COUNTY, FL CLERK OF THE CIRCUIT COURT. 09/04/2025 12:21:30 PM

Case No. 50-2025-CA-004670-XXXA-MB

**ORDERED** that the attorneys/parties must submit to the Court by hard copy if greater than 50 pages (or upload to eCourtesy if less than 50 pages total) seven (7) days before the hearing noting the date and time of the hearing:

1. copies of all relevant pleadings;
2. copies of all case law authority;

If an interpreter is needed for a party or witness in this case, it shall be the responsibility of the party needing same to provide a qualified interpreter.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida.

50-2025-CA-004670-XXXA-MB      09/04/2025
James Sherman
Judge

**COPIES TO:**

| | | |
|---|---|---|
| ELLIOT HANEY | 1001 WATER STREET SUITE 475 TAMPA, FL 33602 | elliolth@sblfirm.com marjoriep@blhtlaw.com eservice@blhtlaw.com heatherw@blhtlaw.com |
| ERIC L STETTIN | 200 EAST BROWARD BLVD SUITE 1900 FORT LAUDERDALE, FL 33301 | estettin@wsh-law.com estettin@wsh-law.com djones@wsh-law.com |
| ETHAN J LOEB | 1001 WATER STREET SUITE 475 TAMPA, FL 33602 | ethanl@blhtlaw.com kerrir@blhtlaw.com eservice@blhtlaw.com heatherw@blhtlaw.com |
| NICHOLAS M GIESELER | 819 S FEDERAL HWY SUITE 300 STUART, FL 34994 | nicholasg@blhtlaw.com mariac@blhtlaw.com |
| STEVEN GIESELER | 819 S FEDERAL HWY SUITE 300 STUART, FL 34994 | steveng@blhtlaw.com mariac@blhtlaw.com heatherw@blhtlaw.com |

Case No. 50-2025-CA-004670-XXXA-MB

# ADA NOTICE

This notice is provided pursuant to Administrative Order No. 2.207

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

     Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

     Defendant/Respondent

_____/

## DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION

Defendant, VILLAGE OF NORTH PALM BEACH, FLORIDA, by its undersigned

counsel, files its Response to the Request for Production, as follows:

1.    All documents and communications from January 1, 2022 to present related to the Subject Property.

    **Response:**

    Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

2.    All documents and communications from January 1, 2022 to present discussing or referencing Nader Salour.

    **Response:**

    Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

3.      All documents listed in Your Initial Disclosures filed on July 21, 2025.

   **Response:**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

4.      All documents and communications from January 1, 2019 to December 31, 2022 related to the adoption of the C-3 PUD regulations described in Paragraph 17 of the Complaint filed on May 12, 2025.

   **Response:**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

5.      All documents and communications from January 1, 2024 to present related to Ordinance 2025-06.

   **Response:**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

6.      All documents You refer to as "competent and substantial evidence" in Paragraph 76 of Your Answer and Affirmative Defenses filed on June 24, 2025.

   **Response:**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

7.      All Ordinances from January 1, 2022 to present approving a Planned Unit Development in the Village of North Palm Beach.

   **Response:**

   None.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

8.      All documents and communications related to the "oral and written representations" referenced in Condition II of Ordinance 2025-06.

**<u>Response:</u>**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

9.      All communications from January 1, 2022 to present between you and the Town of Lake Park related to the Subject Property.

**<u>Response:</u>**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

10.      All documents and communications related to any other applications for a C-3 PUD submitted to You since the adoption of the C-3 PUD Regulations.

**<u>Response:</u>**

None.

11.      All documents and communications related to guidance or training of staff processing C-3 PUD applications.

**<u>Response:</u>**

None.

12.      All documents that support the contention made in Paragraph 87 of your Answer and Affirmative Defenses that Ordinance 2025-06 "bears a rational relationship to a legitimate governmental purpose."

**<u>Response:</u>**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on September 22, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By: /s/ *Eric L. Stettin*
ERIC L. STETTIN
Florida Bar No. 831697

Filing # 253702429 E-Filed 10/15/2025 02:12:17 PM

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware

limited liability company; NP-DEVLAND NORTH,

LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

     Plaintiffs/Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

     Defendant/Respondent

_____/

### AGREED ORDER ON PLAINTIFF'S MOTION TO STRIKE

THIS CAUSE, having come before the Court on Plaintiff's Motion to Strike, and the Court being fully advised of an agreement between Counsel on the matter, and being otherwise advised in the premises, it is hereby:

**ORDERED AND ADJUDGED** that the Motion to Strike is granted without prejudice. Defendant shall file its amended answer and affirmative defenses within 10 days from the date of this order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida.

50-2025-CA-004670-XXXA-MB    10/15/2025
James Sherman
Judge

_____
CIRCUIT COURT JUDGE

Page **1** of **1**

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

     Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

     Defendant/Respondent

_____/

## **ANSWER AND AMENDED AFFIRMATIVE DEFENSES**

Defendant, **VILLAGE OF NORTH PALM BEACH**, by the undersigned counsel, files

this Answer and Amended Affirmative Defenses, and states as follows:

1. Without knowledge, therefore denied.

2. Without knowledge, therefore denied.

3. Without knowledge, therefore denied.

4. Defendant is without knowledge of when and on what dates the Plaintiffs purchased

    the subject property, but admit Plaintiffs represented their ownership during the time

    of the application referenced in the Complaint.

5. Admit.

6. Denied.

7. Denied.

8. Denied.

9. Defendant admits only that venue is proper in Palm Beach County. Defendant denies the remainder of the allegations in this paragraph and demands strict proof thereof.

10. Denied.

11. Admit.

12. Admit.

13. Admit.

14. Denied as phrased.

15. Without knowledge, therefore denied.

16. Without knowledge, therefore denied.

17. Denied as phrased. However, admit Defendant collaborated with NP-Devland regarding the newly created C-3 zoning district referred to as Exhibit B to the Complaint.

18. Denied.

19. Denied as phrased. Without knowledge of NP-Devland's initial conception. Admit the PUD application referred to as Exhibit D to the Complaint.

20. Denied. However, Defendant admits the language in its Code.

21. Denied.

22. Denied.

23. Denied.

24. Denied.

25. Denied.

26. Admit.

2

27. Denied.

28. Denied.

29. Denied as phrased. However, Defendant admits the quoted portion starting with "subject to additional findings…."

30. Denied as phrased.

31. Denied as phrased.

32. Denied.

33. Denied.

34. Denied.

35. Denied.

36. Denied. However, Defendant admits the quoted portion starting with "All ordinances … "

## COUNT I
## Declaratory and Injunctive Relief

37. Defendant incorporates its prior responses to each of the preceding paragraphs as if set forth fully herein.

38. Without knowledge, therefore denied.

39. Denied.

40. Without knowledge, therefore denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

3

46. Denied.

47. Denied as phrased.

## COUNT II
## Declaratory and Injunctive Relief

48. Defendant incorporates its prior responses to each of the preceding paragraphs as if set forth fully herein.

49. Without knowledge, therefore denied.

50. Without knowledge, therefore denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied as phrased.

## COUNT III
## Petition for Writ of Mandamus

59. Defendant incorporates its prior responses to each of the preceding paragraphs as if set forth fully herein.

60. Without knowledge, therefore denied.

61. Denied.

62. Denied.

63. Denied.

4

64. Denied.

65. Denied.

66. Denied.

67. Without knowledge, therefore denied.

68. Denied.

69. Denied.

70. Denied.

71. All allegations not specifically admitted are expressly denied.

**AFFIRMATIVE DEFENSES**

72.     As and for its first affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, alleges that the Court lacks subject-matter jurisdiction because the Complaint is an improper collateral attack on a quasi-judicial decision on their specific PUD application, rendered after a noticed hearing that included staff analysis, sworn applicant presentations, public comment, Council deliberation, and a recorded roll-call vote, culminating in Ordinance 2025-06 on April 10, 2025. Plaintiffs filed a civil complaint on May 12, 2025, seeking to annul or bypass that decision rather than invoking the exclusive petition for first-tier certiorari within 30 days of rendition as required by Fla. R. App. P. 9.100(c). *Grace v. Town of Palm Beach*, 656 So.2d 945 (Fla.4th DCA 1995). Plaintiffs' pleading nonetheless seeks a declaration that the ordinance is "void, inapplicable, and of no force" as to their application and asks the Court to compel processing under prior code provisions. Because the Council has already acted on the application by ordinance following noticed proceedings, Plaintiffs cannot use a plenary civil count for declaratory or injunctive relief to annul or bypass that decision. The only proper method to obtain judicial review of that action was the exclusive petition vehicle within the time

5

fixed by rule and a later-filed civil complaint cannot reopen or relitigate it. For these reasons, Plaintiffs' action should be dismissed as an improper collateral attack and for failure to employ the exclusive method of review.

73.     As and for its second affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, alleges that Plaintiffs' claims are barred and/or limited by the constitutional separation of powers and/or sovereign immunity because they invite the Court to reweigh policy choices the Village Council made in adopting Ordinance 2025-06 on April 10, 2025 with respect to Plaintiffs' specific PUD application. See, *Trianon Park Condominium Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 918 (Fla. 1985) ("under the constitutional doctrine of separation of powers, the judicial branch must not interfere with the discretionary functions of the legislative or executive branches of government absent a violation of constitutional or statutory rights."). See also *Detournay v. City of Coral Gables*, 127 So. 3d 869, 873 (Fla. 3d DCA 2013) ("[t]o hold otherwise . . . would require the judicial branch to second guess the political and police power decisions of the other branches of government and would violate the separation of powers doctrine"). As the Complaint itself pleads, the Council recognized that the application satisfied the C-3 "threshold criteria," yet approved it "subject to additional findings regarding public benefit … during the site plan process," and imposed thirty-seven (37) conditions as set out in Section 4 of the ordinance. Those features reflect legislative-type policy calibration by linking redevelopment objectives and "public benefit" features to later Site Plan and Appearance Review and are not a proper subject for judicial second-guessing absent a pleaded violation of a controlling statute or constitutional provision. On the face of Plaintiffs' own allegations and exhibit, the ordinance conditions approval on future, site-specific determinations at Site Plan and binds the applicant to process representations (Conditions II and JJ).

6

74. As and for its third affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that Plaintiffs had no vested right to unconditional approval, or to commence construction. The ordinance they challenge was adopted April 10, 2025 and expressly approved the PUD subject to thirty-seven (37) enumerated conditions and, by Condition JJ, (i) states that approval of the Master Development/Phasing Plans does not authorize any construction activities, and (ii) reserves the building site area regulations (including massing, setbacks, and related parcel-level metrics) to be determined during the Site Plan and Appearance Review taking into account the public benefit provided. By Condition II Plaintiffs are also bound by their oral and written representations made in the process. Plaintiffs plead no final site-plan approval, no building permits, and no final development order authorizing construction. The Council minutes (Apr. 10, 2025) and PZAB minutes (May 8, 2024) reflect that parcel-level controls and public-benefit calibrations would be set at the Site Plan stage following further submissions and review. On the face of the pleadings and record materials, Plaintiffs lack any "as-of-right" entitlement to build free of the ordinance's conditions or the subsequent Site Plan and Appearance Review, defeating their claims premised on a present, unconditional right to approval. By its text, subsection (10) identifies threshold criteria for eligibility to use 'special PUD regulations'; it does not strip the Village of authority to impose conditions or to stage parcel-level metrics at Site Plan. Plaintiffs' reading would nullify expressly codified site-plan review and Conditions II/JJ quoted in their Complaint.

75. As and for its fourth affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that Plaintiffs' claims are unripe and, to the extent they seek as-applied relief, barred for failure to exhaust administrative remedies. The action challenged Ordinance was adopted April 10, 2025 and approved the PUD subject to thirty-seven (37) conditions and

7

expressly reserved parcel-level building site area regulations to the Site Plan and Appearance Review stage, where those regulations are to be determined "taking into account the public benefit provided" (Condition JJ), and further bound Plaintiffs to the oral and written representations they made during processing (Condition II). By their own pleading Plaintiffs have not completed Site Plan and Appearance Review despite over a year and a half allowance to make changes, have not obtained site-specific determinations on massing, setbacks, or other parcel metrics, and have not been denied relief at that stage. The Council meeting record reflects that these determinations were deliberately sequenced to Site Plan, following further submissions, staff analysis, and applicant response. Because material discretionary steps remain in the administrative process and no final site-specific determinations have been rendered or denied, there is no present controversy fit for judicial resolution; any challenge to how the ordinance's standards and conditions apply to this project is premature until Site Plan and Appearance Review is completed and administrative remedies have been pursued to conclusion.

76.     As and for its fifth affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that Plaintiffs were afforded notice and a full opportunity to be heard, and that the Council's action rests on a developed record. The April 10, 2025, Council hearing on Plaintiffs' PUD was duly noticed and included staff analysis, sworn applicant presentations with written submittals, public comment, Council questioning and deliberation, and a recorded roll-call vote culminating in Ordinance 2025-06. The PZAB hearing likewise reflected noticed proceedings with staff and applicant presentations. The Ordinance, which Plaintiffs attach, adopts thirty-seven (37) project-specific conditions and (by Condition II) binds Plaintiffs to their oral and written representations made during processing; it further (by Condition JJ) reserves parcel-level building site area regulations for determination during Site Plan and Appearance

8

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Review taking into account the public benefit provided. These pleaded and recorded facts demonstrate that (i) Plaintiffs received all process that was due and (ii) the approval was tailored to the project on the basis of the record. Accordingly, any claim premised on an alleged absence of process, standards, or record support is barred and should be denied.

77.     As and for its sixth affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that Plaintiffs' claims are barred and/or limited by waiver and estoppel. Plaintiffs had notice and a full opportunity to be heard at April 10, 2025, quasi-judicial Council hearing on their PUD application and chose not to present evidence in opposition to the ordinance as ultimately adopted. Earlier, at the Planning & Zoning (PZAB) hearing on the same application, Plaintiffs failed to object to the use of conditions and to the sequencing that reserves parcel-level controls to Site Plan and Appearance Review and instead proposed and accepted tangible concessions incorporated into the approval. The resulting Ordinance approved the application subject to thirty-seven (37) conditions, including Condition II binding Plaintiffs to their oral and written representations made during processing and Condition JJ, deferring building-site area regulations to Site Plan, to be determined taking into account the public benefit provided. Having participated without objection, accepted concessions aligned with those public-benefit objectives, and advanced the application to adoption of an ordinance expressly subject to further site-plan determinations, Plaintiffs cannot now repudiate the very conditions, sequencing, and representational commitments that formed the basis of approval. Their claims are therefore barred, in whole or in part, by waiver and estoppel.

78.     As and for its seventh affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that, to the extent the Court finds Ordinance 2025-06 was a legislative action rather than quasi-judicial, the Court must defer to the Village's policy-making function,

9

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

and any challenge is barred because the ordinance is supported by a rational basis. The Complaint and attached ordinance reflect that the Council approved the application subject to thirty-seven (37) conditions, bound the applicant to its oral and written representations (Condition II), and reserved parcel-level building-site regulations to Site Plan and Appearance Review to be determined "taking into account the public benefit provided" (Condition JJ). The Council's deliberations addressed policy objectives which include connectivity, civic/open-space, pedestrian orientation, phasing, and calibration of public-benefit features, all which were implemented through the conditions and staged review. Those facts supply multiple rational basis for the ordinance. Plaintiffs therefore cannot sustain their "very heavy burden" to show a lack of rational basis, and their claims are barred and/or limited under the separation of powers and deferential legislative review.

79.    As and for its eighth affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that Plaintiffs' action fails to state a claim and, independently, fails to satisfy required conditions precedent because Plaintiffs neither allege nor show compliance with the mandatory notice requirements for challenges to the constitutionality of a municipal ordinance. Specifically, Fla. R. Civ. P. 1.071 requires service of the pleading raising the constitutional question on the Attorney General and on the state attorney of the judicial circuit in which the action is pending for challenges to local enactments, and § 86.091, Fla. Stat. requires that the appropriate public officer be served and afforded an opportunity to be heard in declaratory actions. Plaintiffs' Complaint contains no allegation, certificate, or proof of service reflecting such notice, and no docket certificate shows it was given. Accordingly, action is barred and should be dismissed until strict compliance is made and absent compliance, Plaintiffs are not entitled to declaratory or other relief on constitutional grounds.

10

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

80.     As and for its ninth affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that Plaintiffs received all process that was due and that the Council's action rests on a developed record. Plaintiffs' PUD application was heard at a duly noticed Village Council meeting on April 10, 2025, which included staff analysis, sworn applicant presentations and written submittals, public comment, Council questioning and deliberation, and a recorded roll-call vote culminating in Ordinance 2025-06. The application was also the subject of a noticed PZAB hearing (preceding Council action) with staff and applicant presentations. By the terms of the adopted ordinance, the approval was subject to thirty-seven (37) enumerated conditions, including Condition II, which binds Plaintiffs to all oral and written representations made during the application and approval process, and Condition JJ, which reserves parcel-level building-site area regulations to Site Plan and Appearance Review to be determined taking into account the public benefit provided. On the face of the pleadings and the record of proceedings, Plaintiffs had notice and a meaningful opportunity to be heard, and the Council's action was taken on a developed record tailored to the project; accordingly, any claim predicated on a lack of process, standards, or record support is barred and should be denied.

81.     As and for its tenth affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that Count III fails in its entirety because:

(a)     Plaintiffs have no clear legal right to the unconditional approval they demand;

(b)     the Village has no present, purely ministerial duty to issue such approval; and

(c)     Plaintiffs' own conduct waives and estops the relief sought.

11

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

The challenged action approved the application subject to thirty-seven (37) enumerated conditions and, by Condition JJ, confirms that approval of the Master Development/Phasing Plans does not authorize any construction activities, and defers parcel-level building site-area regulations to be determined during the Site Plan and Appearance Review, taking into account the public benefit provided. By Condition II, Plaintiffs are bound by their oral and written representations made during processing. The Council meeting and PZAB meeting reflect that these site-specific determinations and public-benefit calibrations were intentionally reserved for the Site Plan forum following further submissions, staff analysis, and applicant response. Because material discretionary judgments remain to be made in that process, mandamus cannot be used to create an unconditional entitlement that the ordinance withholds or to compel discretionary, site-specific determinations that have not yet been rendered. Further, Plaintiffs proceeded through PZAB and Council without preserving objections to the conditions-and-sequencing framework and proposed/accepted concessions incorporated into the approval (including increased EV charging and golf-cart parking), thereby waiving and estopping any demand for an order compelling unconditional approval. Even if any error were preserved, first-tier certiorari provided an adequate remedy at law, precluding mandamus.

82.     As and for its eleventh affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that Plaintiffs' claims are barred and/or limited by sovereign immunity because they seek relief that would intrude upon planning-level policy determinations reserved to the legislative/executive functions of the Village. In adopting Ordinance 2025-06 the Council exercised its policy-making discretion by going through the steps required to meet redevelopment objectives such as connectivity, civic/open-space, pedestrian orientation, phasing, and delivery of "public benefit" features for a phased mixed-use project and by implementing

12

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

those objectives through an approval subject to thirty-seven (37) conditions. By Condition II, the ordinance binds the applicant to the oral and written representations made during processing and by Condition JJ, it reserves parcel-level building-site area regulations to Site Plan and Appearance Review, to be determined taking into account the public benefit provided. The Council and PZAB records reflect that these judgments were forward-looking policy choices about what benefits must be delivered, when they must be sequenced, and how they must be verified at Site Plan and not adjudications of fixed private rights. Plaintiffs' requested relief that of nullifying or rewriting conditions, overriding the "public benefit" calibration, or compelling immediate application of prior provisions would substitute judicial preferences for discretionary planning choices and expose the Village to liability for functions that are immune from suit. The actions challenged are planning-level and discretionary as such, sovereign immunity bars the claims to the extent they seek damages or equitable relief that would control or second-guess those policy determinations. At minimum, any remedy must be limited to exclude interference with the Village's discretionary planning functions.

83.     As and for its twelfth affirmative defense, Defendant, VILLAGE OF NORTH PALM BEACH, states that Plaintiffs' constitutional attacks on Ordinance 2025-06 fail as a matter of law and fact. A municipal ordinance is presumptively valid, and a facial challenge requires Plaintiffs to demonstrate invalidity beyond a reasonable doubt on the text itself in an as-applied challenge requires well-pled, case-specific facts showing unconstitutional operation in the circumstances alleged. Here, the Complaint and attached ordinance show clear, administrable standards and a defined process where the Council approved the application subject to thirty-seven (37) enumerated conditions; Condition II expressly binds Plaintiffs to all oral and written representations made during processing; and Condition JJ defers parcel-level building-site area

13

regulations to the Site Plan and Appearance Review, to be determined taking into account the public benefit provided. The Council meeting and PZAB meeting reflect how those provisions are applied through noticed hearings, staff analysis, applicant presentations, public comment, Council deliberation, and roll-call vote demonstrating the intelligible framework required, not unbridled discretion. Plaintiffs allege no deprivation of notice or opportunity to be heard, identify no site-plan determination that denied relief on unconstitutional grounds, and point to no ordinance text that forces persons of common understanding to guess at what is required. On the face of the pleadings and record, the ordinance provides workable standards and an established forum and sequence for their application and accordingly, Plaintiffs cannot carry their facial or as-applied constitutional burdens, and the constitutional components of their claims must be dismissed or denied.

WHEREFORE, Defendant, **VILLAGE OF NORTH PALM BEACH**, respectfully requests the Complaint be dismissed with all costs taxed against the Plaintiffs, and for such other and further relief that this Court deems just and proper.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on October 27, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By: <u>/s/ Eric L. Stettin</u>
ERIC L. STETTIN,ESQ.
Florida Bar No. 831697

14

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

     Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

     Defendant/Respondent

_____/

## NOTICE OF UNAVAILABILITY

Defendant, VILLAGE OF NORTH PALM BEACH, FLORIDA, by and through its undersigned counsel, and hereby files this Notice of Unavailability stating that the undersigned counsel will be unavailable between the following dates and requests no hearings, depositions, or other matters be scheduled during this time: Monday, November 17, 2025, through Friday, November 28, 2025.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on November 19, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By: /s/ Eric L. Stettin
   ERIC L. STETTIN,ESQ.
   Florida Bar No. 831697

FILED: PALM BEACH COUNTY, FL, MICHAEL A. CARUSO, CLERK, 11/19/2025 09:42:36 AM

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

Case No.: 50-2025-CA-004670-XXXA-MB

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

## NOTICE OF TAKING VIDEOTAPED DEPOSITION DUCES TECUM

**PLEASE TAKE NOTICE** that the undersigned attorneys will take the deposition of the person named below, pursuant to the Florida Rules of Civil Procedure, before a certified court reporter who is not of counsel to the parties or interested in the event of the cause at the address shown below. This deposition may be used as evidence at an evidentiary hearing, trial, or other court proceedings as allowed under Florida law. The deposition taken by this Firm pursuant to this notice is intended for that purpose or any other lawful purpose, and you are hereby notified of such proceeding and will conduct yourself accordingly and prepare for this deposition accordingly. This deposition will be videotaped by a representative of Olender Reporting, Inc. (866) 420-4020. Deponent shall deliver the documents listed on the attached Exhibit "A" at least 5 business days before the scheduled deposition[1].

---

[1] Documents previously produced need not be reproduced.

1

FILED: PALM BEACH COUNTY, FL, MICHAEL A. CARUSO, CLERK, 12/04/2025 04:59:37 PM

| Name | Date | Location |
|------|------|----------|
| Charles Huff | January 15, 2026 @ 10:00 a.m. | City Hall Conference 501 US Highway 1 North Palm Beach, Florida 33408 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 4, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on: Eric L. Stettin, Esq., estettin@wsh-law.com, DJones@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

/s/ Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829
ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

2

**DEFINITIONS AND INSTRUCTIONS**

1.      The term "NP-Devland" means, the Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC collectively.

2.      The term "Subject Property" means the property described in Paragraph 4 of the Complaint filed on May 12, 2025.

3.      The term "Village," refers to Defendant, Village of North Palm Beach, Florida, including all employees, owners, officers, members, managing members, directors, affiliates, agents, and any other person or entity acting for or on its behalf.

4.      The term "You" and/or "Your" means the party or parties to whom these requests are addressed, including the party or parties or any other agent(s), attorney(s), and all other persons acting or purporting to act on their behalf.

5.      As used herein, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

6.      The terms "document" or "documents" mean any written, typed, printed, recorded or graphic material, however produced, reproduced or stored, including, but not limited to, all Electronic Data, notes, e-mails, memoranda, reports, correspondence, communications, contracts, bills, agreements, letters, messages, minutes, telegrams, memorandums, memorandums of conferences or telephone conversations, study list, compliance of data, papers, books, records, pictures, photographs, tapes and all other tangible things upon which are handwriting, typing, printing, drawing, representative, photostatic or other copies, magnetic or electronic impulse or other forms of communication is recorded or reproduced and all copies (except for identical copies) and drafts thereof. Any copy containing these, or any other alterations, notes or comments not included on any original shall not be deemed an identical copy but shall be deemed a separate document within the foregoing definition.

7.      The terms "communication," "communications," and "correspondence," which are included within the broader terms "document" and "documents" above, mean any statement or utterance, whether written or oral, made by one person to another or in the presence of another, or any document delivered or sent from one person to another, including, but not limited to, notes, electronic messages, e-mails, voice mail messages, text messages, instant/direct messaging or IM, (e.g., iMessages, Slack messages, Skype Messenger, FaceBook Messenger, etc.), tweets, social media posts, information stored on web pages or web servers, and database records.

8.      The term "Electronic Data," which is included within the broader terms "document" and "documents" above, means any information, including files, documents, correspondence, communications, images, videos, metadata or any combination thereof stored, created, or used on any Electronic Storage Device, disk, tape (including backup tapes and other backup media), or other computer or digital storage medium, microfilm, microfiche, floppy, or any other storage or recording medium.

9.      The word "Electronic Storage Device" means any disk, including hard disks and

3

floppy disks, CD-ROM's, DVD's, network servers, shared servers, computers, magnetic tape, back-up tape, voicemail, temporary files, and PDA's, whether currently on your premises or otherwise.

10.     The word "produce" means to make available the documents requested herein—**in their native format, including all meta-data**—for inspection and copying and to separate such documents into the categories set forth in this request.

11.     The term "relating to" means concerning, respecting, referring to, summarizing, digesting, embodying, demonstrating, reflecting, establishing, tending to establish, tending not to establish, evidencing, comprising, connected with, commenting on, responding to, disagreeing with, showing, describing, analyzing, representing, constituting or including.

12.     If you decline to produce any documents requested hereinafter on the basis of any privilege known in the law, you shall, at the time of production designated herein, as to each such document, provide Plaintiff with the following written information pertaining to such document:

   (a)     its date or, if not dated, the date it was prepared or received;

   (b)     the type of document (e.g., letter, memorandum, telegram, chart, photograph, reproduction);

   (c)     the author and addressee;

   (d)     its present location;

   (e)     the identity and address of the individual or person presently custodian thereof;

   (f)     a general description of its contents;

   (g)     the number of pages thereof;

   (h)     the identity of each person who received a copy of such document and the relationship of such person to you;

   (i)     whether such document contains or relates to facts or opinions, or both; and

   (j)     the exact nature of the privilege that you claim with respect to such document.

13.     The words "And," "or" as well as "and/or" shall be interpreted in the most inclusive sense possible.

4

**DOCUMENTS TO BE PRODUCED**

1.     All documents and communications from January 1, 2022 to present related to the Subject Property.

2.     All documents and communications from January 1, 2022 to present discussing or referencing Nader Salour.

3.     All documents listed in Your Initial Disclosures filed on July 21, 2025.

4.     All documents and communications from January 1, 2019 to December 31, 2022 related to the adoption of the C-3 PUD regulations described in Paragraph 17 of the Complaint filed on May 12, 2025.

5.     All documents and communications from January 1, 2024 to present related to Ordinance 2025-06.

6.     All documents You refer to as "competent and substantial evidence" in Paragraph 76 of Your Answer and Affirmative Defenses filed on June 24, 2025.

7.     All Ordinances from January 1, 2022 to present approving a Planned Unit Development in the Village of North Palm Beach.

8.     All documents and communications related to the "oral and written representations" referenced in Condition II of Ordinance 2025-06.

9.     All communications from January 1, 2022 to present between you and the Town of Lake Park related to the Subject Property.

10.     All documents and communications related to any other applications for a C-3 PUD submitted to You since the adoption of the C-3 PUD Regulations.

11.     All documents and communications related to guidance or training of staff processing C-3 PUD applications.

12.    All documents that support the contention made in Paragraph 87 of your Answer and Affirmative Defenses that Ordinance 2025-06 "bears a rational relationship to a legitimate governmental purpose."

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

Case No.: 50-2025-CA-004670-XXXA-MB

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

## NOTICE OF TAKING VIDEOTAPED DEPOSITION DUCES TECUM

**PLEASE TAKE NOTICE** that the undersigned attorneys will take the deposition of the person named below, pursuant to the Florida Rules of Civil Procedure, before a certified court reporter who is not of counsel to the parties or interested in the event of the cause at the address shown below. This deposition may be used as evidence at an evidentiary hearing, trial, or other court proceedings as allowed under Florida law. The deposition taken by this Firm pursuant to this notice is intended for that purpose or any other lawful purpose, and you are hereby notified of such proceeding and will conduct yourself accordingly and prepare for this deposition accordingly. This deposition will be videotaped by a representative of Olender Reporting, Inc. (866) 420-4020. Deponent shall deliver the documents listed on the attached Exhibit "A" at least 5 business days before the scheduled deposition[1].

_____

[1] Documents previously produced need not be reproduced.

1

| Name | Date | Location |
|------|------|----------|
| Valentino Perez | January 19, 2026 @ 10:00 a.m. | City Hall Conference 501 US Highway 1 North Palm Beach, Florida 33408 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 4, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on: Eric L. Stettin, Esq., estettin@wsh-law.com, DJones@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

/s/ Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829
ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
*Counsel for Plaintiffs / Petitioners*

2

## DEFINITIONS AND INSTRUCTIONS

1.      The term "NP-Devland" means, the Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC collectively.

2.      The term "Subject Property" means the property described in Paragraph 4 of the Complaint filed on May 12, 2025.

3.      The term "Village," refers to Defendant, Village of North Palm Beach, Florida, including all employees, owners, officers, members, managing members, directors, affiliates, agents, and any other person or entity acting for or on its behalf.

4.      The term "You" and/or "Your" means the party or parties to whom these requests are addressed, including the party or parties or any other agent(s), attorney(s), and all other persons acting or purporting to act on their behalf.

5.      As used herein, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

6.      The terms "document" or "documents" mean any written, typed, printed, recorded or graphic material, however produced, reproduced or stored, including, but not limited to, all Electronic Data, notes, e-mails, memoranda, reports, correspondence, communications, contracts, bills, agreements, letters, messages, minutes, telegrams, memorandums, memorandums of conferences or telephone conversations, study list, compliance of data, papers, books, records, pictures, photographs, tapes and all other tangible things upon which are handwriting, typing, printing, drawing, representative, photostatic or other copies, magnetic or electronic impulse or other forms of communication is recorded or reproduced and all copies (except for identical copies) and drafts thereof. Any copy containing these, or any other alterations, notes or comments not included on any original shall not be deemed an identical copy but shall be deemed a separate document within the foregoing definition.

7.      The terms "communication," "communications," and "correspondence," which are included within the broader terms "document" and "documents" above, mean any statement or utterance, whether written or oral, made by one person to another or in the presence of another, or any document delivered or sent from one person to another, including, but not limited to, notes, electronic messages, e-mails, voice mail messages, text messages, instant/direct messaging or IM, (e.g., iMessages, Slack messages, Skype Messenger, FaceBook Messenger, etc.), tweets, social media posts, information stored on web pages or web servers, and database records.

8.      The term "Electronic Data," which is included within the broader terms "document" and "documents" above, means any information, including files, documents, correspondence, communications, images, videos, metadata or any combination thereof stored, created, or used on any Electronic Storage Device, disk, tape (including backup tapes and other backup media), or other computer or digital storage medium, microfilm, microfiche, floppy, or any other storage or recording medium.

9.      The word "Electronic Storage Device" means any disk, including hard disks and

3

floppy disks, CD-ROM's, DVD's, network servers, shared servers, computers, magnetic tape, back-up tape, voicemail, temporary files, and PDA's, whether currently on your premises or otherwise.

10.     The word "produce" means to make available the documents requested herein—**in their native format, including all meta-data**—for inspection and copying and to separate such documents into the categories set forth in this request.

11.     The term "relating to" means concerning, respecting, referring to, summarizing, digesting, embodying, demonstrating, reflecting, establishing, tending to establish, tending not to establish, evidencing, comprising, connected with, commenting on, responding to, disagreeing with, showing, describing, analyzing, representing, constituting or including.

12.     If you decline to produce any documents requested hereinafter on the basis of any privilege known in the law, you shall, at the time of production designated herein, as to each such document, provide Plaintiff with the following written information pertaining to such document:

(a)     its date or, if not dated, the date it was prepared or received;

(b)     the type of document (e.g., letter, memorandum, telegram, chart, photograph, reproduction);

(c)     the author and addressee;

(d)     its present location;

(e)     the identity and address of the individual or person presently custodian thereof;

(f)     a general description of its contents;

(g)     the number of pages thereof;

(h)     the identity of each person who received a copy of such document and the relationship of such person to you;

(i)     whether such document contains or relates to facts or opinions, or both; and

(j)     the exact nature of the privilege that you claim with respect to such document.

13.     The words "And," "or" as well as "and/or" shall be interpreted in the most inclusive sense possible.

## DOCUMENTS TO BE PRODUCED

1.      All documents and communications from January 1, 2022 to present related to the Subject Property.

2.      All documents and communications from January 1, 2022 to present discussing or referencing Nader Salour.

3.      All documents listed in Your Initial Disclosures filed on July 21, 2025.

4.      All documents and communications from January 1, 2019 to December 31, 2022 related to the adoption of the C-3 PUD regulations described in Paragraph 17 of the Complaint filed on May 12, 2025.

5.      All documents and communications from January 1, 2024 to present related to Ordinance 2025-06.

6.      All documents You refer to as "competent and substantial evidence" in Paragraph 76 of Your Answer and Affirmative Defenses filed on June 24, 2025.

7.      All Ordinances from January 1, 2022 to present approving a Planned Unit Development in the Village of North Palm Beach.

8.      All documents and communications related to the "oral and written representations" referenced in Condition II of Ordinance 2025-06.

9.      All communications from January 1, 2022 to present between you and the Town of Lake Park related to the Subject Property.

10.      All documents and communications related to any other applications for a C-3 PUD submitted to You since the adoption of the C-3 PUD Regulations.

11.      All documents and communications related to guidance or training of staff processing C-3 PUD applications.

12.	All documents that support the contention made in Paragraph 87 of your Answer and Affirmative Defenses that Ordinance 2025-06 "bears a rational relationship to a legitimate governmental purpose."

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

Case No.: 50-2025-CA-004670-XXXA-MB

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

## AMENDED[1] NOTICE OF TAKING VIDEOTAPED DEPOSITION DUCES TECUM

**PLEASE TAKE NOTICE** that the undersigned attorneys will take the deposition of the person named below, pursuant to the Florida Rules of Civil Procedure, before a certified court reporter who is not of counsel to the parties or interested in the event of the cause at the address shown below. This deposition may be used as evidence at an evidentiary hearing, trial, or other court proceedings as allowed under Florida law. The deposition taken by this Firm pursuant to this notice is intended for that purpose or any other lawful purpose, and you are hereby notified of such proceeding and will conduct yourself accordingly and prepare for this deposition accordingly. This deposition will be videotaped by a representative of Olender Reporting, Inc. (866) 420-4020. Deponent shall deliver the documents listed on the attached Exhibit "A" at least 5 business days before the scheduled deposition[2].

---

[1] Change to start time of deposition
[2] Documents previously produced need not be reproduced.

1

| Name | Date | Location |
|---|---|---|
| Charles Huff | January 15, 2026 @ 1:00 p.m. | City Hall Conference 501 US Highway 1 North Palm Beach, Florida 33408 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 8, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:  Eric L. Stettin, Esq., estettin@wsh-law.com,  DJones@wsh-law.com,  WEISS  SEROTA  HELFMAN  COLE  & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

/s/  Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829
ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

2

## **DEFINITIONS AND INSTRUCTIONS**

1.      The term "NP-Devland" means, the Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC collectively.

2.      The term "Subject Property" means the property described in Paragraph 4 of the Complaint filed on May 12, 2025.

3.      The term "Village," refers to Defendant, Village of North Palm Beach, Florida, including all employees, owners, officers, members, managing members, directors, affiliates, agents, and any other person or entity acting for or on its behalf.

4.      The term "You" and/or "Your" means the party or parties to whom these requests are addressed, including the party or parties or any other agent(s), attorney(s), and all other persons acting or purporting to act on their behalf.

5.      As used herein, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

6.      The terms "document" or "documents" mean any written, typed, printed, recorded or graphic material, however produced, reproduced or stored, including, but not limited to, all Electronic Data, notes, e-mails, memoranda, reports, correspondence, communications, contracts, bills, agreements, letters, messages, minutes, telegrams, memorandums, memorandums of conferences or telephone conversations, study list, compliance of data, papers, books, records, pictures, photographs, tapes and all other tangible things upon which are handwriting, typing, printing, drawing, representative, photostatic or other copies, magnetic or electronic impulse or other forms of communication is recorded or reproduced and all copies (except for identical copies) and drafts thereof. Any copy containing these, or any other alterations, notes or comments not included on any original shall not be deemed an identical copy but shall be deemed a separate document within the foregoing definition.

7.      The terms "communication," "communications," and "correspondence," which are included within the broader terms "document" and "documents" above, mean any statement or utterance, whether written or oral, made by one person to another or in the presence of another, or any document delivered or sent from one person to another, including, but not limited to, notes, electronic messages, e-mails, voice mail messages, text messages, instant/direct messaging or IM, (e.g., iMessages, Slack messages, Skype Messenger, FaceBook Messenger, etc.), tweets, social media posts, information stored on web pages or web servers, and database records.

8.      The term "Electronic Data," which is included within the broader terms "document" and "documents" above, means any information, including files, documents, correspondence, communications, images, videos, metadata or any combination thereof stored, created, or used on any Electronic Storage Device, disk, tape (including backup tapes and other backup media), or other computer or digital storage medium, microfilm, microfiche, floppy, or any other storage or recording medium.

9.      The word "Electronic Storage Device" means any disk, including hard disks and

3

floppy disks, CD-ROM's, DVD's, network servers, shared servers, computers, magnetic tape, back-up tape, voicemail, temporary files, and PDA's, whether currently on your premises or otherwise.

10. The word "produce" means to make available the documents requested herein—**in their native format, including all meta-data**—for inspection and copying and to separate such documents into the categories set forth in this request.

11. The term "relating to" means concerning, respecting, referring to, summarizing, digesting, embodying, demonstrating, reflecting, establishing, tending to establish, tending not to establish, evidencing, comprising, connected with, commenting on, responding to, disagreeing with, showing, describing, analyzing, representing, constituting or including.

12. If you decline to produce any documents requested hereinafter on the basis of any privilege known in the law, you shall, at the time of production designated herein, as to each such document, provide Plaintiff with the following written information pertaining to such document:

> (a) its date or, if not dated, the date it was prepared or received;
>
> (b) the type of document (e.g., letter, memorandum, telegram, chart, photograph, reproduction);
>
> (c) the author and addressee;
>
> (d) its present location;
>
> (e) the identity and address of the individual or person presently custodian thereof;
>
> (f) a general description of its contents;
>
> (g) the number of pages thereof;
>
> (h) the identity of each person who received a copy of such document and the relationship of such person to you;
>
> (i) whether such document contains or relates to facts or opinions, or both; and
>
> (j) the exact nature of the privilege that you claim with respect to such document.

13. The words "And," "or" as well as "and/or" shall be interpreted in the most inclusive sense possible.

4

**DOCUMENTS TO BE PRODUCED**

1.      All documents and communications from January 1, 2022 to present related to the Subject Property.

2.      All documents and communications from January 1, 2022 to present discussing or referencing Nader Salour.

3.      All documents listed in Your Initial Disclosures filed on July 21, 2025.

4.      All documents and communications from January 1, 2019 to December 31, 2022 related to the adoption of the C-3 PUD regulations described in Paragraph 17 of the Complaint filed on May 12, 2025.

5.      All documents and communications from January 1, 2024 to present related to Ordinance 2025-06.

6.      All documents You refer to as "competent and substantial evidence" in Paragraph 76 of Your Answer and Affirmative Defenses filed on June 24, 2025.

7.      All Ordinances from January 1, 2022 to present approving a Planned Unit Development in the Village of North Palm Beach.

8.      All documents and communications related to the "oral and written representations" referenced in Condition II of Ordinance 2025-06.

9.      All communications from January 1, 2022 to present between you and the Town of Lake Park related to the Subject Property.

10.      All documents and communications related to any other applications for a C-3 PUD submitted to You since the adoption of the C-3 PUD Regulations.

11.      All documents and communications related to guidance or training of staff processing C-3 PUD applications.

12.    All documents that support the contention made in Paragraph 87 of your Answer and Affirmative Defenses that Ordinance 2025-06 "bears a rational relationship to a legitimate governmental purpose."

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

       Plaintiffs / Petitioners,

       Case No.: 50-2025-CA-004670-XXXA-MB

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

       Defendant / Respondent.
_____/

### AMENDED[1] NOTICE OF TAKING VIDEOTAPED DEPOSITION DUCES TECUM

**PLEASE TAKE NOTICE** that the undersigned attorneys will take the deposition of the person named below, pursuant to the Florida Rules of Civil Procedure, before a certified court reporter who is not of counsel to the parties or interested in the event of the cause at the address shown below. This deposition may be used as evidence at an evidentiary hearing, trial, or other court proceedings as allowed under Florida law. The deposition taken by this Firm pursuant to this notice is intended for that purpose or any other lawful purpose, and you are hereby notified of such proceeding and will conduct yourself accordingly and prepare for this deposition accordingly. This deposition will be videotaped by a representative of Olender Reporting, Inc. (866) 420-4020. Deponent shall deliver the documents listed on the attached Exhibit "A" at least 5 business days before the scheduled deposition[2].

---

[1] Change to start time of deposition
[2] Documents previously produced need not be reproduced.

1

| Name | Date | Location |
|---|---|---|
| Valentino Perez | January 19, 2026 @ 1:00 p.m. | City Hall Conference 501 US Highway 1 North Palm Beach, Florida 33408 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 8, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:   Eric L. Stettin, Esq., estettin@wsh-law.com,   DJones@wsh-law.com,   WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

/s/  Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariaC@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829
ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

2

## **DEFINITIONS AND INSTRUCTIONS**

1.      The term "NP-Devland" means, the Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC collectively.

2.      The term "Subject Property" means the property described in Paragraph 4 of the Complaint filed on May 12, 2025.

3.      The term "Village," refers to Defendant, Village of North Palm Beach, Florida, including all employees, owners, officers, members, managing members, directors, affiliates, agents, and any other person or entity acting for or on its behalf.

4.      The term "You" and/or "Your" means the party or parties to whom these requests are addressed, including the party or parties or any other agent(s), attorney(s), and all other persons acting or purporting to act on their behalf.

5.      As used herein, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

6.      The terms "document" or "documents" mean any written, typed, printed, recorded or graphic material, however produced, reproduced or stored, including, but not limited to, all Electronic Data, notes, e-mails, memoranda, reports, correspondence, communications, contracts, bills, agreements, letters, messages, minutes, telegrams, memorandums, memorandums of conferences or telephone conversations, study list, compliance of data, papers, books, records, pictures, photographs, tapes and all other tangible things upon which are handwriting, typing, printing, drawing, representative, photostatic or other copies, magnetic or electronic impulse or other forms of communication is recorded or reproduced and all copies (except for identical copies) and drafts thereof. Any copy containing these, or any other alterations, notes or comments not included on any original shall not be deemed an identical copy but shall be deemed a separate document within the foregoing definition.

7.      The terms "communication," "communications," and "correspondence," which are included within the broader terms "document" and "documents" above, mean any statement or utterance, whether written or oral, made by one person to another or in the presence of another, or any document delivered or sent from one person to another, including, but not limited to, notes, electronic messages, e-mails, voice mail messages, text messages, instant/direct messaging or IM, (e.g., iMessages, Slack messages, Skype Messenger, FaceBook Messenger, etc.), tweets, social media posts, information stored on web pages or web servers, and database records.

8.      The term "Electronic Data," which is included within the broader terms "document" and "documents" above, means any information, including files, documents, correspondence, communications, images, videos, metadata or any combination thereof stored, created, or used on any Electronic Storage Device, disk, tape (including backup tapes and other backup media), or other computer or digital storage medium, microfilm, microfiche, floppy, or any other storage or recording medium.

9.      The word "Electronic Storage Device" means any disk, including hard disks and

3

floppy disks, CD-ROM's, DVD's, network servers, shared servers, computers, magnetic tape, back-up tape, voicemail, temporary files, and PDA's, whether currently on your premises or otherwise.

10.     The word "produce" means to make available the documents requested herein—**in their native format, including all meta-data**—for inspection and copying and to separate such documents into the categories set forth in this request.

11.     The term "relating to" means concerning, respecting, referring to, summarizing, digesting, embodying, demonstrating, reflecting, establishing, tending to establish, tending not to establish, evidencing, comprising, connected with, commenting on, responding to, disagreeing with, showing, describing, analyzing, representing, constituting or including.

12.     If you decline to produce any documents requested hereinafter on the basis of any privilege known in the law, you shall, at the time of production designated herein, as to each such document, provide Plaintiff with the following written information pertaining to such document:

> (a)     its date or, if not dated, the date it was prepared or received;
>
> (b)     the type of document (e.g., letter, memorandum, telegram, chart, photograph, reproduction);
>
> (c)     the author and addressee;
>
> (d)     its present location;
>
> (e)     the identity and address of the individual or person presently custodian thereof;
>
> (f)     a general description of its contents;
>
> (g)     the number of pages thereof;
>
> (h)     the identity of each person who received a copy of such document and the relationship of such person to you;
>
> (i)     whether such document contains or relates to facts or opinions, or both; and
>
> (j)     the exact nature of the privilege that you claim with respect to such document.

13.     The words "And," "or" as well as "and/or" shall be interpreted in the most inclusive sense possible.

## DOCUMENTS TO BE PRODUCED

1.      All documents and communications from January 1, 2022 to present related to the Subject Property.

2.      All documents and communications from January 1, 2022 to present discussing or referencing Nader Salour.

3.      All documents listed in Your Initial Disclosures filed on July 21, 2025.

4.      All documents and communications from January 1, 2019 to December 31, 2022 related to the adoption of the C-3 PUD regulations described in Paragraph 17 of the Complaint filed on May 12, 2025.

5.      All documents and communications from January 1, 2024 to present related to Ordinance 2025-06.

6.      All documents You refer to as "competent and substantial evidence" in Paragraph 76 of Your Answer and Affirmative Defenses filed on June 24, 2025.

7.      All Ordinances from January 1, 2022 to present approving a Planned Unit Development in the Village of North Palm Beach.

8.      All documents and communications related to the "oral and written representations" referenced in Condition II of Ordinance 2025-06.

9.      All communications from January 1, 2022 to present between you and the Town of Lake Park related to the Subject Property.

10.      All documents and communications related to any other applications for a C-3 PUD submitted to You since the adoption of the C-3 PUD Regulations.

11.      All documents and communications related to guidance or training of staff processing C-3 PUD applications.

5

12.     All documents that support the contention made in Paragraph 87 of your Answer and Affirmative Defenses that Ordinance 2025-06 "bears a rational relationship to a legitimate governmental purpose."

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware limited liability company; NP-DEVLAND NORTH, LLC, a Delaware limited liability company; and NP-DEVLAND EAST, LLC, a Delaware limited liability company,

     Plaintiffs/Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH, FLORIDA, a Florida municipal corporation,

     Defendant/Respondent.

_____/

## MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant, Village of North Palm Beach (the "Village"), through the undersigned counsel and, pursuant to Fla. Rule Civ. P. 1.140(c), files this Motion for Judgment on the Pleadings because, on the face of the Complaint and the Village's Answer and Affirmative Defenses, Plaintiffs' claims fail to state a valid claim for relief as matter of law.

### A.  Introduction

The Complaints asserts 3 separate claims against the Village of North Palm Beach. Count 1 seeks declaratory and injunctive relief related to Plaintiffs' PUD application; Count 2 seeks declaratory and injunctive relief challenging the constitutionality of the Village of North Palm Beach Ordinance 2025-06; and Count 3 seeks a writ of mandamus requiring the Village to

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

approve the Plaintiffs' PUD application without conditions. As will be demonstrated below, each of the claims raised in the Complaint fail to state a valid claim as a matter of law. Specifically,

(i)      Plaintiffs' Constitutional challenge is procedurally barred and non-justiciable;

(ii)     Plaintiffs' Mandamus claim fails to allege a clear legal right or a ministerial duty; and

(iii)    Plaintiffs' collateral attack improperly circumvents the exclusive, time-limited certiorari review mechanism.

**B.  Procedural Posture and Standard of Review**

Florida Rule of Civil Procedure 1.140(c) authorizes judgment on the pleadings "after the pleadings are closed but within such time as not to delay the trial," and confines the court's review to "the pleadings" and any instruments incorporated into those pleadings. See Fla. R. Civ. P. 1.140(c). The motion is thus a vehicle to resolve purely legal issues on the face of the written record and not to weigh evidence or consider matters dehors the pleadings.

A Rule 1.140(c) motion tests the legal sufficiency of a claim or defense where no material fact issue appears from the pleadings and their attachments; the court must take all well-pleaded facts of the non-movant as true and may not rely on extra-pleading materials. *United States Fire Ins. Co. v. ADT Sec. Servs.*, 134 So. 3d 477 (Fla. 2d DCA 2013) (reiterating that judgment on the pleadings turns on the four corners of the pleadings and attached exhibits); *Yentes v. Papadopoulos*, 352 So. 3d 472 Fla. 2d DCA 2022) (relying on the holding in *Britt v. State Farm Mut. Auto. Ins. Co.*, 935 So. 2d 97 (Fla. 2d DCA 2006) that the trial court is "precluded from relying on matters outside the pleadings" and that exhibits incorporated into the pleadings are part of the record for decision). In applying this standard, courts treat the motion as presenting

2

only questions of law where all well-pleaded allegations of the non-moving party are accepted as true, and any allegations of the movant that are denied are taken as not proved. *Joseph v. Pierre*, 390 So. 3d 261 (Fla. 3d DCA 2024); *Butts v. State Farm Mut. Auto. Ins. Co.*, 207 So. 2d 73 (Fla. 3d DCA 1968).

Applied here, that framework requires judgment on the pleadings where accepting Plaintiffs' well-pleaded facts as the pleadings and their incorporated exhibits still demonstrate: (a) the constitutional count cannot be adjudicated due to noncompliance with statutory and rule-based notice prerequisites and because it presents no ripe, concrete controversy; (b) the mandamus count fails on the face of the ordinance and conditions, which negate any clear legal right or ministerial duty; and (c) the plenary complaint functions as an improper collateral attack on a development-order action that was reviewable, if at all, only by timely petition for writ of certiorari. Fla. R. Civ. P. 1.140(c); *United States Fire Ins. Co. v. ADT Sec. Servs.*, 134 So. 3d 477 (Fla. 2d DCA 2013); *Yentes v. Papadopoulos*, 352 So. 3d 472 (Fla. 2d DCA 2022); *Joseph v. Pierre*, 390 So. 3d 261 (Fla. 3d DCA 2024); *Butts v. State Farm Mut. Auto. Ins. Co.*, 207 So. 2d 73 (Fla. 3d DCA 1968).

C.     **The Constitutional Count Fails as a Matter of Law**

i.     **Plaintiffs did not satisfy mandatory notice prerequisites for a constitutional challenge.**

Florida imposes clear, non-optional prerequisites when a pleading "draws in question the constitutionality of a … municipal … ordinance." Fla. R. Civ. P. 1.071(a). The challenger must serve the Attorney General and the state attorney for the circuit with the pleading that raises the constitutional issue. §§ 86.091–.094, Fla. Stat., likewise require notice to the appropriate public officer so that officer "may be heard" before a court adjudicates the constitutionality of a public

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

enactment. These provisions are designed to ensure the State and the local sovereign have an opportunity to defend the challenged law and to prevent advisory rulings that bind nonparties without their participation.

On the face of the pleadings, Plaintiffs neither allege nor certify compliance with Rule 1.071 or §§ 86.091–.094. The absence of those allegations is dispositive at the Rule 1.140(c) stage because compliance is a condition precedent to adjudication of a constitutional claim. See Fla. R. Civ. P. 1.120(c) (conditions precedent must be specifically performed or excused and so pled). Without the required notices, the constitutional count cannot be reached on the merits and must be resolved in the Village's favor on the pleadings.

Two points follow. First, this is not a curable "technicality" within the four corners as Plaintiffs chose to place the ordinance's constitutionality at issue yet omitted the notices that authorize the court to decide that issue. Second, because the Rule 1.140(c) analysis is confined to the pleadings and incorporated exhibits, the Court cannot presume off-record compliance or consider post-pleading materials to fill the gap. See Fla. R. Civ. P. 1.140(c) (decision "shall be based solely on the pleadings and attachments"). Judgment on the constitutional count is therefore compelled.

Applied here, the four corners of Plaintiffs' pleadings contain no allegation or certificate showing Rule 1.071 service or compliance with § 86.091. Because judgment on the pleadings must be decided "wholly on the pleadings, including exhibits," and the court may not presume off-record compliance, the constitutional count cannot be reached on the merits and must be resolved for the Village as a matter of law. Fla. R. Civ. P. 1.140(c); *Shelton v. Bank of N.Y. Mellon,* 203 So. 3d 1003 (Fla. 2d DCA 2016); *Ramle Int'l Corp. v. Miami-Dade Cty.,* 388 So. 3d

4

126 (Fla. 3d DCA 2023); *Lee Mem'l Health Sys. v. Progressive Select Ins. Co.,* 260 So. 3d 1038 (Fla. 2018).

### ii.        The constitutional claim is unripe and non-justiciable under Chapter 86.

Florida's Declaratory Judgments Act authorizes relief only to resolve present, ascertainable controversies, not to issue advisory opinions about hypothetical future applications of law. §§ 86.021, 86.011, 86.101, Fla. Stat. While the Act is liberally construed to dispel uncertainty, its remedies "have the force and effect of a final judgment," § 86.011, and therefore presuppose a concrete dispute capable of final judicial resolution and not a disagreement contingent on future administrative steps. § 86.021; § 86.101.

The Supreme Court has repeatedly enforced these ripeness and justiciability limits; specifically that trial courts lack jurisdiction to render declaratory relief where operative facts are hypothetical or contingent on future events, explaining that absent a bona fide, present need for a declaration tied to ascertainable facts, a claim is non-justiciable. *Roberts v. Brown*, 43 So. 3d 673 (Fla. 2010) Likewise, *Santa Rosa Cty. v. Admin. Comm'n, Div. of Admin. Hearings*, 661 So. 2d 1190 (Fla. 1995), reiterates that Chapter 86 requires a concrete, existing controversy; speculative disputes do not meet the threshold for judicial intervention. Land-use decisions are no exception. In *Taylor v. Vill. of N. Palm Beach*, 659 So. 2d 1167 (Fla. 4th DCA 1995), the court applied the ripeness doctrine to hold that claims are not fit for review until there is a final governmental determination regarding permissible uses of the property. And *Collins v. Monroe Cty.*, 999 So. 2d 709 (Fla. 3d DCA 2008), distinguishes facial from as-applied challenges, holding that an as-applied constitutional claim becomes ripe only after a regulation is concretely applied to specific facts through the government's final decision.

Those principles dispose of Plaintiffs' constitutional count on the pleadings. By their own exhibits, (i) master-level approval does not authorize construction, and (ii) parcel-specific building-site parameters and related metrics are expressly reserved to subsequent Site Plan and Appearance Review "taking into account the public benefit provided." Thus, Plaintiffs attack generally worded conditions that have not been applied to any identified parcel, plan set, or permit. Under *Taylor* and *Collins*, no final, definitive determination exists; under Roberts and Santa Rosa County, the dispute is therefore hypothetical and advisory. Chapter 86 does not permit courts to supervise the sequencing of administrative decision-making or to pre-decide how general standards will be applied in later, discretionary site-plan proceedings. §§ 86.021, 86.011. Because the pleadings establish the absence of a present, concrete application of the challenged language and the continued necessity of future administrative decisions, the constitutional claim is unripe and must be resolved for the Village as a matter of law on a Rule 1.140(c) record.

### iii. Separation of powers and home-rule principles independently bar the pleaded relief.

Florida's Constitution and statutes reserve to municipalities the prerogative to legislate and administer local land-use, particularly staged, discretionary site-plan processes and correspondingly limit the judicial role. Article II, section 3 embodies separation of powers; circuit courts may not re-administer executive or legislative functions entrusted to local government. Article VIII, section 2(b) grants municipalities "governmental, corporate and proprietary powers" to conduct municipal affairs, and the Municipal Home Rule Powers Act, § 166.021, implements that grant, expressly removing judicially imposed limitations except where the Constitution, general or special law, or county charter says otherwise. Read together, these

6

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

provisions foreclose the kind of relief Plaintiffs seek by invalidating or rewriting conditions embedded in an ordinance and short-circuiting the reserved, staged site-plan review.

Florida courts apply those constitutional and statutory directives with restraint and deference. The Supreme Court in *City of Hollywood v. Mulligan*, 934 So. 2d 1238 (Fla. 2006), reaffirmed that municipalities enjoy broad home-rule authority and that courts may not intrude absent express preemption or a clear violation of law. Likewise, *Boca Raton v. Gidman*, 440 So. 2d 1277 (Fla. 1983), recognizes that municipal actions undertaken for valid municipal purposes are entitled to judicial deference unless expressly prohibited. Earlier authorities such as *Broward County Rubbish Contractors Ass'n v. Broward County*, 112 So. 2d 898 (Fla. 1959), provides that courts will not interfere with municipal legislative discretion absent fraud, bad faith, or gross abuse of power, none of which is pleaded here. And *City of Temple Terrace v. Tozier*, 903 So. 2d 970 (Fla. 2d DCA 2005), confirms that the Home Rule Powers Act "removed judicially imposed limitations," permitting municipalities to condition land-use approvals within their authority so long as no express prohibition exists.

Those principles have particular force in staged development programs. Plaintiffs' own exhibits show that approval of a Master Plan does not authorize construction and that parcel-level parameters are expressly reserved to subsequent Site Plan and Appearance Review, "taking into account the public benefit provided." Under the separation-of-powers framework, a circuit court does not rewrite those conditions, set substitute parcel metrics, or engage in resequencing of the administrative path. Where applicable regulations are clear and a quasi-judicial site-plan process is prescribed, courts review for compliance with law; they do not substitute their judgment for that of municipal decisionmakers. See *Park of Com. Assocs. v. Delray Beach*, 606

7

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

So. 2d 633 (Fla. 4th DCA 1992 (site-plan review is a quasi-judicial application of standards; once the legal framework is set, courts do not second-guess municipal discretion in administering it).

Applied here, Plaintiffs ask the Court to (i) declare general conditions "void" in the abstract, (ii) excise or rewrite the ordinance's public-benefit and reservation clauses, and (iii) effectively direct the Village how to conduct its sequenced site-plan review. That relief collides with Art. II, § 3, Art. VIII, § 2(b), and § 166.021 and the deference articulated in the cases above. On the face of the pleadings and incorporated instruments, the requested judicial re-administration of discretionary municipal processes is barred as a matter of law, warranting judgment on the pleadings for the Village on the constitutional count.

### D. Mandamus Fails as a Matter of Law

Mandamus is an extraordinary remedy confined to compelling a ministerial duty "clearly defined by law," not to controlling judgment calls embedded in administrative or quasi-judicial processes. The petitioner must show a clear legal right, an indisputable legal duty, and no other adequate remedy; where discretion is involved, the writ does not lie. *White v. Crosby*, 851 So. 2d 730 (Fla. 2003); *Bd. of Cty. Comm'rs Broward Cty. Fla. v. Parrish*, 154 So. 3d 412 (Fla. 4th DCA 2014). A ministerial duty is one that is mandatory and leaves no room for discretion; approvals that require fact-finding and application of criteria are the opposite. *City of Tarpon Springs v. Planes*, 30 So. 3d 693 (Fla. 2d DCA 2010), *Key Biscayne Gateway Partners, Ltd. v. Vill. of Key Biscayne*, 172 So. 3d 499 (Fla. 3d DCA 2015) (mandamus was inappropriate because site-plan approval involves quasi-judicial discretion rather than a ministerial act). Similarly, mandamus cannot be used to review or compel actions taken in a quasi-judicial capacity; those are reviewed by certiorari. *Marion Cty. v. Kirk*, 965 So. 2d 330 (Fla. 5th DCA 2007).

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Applied to the pleadings here, the Village approved a Master Plan or master-level framework for future development subject to conditions and expressly reserved parcel-level determinations to later Site Plan and Appearance Review requiring evaluation of phase-specific submittals, application of appearance and design standards, and weighing of public-benefit considerations. Those are discretionary tasks, not rote commands; therefore, Plaintiffs cannot establish either a clear legal right or an indisputable ministerial duty. *Bd. of Cty. Comm'rs Broward Cty. Fla. v. Parrish*, 154 So. 3d 412 (Fla. 4th DCA 2014); *Key Biscayne Gateway Partners, Ltd. v. Vill. of Key Biscayne*, 172 So. 3d 499 (Fla. 3d DDCA 2015); *Marion Cty. v. Kirk*, 965 So. 2d 330 (Fla. 5th DCA 2007). Nor may Plaintiffs use mandamus to establish a right that does not yet exist; the writ enforces only rights already clearly established. *State ex rel. Glynn v. McNayr*, 133 So. 2d 312 (Fla. 1961).

Mandamus is also unavailable because an adequate alternative remedy exists. Florida Rule of Appellate Procedure 9.100 provides the exclusive mechanism for certiorari review of quasi-judicial land-use decisions. Fla. R. App. P. 9.100; *Washington v. Am. Homes 4 Rent Props. Six, LLC*, 262 So. 3d 728 (Fla. 2d DCA 2018). Certiorari and not mandamus is the proper vehicle to challenge whether a quasi-judicial decision is supported by competent substantial evidence and accords with the essential requirements of law. *Marion Cty. v. Kirk*, 965 So. 2d 330 (Fla. 5th DCA 2007); *Orange County v. Quadrangle Dev. Co.*, 780 So. 2d 994. In *Washington v. Am. Homes 4 Rent Props. Six*, LLC, 262 So. 3d 728 (Fla. 2d DCA 2018), the court denied mandamus because certiorari was available; likewise, in *Orange County v. Quadrangle Dev. Co.*, 780 So. 2d 994 (Fla. 5th DCA 2001), the court quashed a writ of mandamus, holding certiorari was the appropriate remedy.

9

Finally, the separation-of-powers and home-rule framework forecloses the writ sought here. Florida reserves to municipalities the authority to administer local functions and exercise discretion in governance; judicial intervention in discretionary municipal functions violates those principles. Fla. Stat. § 166.021, Fla. Const. Art. VIII, § 2, *Fla. League of Cities, Inc. v. Dept. of Ins. & Treasurer*, 540 So. 2d 850 (Fla. 1st DCA 1989). Mandamus cannot compel a municipality to exercise discretionary zoning or building powers against private parties or to re-administer a staged site-plan process. *Detournay v. City of Coral Gables*, 127 So. 3d 869 (Fla. 3d DCA 2013). Granting the writ here would require the Court to interfere with the Village's discretionary functions—rewriting conditions, resequencing the site-plan review, and dictating how public-benefit and design criteria must be weighed—which the cited authorities forbid. Fla. Stat. § 166.021, Fla. Const. Art. VIII, § 2; *Florida League of Cities, Inc. v. Department of Ins. & Treasure*r, 540 So. 2d 850 (Fla. 1st DCA 1989).

Because the pleadings show discretionary decision-making, an adequate certiorari remedy, and constitutional limits on judicial re-administration, Plaintiffs cannot demonstrate a clear legal right, an indisputable ministerial duty, or the absence of an adequate remedy. Judgment on the pleadings should therefore be entered for the Village on the mandamus count.

### E. Plaintiffs' Plenary Complaint Is an Improper Collateral Attack; Certiorari Was the Exclusive Avenue

Plaintiffs' pleading repackages a site-specific, noticed development decision into a plenary suit for declaratory, injunctive, and mandamus relief. Florida law does not permit that end-run. Quasi-judicial development orders are reviewable exclusively by petition for writ of certiorari filed in the circuit court within thirty days of rendition, with review confined to (i) procedural due process, (ii) observance of the essential requirements of law, and (iii) competent

10

substantial evidence. Fla. R. App. P. 9.100(c), *Miami-Dade Cty. v. City of Miami*, 315 So. 3d 115 (Fla. 3d DCA 2020); *American Riviera Real Estate Co. v. City of Miami Beach*, 735 So. 2d 527 (Fla. 3d DCA 1999). Certiorari review is limited to determining whether procedural due process was observed, whether the essential requirements of law were followed, and whether the decision was supported by competent substantial evidence. *Miami-Dade Cty. v. City of Miami*, 315 So. 3d 115 (Fla. 3d DCA 2020). Consistent with that framework, when a party challenges a quasi-judicial land-use decision, the proper vehicle is certiorari and not a plenary complaint. *American Riviera Real Estate Co. v. City of Miami Beach*, supra. Courts routinely dismiss plenary suits that attempt to substitute for the missed certiorari window; a trial court lacks jurisdiction to entertain such collateral attacks. *Ft. Pierce v. Dickerson*, 588 So. 2d 1080 (Fla. 4th DCA 1991).

Nor does Chapter 86 salvage Plaintiffs' approach. The Declaratory Judgments Act is remedial and does not enlarge the circuit court's authority to re-adjudicate quasi-judicial decisions or bypass Rule 9.100(c). Fla. Stat. § 86.011. Florida courts have consistently refused to allow declaratory actions to collaterally attack such decisions. *Hollywood Lakes Section Civic Ass'n v. City of Hollywood*, 676 So. 2d 500 (Fla. 4th DCA 1996). Injunction and mandamus fare no better: they cannot be used to circumvent the certiorari process, and mandamus, in particular, may not be used to challenge discretionary quasi-judicial decisions. Key *Biscayne Gateway Partners, Ltd. v. Vill. Council for Key Biscayne*, 240 So. 3d 84 (Fla. 3d DCA 2018).

This case presents the textbook collateral attack. The pleadings themselves identify the noticed proceeding, the Council's action, and Plaintiffs' decision to forgo the thirty-day petition pathway. Under Florida law, that choice is dispositive: quasi-judicial decisions are subject to certiorari review and attempts to bypass that process through alternative pleadings (such as the

Complaint in this case) are procedurally defective and must be dismissed. *Miami-Dade Cty. v. City of Miami*, 315 So. 3d 115 (Fla. 3d DCA 2020; Ft. *Pierce v. Dickerson*, 588 So. 2d 1080 (Fla. 4th DCA 1991. The policy rationale is equally clear. Allowing plenary complaints would nullify the thirty-day jurisdictional deadline, expand record-based certiorari into de novo litigation, and erode the finality of development orders. *Education Dev. Ctr., Inc. v. Palm Beach County*, 721 So. 2d 1240 (Fla. 4th DCA 1998); Fla. Stat. § 163.3215. Because Rule 9.100(c) supplied the exclusive avenue and Plaintiffs did not pursue it, their complaint is an impermissible collateral attack and fails as a matter of law.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on December 18, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By: _/s/ Eric L. Stettin_
   ERIC L. STETTIN, ESQ.
   Florida Bar No. 831697

Filing # 238589866 E-Filed 12/30/2025 05:49:36 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

      Plaintiffs/Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant/Respondent.

_____/

### MOTION TO STAY DISCOVERY AND FOR PROTECTIVE ORDER

Defendant, the VILLAGE OF NORTH PALM BEACH ("Village"), through its undersigned counsel, and pursuant to Florida Rule of Civil Procedure 1.280(c), hereby files this Motion for a Temporary Stay of Discovery Pending Resolution of Defendant's Motion for Judgment on the Pleadings, and for a Protective Order to preclude depositions set by Plaintiffs NP-Devland Holdings, LLC, NP-Devland North, LLC, and NP-Devland East, LLC (collectively "Plaintiffs") of Charles Huff and Valentino Perez. In support, the Village states as follows:

1.      A Motion for Judgment on the Pleadings was filed by the Village on December 18, 2025, and is currently pending before this Court.

2.      The Parties will schedule the Motion for Judgment on the Pleadings for hearing on their next available, mutually agreeable date and time.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

3.      Plaintiffs scheduled the deposition of two Village employees, specifically Charles Huff for January 15, 2026, and Valentino Perez for January 19, 2026.

4.      As argued in the Motion for Judgment on the Pleadings, Plaintiffs' constitutional challenge is procedurally barred and non-justiciable, Plaintiffs' mandamus claim fails to allege a clear legal right or a ministerial duty, and Plaintiffs' collateral attack improperly circumvents the exclusive, time-limited certiorari review mechanism. Because this matter will likely be resolved on this motion, Plaintiffs have no need to conduct discovery in this proceeding. As a result, the Village seeks a temporary stay of all discovery until after the Court rules on the Motion for Judgment on the Pleadings.

5.      According to Rule 1.280(c) of the Florida Rules of Civil Procedure, a court may postpone discovery with "good cause shown." *See Deltona Corp., v. Bailey*, 336 So. 2d 1163, 1169 (Fla. 1976) (noting that postponing discovery for a short period of time pending determination of material outstanding motions is within the discretion of the trial court so long as the delay is not for a protracted period of time); *see also* Fla. R. Civ. P. 1.280(d) (outlining the process by which the court may grant a protective order).

6.      Moreover, it is within the Court's discretion to stay discovery or abate the proceedings pending the resolution of a dispositive motion. *See, e.g.*, *Baptist Hosp. of Mia., Inc. v. Demario*, 683 So. 2d 641, 643 (Fla. 3d DCA 1996) (quashing lower court's denial of stay because it would be improper to permit discovery without an initial determination that the plaintiff had standing to sue); *Bank of Am., N.A. v. De Morales*, 314 So. 3d 528, 531 (Fla. 3d DCA 2020) ("A request to stay discovery pending a resolution of a motion is rarely appropriate unless resolution of the motion will dispose of the entire case." (quoting McCabe v. Foley, 233

F.R.D. 683, 685 (M.D. Fla. 2006))); *Mishiyev v. Davis*, 402 So. 3d 443, 453 (Fla. 2d DCA 2025) (the trial court has discretion to stay discovery until ruling on dispositive motion).

7.     Should the Court grant the Motion for Judgment on the Pleadings, the Court will be divested of jurisdiction to adjudicate the merits of the Parties' dispute, mooting Plaintiffs' need for any discovery in this case.

8.     Plaintiffs will not experience prejudice due to the requested stay because the Motion for Judgment on the Pleadings will be heard and decided in the coming months. To the contrary, the Village would undergo serious prejudice if forced to participate in pointless discovery.

9.     Pursuant to Fla.R.Civ.P. 1.280, Defendant is entitled to stay of discovery pending resolution of the case dispositive Motion for Judgment on the Pleadings, and additionally a protective order preventing the scheduled depositions of Charles Huff and Valentino Perez.

10.     This motion is filed in good faith and not for the purposes of delay.

## CERTIFICATE OF CONFERRAL

Pursuant to Florida Rule of Civil Procedure 1.202, undersigned counsel conferred with Plaintiffs' counsel on December 30, 2025. Plaintiffs' counsel opposes this Motion.

WHEREFORE, Defendant, the Village of North Palm Beach, respectfully requests that this Court enter an Order granting this Motion, and to temporarily stay all discovery in this case pending disposition of the case dispositive Motion for Judgment on the Pleadings, and for any such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on December 30, 2025.

3

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By:  /s/ *Eric L. Stettin*
    ERIC L. STETTIN
    Florida Bar No. 831697

4

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 268 of 429

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

     Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

     Defendant/Respondent

_____/

## NOTICE OF HEARING
### (Motion Calendar-VIA ZOOM)

YOU ARE HEREBY NOTIFIED that the undersigned has called up for hearing the following:

     **DATE:**      **Wednesday January 21, 2026**

     **TIME:**      **8:30 am**

     **JUDGE:**      **Honorable James Sherman**

     **PLACE:**      **VIA ZOOM VIDEO CONFERENCE**

SPECIFIC MATTERS TO BE HEARD:

**Motion to Stay Discovery and Motion for Protective Order**

THE CLERK WILL PLEASE PLACE SAME ON THE CALENDAR.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

**IN ACCORDANCE WITH THE AMERICAN'S WITH DISABILITIES ACT OF 1990, <u>ALL PERSONS WHO ARE DISABLED AND WHO NEED SPECIAL ACCOMMODATIONS TO PARTICIPATE IN THIS PROCEEDING BECAUSE OF THAT DISABILITY</u> SHOULD CONTACT THE COURT ADA COORDINATOR NO LATER THAN SEVEN DAYS PRIOR TO THE PROCEEDING.  TELEPHONE (305) 375-2006 FOR ASSISTANCE; IF HEARING IMPAIRED, TELEPHONE COURT TDD NUMBER (305) 375-2007 (FLORIDA RELAY SERVICE 1 800 955-8771) FOR ASSISTANCE.**

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on January 6, 2026.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By:  /s/ *Eric L. Stettin*
ERIC L. STETTIN
Florida Bar No. 831697

Filing # 239175562 E-Filed 01/09/2026 01:50:11 PM

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

v.

THE VILLAGE OF NORTH PALM
BEACH, FLORIDA, a Florida municipal
corporation,

        Defendant / Respondent.

_____/

Case No.: 50-2025-CA-004670

## PLAINTIFFS' MOTION TO COMPEL RESPONSES TO FIRST SET OF INTERROGATORIES

Plaintiffs / Petitioners NP-DEVLAND HOLDINGS, LLC, NP-DEVLAND NORTH, LLC, and NP DEVLAND EAST, LLC (collectively, "**NP-Devland**"), though the undersigned counsel and pursuant to Fla. R. Civ. P. 1.280(c)(1), 1.340, and 1.380, moves to compel Defendant THE VILLAGE OF NORTH PALM BEACH, FLORIDA ("**Defendant**") to respond to NP-Devland's First Set of Interrogatories, served on August 15, 2025, and state as follows:

1.     NP-Devland filed suit against Defendant in May of 2025, pleading three counts based on Defendant's failure to adhere to the written ordinances governing applications for planned unit developments within Defendant's municipal limits.

2.     On August 15, 2025, NP-Devland served Defendant with Plaintiff's First Set of Interrogatories. A copy of these interrogatories as served, and the notice of service filed with the Clerk of the Court, are together attached hereto as **Exhibit A**.

1

3.      Defendant did not timely serve responses to the First Set of Interrogatories within the time allowed by the Florida Rules of Civil Procedure. As such, counsel for NP-Devland followed up with Defendant's counsel on October 3, 2025, inquiring about the status of the overdue responses. A copy of this email correspondence is attached hereto as **Exhibit B**. A subsequent email inquiry made prior to filing this motion, as required by Florida Rule of Civil Procedure 1.202 and attached as **Exhibit C**, also failed to procedure the required responses.

4.      To date—more than four (4) months since Defendant's responses to the First Set of Interrogatories were due, and more than (3) months since counsel first inquired in writing as to the status of the responses—Defendant has not served any responses to the interrogatories, nor offered any explanation for this abject failure to comply with the requirements governing discovery under Florida law.

5.      Instead, and incredibly, Defendant's tactic has been to file a motion to stay all discovery in this case, pending resolution of a boilerplate motion for judgment on the pleadings not scheduled to be heard until February of 2026.

6.      "Generally, where a party fails to respond to discovery requests and does not give notice and sound reason for his failure to do so, sanctions should usually be imposed." *Ford Motor Co. v. Garrison*, 415 So. 2d 843, 844 (Fla. 1st DCA 1982). Indeed, a failure to respond to discovery within the prescribed time period results in a waiver of objections. *See, e.g., Adventist Health Sys./ Sunbelt Health v. Judge*, 739 So. 2d 695, 696 (Fla. 5th DCA 1999).

7.      Defendant has provided no reason for its failure to respond to the First Set of Interrogatories, and has essentially ignored all good faith efforts to resolve this dispute without requiring the Court's intervention. NP-Devland can surmise, from Defendant's motion for stay, that is wishes it had not been sued, but this is, of course, not a cognizable basis for willful refusal

2

to participate in discovery as required by the Rules of Civil Procedure. And, it is similarly axiomatic that the mere filing of a motion to stay—without a Court order granting that motion—does not relieve a party from its discovery obligations.

WHEREFORE, NP-Devland respectfully requests that this Court enter an order (1) granting this Motion and compelling Defendant to answer the First Set of Interrogatories, on their substantive merits and without objections, within seven (7) days of the order; (2) awarding NP-Devland its attorneys fees and costs incurred in procuring this relief, as permitted by Florida Rule of Civil Procedure 1.380; and (3) imposing such sanctions and granting such other relief as this Court deems just and proper.

<u>**CERTIFICATE OF GOOD FAITH CONFERENCE**</u>

Prior to the filing of this motion, counsel for NP-Devland attempted to resolve the foregoing dispute with counsel for the Defendant via email on October 3, 2025 and January 7, 2026. However, such efforts were unsuccessful, necessitating this motion.

Respectfully submitted,

<u>/s/ Ethan J. Loeb</u>
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829
ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
**BARTLETT LOEB HINDS**

3

**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422

*Counsel for Plaintiffs / Petitioners*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 9, 2026, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:  Eric L. Stettin, Esq., estettin@wsh-law.com,  DJones@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338

4

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Case No.: 50-2025-CA-004670-XXXA-MB

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.
_____/

**PLAINTIFFS' NOTICE OF SERVICE OF FIRST SET OF
INTERROGATORIES TO DEFENDANT, VILLAGE OF NORTH PALM BEACH**

Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC, by and through their undersigned counsel, pursuant to Florida Rules of Civil Procedure 1.340, hereby gives notice of serving Plaintiffs' First Set of Interrogatories, numbered 1 through 13, upon Defendant, Village of North Palm Beach, Florida.

        /s/ Ethan J. Loeb
        **ETHAN J. LOEB**
        Florida Bar No. 0668338
        EthanL@BLHTLaw.com
        Eservice@BLHTLaw.com
        KerriR@BLHTLaw.com
        HeatherW@BLHTLaw.com
        **STEVEN GIESELER**
        Florida Bar No. 0080981
        StevenG@BLHTLaw.com
        MariaC@BLHTLaw.com
        **ELLIOT P. HANEY**
        Florida Bar no. 1018829

**EXHIBIT A**

ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
MariaC@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
*Counsel for Plaintiffs / Petitioners*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 15, 2025, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:   Eric L. Stettin, Esq., estettin@wsh-law.com,   DJones@wsh-law.com,   WEISS   SEROTA   HELFMAN   COLE   & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

                Case No.: 50-2025-CA-004670-XXXA-MB

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT, VILLAGE OF NORTH PALM BEACH

Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC, by and through their undersigned counsel, pursuant to Florida Rule of Civil Procedure 1.340, hereby propounds their First Set of Interrogatories numbered 1 through ____ to Defendant, Village of North Palm Beach, Florida, to be responded to, separately and fully in writing, within thirty (30) days from the date of service hereof.

## DEFINITIONS AND INSTRUCTIONS

1.      The term "NP-Devland" means, the Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC collectively.

2.      The term "Village," refers to Defendant, Village of North Palm Beach, Florida, including all employees, owners, officers, members, managing members, directors, affiliates, agents, and any other person or entity acting for or on its behalf.

3.      As used herein, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

4. The terms "regarding," "related to" and "relating to" mean concerning, respecting, referring to, summarizing, digesting, embodying, reflecting, establishing, tending to establish, evidencing, comprising, connected with, commenting on, responding to, showing, describing, analyzing, representing, constituting or including.

5. The words "and," "or" as well as "and/or" shall be interpreted in the most inclusive sense possible.

6. The words "communication," "communications," and "correspondence" mean any statement or utterance, whether written or oral, made by one person to another or in the presence of another, or any document delivered or sent from one person to another, including notes, electronic messages, e-mails, voice mail messages, text messages, instant/direct messaging or IM, (e.g., iMessages, Slack messages, Skype Messenger, FaceBook Messenger, etc.), tweets, social media posts, information stored on web pages or web servers, and database records.

7. "Each," "any," and "all" are both singular and plural.

8. As used herein, to "identify" a person shall mean to state the full name and the present or last known business and residence address.

9. As used herein, "facts" shall refer to and shall include, without limitation and in the singular as well as in the plural, all circumstances, occurrences, occasions, events, incidents, oral communications, writings, episodes, experiences, happenings, transactions, and all kinds of other affairs, matters, or things.

10. Where any of the Interrogatories set forth below cannot be answered in full, state, in detail, the reasons for such inability to answer.

11. If you object to any Interrogatories or any portion thereof, on the ground that it requests information that is privileged or falls within the work-product doctrine, provide the following information:

a. Identify all persons known to you to have seen the communication.

b. State the nature of the privilege or doctrine you claim.

c. If a document:
   1) Identify it; and
   2) Identify all persons known to you to have seen the document;

d. If an oral communication:
   1) Identify it;
   2) Identify all persons known to you to whom the substance of the oral communication has been disclosed.

    e.  If an electronic communication:
      1)     Identify it; and
      2)     Identify all persons known to you to have seen the communication.

## MODE AND DETAIL OF ANSWERS

In answering each Interrogatory:

a)    Identify each writing

    1.    Relied upon in the preparation of each answer; or

    2.    Which forms all or part of the basis for the answer; or

    3.    Which corroborates the answer; or

    4.    The substance of which forms all or part of the answer.

b)    If all the information furnished in answer to all or any part of an Interrogatory is not within the personal knowledge of the affiant, identify each person to whom all or any part of the information furnished is a matter of personal knowledge, and identify each person who communicated to the affiant any part of the information furnished.

## INTERROGATORIES

1.    Identify the name(s) of the person answering these Interrogatories and anyone who assisted in formulating the responses.

**RESPONSE:**

2.    Identify each person with knowledge of the PUD Application described in Paragraph 19 of the Complaint filed on May 12, 2025, and describe the general knowledge each person has of the PUD Application.

**RESPONSE:**

3.    For each Condition listed in Section 4 of Ordinance 2025-06 identify the specific provision of the Village of North Palm Beach Town Code that authorizes the Condition.

**RESPONSE:**

4. Identify the "building regulations" referenced in Paragraph 74 of Your Answer and Affirmative Defenses that preclude NP-Devland from having a vested right to build.

**RESPONSE:**

5. Identify the "competent and substantial evidence" referenced in Paragraph 76 of Your Answer and Affirmative Defenses that support the Conditions listed in Section 4 of Ordinance 2025-06

**RESPONSE:**

6. Identify each fact that supports the allegation made in Paragraph 77 of Your Answer and Affirmative Defenses that NP-Devland "consented" to the Conditions listed in Section 4 of Ordinance 2025-06.

**RESPONSE:**

7. Identify each person who participated in drafting the C-3 PUD Regulations referenced in Paragraph 17 of the Complaint filed on May 12, 2025, and provide a general description of the person's role in drafting the regulation.

**RESPONSE:**

8. Identify each fact that supports Your denial of the allegation made in Paragraph 21 of the Complaint filed on May 12, 2025 that NP-Devland's PUD application satisfied the "threshold criteria" set forth in the Village's C-3 PUD Regulations.

**RESPONSE:**

9. Identify each fact that supports Your denial of the allegation made in Paragraph 21 of the Complaint filed on May 12, 2025 that NP-Devland's PUD application is consistent with the Village's Comprehensive Plan.

**RESPONSE:**

10.     Identify each fact that supports the contention made in Paragraph 87 of your Answer and Affirmative Defenses that the Conditions listed in Section 4 of Ordinance 2025-06 "bear[s] a rational relationship to a legitimate governmental purpose."

**RESPONSE:**

11.     Identify which Conditions listed in Section 4 of Ordinance 2025-06 "involve the exercise of professional, discretionary decision-making" as contended in Paragraph 83 of your Answer and Affirmative Defenses.

**RESPONSE:**

12.     Identify which of the four "threshold criteria," as defined in Paragraph 21 of the Complaint filed on May 12, 2025 require "discretionary decision-making."

**RESPONSE:**

13.     Identify all oral or written statements made by NP-Devland that you contend constitute waiver or estoppel.

**RESPONSE:**

## **VERIFICATION**

I have read the foregoing Answers to Plaintiffs' First Set of Interrogatories and do swear that they are true and correct to the best of my knowledge, information and belief.

BY: _____

STATE OF _____

COUNTY OF _____

BEFORE ME, personally appeared _____ who, upon being first duly sworn according to law, depose(s) and say(s) that he executed the foregoing Answers to the First Set of Interrogatories are true and correct to the best of his knowledge and belief.

SWORN AND SUBSCRIBED before me on _____, _____.

_____
Notary Public
My Commission Expires:

| **From:** | Heather A. Wilfong |
|---|---|
| **To:** | Eric L. Stettin; Daphnee Jones |
| **Cc:** | Ethan J. Loeb; Elliot P. Haney; Steven Gieseler; Kerri Rick |
| **Subject:** | NP Devland Holdings, LLC v. Village of North Palm Beach - Overdue Interrogatory Answers |
| **Date:** | Friday, October 3, 2025 1:49:00 PM |
| **Attachments:** | image001.png<br>2025_08_15_ROG_NP Devland 1st to Village of NPB.pdf<br>2025_08_15_NOS_NP NOS 1st Rogs to VNPB.pdf |

Good Afternoon,

A review of our file and the docket show we have not received your answers to Plaintiffs' First Interrogatories served on August 15th.

These are over a month past due, please advise when we can expect to receive the answers.

Thank you,

Heather A. Wilfong | Senior Paralegal
**Bartlett Loeb Hinds Thompson & Angelos**
heatherw@blhtlaw.com
1001 Water Street, Suite 475
Tampa, FL 33602
813-223-3888
**www.blhtlaw.com**



The page(s) comprising this e-mail transmission contain(s) CONFIDENTIAL INFORMATION from Bartlett Loeb Hinds Thompson & Angelos.  This information is intended solely for the use by the individual entity named as recipient hereof.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this transmission is prohibited. If you have received this message in error, please notify the sender immediately by telephone (813-223-3888) or by return e-mail to the sender.

IRS Circular 230 Disclosure.  New Treasury Regulations require us to inform you of the following:  to ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another person any transaction or matter addressed in this communication. To obtain penalty protection, the new Regulations require attorneys, accountants and other tax advisors to perform increased due diligence to verify all relevant facts and to format the written tax advice in a lengthy number of separately enumerated sections with numerous disclosures.  If you would like written tax advice designed to provide penalty protection, please contact us and we will need to discuss the matter with you in more detail.

**EXHIBIT B**

| | |
|---|---|
| **From:** | Heather A. Wilfong |
| **To:** | Eric L. Stettin; Daphnee Jones |
| **Cc:** | Ethan J. Loeb; Elliot P. Haney; Steven Gieseler; Nicholas Gieseler; Kerri Rick |
| **Subject:** | FW: NP Devland Holdings, LLC v. Village of North Palm Beach - Overdue Interrogatory Answers |
| **Date:** | Wednesday, January 7, 2026 1:55:00 PM |
| **Attachments:** | image001.png<br>2025_08_15_ROG_NP Devland 1st to Village of NPB.pdf<br>2025_08_15_NOS_NP NOS 1st Rogs to VNPB.pdf |
| **Importance:** | High |

Good afternoon

We have not received answers to our first set of interrogatories.   These are over 4 months past due.  Please provide your responses by 12:00 pm on Friday.

Thank you,

Heather A. Wilfong | Senior Paralegal
**Bartlett Loeb Hinds Thompson & Angelos**
heatherw@blhtlaw.com
1001 Water Street, Suite 475
Tampa, FL 33602
813-223-3888
www.blhtlaw.com

---

**From:** Heather A. Wilfong
**Sent:** Friday, October 3, 2025 1:50 PM
**To:** Eric L. Stettin <estettin@wsh-law.com>; Daphnee Jones <djones@wsh-law.com>
**Cc:** Ethan J. Loeb <EthanL@blhtlaw.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>
**Subject:** NP Devland Holdings, LLC v. Village of North Palm Beach - Overdue Interrogatory Answers

Good Afternoon,

A review of our file and the docket show we have not received your answers to Plaintiffs' First Interrogatories served on August 15th.

These are over a month past due, please advise when we can expect to receive the answers.

Thank you,

Heather A. Wilfong | Senior Paralegal
**Bartlett Loeb Hinds Thompson & Angelos**
heatherw@blhtlaw.com
1001 Water Street, Suite 475
Tampa, FL 33602
813-223-3888
www.blhtlaw.com



The page(s) comprising this e-mail transmission contain(s) CONFIDENTIAL INFORMATION from Bartlett Loeb Hinds Thompson & Angelos.  This information is intended solely for the use by the individual entity named as recipient hereof.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this transmission is prohibited. If you have received this message in error, please notify the sender immediately by telephone (813-223-3888) or by return e-mail to the sender.

IRS Circular 230 Disclosure.  New Treasury Regulations require us to inform you of the following:  to ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another person any transaction or matter addressed in this communication. To obtain penalty protection, the new Regulations require attorneys, accountants and other tax advisors to perform increased due diligence to verify all relevant facts and to format the written tax advice in a lengthy number of separately enumerated sections with numerous disclosures.  If you would like written tax advice designed to provide penalty protection, please contact us and we will need to discuss the matter with you in more detail.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION AK

CASE NO. 50-2025-CA-004670-XXXA-MB

NP DEVLAND HOLDINGS LLC,
NP DEVLAND NORTH LLC,
NP DEVLAND EAST LLC,
  Plaintiff/Petitioners

vs.

VILLAGE OF NORTH PALM BEACH FLORIDA,
  Defendant/Respondent.

_____/

## ORDER SPECIALLY SETTING REMOTE HEARING

[Scheduling Order and Notice of Hearing]

[*a copy of the motion/s must be attached when submitted to the Court*]

**THIS MATTER** is specially set for REMOTE hearing before **JUDGE JAMES SHERMAN** as follows:

**DATE OF HEARING: Tuesday, February 10, 2026**

**TIME OF HEARING: 10:00 AM**

**TIME RESERVED FOR HEARING: 30 minutes**

**MATTER(s) TO BE HEARD: Motion to Stay**

### IMPORTANT ZOOM INFORMATION:

Join Zoom Meeting
https://us02web.zoom.us/j/89696185484

Meeting ID: 89696185484

Dial-in Information
  877 853 5257 US Toll-Free
  888 475 4499 US Toll-Free

**THIS MATTER HAS BEEN SPECIALLY SET BY COURT ORDER AND CANNOT BE CANCELED OR RESET EXCEPT BY FURTHER ORDER OF THE COURT.** It is further

Page **1** of **4**

Case No. 50-2025-CA-004670-XXXA-MB

**ORDERED** that the attorneys/parties must submit to the Court by hard copy if greater than 50 pages (or upload to eCourtesy if less than 50 pages total) seven (7) days before the hearing noting the date and time of the hearing:

1. copies of all relevant pleadings;
2. copies of all case law authority;

If an interpreter is needed for a party or witness in this case, it shall be the responsibility of the party needing same to provide a qualified interpreter.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida.

50-2025-CA-004670-XXXA-MB    01/12/2026
James Sherman
Judge

**COPIES TO:**

| | | |
|---|---|---|
| ELLIOT HANEY | 1001 WATER STREET SUITE 475 TAMPA, FL 33602 | ellioth@sblfirm.com marjoriep@blhtlaw.com marjoriep@blhtlaw.com ellioth@blhtlaw.com eservice@blhtlaw.com heatherw@blhtlaw.com |
| ERIC L STETTIN | 200 EAST BROWARD BLVD SUITE 1900 FORT LAUDERDALE, FL 33301 | estettin@wsh-law.com estettin@wsh-law.com djones@wsh-law.com |
| ETHAN J LOEB | 1001 WATER STREET SUITE 475 TAMPA, FL 33602 | ethanl@blhtlaw.com ethanl@blhtlaw.com ethanl@blhtlaw.com eservice@blhtlaw.com heatherw@blhtlaw.com |
| NICHOLAS M GIESELER | 819 S FEDERAL HWY SUITE 300 STUART, FL 34994 | nmg@gieselerlaw.com nicholasg@blhtlaw.com nicholasg@blhtlaw.com mariac@blhtlaw.com heatherw@blhtlaw.com |

Page **2** of **4**

STEVEN GIESELER              1001 WATER ST SUITE 475        sgg@gieselerlaw.com
                            TAMPA, FL 33602                 steveng@blhtlaw.com
                                                           steveng@blhtlaw.com
                                                           mariac@blhtlaw.com
                                                           heatherw@blhtlaw.com

Case No. 50-2025-CA-004670-XXXA-MB

# ADA NOTICE

This notice is provided pursuant to Administrative Order No. 2.207

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

Filing # 239273920 E-Filed 01/12/2026 11:58:08 AM

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

Case No.: 50-2025-CA-004670-XXXA-MB

### NOTICE OF POSTPONEMENT OF VIDEOTAPED DEPOSITION

**PLEASE TAKE NOTICE** that Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North, LLC and NP-Devland East, LLC (collectively "Plaintiffs"), by and through their undersigned counsel give notice that the deposition of Valentino Perez scheduled for January 19, 2026 at 10:00 a.m. is hereby POSTPONED and will be rescheduled for a future date and time.

        Respectfully submitted,

        */s/ Ethan J. Loeb*
        **ETHAN J. LOEB**
        Florida Bar No. 0668338
        EthanL@BLHTLaw.com
        Eservice@BLHTLaw.com
        KerriR@BLHTLaw.com
        HeatherW@BLHTLaw.com
        **STEVEN GIESELER**
        Florida Bar No. 0080981
        StevenG@BLHTLaw.com
        **ELLIOT P. HANEY**
        Florida Bar no. 1018829
        ElliotH@BLHTlaw.com

MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on January 12, 2026, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:   Eric L. Stettin, Esq., estettin@wsh-law.com,  DJones@wsh-law.com,  WEISS  SEROTA  HELFMAN  COLE  & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 291 of 429

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

Case No.: 50-2025-CA-004670-XXXA-MB

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

        Defendant / Respondent.

_____/

**SECOND AMENDED[1] NOTICE OF**
**TAKING VIDEOTAPED DEPOSITION DUCES TECUM**

**PLEASE TAKE NOTICE** that the undersigned attorneys will take the deposition of the person named below, pursuant to the Florida Rules of Civil Procedure, before a certified court reporter who is not of counsel to the parties or interested in the event of the cause at the address shown below. This deposition may be used as evidence at an evidentiary hearing, trial, or other court proceedings as allowed under Florida law. The deposition taken by this Firm pursuant to this notice is intended for that purpose or any other lawful purpose, and you are hereby notified of such proceeding and will conduct yourself accordingly and prepare for this deposition accordingly. This deposition will be videotaped by a representative of Olender Reporting, Inc. (866) 420-4020. Deponent shall deliver the documents listed on the attached Exhibit "A" at least 5 business days before the scheduled deposition[2].

---

[1] Amended to note counsel for Plaintiff is appearing via Zoom
[2] Documents previously produced need not be reproduced.

1

| Name | Date | Location |
|---|---|---|
| Charles Huff | January 15, 2026 @ 1:00 p.m. | City Hall Conference 501 US Highway 1 North Palm Beach, Florida 33408 <br><br> **counsel for Plaintiff will be appearing via Zoom |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 12, 2026, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on: Eric L. Stettin, Esq., estettin@wsh-law.com, DJones@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

/s/  Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829
ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
*Counsel for Plaintiffs / Petitioners*

2

## **DEFINITIONS AND INSTRUCTIONS**

1.      The term "NP-Devland" means, the Plaintiffs, NP-Devland Holdings, LLC, NP-Devland North LLC and NP-Devland East, LLC collectively.

2.      The term "Subject Property" means the property described in Paragraph 4 of the Complaint filed on May 12, 2025.

3.      The term "Village," refers to Defendant, Village of North Palm Beach, Florida, including all employees, owners, officers, members, managing members, directors, affiliates, agents, and any other person or entity acting for or on its behalf.

4.      The term "You" and/or "Your" means the party or parties to whom these requests are addressed, including the party or parties or any other agent(s), attorney(s), and all other persons acting or purporting to act on their behalf.

5.      As used herein, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

6.      The terms "document" or "documents" mean any written, typed, printed, recorded or graphic material, however produced, reproduced or stored, including, but not limited to, all Electronic Data, notes, e-mails, memoranda, reports, correspondence, communications, contracts, bills, agreements, letters, messages, minutes, telegrams, memorandums, memorandums of conferences or telephone conversations, study list, compliance of data, papers, books, records, pictures, photographs, tapes and all other tangible things upon which are handwriting, typing, printing, drawing, representative, photostatic or other copies, magnetic or electronic impulse or other forms of communication is recorded or reproduced and all copies (except for identical copies) and drafts thereof. Any copy containing these, or any other alterations, notes or comments not included on any original shall not be deemed an identical copy but shall be deemed a separate document within the foregoing definition.

7.      The terms "communication," "communications," and "correspondence," which are included within the broader terms "document" and "documents" above, mean any statement or utterance, whether written or oral, made by one person to another or in the presence of another, or any document delivered or sent from one person to another, including, but not limited to, notes, electronic messages, e-mails, voice mail messages, text messages, instant/direct messaging or IM, (e.g., iMessages, Slack messages, Skype Messenger, FaceBook Messenger, etc.), tweets, social media posts, information stored on web pages or web servers, and database records.

8.      The term "Electronic Data," which is included within the broader terms "document" and "documents" above, means any information, including files, documents, correspondence, communications, images, videos, metadata or any combination thereof stored, created, or used on any Electronic Storage Device, disk, tape (including backup tapes and other backup media), or other computer or digital storage medium, microfilm, microfiche, floppy, or any other storage or recording medium.

9.      The word "Electronic Storage Device" means any disk, including hard disks and

floppy disks, CD-ROM's, DVD's, network servers, shared servers, computers, magnetic tape, back-up tape, voicemail, temporary files, and PDA's, whether currently on your premises or otherwise.

10.     The word "produce" means to make available the documents requested herein—**in their native format, including all meta-data**—for inspection and copying and to separate such documents into the categories set forth in this request.

11.     The term "relating to" means concerning, respecting, referring to, summarizing, digesting, embodying, demonstrating, reflecting, establishing, tending to establish, tending not to establish, evidencing, comprising, connected with, commenting on, responding to, disagreeing with, showing, describing, analyzing, representing, constituting or including.

12.     If you decline to produce any documents requested hereinafter on the basis of any privilege known in the law, you shall, at the time of production designated herein, as to each such document, provide Plaintiff with the following written information pertaining to such document:

       (a)     its date or, if not dated, the date it was prepared or received;

       (b)     the type of document (e.g., letter, memorandum, telegram, chart, photograph, reproduction);

       (c)     the author and addressee;

       (d)     its present location;

       (e)     the identity and address of the individual or person presently custodian thereof;

       (f)     a general description of its contents;

       (g)     the number of pages thereof;

       (h)     the identity of each person who received a copy of such document and the relationship of such person to you;

       (i)     whether such document contains or relates to facts or opinions, or both; and

       (j)     the exact nature of the privilege that you claim with respect to such document.

13.     The words "And," "or" as well as "and/or" shall be interpreted in the most inclusive sense possible.

4

**DOCUMENTS TO BE PRODUCED**

1.      All documents and communications from January 1, 2022 to present related to the Subject Property.

2.      All documents and communications from January 1, 2022 to present discussing or referencing Nader Salour.

3.      All documents listed in Your Initial Disclosures filed on July 21, 2025.

4.      All documents and communications from January 1, 2019 to December 31, 2022 related to the adoption of the C-3 PUD regulations described in Paragraph 17 of the Complaint filed on May 12, 2025.

5.      All documents and communications from January 1, 2024 to present related to Ordinance 2025-06.

6.      All documents You refer to as "competent and substantial evidence" in Paragraph 76 of Your Answer and Affirmative Defenses filed on June 24, 2025.

7.      All Ordinances from January 1, 2022 to present approving a Planned Unit Development in the Village of North Palm Beach.

8.      All documents and communications related to the "oral and written representations" referenced in Condition II of Ordinance 2025-06.

9.      All communications from January 1, 2022 to present between you and the Town of Lake Park related to the Subject Property.

10.      All documents and communications related to any other applications for a C-3 PUD submitted to You since the adoption of the C-3 PUD Regulations.

11.      All documents and communications related to guidance or training of staff processing C-3 PUD applications.

12.     All documents that support the contention made in Paragraph 87 of your Answer and Affirmative Defenses that Ordinance 2025-06 "bears a rational relationship to a legitimate governmental purpose."

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

     Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

     Defendant/Respondent

_____/

## NOTICE OF SERVICE OF ANSWERS TO INTERROGATORIES

     Defendant, **VILLAGE OF NORTH PALM BEACH**, by its undersigned counsel files

this Notice of Service of Answers to Interrogatories propounded by Plaintiff.

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-

Filing Portal on January 14, 2026.

                    WEISS SEROTA HELFMAN
                    COLE & BIERMAN, P.L.
                    Attorneys for Defendant
                    200 East Broward Boulevard, Suite 1900
                    Fort Lauderdale, Florida 33301
                    Telephone: (954) 763-4242

                    By:  /s/ *Eric L. Stettin*
                       ERIC L. STETTIN
                     Florida Bar No. 831697

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

v.

THE VILLAGE OF NORTH PALM
BEACH, FLORIDA, a Florida municipal
corporation,

        Defendant / Respondent.

_____/

Case No.: 50-2025-CA-004670

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO STAY DISCOVERY
AND FOR PROTECTIVE ORDER**

Plaintiffs / Petitioners NP-DEVLAND HOLDINGS, LLC, NP-DEVLAND NORTH, LLC,

and NP DEVLAND EAST, LLC (collectively, "**NP-Devland**"), though the undersigned counsel,

file this response to the *Motion to Stay Discovery and for Protective Order* filed by Defendant

THE VILLAGE OF NORTH PALM BEACH, FLORIDA ("**Defendant**") on December 30, 2025

(the "**Motion**"), and state as follows:

1.      NP-Devland filed suit against Defendant in May of 2025, pleading three counts

based on Defendant's failure to adhere to the written ordinances governing applications for

planned unit developments within Defendant's municipal limits.

2.      Defendant did not timely serve a response to the complaint within the period

prescribed by the Florida Rules of Civil Procedure, necessitating the filing of a motion for clerk's

default. Only then did Defendant finally serve its Answer and Affirmative Defenses, on June 24,

1

2025. Unfortunately, this belated response was a harbinger of Defendant's constant efforts to delay and obstruct the most basic of requirements governing litigation in this State and Circuit.

3.     To wit, and as set forth in NP-Devland's recently-filed motion to compel, Defendant was more than four months late in serving responses to NP-Devland's first set of interrogatories in this case, which delay had no reasonable explanation or good cause.

4.     Similarly, even the belated Answer and Affirmative Defenses (referenced above) so readily failed to comport with the Rules of Civil Procedure that NP-Devland was forced to file a motion to strike, which resulted in an amended answer finally filed by Defendant in October of 2025.

5.     In a rare instance of compliance, Defendant did file a response to NP-Devland's first request for production of documents, on September 22, 2025, at least cursorily demonstrating a recognition that Defendant was beholden to the rules governing discovery. *See* **Exhibit A** attached hereto.  To date, Defendant's production remains deficient and another forthcoming motion to compel and for sanctions is due to be filed shortly.

6.     On December 18, 2025, Defendant filed a motion for judgment on the pleadings, which is set to be heard in February. NP-Devland is content to argue the full merits (or lack thereof) of that motion at the appropriate time, other than to point out here that on its face that motion is riddled with factual and legal errors, such as its initial argument that NP-Devland failed to comply with the jurisdictional requirement to serve the State of Florida with a copy of its complaint when in fact notice of compliance with this requirement was filed with the Clerk on May 14, 2024 (two days after filing of the complaint, and more than six months before Defendant's assertion to the contrary in the motion for judgment on the pleadings), *see* **Exhibit B** attached hereto.

2

7. On this flimsy premise—and after (a) already partly participating in the discovery process and (b) otherwise delaying and obstructing any and all efforts at litigating this case as required by the Rules—Defendant now has filed the Motion, seeking a stay and protective order precluding all discovery until the motion for judgment on the pleadings can be heard.

8. In ostensible support thereof, Defendant cites to a scant few cases which stand for the proposition that in certain unique circumstances, courts *can* stay discovery pending resolution of a dispositive motion. But Defendant cites to no case explaining why that discretion should be used here—that is, any case holding that this Court *should* stay the discovery that Defendant already has, by its conduct, itself "stayed" for months.

9. Even the few cases cited by Defendant do its argument no favors. For example, Defendant seeks to rely on *Bank of America N.A. v. De Morales*, 314 So. 3d 528 (Fla. 3d DCA 2020). But in *De Morales*, the Third DCA was confronted with a defendant asserting *immunity from being sued* in a motion to dismiss, which if granted would have validated the defendant's argument that it should never have been subjected to discovery in the first place. *Id*. at 531 ("Given the purpose of the immunity asserted, the potentially dispositive nature of the motion, and the circumstances, the trial court abused its discretion in failing to stay discovery until it ruled on the bank's motion to dismiss. Although the expense of continued litigation is ordinarily not a harm that warrants certiorari relief, it may lie in cases where the immunity asserted is from litigation altogether, and not just from liability."). Defendant's reliance on *Mishiyev v. Davis*, 402 So. 3d 402 So. 3d 443 (Fla. 2d DCA 2025)—a case dealing with anti-SLAPP *immunity from suit*—suffers from the same infirmity, and is, therefore similarly inapplicable.

10. Defendant's motion for judgment on the pleadings makes no such immunity argument. And, even if it had, a putative and subsidiary "immunity from discovery" argument was

long ago waived by Defendant (albeit only partially) participating in the discovery process via its response to NP-Devland's production requests.

11.     Florida's appellate courts long have held that the pendency of other—even potentially dispositive—motions is not "good cause" to "justify postponing discovery for [a] protracted period of time." *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 710 So. 2d 1022, 1025 (Fla. 1st DCA 1998). To that end, Defendant has not cited any case where a court has employed its discretion in discovery matters to stay discovery *months after* outstanding discovery responses were due, and after the moving party already has otherwise participated in the discovery process.

12.     NP-Devland respectfully submits that it would, in fact, be an abuse of the Court's discretion to validate such a pretextual, after-the-fact, and cynical attempt to justify Defendant's failure to conduct discovery in good faith as required by the Rules of Civil Procedure, particularly in light of our supreme court's new emphasis on the speedy and efficient progress and resolution of civil matters.

13.     In sum, nothing in Defendant's Motion suggests, let alone compels, this Court's retroactive approval of  Defendant's efforts at delaying the progress of this case and its attendant willingness to ignore the authority of the Rules of Civil Procedure and of this Court.

**WHEREFORE**, NP-Devland respectfully requests that this Court deny the Motion in its entirety.

DATED:        January 14, 2026.

Respectfully submitted,

*/s/ Ethan J. Loeb*
ETHAN J. LOEB
Florida Bar No. 0668338
EthanL@BLHTLaw.com
KerriR@BLHTLaw.com

4

HeatherW@BLHTLaw.com
STEVEN GIESELER
Florida Bar No. 0080981
StevenG@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
*Counsel for Plaintiffs / Petitioners*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 14, 2026, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on:   Eric L. Stettin, Esq., estettin@wsh-law.com, DJones@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

Respectfully submitted,

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

     Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

     Defendant/Respondent

_____/

## DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION

Defendant, VILLAGE OF NORTH PALM BEACH, FLORIDA, by its undersigned

counsel, files its Response to the Request for Production, as follows:

1.    All documents and communications from January 1, 2022 to present related to the Subject Property.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

2.    All documents and communications from January 1, 2022 to present discussing or referencing Nader Salour.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.
**EXHIBIT A**

3. All documents listed in Your Initial Disclosures filed on July 21, 2025.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

4. All documents and communications from January 1, 2019 to December 31, 2022 related to the adoption of the C-3 PUD regulations described in Paragraph 17 of the Complaint filed on May 12, 2025.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

5. All documents and communications from January 1, 2024 to present related to Ordinance 2025-06.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

6. All documents You refer to as "competent and substantial evidence" in Paragraph 76 of Your Answer and Affirmative Defenses filed on June 24, 2025.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

7. All Ordinances from January 1, 2022 to present approving a Planned Unit Development in the Village of North Palm Beach.

**Response:**

None.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

8. All documents and communications related to the "oral and written representations" referenced in Condition II of Ordinance 2025-06.

   **<u>Response:</u>**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

9. All communications from January 1, 2022 to present between you and the Town of Lake Park related to the Subject Property.

   **<u>Response:</u>**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

10. All documents and communications related to any other applications for a C-3 PUD submitted to You since the adoption of the C-3 PUD Regulations.

    **<u>Response:</u>**

    None.

11. All documents and communications related to guidance or training of staff processing C-3 PUD applications.

    **<u>Response:</u>**

    None.

12. All documents that support the contention made in Paragraph 87 of your Answer and Affirmative Defenses that Ordinance 2025-06 "bears a rational relationship to a legitimate governmental purpose."

    **<u>Response:</u>**

    Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-

Filing Portal on September 22, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By:  /s/ *Eric L. Stettin*
ERIC L. STETTIN
Florida Bar No. 831697

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

         Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

         Defendant / Respondent.

_____/

Case No.:  25-CA-004670

**NOTICE OF COMPLIANCE WITH
SECTION 86.091, FLORIDA STATUTES**

THE UNDERSIGNED HEREBY GIVES NOTICE of compliance with Fla. R. Civ. P. 1.071, with respect to Plaintiffs' constitutional challenge to Village of North Palm Beach Ordinance 2025-06, set forth in Count II of Plaintiffs' Complaint in the captioned action. The undersigned complied with the Rule on May 14, 2025, by serving the Attorney General for the State of Florida with a copy of the Complaint challenging the constitutionality of Ordinance 2025-06 via (a) certified mail and (b) email at oag.civil.eserve@myfloridalegal.com, pursuant to the Attorney General's standing eservice instructions.

         DATED:      May 14, 2025.

         */s/ Ethan J. Loeb*
         **ETHAN J. LOEB**
         Florida Bar No. 0668338
         EthanL@BLHTLaw.com
         Eservice@BLHTLaw.com
         KerriR@BLHTLaw.com
         HeatherW@BLHTLaw.com

{00095215:1}         1

**EXHIBIT B**

**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariC@BLHTLaw.com
**BARTLETT LOEB HINDS
THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

v.

THE VILLAGE OF NORTH PALM
BEACH, FLORIDA, a Florida municipal
corporation,

        Defendant / Respondent.

_____/

Case No.: 50-2025-CA-004670

### PLAINTIFFS' MOTION TO COMPEL PRODUCTION

Plaintiffs / Petitioners NP-DEVLAND HOLDINGS, LLC, NP-DEVLAND NORTH, LLC, and NP DEVLAND EAST, LLC (collectively, "**NP-Devland**"), through the undersigned counsel and pursuant to Florida Rules of Civil Procedure 1.280, 1.350, and 1.380, move to compel production from Defendant THE VILLAGE OF NORTH PALM BEACH, FLORIDA ("**Defendant**"), and in support state:

1. NP-Devland filed suit against Defendant in May of 2025, pleading three counts based on Defendant's failure to adhere to the written ordinances governing applications for planned unit developments within Defendant's municipal limits.

2. Since then, Defendant has routinely flouted, or entirely ignored, the Florida Rules of Civil Procedure and this Court's rules. To wit:

    a. Defendant did not timely serve a response to the Complaint, necessitating the filing of a motion for clerk's default;

1

b. Defendant eventually served a belated Answer and Affirmative Defenses that so readily failed to comply with the Rules of Civil Procedure that NP-Devland was forced to file a motion to strike, and Defendant did not ultimately file a compliant amended answer until October 2025, *five months* after NP-Devland filed the Complaint;

c. Defendant was more than *four months* late in serving responses to NP-Devland's first set of interrogatories, without any reasonable explanation or good cause for the delay; and,

d. Defendant has filed a facially frivolous motion for judgment on the pleadings that is set to be heard in February 2026, and improperly used that motion, after already having participated in discovery, as the flimsy basis for a motion for protective order seeking a stay of all discovery until the motion for judgment on the pleadings is heard.[1]

3. Defendant did at least cursorily comply with the Rules of Civil Procedure in responding to NP-Devland's first request for production of documents on September 22, 2025. Indeed, in their responses, Defendants asserted *no objections*. [*See* **Exhibit A**].[2] Unfortunately, Defendant's ostensible compliance ended there.

4. First, Defendant's supplemental production, served on October 3, 2025, apparently contained "additional documents and emails" beyond those produced in Defendant's initial production. The supplemental production also included, however, "error logs" referencing three

---

[1] A hearing on the motion for protective order is scheduled for January 21, 2026.

[2] Indeed, at this point, and objections Defendant may now try to make should be deemed waived. *See, e.g., Ins. Co. of N. Am. v. Noya*, 398 So. 2d 836, 838 (Fla. 5th DCA 1981) ("Failure to take such timely action waives these [non-privilege] objections.").

responsive documents that were not included in the production, which documents appear to be corrupted.  NP-Devland followed up with Defendant repeatedly—via emails on October 6, 14, and 27, November 7, 11, 19, and 21, and December 1 and 8, 2025—attempting to obtain viewable replacement files for those documents.  Defendants, to date, have completely ignored NP-Devland's repeated requests for the corrupted files—even while responding to other issues, such as scheduling of depositions, in the very same email chain.  [*See* **Exhibit B**].

5.      Second, Defendant's productions did not include any responsive text messages, even though NP-Devland's requests each sought "documents" and/or "communications," expressly defined to include, inter alia, "electronic messages," "text messages," and "instant/direct messaging or IM," and Defendant did not object to any of NP-Devland's requests.  NP-Devland raised the issue with Defendant immediately following service of the supplemental production, at which time Defendant stated:  "We are still checking if there are any responsive txt messages and will supplement if located."  No responsive text messages have since been produced and the Defendant has not indicated that no responsive text messages exist.

6.      Under Fla. R. Civ. P. 1.380(a)(2)(F), a party may "move for an order compelling a response if a party fails to produce documents and things under rule 1.350(b)."

7.      Here, NP-Devland has requested, and Defendant has seemingly attempted to produce, unidentifiable responsive documents Defendant delivered to NP-Devland in a corrupted format.  The Court should require Defendant to produce viewable copies of those documents immediately.  *See, e.g.*, *In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 659, 665 (M.D. Fla. 2007) (granting motion to compel and awarding sanctions when electronic data was not produced in a usable or accessible format); *LE-1 v. Trower*, 320 So. 3d 176, 177 (Fla. 4th DCA 2021) (upholding order granting motion to compel "a better response to discovery," including production

3

of additional responsive documents); *see also Coleman (Parent) Holdings Inc. v. Morgan Stanley, Inc.*, 2005 WL 674885, at \*6 (Fla. 15th Cir. Ct. Mar. 23, 2005) (granting default judgment based on pervasive and unaddressed discovery deficiencies and misconduct, including "script errors" that caused responsive emails and attachments not to be produced, the bodies of some emails to be truncated and unviewable, and other search errors failing to capture responsive documents).

8.      Additionally, NP-Devland has requested, and Defendant has failed to produce, despite raising no objection whatsoever, text messages responsive to each of NP-Devland's requests for production.  The Court should require Defendant to search for such text messages if they have not already done so, and produce responsive text messages immediately.  *See, e.g.*, *Trower*, 320 So. 3d at 177 (discussed *supra*); *Am. Funding, Ltd. v. Hill*, 402 So. 2d 1369, 1371 (Fla. 1st DCA 1981) (granting motion to compel when "no timely objections to the request for production had been made").

9.      NP-Devland has made a good faith effort to obtain the requested discovery without judicial intervention, including by the communications discussed above and the conferral described below.  NP-Devland has waited months for documents that Defendant should have produced long ago.  With scheduled depositions impending, NP-Devland cannot wait any longer.

**WHEREFORE**, NP-Devland respectfully requests that this Court grant this Motion, compel Defendant to produce the requested documents, and order such other and further relief as the Court deems appropriate under the circumstances, including costs and attorney's fees under Fla. R. Civ. P. 1.380(a)(4).

## CERTIFICATE OF CONFERRAL

As described above, counsel has attempted to confer and obtain the requested documents on multiple occasions. To date, the undersigned has not received the requested documents or a satisfactory response.

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 15, 2026, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on: Eric L. Stettin, Esq., estettin@wsh-law.com, DJones@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829
ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
CarrieS@BLHTlaw.com
**BARTLETT LOEB HINDS THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422

*Counsel for Plaintiffs / Petitioners*

5

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

     Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

     Defendant/Respondent

_____/

### DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION

Defendant, VILLAGE OF NORTH PALM BEACH, FLORIDA, by its undersigned

counsel, files its Response to the Request for Production, as follows:

1.    All documents and communications from January 1, 2022 to present related to the Subject Property.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

2.    All documents and communications from January 1, 2022 to present discussing or referencing Nader Salour.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.
**EXHIBIT A**

3.      All documents listed in Your Initial Disclosures filed on July 21, 2025.

   **Response:**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

4.      All documents and communications from January 1, 2019 to December 31, 2022 related to the adoption of the C-3 PUD regulations described in Paragraph 17 of the Complaint filed on May 12, 2025.

   **Response:**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

5.      All documents and communications from January 1, 2024 to present related to Ordinance 2025-06.

   **Response:**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

6.      All documents You refer to as "competent and substantial evidence" in Paragraph 76 of Your Answer and Affirmative Defenses filed on June 24, 2025.

   **Response:**

   Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

7.      All Ordinances from January 1, 2022 to present approving a Planned Unit Development in the Village of North Palm Beach.

   **Response:**

   None.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

8.      All documents and communications related to the "oral and written representations" referenced in Condition II of Ordinance 2025-06.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

9.      All communications from January 1, 2022 to present between you and the Town of Lake Park related to the Subject Property.

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

10.    All documents and communications related to any other applications for a C-3 PUD submitted to You since the adoption of the C-3 PUD Regulations.

**Response:**

None.

11.    All documents and communications related to guidance or training of staff processing C-3 PUD applications.

**Response:**

None.

12.    All documents that support the contention made in Paragraph 87 of your Answer and Affirmative Defenses that Ordinance 2025-06 "bears a rational relationship to a legitimate governmental purpose."

**Response:**

Attached. Discover is ongoing and Defendant reserves the right to supplement the response to this request.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on September 22, 2025.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By:  /s/ *Eric L. Stettin*
ERIC L. STETTIN
Florida Bar No. 831697

| | |
|---|---|
| **From:** | Heather A. Wilfong |
| **To:** | Daphnee Jones; Ethan J. Loeb |
| **Cc:** | Eric L. Stettin; Elliot P. Haney; Nicholas Gieseler; Kerri Rick; Steven Gieseler |
| **Subject:** | RE: Devland vs. North Palm |
| **Date:** | Monday, December 8, 2025 5:11:00 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | ~�aft Staff Report Village Place 7.18.2024.docx_Error.txt_Error.txt |
| | ~�0824 NPB-PZAB Joint 1st Draft Minutes.docx_Error.txt_Error.txt |
| | ~�0824 NPB-PZAB Joint 1st Draft Minutes 2.docx_Error.txt_Error.txt |
| | All_Errors.txt |

Daphnee

I will be filing the amended deposition notices shortly.  I wanted to follow up on the replacement copies of the documents we received from your supplemental production which were corrupted.  I have been requesting these since the beginning of October and we have not received them.  Please provide by close of business on Friday, December 12th.

Thank you,

Heather A. Wilfong | Senior Paralegal
**Bartlett Loeb Hinds Thompson & Angelos**
heatherw@blhtlaw.com
1001 Water Street, Suite 475
Tampa, FL 33602
813-223-3888
www.blhtlaw.com

**From:** Daphnee Jones <DJones@wsh-law.com>
**Sent:** Monday, December 8, 2025 10:20 AM
**To:** Heather A. Wilfong <heatherw@blhtlaw.com>; Ethan J. Loeb <EthanL@blhtlaw.com>
**Cc:** Eric L. Stettin <EStettin@wsh-law.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** RE: Devland vs. North Palm
**Importance:** High


Good morning Heather:

We received the Notice of Taking Deposition for 10 am. We gave afternoon times 1-4.  Please amend the notices.

Thank you.


DAPHNEE

# JONES

*LEGAL ASSISTANT/FRP PARALEGAL OF ERIC STETTIN.*


**EXHIBIT B**

WSH logo



200 E. Broward Blvd., Suite 1900 | Fort Lauderdale, FL 33301

P: (954) 763-4242   E: djones@wsh-law.com

 

**THINK BEFORE YOU PRINT**

This message, together with any attachments, is intended only for the addressee. It may contain information which is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use, or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone or by return e-mail and delete the message, along with any attachments.

Pursuant to the Fair Debt Collection Practices Act, this communication is from a debt collector. Any information obtained will be used for the purpose of collecting a debt.

---

**From:** Heather A. Wilfong <heatherw@blhtlaw.com>
**Sent:** Monday, December 1, 2025 8:10 AM
**To:** Daphnee Jones <DJones@wsh-law.com>; ethanl <ethanl@blhtlaw.com>
**Cc:** Eric L. Stettin <EStettin@wsh-law.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** RE: Devland vs. North Palm

Good Morning Daphnee

We will set Mr. Huff on the 15th and Mr. Perez on the 19th.  We will be setting these in person, please advise if we can set these at your office.

Also, I am still waiting for replacement copies of the corrupted documents from production.  Please provide those.

Thank you,

Heather A. Wilfong | Senior Paralegal
**Bartlett Loeb Hinds Thompson & Angelos**
heatherw@blhtlaw.com
1001 Water Street, Suite 475
Tampa, FL 33602
813-223-3888
**https://link.edgepilot.com/s/bdfc5234/P0if002gTEODfBuF8AMTBg?u=http://www.blhtlaw.com/**

---

**From:** Daphnee Jones <DJones@wsh-law.com>
**Sent:** Monday, November 24, 2025 12:02 PM
**To:** Ethan J. Loeb <EthanL@blhtlaw.com>

**Cc:** Heather A. Wilfong <heatherw@blhtlaw.com>; Eric L. Stettin <EStettin@wsh-law.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** RE: Devland vs. North Palm

Hi I can offer the following dates:

January 12th, 15th or 19th from 1:00 p.m. to 4:00 p.m.

Thank you.

DAPHNEE

# JONES

*LEGAL ASSISTANT/FRP PARALEGAL OF ERIC STETTIN.*

WSH logo



200 E. Broward Blvd., Suite 1900 | Fort Lauderdale, FL 33301

P: (954) 763-4242   E: djones@wsh-law.com

**THINK BEFORE YOU PRINT**

This message, together with any attachments, is intended only for the addressee. It may contain information which is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use, or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone or by return e-mail and delete the message, along with any attachments.

Pursuant to the Fair Debt Collection Practices Act, this communication is from a debt collector. Any information obtained will be used for the purpose of collecting a debt.

**From:** Ethan J. Loeb <EthanL@blhtlaw.com>
**Sent:** Monday, November 24, 2025 11:21 AM
**To:** Daphnee Jones <DJones@wsh-law.com>
**Cc:** Heather A. Wilfong <heatherw@blhtlaw.com>; Eric L. Stettin <EStettin@wsh-law.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** Re: Devland vs. North Palm

Thank you.  Can you provide dates for mid January?  Thank you.

Ethan J. Loeb | Attorney

# Bartlett Loeb Hinds Thompson & Angelos

# 1001 Water Street, Suite 475

Tampa, FL 33602

ethanl@blhtlaw.com

(813) 223-3888 office

(813) 789-4860 cell

https://link.edgepilot.com/s/a37157d2/AMinDowpd0ywbp7t4NLbGg?
u=http://www.blhtlaw.com/

Assistant: Kerri Rick | kerrir@blhtlaw.com

Paralegal: Ms. Heather Wilfong | HeatherW@blhtlaw.com


On Nov 24, 2025, at 10:33 AM, Daphnee Jones <DJones@wsh-law.com> wrote:


Good morning Mr. Loeb:

With Mr. Stettin being out of the country until Monday December 1, 2025, and to avoid the filing of any motion, please see below 3 dates for the depositions of Mr. Huff and Perez:  01.06.26, 01.07.26 or 01.08.26.


Thank you.

DAPHNEE

# JONES

*LEGAL ASSISTANT/FRP PARALEGAL OF ERIC STETTIN.*

<image001.png>

200 E. Broward Blvd., Suite 1900 | Fort Lauderdale, FL 33301

P: (954) 763-4242    E: djones@wsh-law.com

<image002.png>

<image003.png>

<image004.png>


**THINK BEFORE YOU PRINT**

This message, together with any attachments, is intended only for the addressee. It may contain information which is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you

are hereby notified that any disclosure, copying, distribution, use, or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone or by return e-mail and delete the message, along with any attachments.

Pursuant to the Fair Debt Collection Practices Act, this communication is from a debt collector. Any information obtained will be used for the purpose of collecting a debt.

---

**From:** Ethan J. Loeb <EthanL@blhtlaw.com>
**Sent:** Friday, November 21, 2025 2:47 PM
**To:** Daphnee Jones <DJones@wsh-law.com>
**Cc:** Heather A. Wilfong <heatherw@blhtlaw.com>; Eric L. Stettin <EStettin@wsh-law.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** Re: Devland vs. North Palm

Good afternoon.  We can no longer wait for responses. This is taking way too long. We will file a motion with the court on the topics in my email and Heather's. Let me know if there is any movement on your side on these topics by the close of business this coming Monday. Thank you.

Ethan J. Loeb
Bartlett Loeb Hinds Thompson  &
Angelos
1001 Water Street, Suite 475
Tampa, Florida 33602
ethanl@blhtlaw.com
(813) 223-3888 office
(813) 789-4860 cell

Sent from my iPhone*

*Apologies in advance for typos - typed with thumbs, likely while multi-tasking, and I loathe auto correct

> On Nov 19, 2025, at 10:11 AM, Daphnee Jones <DJones@wsh-law.com> wrote:

Good morning Heather:

Eric is out of the country until 12/01.  We will address your email request upon his return.

Thank you.

DAPHNEE

# JONES

*LEGAL ASSISTANT/FRP PARALEGAL OF ERIC STETTIN.*
<image001.png>

200 E. Broward Blvd., Suite 1900 | Fort Lauderdale, FL 33301
P: (954) 763-4242   E: djones@wsh-law.com

<image002.png>

<image003.png>

<image004.png>

**THINK BEFORE YOU PRINT**

This message, together with any attachments, is intended only for the addressee. It may contain information which is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use, or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone or by return e-mail and delete the message, along with any attachments.

Pursuant to the Fair Debt Collection Practices Act, this communication is from a debt collector. Any information obtained will be used for the purpose of collecting a debt.

**From:** Heather A. Wilfong <heatherw@blhtlaw.com>
**Sent:** Wednesday, November 19, 2025 10:07 AM
**To:** Eric L. Stettin <EStettin@wsh-law.com>; ethanl <ethanl@blhtlaw.com>
**Cc:** Daphnee Jones <DJones@wsh-law.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** RE: Devland vs. North Palm

Mr. Stettin,

I am following up on Mr. Loeb's email regarding deposition dates of Chuck Huff and Valentino Perez.

Additionally, I am following up on my requests for replacement of the documents from your production.

Please advise.

Thank you,

Heather A. Wilfong | Senior Paralegal
**Bartlett Loeb Hinds Thompson & Angelos**
heatherw@blhtlaw.com
1001 Water Street, Suite 475
Tampa, FL 33602
813-223-3888
https://link.edgepilot.com/s/1af54d99/likdAhx4_UaTMueebeUz0g?u=http://www.blhtlaw.com/

---

**From:** Eric L. Stettin <EStettin@wsh-law.com>
**Sent:** Sunday, November 9, 2025 2:01 PM
**To:** Ethan J. Loeb <EthanL@blhtlaw.com>; Heather A. Wilfong <heatherw@blhtlaw.com>
**Cc:** Daphnee Jones <DJones@wsh-law.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** RE: Devland vs. North Palm

Working on dates, will coordinate early this week.

---

**From:** Ethan J. Loeb <EthanL@blhtlaw.com>
**Sent:** Friday, November 7, 2025 10:37 AM
**To:** Heather A. Wilfong <heatherw@blhtlaw.com>
**Cc:** Eric L. Stettin <EStettin@wsh-law.com>; Daphnee Jones <DJones@wsh-law.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** Re: Devland vs. North Palm

Eric

Could you also provide us with dates that Chuck Huff and Valentino Perez can sit for deposition?  Thank you.

Ethan J. Loeb | Attorney
# Bartlett Loeb Hinds Thompson & Angelos

1001 Water Street, Suite 475

Tampa, FL 33602

ethanl@blhtlaw.com

(813) 223-3888 office

(813) 789-4860 cell

https://link.edgepilot.com/s/45df7718/svOvpisazECSTovZCBpKZg?u=http://www.blhtlaw.com/

Assistant: Kerri Rick | kerrir@blhtlaw.com

Paralegal: Ms. Heather Wilfong | HeatherW@blhtlaw.com

On Nov 7, 2025, at 8:46 AM, Heather A. Wilfong <heatherw@blhtlaw.com> wrote:

Good Morning,

I am following up on several emails I have sent regard replacement of the attached documents.

Thank you,

Heather A. Wilfong | Senior Paralegal
**Bartlett Loeb Hinds Thompson & Angelos**
heatherw@blhtlaw.com
1001 Water Street, Suite 475
Tampa, FL 33602
813-223-3888
https://link.edgepilot.com/s/45df7718/svOvpisazECSTovZCBpKZg?u=http://www.blhtlaw.com/

**From:** Heather A. Wilfong
**Sent:** Monday, October 27, 2025 9:16 AM
**To:** Eric L. Stettin <estettin@wsh-law.com>; Daphnee Jones <djones@wsh-law.com>
**Cc:** Ethan J. Loeb <EthanL@blhtlaw.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** FW: Devland vs. North Palm

Good Morning,

I am following up on my emails from October 6th and 14th.  Please provide the documents referenced in the error logs.

Thank you,

Heather A. Wilfong | Senior Paralegal
**Bartlett Loeb Hinds Thompson & Angelos**
heatherw@blhtlaw.com
1001 Water Street, Suite 475
Tampa, FL 33602
813-223-3888
https://link.edgepilot.com/s/45df7718/svOvpisazECSTovZCBp
KZg?u=http://www.blhtlaw.com/

---

**From:** Heather A. Wilfong
**Sent:** Monday, October 6, 2025 10:24 AM
**To:** Eric L. Stettin <estettin@wsh-law.com>; Daphnee Jones <djones@wsh-law.com>
**Cc:** Ethan J. Loeb <EthanL@blhtlaw.com>; Elliot P. Haney <ElliotH@blhtlaw.com>; Nicholas Gieseler <NicholasG@blhtlaw.com>; Kerri Rick <kerrir@blhtlaw.com>; Steven Gieseler <steveng@blhtlaw.com>
**Subject:** RE: Devland vs. North Palm

Good Morning,

In the supplemental production provided – the attached error logs were included with the documents. Can you please provide the actual documents referenced in the logs.

Thank you,

Heather A. Wilfong | Senior Paralegal
**Bartlett Loeb Hinds Thompson & Angelos**
heatherw@blhtlaw.com
1001 Water Street, Suite 475
Tampa, FL 33602
813-223-3888
https://link.edgepilot.com/s/45df7718/svOvpisazECSTovZCBp
KZg?u=http://www.blhtlaw.com/

---

**From:** Ethan J. Loeb <EthanL@blhtlaw.com>
**Sent:** Friday, October 3, 2025 4:56 PM
**To:** Heather A. Wilfong <heatherw@blhtlaw.com>
**Subject:** Fw: Devland vs. North Palm

---

**From:** Eric L. Stettin <EStettin@wsh-law.com>
**Sent:** Friday, October 3, 2025 4:35 PM
**To:** Ethan J. Loeb <EthanL@blhtlaw.com>

**Subject:** Devland vs. North Palm

Ethan,

We supplement the prior responses to production with additional documents and emails.  I shared the folder on OneDrive with your email and they should also be accessible at the link below.  We are still checking if there are any responsive txt messages and will supplement if located.  Note the Village IT searched the email server for messages related to the project and those with the names of the principals.  There is no easy way to conduct the search and weed out each specific document, so  the documents are batched in pst format which is native.

As to the answers to interrogatories, Len and I are still working on them to get in final form.  Due to the Jewish holidays, trials and my being out of town, I haven't had a chance to get this done.  I'm starting a 2-3 day trial Monday and will do my best to get the answers by the end of the week.
Thank you again for your patience and consideration.

Link to documents:
<image001.png>
 Devland vs. North Palm Beach

ERIC L.
# STETTIN
PARTNER
*Martindale-Hubbell Peer Review Ratings: AV Preeminent*

<image002.png>
200 E. Broward Blvd., Suite 1900 | Fort Lauderdale, FL 33301
P: (954) 763-4242   E: info@wsh-law.com   Bio | wsh-law.com | vCards

<image003.png>

<image004.png>

<image005.png>

**THINK BEFORE YOU PRINT**

This message, together with any attachments, is intended only for the addressee. It may contain information which is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use, or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone or by return e-mail and delete the message, along with any attachments.

Pursuant to the Fair Debt Collection Practices Act, this communication is from a debt collector. Any information obtained will be used for the purpose of collecting a debt.

<~�aft Staff Report Village Place 7.18.2024.docx_Error.txt_Error.txt>
<~�0824 NPB-PZAB Joint 1st Draft Minutes.docx_Error.txt_Error.txt>
<~�0824 NPB-PZAB Joint 1st Draft Minutes 2.docx_Error.txt_Error.txt>
<___All_Errors.txt>

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to

proceed to the destination. If suspicious content is detected, you will see a warning.


Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 330 of 429

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 50-2025-CA-004670-XXXA-MB

NP-DEVLAND HOLDINGS, LLC, a Delaware
limited liability company; NP-DEVLAND NORTH,
LLC, a Delaware limited liability company; and
NP-DEVLAND EAST, LLC, a Delaware limited liability company,

       Plaintiffs /Petitioners,

vs.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

       Defendant/Respondent

_____/

## NOTICE OF CANCELLATION OF HEARING
*(Motion Calendar)*

YOU ARE HEREBY NOTIFIED that the hearing below set on motion calendar is hereby

**CANCELLED.**

       **DATE:**      **Wednesday January 21, 2026**

       **TIME:**      **8:30 am**

       **JUDGE:**     **Honorable James Sherman**

       **PLACE:**     **VIA ZOOM VIDEO CONFERENCE**

SPECIFIC MATTERS TO BE HEARD:

**Motion to Stay Discovery and Motion for Protective Order**

THE CLERK WILL PLEASE PLACE SAME ON THE CALENDAR.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

**IN ACCORDANCE WITH THE AMERICAN'S WITH DISABILITIES ACT OF 1990, <u>ALL PERSONS WHO ARE DISABLED AND WHO NEED SPECIAL ACCOMMODATIONS TO PARTICIPATE IN THIS PROCEEDING BECAUSE OF THAT DISABILITY</u> SHOULD CONTACT THE COURT ADA COORDINATOR NO LATER THAN SEVEN DAYS PRIOR TO THE PROCEEDING.   TELEPHONE (305) 375-2006 FOR ASSISTANCE; IF HEARING IMPAIRED, TELEPHONE COURT TDD NUMBER (305) 375-2007 (FLORIDA RELAY SERVICE 1 800 955-8771) FOR ASSISTANCE.**

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a copy of the foregoing was served using the Florida Courts e-Filing Portal on January 16, 2026.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
Attorneys for Defendant
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
Telephone: (954) 763-4242

By:   /s/ *Eric L. Stettin*
        ERIC L. STETTIN
        Florida Bar No. 831697

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Filing # 241333412 E-Filed 02/09/2026 03:51:08 PM

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Case No.: 50-2025-CA-004670

     Plaintiffs / Petitioners,

v.

THE VILLAGE OF NORTH PALM
BEACH, FLORIDA, a Florida municipal
corporation,

     Defendant / Respondent.

_____/

## STIPULATED ORDER CANCELLING HEARING

THIS CAUSE having come before the Court upon the Stipulation of Plaintiffs NP-DEVLAND HOLDINGS, LLC, NP-DEVLAND NORTH, LLC, and NP DEVLAND EAST, LLC and Defendant THE VILLAGE OF NORTH PALM BEACH, FLORIDA (collectively, the "Parties"), and the Court being in agreement and fully advised in the premises, it is ORDERED THAT:

(a)    The hearing scheduled for February 10, 2026 on Defendant's *Motion for Judgment on the Pleadings* is **CANCELLED**;

(b)    Plaintiffs shall file and serve their amended complaint on or before February 20, 2026, upon which filing and service Defendant shall have thirty (30) days to file serve a response.

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida.

50-2025-CA-004670-XXXA-MB    02/09/2026
James Sherman
Judge

_____
JAMES SHERMAN
CIRCUIT JUDGE

**Copies to:**    Ethan J. Loeb, Esq.

Page **1** of **2**

Case No. 50-2025-CA-004670-XXXA-MB

**Steven Gieseler, Esq.**
**Eric Stettin, Esq.**

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

v.

THE VILLAGE OF NORTH PALM
BEACH, FLORIDA, a Florida municipal
corporation,

        Defendant / Respondent.

_____/

Case No.: 50-2025-CA-004670

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiffs / Petitioners NP-DEVLAND HOLDINGS, LLC, NP-DEVLAND NORTH, LLC,

and NP DEVLAND EAST, LLC (collectively, "**NP-Devland**"), though the undersigned counsel,

files this Response in Opposition to the *Motion for Judgment on the Pleadings* (the "**Motion**")

served by Defendant THE VILLAGE OF NORTH PALM BEACH, FLORIDA ("**Defendant**"),

stating as follows:

### INTRODUCTION

The facts of this case are (perhaps deceptively) straightforward. NP-Devland submitted an

application to the Defendant, seeking approval of a Master Plan seeking to redevelop a large parcel

of land located within the Village of North Palm Beach that was once the site of the Twin Cities

Mall.  Complaint ¶19. Via this application, NP-Devland sought *only* PUD (and associated Master

1

Plan) approval under section 45-34.1(10) of the Village's code of ordinances;[1] it did not ask Defendant to approve a building permit or a certificate of occupancy. Complaint ¶20.

Defendant's written ordinance governing PUD applications in the zoning category including NP-Devland's property states, unequivocally, that Defendant "shall" approve a Master Plan application if Defendant finds that four (4) "threshold criteria" are met. Complaint ¶20. The Master Plan (which can be phased) that is approved must contain the intensity of uses, maximum floor area ratios, and building heights on the land that is subject to the approval.  At the quasi-judicial hearing on the PUD application, Defendant found that these four "threshold criteria" were, indeed, met. Complaint ¶21. Nevertheless, Defendant refused to issue NP-Devland the approval that the code required, instead conditioning such approval on thirty-seven (37) additional "conditions" (the majority of which are not contained within the code) NP-Devland would have to satisfy during later stages of development including the site plan review process.

In the Motion, Defendant does not dispute any of this. Rather, Defendant attempts to make this case about something it is not, appealing to its putative "discretion" and "home rule" authority with regard to matters like "staged, discretionary site-plan processes." Motion at 6. But this isn't case about the scope of Defendant's abstract ability to regulate property, and so appeals to whatever authority Defendant might or not possess in this regard are of no moment. NP-Devland was entitled as a matter of law—Defendant's *own* law, and by Defendant's own admission—to approval of its PUD application, and so NP-Devland is entitled to the relief requested in this case.

---

[1] Under subsection 10 of section 45-34.1, "It is the intention of the village to provide a mechanism and process to promote the redevelopment or the obsolete and underutilized areas of the C-3 zoning district with large-scale, master planned projects that promote: a mix of uses; connectivity; pedestrian-oriented development; removal of surface parking; creation of parking; creation of public/civic gathering spaces; shopping, entertainment, and restaurant uses within the form of an urban neighborhood incorporating residential development as an integral use."

## STANDARD OF REVIEW

It is well settled that a "motion for judgment on the pleadings is determined by the same legal test as a motion to dismiss a complaint for failure to state a cause of action." *Domres v. Perrigan*, 760 So. 2d 1028, 1029 (Fla. 5th DCA 2000) (citing *Castner v. Ziemer*, 113 So. 2d 263, 266 (Fla. 2d DCA 1959)).

Under this therefore-controlling motion to dismiss standard, it is fundamental that a court must consider only whether "[t]he complaint on its face alleges . . . sufficient facts to state a cause of action as required by Rule 1.110." *Pizzi v. Cent. Bank & Trust Co.*, 250 So. 2d 895, 897 (Fla. 1971). "This is all that may be considered by the trial court when ruling on a motion to dismiss," and the trial court "must confine itself strictly to the allegations of within the four corners of the complaint." *Id*. (citations omitted).

Moreover, the trial court must accept the plaintiff's factual allegations as true, and construe the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236-38 (1974). "The threshold sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low," *Lewis v. City of St. Petersburg*, 98 F. Supp. 2d 1344, 1346 (M.D. Fla. 2000), because "complaints should not be dismissed for failure to state a cause of action unless the movant can establish beyond any doubt that the claimant could prove no set of facts whatever in support of its claim," *Hillman Const. Co. v. Wainer*, 636 So. 2d 576, 578 (Fla. 4th DCA 1994).

## ARGUMENT

### I.    As a Matter of Record Fact, NP-Devland Complied With Fla. R. Civ. P. 1.071

Defendant's first argument in the Motion is easily disposed of. In short, Defendant claims that NP-Devland had to certify, in the Complaint, that it complied with Florida Rule of Civil

Procedure 1.071. Motion at 3. For reasons that are readily apparent, this argument borders on the absurd. The rule reads as follows:

> A party that files a pleading, written motion, or other document drawing into question the constitutionality of a state statute or a county or municipal charter, ordinance, or franchise must promptly
>
> (a) file a notice of constitutional question stating the question and identifying the document that raises it; and
>
> (b) serve the notice and the pleading, written motion, or other document drawing into question the constitutionality of a state statute or a county or municipal charter, ordinance, or franchise on the Attorney General or the state attorney of the judicial circuit in which the action is pending, by either certified or registered mail.

Fla. R. Civ. P. 1.071.

Nothing in this rule requires that a certification of compliance—nor any other language related to satisfying this requirement—be included in the complaint itself. And as the plain text of the rule indicates, the requirements incumbent on a plaintiff "that files" a lawsuit begin running "promptly" after the lawsuit is filed. This makes logical sense—a plaintiff obviously cannot certify *in the complaint itself* that it has served a filed complaint upon the Attorney General or the state attorney, since there is nothing to serve until the complaint is filed.

NP-Devland served the Attorney General with a copy of the complaint, and a notice of the constitutional question contained therein, on May 14, 2025, filing a notice of this compliance with the Clerk the same day (see **Exhibit A** attached hereto). This notice of compliance is Document #7 on this case's docket.

Despite these textual, factual, and logical constraints, Defendant has decided to argue that the Court must enter judgment in its favor because the "four corners" of the Complaint itself do not include a certification that the rule was complied with. Defendant does not cite in the Motion

4

any case—and NP-Devland certainly isn't aware of such a case—holding that a complaint must include such a certification in its body. Indeed, the first case cited by Defendant in ostensible support of its argument turns on the court's finding that "nothing *in the record before this court*" indicates that the plaintiff complied with Rule 1.071. *See Shelton v. Bank of N.Y. Mellon*, 203 So. 3d 1003, 1005 (Fla. 2d DCA 2016) (emphasis added); *accord Ramle Int'l Corp. v. Miami-Dade County*, 388 So. 3d 126, 131 (Fla. 3d DCA 2023 ("Here, Ramle provided no evidence that it provided the State with the requisite service.") and *Brinkmann v. Francois*, 184 So. 3d 504, 507 (Fla. 2016).

Again, it is meaningless under the rule to serve the Attorney General with a copy of a complaint until it is filed, and therefore the Complaint itself (the text of which must be finalized prior to filing) cannot certify that compliance with the rule has been satisfied. This setting is easily distinguishable from a certification of service in a filing such as the instant motion, where the same singular action—uploading the document via the e-file portal—both files the document and provides service to those on the service list. In the context of Rule 1.071, the filing of the complaint with the Clerk accomplishes that task alone, and so the "prompt" service on the Attorney General requires a distinct and subsequent action with which a plaintiff simply cannot certify compliance in the complaint itself. For that reason, Defendant's argument is without any basis.

## II.     "Home Rule Powers" Have No Bearing On this Case

Defendant's next argument fares not much better. Pages 5 through 8 of the Motion consist of a paean to the Village's home rule powers and the importance of its discretion in regarding "staged development programs." The gravamen of this argument appears to be that since local governments tend to have discretion (writ large) in planning matters, that discretion must be retrofitted to the specific dispute at issue in this case.

5

The problem with this argument is that it is obviated by the plain language of the Village's own controlling ordinance. As set forth in the Complaint, that ordinance states without any equivocation that if the four "threshold criteria" are met by a PUD application, then the Village **shall** grant the application.  That is to say, the "discretion" on which the Motion so heavily relies is found in the Village's determination of whether those four threshold criteria are met; where, as in this case, the Village has confirmed (in its discretion) that those criteria are met, then that discretion ends, and the mandatory approval language of the ordinance governs. This is because it is virtually axiomatic that where a statute or ordinance includes the word "shall," as opposed to the word "may," the provision is to be read as mandatory in nature, and not merely as permissive. *See, e.g., Progressive Select Ins. Co. v. Fla. Hosp. Med. Ctr.*, 236 So. 3d 1183, 1187 (Fla. 5th DCA 2018) (quoting *Fla. Bar v. Trazenfeld*, 833 So. 2d 734, 738 (Fla. 2002)). In the permitting context, under Florida law, "shall" provisions entitle an applicant to a permit, as of right, if the subject criteria are met. And as noted in the Complaint, the Village expressly concedes, on the face of the ordinance "conditionally approving" the PUD application, that NP-Devland meets the PUD ordinance's threshold criteria. Complaint ¶¶20-21; 27-29.

As an offshoot of this appeal to its own discretion, Defendant makes an attenuated leap to argue that since *later* stages of the development process may involve greater latitude in terms of the approval of applications, any litigation over the PUD application itself is premature and meaningless. Motion at 5-6. But this case isn't about those later applications—it's about the PUD application, and NP-Devland is wholly within its rights as a litigant (under Chapter 86 of the Florida Statutes, and common law) to seek a declaration as to the immediate rights and privileges stemming from Defendant's baseless denial.

It is a puzzling argument, indeed, for the Village to put a PUD applicant through the exhaustive and expensive process of seeking PUD approval only to advise the Court that the entire process is in fact, and for practical purposes, meaningless. If the Village wishes to strike the PUD ordinance from its code as superfluous, then it has the discretion to do so. Until that time—and based on Florida Supreme Court zoning decisions going back more than a half-century, *see Rinker Materials Corp. v. City of North Miami*, 286 So. 2d 552, 553 (Fla. 1973)—the Village's land use decisions *must* be grounded in the plain and controlling language of its own, written land use regulations.

### III.     The Complaint is the Proper Vehicle for NP-Devland's Lawsuit

Finally, Defendant argues in the Motion that NP-Devland's exclusive remedy to challenge the Village's refusal to apply its own PUD ordinance is via a petition for writ of certiorari. Motion at 9. This argument fails for two reasons.

First, as the Motion acknowledges in several places, Count II is a claim challenging the constitutionality of the ordinance "conditionally granting" NP-Devland's PUD application. Complaint ¶¶48-58. As the Florida Supreme Court has succinctly explained in the land use context, "a petition seeking certiorari review is not the proper procedural vehicle to challenge the constitutionality of a statute or ordinance." *Miami-Dade County v. Omnipoint Holdings, Inc.*, 863 So. 2d 195, 199 (Fla. 2003) (citing *City of Deerfield Beach v. Vaillant*, 419 So. 2d 624, 626 (Fla. 1982)). In this regard, the Motion has it precisely backwards; not only *can* NP-Devland bring its constitutional claim via the Complaint (as opposed it via certiorari petition), it *must* bring the constitutional challenge in that manner.[2]

---

[2] On this point, and in the interests of full disclosure to the Court, upon resolution of the Motion NP-Devland will be filing a motion to amend the Complaint based on documents and communications obtained in the early stages of discovery. First, NP-Devland will seek to add another constitutional challenge to the "conditional grant" ordinance, this one seeking redress for violation of the related doctrines of unconstitutional exactions / unconstitutional

7

The Motion also takes aim at Count III of the Complaint, which seeks a writ of mandamus requiring the Village to grant the PUD application in accordance with the PUD ordinance. In doing so, the Village again appeals to its discretion in land use matters, arguing that such discretion is not congruent with the "ministerial duty" that must underlie a successful mandamus action.

Plaintiff illustrated above why the Village's emphasis on its "discretion" misses the point in this case. It is for this same reason that the Village's assertion of a categorical, bright-line rule prohibiting mandamus actions that challenge quasi-judicial decisions does not fit the facts of this case. In the typical quasi-judicial hearing—in fact, in most of them—the governmental body is charged with fact-finding and the weighing of evidence necessary to support whichever decision the body might eventually reach. The Motion is explicit in this regard, contrasting quasi-judicial "approvals that require fact-finding and application of criteria" with the "ministerial" duties giving rise to mandamus actions. Motion at 8 (citing *Key Biscayne Gateway Partners, Ltd. v. Village of Key Biscayne*, 172 So. 3d 499 (Fla. 3d DCA 2015)).

But this contrast, and its foundation in cases like *Key Biscayne*, actually does the Village's argument no favors, for the simple reason that by the Village's own admission, all of the "facts found" at the quasi-judicial hearing in this case demonstrated that NP-Devland met the criteria in the PUD ordinance. Once this happened—once the Village employed its discretion, and applied its criteria, in this manner—then the Village's duty did become entirely ministerial and therefore

---

conditions. Furthermore, having obtained email communications evidencing a blatant violation of Florida Sunshine Law in the consideration of the ordinance—significant enough that Defendant's Village Manager refused to answer dozens of questions about the violation at his deposition, under advice of counsel to avoid self-incrimination under the Fifth Amendment to the U.S. Constitution—Plaintiff will be adding a Sunshine Law count which seeks as its remedy the invalidation of the resulting quasi-judicial decision.

8

appropriate for mandamus. Precisely *none* of the cases cited by the Village for its categorial rule features an analogous situation. And for that reason, in light of the allegations of the Complaint— and the burdens, benefits, and inferences attendant to the instant Motion—this Court should deny the Motion's argument with regard to Count III and allow NP-Devland's mandamus claim to be adjudicated on its merits.

**WHEREFORE**, NP-Devland respectfully requests that this Court deny the Motion in its entirety.

Respectfully submitted,

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
CarrieS@BLHTLaw.com
**ELLIOT P. HANEY**
Florida Bar no. 1018829
ElliotH@BLHTlaw.com
MarjorieP@BLHTlaw.com
**NICHOLAS GIESELER**
Florida Bar No. 43979
Nicholasg@BLHTlaw.com
CarrieS@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 3, 2026, a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal and served on: Eric L. Stettin, Esq., estettin@wsh-law.com, DJones@wsh-law.com, WEISS SEROTA HELFMAN COLE & BIERMAN, P.L., 200 East Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301, *Counsel for Defendants.*

/s/ Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338

10

Case 9:26-cv-80304-AMC Document 1-3 Entered on FLSD Docket 03/20/2026 Page 344 of 429

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

Case No.:  25-CA-004670

      Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation,

      Defendant / Respondent.

_____/

## NOTICE OF COMPLIANCE WITH
## SECTION 86.091, FLORIDA STATUTES

THE UNDERSIGNED HEREBY GIVES NOTICE of compliance with Fla. R. Civ. P. 1.071, with respect to Plaintiffs' constitutional challenge to Village of North Palm Beach Ordinance 2025-06, set forth in Count II of Plaintiffs' Complaint in the captioned action. The undersigned complied with the Rule on May 14, 2025, by serving the Attorney General for the State of Florida with a copy of the Complaint challenging the constitutionality of Ordinance 2025-06 via (a) certified mail and (b) email at oag.civil.eserve@myfloridalegal.com, pursuant to the Attorney General's standing eservice instructions.

DATED:      May 14, 2025.

/s/ Ethan J. Loeb
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com

{00095215:1}

1

**EXHIBIT A**

**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
MariC@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
***Counsel for Plaintiffs / Petitioners***

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

Case No.: 50-2025-CA-004670

Plaintiffs / Petitioners,

v.

THE VILLAGE OF NORTH PALM
BEACH, FLORIDA, a Florida municipal
corporation,

Defendant / Respondent.

_____/

### STIPULATED ORDER CANCELLING HEARING

THIS CAUSE having come before the Court upon the Stipulation of Plaintiffs NP-DEVLAND HOLDINGS, LLC, NP-DEVLAND NORTH, LLC, and NP DEVLAND EAST, LLC and Defendant THE VILLAGE OF NORTH PALM BEACH, FLORIDA (collectively, the "Parties"), and the Court being in agreement and fully advised in the premises, it is ORDERED THAT:

(a)      The hearing scheduled for February 10, 2026 on Defendant's *Motion for Judgment on the Pleadings* is **CANCELLED**;

(b)      Plaintiffs shall file and serve their amended complaint on or before February 20, 2026, upon which filing and service Defendant shall have thirty (30) days to file serve a response.

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida.

50-2025-CA-004670-XXXA-MB     02/09/2026
James Sherman
Judge

_____
JAMES SHERMAN
CIRCUIT JUDGE

**Copies to:**      Ethan J. Loeb, Esq.

Page **1** of **2**

Case No. 50-2025-CA-004670-XXXA-MB

**Steven Gieseler, Esq.**
**Eric Stettin, Esq.**

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

NP-DEVLAND HOLDINGS, LLC,
a Delaware limited liability company;
NP-DEVLAND NORTH, LLC,
a Delaware limited liability company; and
NP-DEVLAND EAST, LLC,
a Delaware limited liability company,

        Plaintiffs / Petitioners,

v.

VILLAGE OF NORTH PALM BEACH,
FLORIDA, a Florida municipal corporation;
and the VILLAGE COUNCIL OF THE
VILLAGE OF NORTH PALM BEACH,
FLORIDA,

        Defendants / Respondents.
_____/

Case No.: 50-2025-CA-004670

**FIRST AMENDED COMPLAINT &
PETITION FOR WRIT OF MANDAMUS**

Plaintiffs / Petitioners NP-DEVLAND HOLDINGS, LLC, NP-DEVLAND NORTH, LLC, and NP DEVLAND EAST, LLC (collectively, "**NP-Devland**") through their undersigned counsel, bring this action against the VILLAGE OF NORTH PALM BEACH, FLORIDA (the "**Village**"), a Florida municipal corporation, and the VILLAGE COUNCIL OF THE VILLAGE OF NORTH PALM BEACH (the "**Village Council**"), and state as follows:

**PARTIES, JURISDICTION, & VENUE**

1.      Plaintiff NP-Devland Holdings, LLC is a limited liability company organized under the laws of the State of Delaware, and is authorized to conduct business in the State of Florida.

2.      Plaintiff NP-Devland North, LLC is a limited liability company organized under the laws of the State of Delaware, and is authorized to conduct business in the State of Florida.

{00095130:1}             1

3. Plaintiff NP-Devland East, LLC is a limited liability company organized under the laws of the State of Delaware, and is authorized to conduct business in the State of Florida.

4. At all times material hereto, Plaintiffs have collectively owned the real property, consisting of approximately 13.155 acres located in Palm Beach County, Florida, that is the subject of this action (the "**Property**").

5. The Village is a municipal corporation of the State of Florida established in 1956. The Village is responsible for enacting and applying its Code of Ordinances governing real property located within its boundaries. The Village Council is the legislative branch of the Village government.

6. This Court has jurisdiction over this matter as the amount in controversy exceeds $50,000.00 exclusive of attorneys' fees, costs, and interest. FLA. CONST. art. V, §20; Fla. Stat. §26.012.

7. As this Complaint seeks a declaratory judgment from this Court, including a declaratory judgment stemming from the Village Council's violation of Florida's Sunshine Law, Fla. Stat. §286.001 *et seq.*, the Court further has jurisdiction pursuant to Chapter 86 and Chapter 286 of the Florida Statutes.

8. Because Plaintiffs seek a writ of mandamus from this Court, the Court moreover has jurisdiction pursuant to Article V, Section 5(b) of the Florida Constitution.

9. Venue is proper in this Court as Plaintiffs own property and transact business in this Circuit, the Village and Village Council reside and transact their business in this Circuit, the real property at issue is located in Palm Beach County, Florida, and the claims asserted herein arose and accrued in this Circuit.

10. All conditions precedent to this action have been satisfied by Plaintiffs, have been waived by the Defendants, and/or have been rendered futile by the Village's pattern of conduct.

## FACTS COMMON TO ALL COUNTS

11. The Property is comprised of five separate lots located primarily in the Village, but partially in the neighboring Town of Lake Park, bearing Palm Beach County Parcel Control Numbers 68-43-42-21-29-007-0020; 68-43-42-21-29-001-0030; 68-43-42-21-200-001-0010; 36-43-42-21-29-007-0030; and 36-43-42-21-00-000-3040. A legal description for the Property, describing each lot with particularity, is attached hereto and incorporated herein by reference as **Exhibit "A"**.

12. The Property once housed the Twin City Mall, an enclosed shopping mall which opened in 1971. By as early as 1988, when the nearby Gardens Mall opened, notable tenants had begun leaving and the Property started a descent into disrepair.

13. Since the 1990's, various parties have proposed initiatives to redevelop the Property. None of these proposals came to complete fruition, as they lacked either economic viability or a decided benefit for the Village and its residents. During this more than 30-year period, only partial redevelopment has occurred, with portions of the Property becoming the Northlake Promenade Shoppes PUD and the Village Shoppes PUD, respectively.

14. Beginning in 2015, the Village, Lake Park, and the Treasure Coast Regional Planning Council undertook studies to determine a way to revitalize the region as a whole, and the Property in particular, including via the adoption of Master Plan regulations.

15. As a result of the Village's interest in facilitating Master Plans and Planned Unit Developments ("**PUDs**"), NP-Devland undertook due diligence to consider purchasing and developing the Property as a PUD.

16.     NP-Devland envisioned the Property as a mixed-use development providing for retail / commercial uses, civic open spaces, apartments, senior living, condominiums, and a hotel.

17.     As NP-Devland continued its due diligence, the Village commenced the formulation and adoption of formal PUD regulations which would govern development of the Property. Indeed, the Village worked with NP-Devland's input to revise and ultimately finalize proposed PUD regulations for the newly-created "C-3" zoning district. The Village ultimately adopted these PUD regulations, which are codified as Appendix C, Article III, Section 45-34.1 of the Village's Code of Ordinances (the "**C-3 PUD Regulations**"). A copy of the C-3 PUD Regulations is attached hereto and incorporated herein as **Exhibit "B".**

18.     During the pendency of the Village's consideration and formulation of the C-3 PUD Regulations, and in direct reliance upon the Village's efforts in formalizing such regulations governing the Property, NP-Devland purchased the Property in 2022. A copy of the deed by which Plaintiffs originally deraigned title to the Property is attached hereto and incorporated herein as **Exhibit "C"**.

19.     After lengthy collaboration with the Village and its planning staff, in 2023, NP-Devland submitted an application, supported by detailed plans, seeking approval of a Special C-3 Planned Unit Development on the Property. The proposed PUD, to be known as the "Village Place PUD," was consistent with NP-Devland's initial conception, consisting of over 90,000 square feet of commercial space in addition to residential and open space amenities. A copy of NP-Devland's initial PUD application (the "**PUD Application**") is attached hereto and incorporated herein as **Exhibit "D"**.

20.     Though the Village's C-3 PUD Regulations are lengthy in detailing the requirements for ultimate development of a PUD, their provisions governing the Village's approval

of the PUD Application itself are concise and straightforward. As set forth in subsection (10), the C-3 PUD regulations set forth four (4) "threshold criteria." If the Village determines that each of the four "threshold criteria" are met by a PUD application, and if the PUD application is consistent with the Village's Comprehensive Plan, then the Village **shall** allow the PUD applicant to "utilize the special PUD regulations" located throughout the remainder of Section 45-34-1—that is to say, the Village **shall** approve the PUD application. The applicable governing language is as follows:

> (10)     *Special C-3 planned unit development (PUD) provisions.* It is the intention of the village to provide a mechanism and process to promote the redevelopment of the obsolete and underutilized areas of the C-3 zoning district with large-scale, master-planned projects that promote: a mix of uses; connectivity; pedestrian-oriented development; removal of surface parking; creation of public/civic gathering spaces; and shopping, entertainment, and restaurant uses within the form of an urban neighborhood incorporating residential development as an integral use. These projects promote the economic and redevelopment goals of the village, and the village has created these planned unit development (PUD) provisions to facilitate these goals. The development regulations applicable within the PUD are not permitted or allowed by right and shall only apply if the village council determines that each of the threshold criteria is met. Properties located in the C-3 zoning district that do not meet the threshold criteria set forth below may utilize the general PUD provisions of section 45-35.1 of this code as set forth in section 45-35.1(D). Properties located in the C-3 zoning district that do meet each of the threshold criteria below may, at the option of the property owner, utilize the following special PUD regulations:
>
> a. The threshold criteria for use of these special provisions are as follows:
>
> 1.     The development parcel includes a minimum of at least five (5) contiguous acres of land that will be initially reviewed and approved as one (1) overall development project. Any subsequent amendments to such plan or individual phases of such plan shall also be subject to these special provisions.
>
> 2.     The project provides a minimum of one-half (½) acre for a civic space within the project site. "Civic space" shall be defined as an open space that is dedicated for public use including all adjacent pedestrian amenities. The civic space may include, parks, plazas, courtyards, playgrounds, or similar uses. The civic space may be owned, maintained and/or operated either publicly or privately. The civic space may be

reconfigured or relocated from the orientation shown on the regulating plan. Civic space provided pursuant to this subsection shall be credited towards the public sites and open spaces requirements of section 36-23 of this Code.

3.      To achieve a mixed-use project, a minimum of fifty thousand (50,000) square feet of the total project development shall be allocated to non-residential uses.

4.      The project provides additional public benefits in the form of enhanced landscaping over and above code requirements; enhanced pedestrian amenities (such as awnings canopies, outdoor art, or seating areas); the creation of functional living, shopping and/or working environments; or innovative architectural design. The village council reserves the right to approve alternate public benefits.

21.     There has never been any question or dispute, on behalf of the Village (or anyone else), that NP-Devland's PUD Application (a) satisfies the four "threshold criteria" set forth above and (b) is consistent with the Village's Comprehensive Plan, with the Village's staff opining, from the project's earliest iteration, that the PUD Application "is consistent with the measurable Village Code requirements." As such, under the C-3 PUD Regulations, NP-Devland was entitled to approval of its PUD application and to the use of the full panoply of regulations found elsewhere in the applicable Village code.

22.     Despite this reality, from the very first consideration of the application—a May 8, 2024 hearing before the Village's Planning, Zoning and Adjustment Board—the Village began insisting that its approval of the PUD application would be contingent on NP-Devland's agreement to various "concessions" the Village would insist on, above-and-beyond the requirements for approval set forth (as mandatory) in the C-3 PUD Regulations.

23.     In an attempt to continue to work in a collaborative fashion with the Village, NP-Devland agreed it would predicate final development of the Property on various tangible "concessions"—for example, "concessions" related to an increase in vehicle charging stations

and golf cart parking areas—but never agreed to condition approval of the PUD Application itself on such "concessions."

24.     Nevertheless, the Village continued to insist that despite the language of the C-3 PUD Regulations—requiring approval of the PUD Application upon a showing of compliance with the "threshold criteria" and the Comprehensive Plan—it would condition its approval of the Village Place PUD on an increasing litany of "concessions."

25.     Though the Village represented the growing list of "concessions" as being required for "public benefit," the only "public benefits" to be considered among the "threshold criteria" are those expressly listed in the fourth of the four "threshold criteria," which the Village has always conceded the PUD Application readily satisfies.

26.     On April 10, 2025, the Village adopted Ordinance 2025-06, purportedly addressing the PUD Application. A copy of Ordinance 2025-06 is attached hereto and incorporated herein as **Exhibit "E"**.

27.     Though Ordinance 2025-06 ostensibly embodies the Village Council's "approval" of the PUD Application, it is, in reality and by its own terms, a complete rewriting of the Village's C-3 PUD Regulations.

28.     Ordinance 2025-06 begins, in the "Whereas" clauses, with a recognition that "the Village Council determines that the Special C-3 PUD application is consistent with the Village's Comprehensive Plan and meets each of the applicable requirements set forth [in] Section 45.34.1(10)(a) of the Village Code of Ordinances,"—that is, the "threshold criteria" mandating approval.

{00095130:1}                                                    7

29.     Despite this express finding, the ordinance nevertheless continues that the Village is approving the PUD Application *only* "subject to additional findings regarding public benefit as may be required during the site plan process."

30.     The C-3 PUD Regulations include no provision conditioning PUD approval on "additional findings" outside the four "threshold criteria," let alone those to be subsequently adduced during the "site plan process."  Indeed, the additional language that the Village added is contrary to the plain language of the C-3 PUD Regulations.

31.     Ordinance 2025-06 proceeds to list no fewer than thirty-seven (37) "conditions" on which the Village's approval of the PUD Application are predicated. To be sure, these are not "conditions" which must be satisfied before site plan approval, a building permit, or a certificate of occupancy are issued. To the contrary, by the ordinance's express terms found in Section 4, "[t]he Village Council's approval of the PUD is subject to the [37] additional conditions."

32.     NP-Devland, at no point and in no manner, ever agreed to condition approval of its PUD Application on any of these "additional conditions."

33.     Compounding matters, two of the "additional conditions" include no tangible requirements or standards whatsoever, but instead merely kick the proverbial "approval" can even further down the road. Conditions II and JJ, respectively, purport to condition PUD approval on the following:

> II.     The Applicant shall be bound by all oral and written representations both on the record and as part of the application and approval process.
>
> JJ.     Approval of the Master Development Plan and Master Phasing Plan does not authorize any construction activities nor shall it operate as an approval of the maximum development parameters for PUDs within the C-3 zoning district permitted by Code. The building site area regulations

for each phase/parcel shall be determined through the Site Plan and Appearance Review process, taking into account the public benefit provided.

34. By the express terms of Condition II—binding NP-Devland to oral representations made by any party during the application and approval process—Ordinance 2025-06 permits the Village to condition approval of the PUD Application on any ostensible, undefined verbal demand or suggestion made by *either* the Village or NP-Devland during the span of approximately three (3) years encompassing the application process.

35. Condition JJ, by its express terms, supersedes and obviates the entirety of the existing C-3 PUD Regulations on which NP-Devland relied to purchase and seek to develop the Property, replacing these regulations with whatever the Village wishes to impose upon NP-Devland during the "Site Plan and Appearance Review Process," on the amorphous and undefined basis of "the public benefit provided."

36. Lest there remain any doubt as to the purpose and intended effect of Condition JJ, Section 7 of the ordinance expressly states: "All ordinances or resolutions in conflict with the provisions of this Ordinance are hereby repealed to the extent of such conflict."

37. During the pendency of this litigation, NP-Devland became aware of a chain of email communications taking place among Village officials in the runup to the enactment of Ordinance 2025-06, which email chain is attached hereto and incorporated herein as **Exhibit "F"**.

38. In material part, this email chain begins on January 16, 2025, with the Village Manager, Mr. Charles Huff (the Chief Administrative Officer of the Village, responsible to the Village Council for the administration of all Village affairs) emailing a member of the Village

Council, Lisa Interlandi, with a suggested change to what would become the "material representations" condition eventually embodied in Condition II described herein.

39.     Later that same day, Village Councilmember Interlandi responded in writing to Mr. Huff, with regard to his proposed ordinance language: "yes, that sound good."

40.     As clearly evidenced by Exhibit F, Mr. Huff later forwarded this communication, among others pertaining to the Condition II language, to another member of the Village Council—the Mayor, Ms. Deborah Searcy—with the note "FYI All the best."

41.     These communications took place out of the public view, and therefore constituted "daisy chaining"—the use of an intermediary to conduct communication between two elected officials on a matter of public concern in contravention of Florida's Sunshine Law, Chapter 286 Florida Statutes.

42.     Mr. Huff was deposed by counsel for the Plaintiff on January 15, 2026. When the referenced email chain was introduced as an exhibit and counsel began to question Mr. Huff as to this statutory violation, counsel for the Village halted the deposition for purposes of internally discussing a "privilege issue." Relevant excerpts of Mr. Huff's deposition testimony are attached hereto as **Exhibit "G"**.

43.     When the deposition re-started, the Village's counsel advised Mr. Huff that he had a Fifth Amendment right against self-incrimination as it pertained to the email chain.

44.     Based on this advice of counsel, Mr. Huff proceeded to invoke his Fifth Amendment right against self-incrimination by stating simply "I plead the Fifth" in response to twenty-five (25) questions pertaining to the email chain.

### COUNT I
### Declaratory & Injunctive Relief (vs. Village)

45.     Plaintiffs incorporate paragraphs 1 through 44 as if fully restated herein.

{00095130:1}                                                10

46. This is an action for declaratory and injunctive relief pursuant to Chapter 86 of the Florida Statutes.

47. There is a bona fide, actual, and practical need to determine the applicability of Ordinance 2025-06 to the Village's consideration of NP-Devland's PUD Application.

48. NP-Devland is in doubt as to whether its reliance on the existing C-3 PUD Regulations, and its expenditure of significant funds in direct reliance thereupon, has vested NP-Devland with the right to have its application considered pursuant to the C-3 PUD Regulations, as opposed to the ex post facto regulations and conditions imposed by the Village via Ordinance 2025-06.

49. Specifically, NP-Devland is in doubt as to whether (a) the approval of its Master Development Plan / Master Phasing Plan, attached hereto as **Exhibit "H"**, operates as an approval of the intensity of uses (i.e. density) identified therein—as expressly provided for in the C-3 PUD Regulations, or (b) as claimed by the Village via Condition JJ in Ordinance 2025-06, the Village can contravene the plain language of the regulation and withhold such density approvals, among others, until the "Site Plan and Appearance Review" process.

50. On information and belief, the Village has acted in bad faith by inducing NP-Devland to expend considerable time and money on the PUD Application in reliance on the existing C-3 PUD Regulations with which the application complies, only to leverage this expense by imposing the additional "conditions" on NP-Devland via the ordinance.

51. There are powers, privileges, and rights of NP-Devland, and of the Village, that are dependent upon a determination on the facts and controlling law applicable to this dispute.

52. The parties have an actual, present, adverse, and antagonistic interest in the subject matter of this case, both in fact and in law.

53. The antagonistic and adverse interests of the parties are before the Court by proper process, and the relief sought is not merely the giving of legal advice by the Court or an answer to questions propounded from curiosity.

54. Upon the issuance of a declaratory judgment in their favor, Plaintiffs will have no adequate remedy at law, and upon proper application will be entitled to supplemental relief in the form of (a) an injunction prohibiting the Village from applying the requirements of Ordinance 2025-06 to the consideration of the PUD Application, and (b) a mandatory injunction requiring the Village to consider the PUD Application in accordance with the C-3 PUD Regulations as they existed prior to their legislative amendment via Ordinance 2025-06.

55. In the absence of such injunctive relief, the harms imposed upon Plaintiffs and the Property, which is a unique parcel of land, through government action, are irreparable.

56. It is in the public interest to require local governments to abide by the laws they adopt and administer, to require certainty in the establishment and application of laws governing private property, and to treat all parties in a fair, equal, and predictable fashion.

WHEREFORE, Plaintiffs request the following relief:

(a) Entry of a declaratory judgment in Plaintiffs' favor, and against the Village, adjudging that Ordinance 2025-06 is inapplicable and of no force with regard to Plaintiffs' PUD Application (including the intensity of uses as established by the Master Development Plan / Master Phasing Plan), which application is properly governed by and to be reviewed pursuant to the Village's C-3 PUD Regulations as they existed prior to their amendment via Ordinance 2025-06;

(b) Upon proper application and as supplemental relief, entry of a permanent injunction prohibiting the Village from applying, or enforcing, Ordinance 2025-06 with regard to the Property or the PUD Application (including the intensity of uses as established by the Master Development Plan / Master Phasing Plan), and requiring the Village to review the PUD Application pursuant to the C-3 PUD Regulations as they existed prior to their amendment via Ordinance 2025-06;

(c) An award of costs incurred in obtaining this relief; and

(d) Such other relief as this Court deems just.

## COUNT II
### Declaratory & Injunctive Relief (vs. Village)

57.    Plaintiffs incorporate paragraphs 1 through 44 as if fully restated herein.

58.    This is an action pursuant to Chapter 86 of the Florida Statutes, seeking a declaratory judgment that Ordinance 2025-06 is unconstitutional, on its face and as applied to Plaintiffs, and void for vagueness.

59.    There is a bona fide, actual, and practical need to determine whether Condition II and Condition JJ, as set forth in Ordinance 2025-06, are sufficiently clear, and its provisions adequately defined, so that Plaintiffs are able to determine prospectively what conduct, with regard to the Property, is prohibited or required.

60.    NP-Devland is particularly in doubt, with regard to Condition II and Condition JJ, as to what rules and regulations the Village purports govern the consideration of the PUD Application, and as to what "maximum development parameters" and "building site and area regulations" prospectively control the Property's development.

61.    Because, by express terms of Ordinance 2025-06, these conditions (and others) supersede any existing ordinances or regulations "in conflict" with the new ordinance, but these superseded ordinances or regulations are not identified or named, Plaintiffs are in doubt as to what rules govern their Property.

62.    There are powers, privileges, and rights of NP-Devland, and of the Village, that are dependent upon a determination on the facts and controlling law applicable to this dispute.

63.    The parties have an actual, present, adverse, and antagonistic interest in the subject matter of this case, both in fact and in law.

64. The antagonistic and adverse interests of the parties are before the Court by proper process, and the relief sought is not merely the giving of legal advice by the Court or an answer to questions propounded from curiosity.

65. Upon the issuance of a declaratory judgment in their favor, Plaintiffs will have no adequate remedy at law, and upon proper application will be entitled to supplemental relief in the form of (a) an injunction prohibiting the Village from applying the requirements of Ordinance 2025-06 to the consideration of the PUD Application, and (b) a mandatory injunction requiring the Village to consider the PUD Application in accordance with the C-3 PUD Regulations as they existed prior to their amendment via Ordinance 2025-06.

66. In the absence of such injunctive relief, the harms imposed upon Plaintiffs and the Property, which is a unique parcel of land, through government action, are irreparable.

67. It is in the public interest to require certainty, clarity, and intelligibility in the establishment and application of laws governing private property, and to treat all parties in a fair, equal, and predictable fashion.

WHEREFORE, Plaintiffs request the following relief:

(a) Entry of a declaratory judgment in Plaintiffs' favor, and against the Village, adjudging that Ordinance 2025-06 is unconstitutionally vague and therefore is void, inapplicable, and of no force with regard to Plaintiffs' PUD Application, which application is properly governed by and to be reviewed pursuant to the Village's C-3 PUD Regulations as they existed prior to their putative amendment via Ordinance 2025-06;

(b) Upon proper application and as supplemental relief, entry of a permanent injunction prohibiting the Village from applying, or enforcing, Ordinance 2025-06 with regard to the Property or the PUD Application, and requiring the Village to review the PUD Application pursuant to the C-3 PUD Regulations as they existed prior to their putative amendment via Ordinance 2025-06;

(c) An award of costs incurred in obtaining this relief; and

(d) Such other relief as this Court deems just.

## COUNT III
### Declaratory & Injunctive Relief—Sunshine Law (vs. Village Council)

68.     Plaintiffs incorporate paragraphs 1 through 44 as if fully re-stated herein.

69.     This is an action for declaratory and injunctive relief against the Village Council under Chapter 86 and Chapter 286 of the Florida Statutes.

70.     The Village Council is a "board or commission" within the meaning of Florida Statutes Section 286.0114(1), and this action is, therefore, a statutorily authorized "action filed against a board or commission to enforce this section," Fla. Stat. §286.0114(7).

71.     Florida Statutes Section 286.011, part of Florida's Sunshine Law, requires all communications between two elected officials of the same legislative body, on matters of public concern, to take place in full view of the public, and prohibits the use of an intermediary to evade this requirement.

72.     There is a bona fide, actual, present and practical need to determine whether the Village Council, based on the conduct alleged herein, violated the Sunshine Law when the Village Manager acted as an intermediary in permitting Ms. Interlandi and Mayor Searcy to discuss proposed changes to the proposed ordinance via email, out of the public view.

73.     Accordingly, there is a bona fide, actual, present and practical need to determine whether the Village Council has and/or is engaged in a pattern and practice of violating Florida's Sunshine Law and its central requirement that matters of public concern be considered and discussed in full view of the public.

74.     There are powers, privileges and rights of NP-Devland and the Village Council that are dependent upon a determination of the facts and the law applicable to the facts in this case.

{00095130:1}                                    15

75.     The parties have an actual, present, adverse, and antagonistic interest in the subject matter, both in fact and in law.

76.     The antagonistic and adverse interests are all before the Court by proper process and the relief sought is not merely the giving of legal advice by the Court or to answer questions propounded from curiosity.

77.     Upon an issuance of a declaratory judgment in its favor, NP-Devland will have no adequate remedy at law, and upon proper application will be entitled to injunctive relief necessary to ensure the Village Council's compliance with the Sunshine Law in the future.

WHEREFORE, Plaintiffs respectfully request the following relief:

(a) A final judgment declaring that the Village Council violated the Sunshine Law via the conduct alleged herein, and further declaring Ordinance 2025-06 void ab initio, and therefore invalid and of no effect, as a result and product of this Sunshine Law violation;

(b) Upon proper application, supplemental relief in the form of an order prohibiting the Village Council from similarly violating the Sunshine Law;

(c) Pursuant to Florida Statutes Section 286.0114, and award of NP-Devland's attorneys' fees and costs incurred in procuring this relief; and

(d) such other relief as this Court deems just and proper.

## COUNT IV
### Unconstitutional Conditions Taking / Exaction (vs. Village)

78.     Plaintiffs incorporate paragraphs 1 through 44 as if fully re-stated herein.

79.     The "unconstitutional conditions" doctrine forbids government entities, like the Village, from coercively withholding permitting approval and other benefits from a property owner in return for the forfeiture of other rights in the manner of the "conditions" imposed on NP-Devland via Ordinance 2025-06.

80.     The Village's actions, as described herein, violate the unconstitutional conditions

doctrine as formulated and applied by the United States Supreme Court in, among other cases, *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013).

81. Moreover, the Village's conduct, in conditioning PUD approval on requirements with no basis in the C-3 PUD Regulations, violates the "dual rational nexus" test applied in such contexts by the Supreme Courts of the United States and the State of Florida, and therefore constitutes an unconstitutional exaction.

82. The Village's violation of the unconstitutional conditions doctrine, and its predicating of PUD approval on an unconstitutional exaction, constitutes a taking of private property without payment of just compensation, in violation of Article X, Section 6, of the Florida Constitution.

83. As a result of the Village's unconstitutional taking, Plaintiffs are entitled to just compensation in excess of $50,000.00, exclusive of expenses, costs, and attorneys' fees.

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

(a) entry of a judgment that the Village's conduct constitutes a taking of private property, without payment of just compensation, in violation of Article X, Section 6, of the Florida Constitution;

(b) judgment that PUD approval is not, and legally cannot be, improperly predicated or conditioned in the manner embodied in Ordinance 2025-06;

(c) an award of just compensation occasioned by the Village's taking of Plaintiff's private property;

(d) upon proper application, a permanent injunction prohibiting the Village from predicating or conditioning PUD approval in the manner alleged herein;

(e) an award of attorneys' fees and costs as allowed by statute; and

(f) such other relief as is allowed by statute or deemed just by this Court.

## COUNT V
## Petition for Writ of Mandamus (vs. Village)

84. Plaintiffs incorporate paragraphs 1 through 44 as if fully restated herein.

85. This Petition for Writ of Mandamus is brought pursuant to Florida Rule of Civil Procedure 1.630.

86. Section 45.34.1(10) of the Village's Code of Ordinances obligates the Village to approve an application to create a PUD in the C-3 zoning district where the Village Council deems the PUD application to comply with (a) the four "threshold criteria" set forth in subsection (10) and (b) the Village's Comprehensive Plan.

87. By the express terms of Ordinance 2025-06 itself, the Village Council has determined that Plaintiffs' PUD Application satisfies each of the "threshold criteria," and complies with the Village's Comprehensive Plan.

88. As Section 45.34.1(10) makes clear, including via its use of the term "shall," upon the Village Council's determination of the PUD Application's compliance with the "threshold criteria" and the Comprehensive Plan, approval of the PUD Application is not a matter in which the Village Council retains discretion.

89. Plaintiffs have a clear legal right to immediate issuance of an order granting the PUD Application and establishing the Village Place PUD, and entitling Plaintiffs to the full development rights—without condition—set forth in the existing C-3 PUD Regulations.

90. Rather than perform its clear, legal, ministerial duty, the Village, through its Council, has refused to approve the PUD Application, instead conditioning such approval on an exhaustive series of post hoc, vague, and indefinite "conditions" set forth in a legislative amendment to the existing regulations barely masquerading—on its own terms—as a quasi-judicial decision on a pending application.

{00095130:1}                                    18

91.    All legal conditions precedent to unconditional approval of the PUD Application have been performed, satisfied, waived, or rendered futile by the Village's pattern of conduct.

92.    Plaintiffs have no adequate remedy at law, other than issuance of a writ of mandamus, to compel the Village to perform its ministerial duty to disregard its post hoc legislative amendment to the C-3 PUD Regulations and render a true quasi-judicial decision approving the PUD Application.

93.    Plaintiffs have been damaged, and continue to be damaged, in an amount not presently quantifiable.

94.    By reason of the Village's refusal to approve the PUD Application without conditions, Plaintiffs are, and will continue to be, wrongfully deprived of their right to to pursue development of the Property to the fullest extent permissible by the C-3 PUD Regulations.

95.    Plaintiffs are entitled to have the Village perform its mandatory duty to approve the PUD Application in accordance with the C-3 PUD Regulations prior to their legislative amendment via Ordinance 2005-06.

WHEREFORE, Plaintiffs request the following relief:

(a) Issuance of a writ of mandamus requiring the Village to issue an order approving the PUD Application, without conditions, or an order to show cause why the Village should not be required to so issue such an order;

(b) Upon consideration of the response of the Village to an order to show cause, and the uncontroverted facts asserted herein, issuance of a peremptory writ of mandamus requiring the Village to fulfill its ministerial duty to approve the PUD Application without conditions;

(c) An award of costs incurred in obtaining this relief; and

(d) Such other relief as this Court deems just.

## COMPLIANCE WITH FLA. STAT. §86.091

96.     Following the filing of the original complaint in this case, Plaintiffs complied with Florida Statutes Section 86.091, and Florida Rule of Civil Procedure 1.071, by serving the Attorney General for the State of Florida with a copy of the compliant (including Count II, challenging the constitutionality of Ordinance 2025-06) via certified mail and email on May 14, 2025.

DATED:        February 20, 2026.

Respectfully submitted,

*/s/ Ethan J. Loeb*
**ETHAN J. LOEB**
Florida Bar No. 0668338
EthanL@BLHTLaw.com
Eservice@BLHTLaw.com
KerriR@BLHTLaw.com
HeatherW@BLHTLaw.com
**STEVEN GIESELER**
Florida Bar No. 0080981
StevenG@BLHTLaw.com
CarrieS@BLHTLaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
*Counsel for Plaintiffs / Petitioners*

{00095130:1}                                            20

**Exhibit "A"**
**Legal Description**

PARCEL A:

PARCEL I:
A certain parcel of land in land in Section 21, Township 42 South, Range 43 East, Palm Beach County, Florida, being more particularly described as follows:

Beginning at the intersection of the Westerly right-of-way line of State Road No. 5 as described in a deed from Tesdem, Inc. to the State of Florida as same is recorded in Deed Book 838, Page 25, Public Records of Palm Beach County, Florida with the Northerly right-of-way of Palmetto Road as shown on the Plat of Kelsey City (now Lake Park) as same is recorded in Plat Book 8, Page 35, Public Records of Palm Beach County, Florida, and from said point of intersection run (for convenience the said Northerly right-of-way line of Palmetto Road is assumed to bear 89°57'15" West and all other bearings mentioned herein are relative thereto), North 89°57' 15" West running along the said Northerly right-of-way line a distance of 468.28 feet; thence North 7°27'45" West, a distance of 247.44 feet; thence South 88°43'22" West a distance of 249.34 feet to a point in a line parallel with and one foot Westerly from (measured at right angles to) the Westerly wall of the Truck Well so called at the Westerly end of the J.M. Fields Store Building, so called; thence North 01° 19'04" West, along said parallel line, a distance of 152.45 feet, more or less, to a point in the Westerly extension of the North face of the South wall of the Garden Shop so called, said Garden Shop located in the Northwesterly corner of the said J.M. Fields Store Building; thence North 88°40'56" East along the just said Westerly extension and along the just said North face of the South wall a distance of 41 feet, more or less, to a point in the West face of the East wall of said Garden Shop; thence North 01° 19'04" West running along the just said West face of the East wall and the Northerly extension thereof a distance of 120.27 feet, more or less, to a point in the face of the curb, said curb being 20.26 feet Northerly from and parallel with the face of the North wall of said building; thence North 88°40'56" East running along the said face of the curb and its Easterly extension of a distance of 637.31 feet, more or less, to a point in the said Westerly right-of-way line of State Road No.5, said point being also a point on a curve concave to the West, having a radius of 11394.22 feet and whose tangent passing through said point bears South 10°13'29" East; thence Southerly running along the arc of the just described curve and along the said Westerly right-of-way line subtending a central angle of 01°48'07", a distance of 358.34 feet, more or less, to the end of said curve; thence South 81°34'38", West running along a line radial to the just described curve and radial to the next described curve and continuing along said Westerly right-of-way line a distance of 5 feet to a point in a curve concave to the West, being concentric with the last described curve and having a radius of 11389.22 feet; thence Southerly running along the arc of the just described curve and continuing along the said Westerly right-of-way line; subtending a central angle of 00°25'22", a distance of 84.04 feet to the end of said curve; thence South 08°00'00" East along said Westerly right-of-way line distance of 91.77 feet, more or less, to the POINT OF BEGINNING.

PARCEL II:

A parcel of land lying in Section 21, Township 42 South, Range 43 East, Palm Beach County, Florida, being more particularly described as follows:

Commence at the intersection of Westerly right-of-way line of State Road No. 5, as described in deed from Tesdem, Incorporated to the State of Florida, recorded in Deed Book 838, Page 25,

Page 1 of 3

**EXHIBIT A**

Public Records of Palm Beach County, Florida, with the Northerly right-of-way line of Palmetto Road, as shown on the Plat of Kelsey City (now Lake Park), recorded in Plat Book 8, Page 35, Public Records of Palm Beach County, Florida; thence Westerly, along said Northerly right-of-way line, a distance of 468.28 feet to a point on a portion of the Westerly boundary of that certain parcel of land described in Official Record Book 3343, Page 1786, Public Records of Palm Beach County, Florida, and the point of beginning of the hereinafter described parcel; thence Northerly along said Westerly boundary, making an angle with the preceding course, measured from East to North of 97°30'30", a distance of 247.44 feet to a point; thence Westerly, making an angle with the preceding course, measured from South to West of 96° 11'07", a distance of 208.80 feet to the point of the Easterly boundary of that certain parcel of land described in Official Record Book 3259, Page 276, Public Records of Palm Beach County, Florida; thence Southerly, along said Easterly boundary, making an angle With the preceding course, measured from East to South of 89°58'58", a distance of 240.56 feet to a point on said Northerly right-of-way line, making an angle with the preceding course, measured from North to East of 91°21'25", a distance of 235.45 feet to the POINT OF BEGINNING.

PARCEL B:

A parcel of land being all of Parcel 1B and a portion of Parcel 7 according to the plat of NORTHLAKE PROMENADE SHOPPES, A PUD, as shown in Plat Book 102, Pages 130 and 131, of the Palm Beach County, Florida Public Records. Said plat also being a portion of Section 21, Township 42 South, Range 43 East, Town of Lake Park and Village of North Palm Beach, Palm Beach County, Florida, being more particularly described as follows:

Begin at the Southeast corner of said Parcel 1B; thence S 89°59'30" W along the South line of said Parcel 1B, with all bearings contained within relative thereto, a distance of 637.68 feet; thence S 00°00'25" E along the East line of said plat, a distance of 119.95 feet to the intersection with the North face of a building wall described in Official Records Book 3343, Page 1787; thence 89°59'35" W, a distance of 41.00 feet; thence departing said East line continue S 89°59'35" W, a distance of 30.65 feet; thence N 00°09'32" E, a distance of 429.19 feet to the intersection with the South line of Parcel R-1 of said plat; thence N 90°00'00" E along said South line, a distance of 175.42 feet; thence N 00°00'00" E along the East line of Parcel R- 1, a distance of 155.65 feet to the Northeast corner of said Parcel R-1 ; thence N 90°00'00" E along a line 35.50 feet South of and parallel with the South line of Parcel 5 of said plat, a distance 117.06 feet; to a curve to the right having a radial bearing of S 00°00'00" E, a radius of 80.00 feet, and a central angle of 34°25'35"; thence proceed along the arc of said curve, a distance of 48.07 feet to the end of said curve; thence S 55°34'25" E, a distance of 100.26 feet; to a curve to the right having a radial bearing of S 34°25'35" W, a radius of 80.00 feet, and a central angle of 46°43'50"; thence proceed along the arc of said curve, a distance of 65.25 feet to the end of said curve; thence S 08°50'35" E along a line 35.50 feet West of and parallel with the West line of Parcel 6 of said plat, a distance of 249.82 feet to a point on the prolongation of the North line of aforesaid Parcel 1-B; thence N 84°09'54" E along said prolongation, a distance of 30.18 feet to a Northwest corner of Parcel 1-B; thence continue N 84°09'54" E along the North line of Parcel 1-B, a distance of 167.65 feet to a point of intersection with the East line of said plat, said point also lying on the West right-of-way line of U.S. Highway No. 1; said point also being the Northeast corner of said Parcel I-B, said point also being the beginning of a curve having a radial bearing of S 80°22'21" W, a radius of 11394.22 feet, and a central angle of 00°34'45"; thence proceed Southerly along the arc of said curve, a distance of 115.19 feet to the end of said curve and the POINT OF BEGINNING of the herein described parcel.

PARCEL C:

PARCEL I:

Non-exclusive easements, for the benefit of Parcel A and Parcel B herein described above, as created in Fourth Amendment to Declaration of Restrictions, Covenants and Conditions and Grant of Easement by and between Twin Cities Investors, Inc. and Developers of Northlake, Inc. as recorded in Official Records Book Official Records Book 21438, Page 1886 as corrected in Official Records Book 22831, Page 89 for purposes of Ingress and Egress Easement in Article 6.1; Utility Easement in Article 7.1 and Drainage Easement in Article 8.1 over and across the lands described in said Easement.

PARCEL II:

Non-exclusive easement(s), created by and described in that certain Declaration of Restrictions, Covenants and Conditions and Grant of Easements recorded in Official Records Book 11923, Page 861, as amended in Official Records Book 13154, Page 1892; Official Records Book 17516, Page 1987; Official Records Book 17595, Page 1781; and Official Records Book 21438, Page 1886 as re-recorded in Official Records Book 22831, Page 89; less and except those lands conveyed to the State of Florida Department of Transportation by Quit-Claim Deeds recorded June 9, 2004 in Official Records Book 17093, Page 214 and recorded June 1, 2004 in official records book 17062, Page 1971, of the Public Records of Palm Beach County, Florida.

PARCEL III:

Non-exclusive easement(s), created by and described in Declaration of Reciprocal Easements recorded in Official Records Book 17344, Page 1311, of the Public Records of Palm Beach County, Florida.

PARCEL IV:

Non-exclusive easement(s), created by and described in Access, Parking and Landscape Easement by and between Twin Cities Investors, Inc., a Florida corporation, Developers of Northlake, Inc., a Florida corporation and Village Shoppes At U.S. 1, LLC, a Florida limited liability company, dated February 21, 2007 and recorded February 22, 2007 in Official Records Book 21438, Page 1917, of the Public Records of Palm Beach County, Florida.

Sec. 45-34.1. - C-3 regional business district.

The C-3 regional business district is designed for the re-use and/or redevelopment of commercial property. It contains special regulations and procedures that are integrated with those of the Town of Lake Park to avoid conflicts that could otherwise be created by the location of the town/village boundary. Within C-3 business districts, the following regulations shall apply:

(1)  *Uses permitted.* Table 1 indicates allowable uses in the C-3 regional business district:

### Table 1 - Allowable Uses

| | Uses Permitted | By PUD Only[1] | Not Permitted |
|---|---|---|---|
| **Residential Uses** | | | |
| Mobile home park | | | ● |
| Dwelling, one family detached | | | ● |
| Dwelling, all other dwelling types | ● | | |
| Live/work unit | | ● | |
| Assisted living facility | | ● | |
| Community residential home | ● [2] | | |
| **Lodging Uses** | | | |
| Bed-and-breakfast establishment | | ● | |
| Hotel, including Extended Stay | ● | | |
| Motel | | | |
| Time-share unit | | ● | |
| **Business Uses** | | | |

**EXHIBIT B**

| | | | |
|---|---|---|---|
| Offices, general | ● | | |
| Office or clinic, medical or dental | ● | | |
| Stores & services, general | ● | | |
| Stores & services, large format | ● | | |
| Adult entertainment | | | ● |
| Convenience store with fuel | | ● | |
| Dog daycare | | ● | |
| Drive-through facility (for any use) | | ● | |
| Garage, parking | | ● | |
| Heavy commercial and light industrial | | | ● |
| Medical marijuana treatment center | | | ● |
| Restaurant | ● | | |
| Bar, Night Clubs or Entertainment Establishments | ● | | |
| Telecommunications antennas | | ● | |
| **Civic & Education Uses** | | | |
| Child care facility | | ● | |
| Church or place of worship | ● | | |
| Civic space | ● | | |

| | | | |
|---|---|---|---|
| Family day care | | ● | |
| Government building | ● | | |
| Hospital or medical center | | ● | |
| Public space | ● | | |
| School, public or private | | ● | |

[1] See section 10 for additional PUD requirements

[2] Subject to the same requirements as apply in the R-2 zoning district

(2) *Off-street parking.* All proposed land uses shall provide a sufficient number of parking spaces to accommodate the number of vehicles that can be expected to be attracted to that use. Individual land uses can provide at least the number of spaces listed below on the same parcel of land as the principal building (or on an adjoining parcel under identical ownership) in lieu of using the parking space standards found elsewhere in this Code. However, certain land uses may require less parking; and combinations of land uses may be able to reduce the total number of spaces by sharing those spaces during differing peak hours or because of pedestrian traffic or multi-purpose trips. Modified standards may be approved if fewer spaces will accommodate the number of vehicles that can be expected to be attracted to that use (or combination of uses) at the proposed location. Such a modification may be made on individual parcels of land (or adjoining parcels under identical ownership) by the building official when permitted by consensus national codes or standards or after submission of persuasive technical evidence (such as publications of the Institute of Transportation Engineers (ITE)). Modifications that involve shared parking on parcels of land that are not under identical ownership, or parking in a different municipality than the principal building regardless of ownership, may be approved through the special C-3 PUD procedures found below in section 45-34.1(10).

    a. Auditoriums of any kind — One (1) space per three (3) seats.

    b. Banks and other financial institutions — Three (3) spaces per one thousand (1,000) square feet.

    c. Hotels and motels — One (1) space per guest room plus one (1) space per two (2) employees during the peak period; parking for restaurants and other guest facilities to be calculated separately.

d. Offices, medical/dental — Five (5) spaces per one thousand (1,000) square feet.

e. Offices, all other — Three (3) spaces per one thousand (1,000) square feet.

f. Residential — Two (2) spaces per dwelling unit.

g. Restaurants and nightclubs — Twelve (12) spaces per one thousand (1,000) square feet, except six (6) spaces per one thousand (1,000) square feet for restaurants offering take-out service.

h. Retail uses and personal services — Four (4) spaces per one thousand (1,000) square feet, except one and one-half (1.5) spaces per one thousand (1,000) square feet for furniture sales.

i. Shopping centers — Four (4) spaces per one thousand (1,000) square feet.

j. Uses not listed above to be determined by the building official using standards found elsewhere in this Code or upon submission of persuasive technical evidence about the number of vehicles that can be expected to be attracted.

*NOTES:*

1. All areas are measured as gross floor area except multi-tenant shopping centers and office complexes, which are measured as gross leasable area.

2. Fractional spaces can be disregarded.

3. Wherever the term "identical ownership" is used, the land parcels in question must be contiguous and must be owned by or under the unified control of the applicant.

(3) *Off-street loading and internal circulation.* Requirements for off-street loading, parking lot aisles, accessways, and general internal circulation shall be same as would apply in the C-S zoning district.

a. *Lighting:* Parking lots shall be fully illuminated during hours of business operation with a minimum standard of illumination from closing to dawn per the Palm Beach County Code or ITE, whichever is more stringent.

(4) *Landscaping.* Landscaping shall be required along the outer boundary of the C-3 zoning district (irrespective of any municipal boundary) and also in unroofed parking areas whenever a parking area is constructed, reconstructed, or reconfigured. In addition to the other provisions of chapter 27 of this Code, the following landscaping requirements shall be met:

a. *Required landscaping adjacent to public rights-of-way:* The required landscaped strip between a public right-of-way and an off-street parking area shall be at least fifteen (15) feet wide and shall contain at least five (5) shade trees and eighteen (18) shrubs for each one hundred (100) lineal feet.

b.

*Parking area interior landscaping for unroofed parking areas:* At least ten (10) percent of the total paved surface area shall be devoted to landscaped areas. Each area counting toward the ten (10) percent total shall have an average minimum dimension of ten (10) square feet. At least one (1) shade tree shall be planted for every two hundred fifty (250) square feet of required internal planting area. No parking space shall be more than one hundred (100) feet from a shade tree planted in a permeable island, peninsula, or median having a ten-foot minimum width.

    c. *Indigenous native vegetation:* To reduce maintenance and water consumption, required landscaping shall include at least seventy-five (75) percent indigenous native trees and fifty (50) percent indigenous native shrubs.

    d. *Installation:* All required landscaping shall be installed using xeriscape principles including water conservation through the appropriate use of drought-tolerant plants, mulching, and the reduction of turn areas. Irrigation systems shall be designed to operate only when needed and only in those areas that require irrigation.

    e. *Maintenance:* The property owner shall be responsible for the maintenance of all required landscaped areas in a healthy and vigorous condition at all times. Required trees shall not be trimmed or pruned in such a way as to alter or limit their normal mature height or crown spread. If required plants die, they shall be replaced within sixty (60) days.

(5) *Setbacks and height.* The following setback, height, and spacing regulations apply in the C-3 zoning district:

    a. *Perimeter setbacks:* All buildings and structures shall be set back a minimum of thirty (30) feet from the outer boundary of the C-3 zoning district, except an interior common municipal boundary. For buildings in excess of two (2) stories or thirty (30) feet in height, one (1) foot shall be added to the required perimeter setback for each extra foot of height over thirty (30) feet.

    b. *Additional setbacks to internal property lines:* The need for building setbacks to property lines adjoining other land zoned C-3 is related to the existing or proposed uses of those properties. Unless modified through the special C-3 PUD procedures found below in <u>section 45-34.1</u>(10), all new buildings and structures shall be set back a minimum of twenty-five (25) feet from each of its property lines.

    c. *Maximum building height:* The maximum height of any building shall be fifty (50) feet.

    d. *Spacing between buildings:* The minimum spacing between individual buildings on the same or adjoining C-3 properties shall be as required by applicable fire and building codes.

(6) *Maximum lot coverage.* There is no fixed cap on lot coverage or floor area ratio. Maximum intensity will be governed by the application of the parking, loading, setback, building height, and surface water management standards found herein.

(7) *Signs.* In addition to the other provisions of sections 6-111 through 6-117 of this Code, but notwithstanding any conflicting standards found therein, signs in the C-3 zoning district shall comply with the following regulations unless modified through the special C-3 PUD procedures.

   a. *Ground signs* are mounted on a monolithic base and are independent of any building for support. They are permitted only when the sign and base are monolithic and have essentially the same contour from grade to top. Ground signs that meet the following regulations are permitted in the C-3 district only along U.S. Route 1 and Northlake Boulevard:

   1. *Maximum number of ground signs:* One (1) ground sign along U.S. Route 1 and one (1) ground sign along Northlake Boulevard, regardless of jurisdiction, North Palm Beach or Lake Park.

   2. *Maximum height of ground sign base:* Three (3) feet.

   3. *Maximum height of ground signs:* Thirteen (13) feet including the base, measured from the finished grade nearest the base (excluding berms).

   4. *Maximum size of ground signs:* One hundred (100) square feet; copy may be placed on two (2) sides of a ground sign without counting the area twice.

   b. *Pole signs* are not attached to any building and are supported upon the ground by poles or braces. Pole signs are not permitted in the C-3 district.

   c. *Wall signs* are those that are attached to the exterior of a building or structure in such a manner that the wall becomes the supporting structure, and may form the background surface, of the sign. Wall signs are permitted in the C-3 district provided they meet the following regulations:

   1. *Maximum depth of wall signs:* Wall signs may not be painted directly on the wall and may not project more than two (2) feet from the building to which they are fastened.

   2. *Allowable slope of wall signs:* Wall signs may not be attached to walls that slope more than forty-five (45) degrees from a vertical plane.

   3. *Maximum height of wall signs:* Eighteen (18) feet measured from the finished grade nearest the wall, except that on a building of more than two (2) stories, a single wall sign is allowed above eighteen (18) feet. No wall sign may extend above the top of the wall to which it is attached.

   4. *Maximum number of wall signs:* One (1) permanent wall sign is permitted for each business which has direct ground level walk-in access from a public or private roadway or sidewalk, and one (1) additional permanent wall sign identifying the building is permitted for each multiple occupancy complex.

   5.

*Maximum size of wall signs:* Five (5) percent of the area of the wall to which it is attached; or seven (7) percent if the front building setback is greater than seventy (70) feet; or ten (10) percent if the front building setback is greater than one hundred (100) feet. However, in no case shall a wall sign exceed one hundred (100) square feet in size.

d. *Roof signs* are erected and constructed wholly on and over the roof of a building, and are supported by the roof structure or are an integral part of the roof. Roof signs are not permitted in the C-3 district.

e. *Size computations:* When these regulations establish the maximum size of a sign, it shall be computed by means of the smallest square, circle, rectangle, triangle, or combination thereof that will encompass the extreme limits of the writing, representation, emblem, or other display, together with any material or color forming an integral part of the background of the display or used to differentiate the sign any backdrop or structure against which it is placed.

f. *Allowable colors:* Notwithstanding the regulations in chapter 6 of this Code, color tones utilized for all signs complying with these regulations shall be compatible with surrounding area.

g. *Lighting:* Signs containing illumination shall be turned off by 12:00 a.m. (midnight) each night, or when the business closes, whichever is later.

h. *Appeals:* Notwithstanding conflicting appeal procedures found elsewhere in this Code, all requests for modifications to sign regulations in the C-3 zoning district shall be made through the special C-3 PUD procedures found below in 45-34.1(10).

(8) *Surface water management.* A complete surface water management system shall be provided to current standards of the South Florida Water Management District whenever a building or parking area is substantially redeveloped.

(9) *Location of business for retail sales of alcoholic beverages.*

a. No licensed retail sales of alcoholic beverages shall be carried on where the proposed place of business is within five hundred (500) feet of a church, synagogue, temple or other place of worship.

b. The method of measurement provided for above shall be made or taken from the main front entrance of such church to the main front entrance of the applicants proposed place of business along the route of ordinary pedestrian traffic.

c. The restrictions of section 45-34.1(9), (1)[a.] shall not apply to the retail sale of beer, ale or wine for off-premises consumption.

d. The restrictions of section 45-34.1(9), (1)[a.] shall not apply to any bona fide restaurant as defined and licensed under Florida Statutes as a restaurant with full kitchen facilities, regardless of size or seating capacity, where alcoholic beverages are served solely as an

accessory use to the restaurant and only when such restaurant is open for the sale and service of food.

(10) *Special C-3 planned unit development (PUD) provisions.* It is the intention of the village to provide a mechanism and process to promote the redevelopment of the obsolete and underutilized areas of the C-3 zoning district with large-scale, master-planned projects that promote: a mix of uses; connectivity; pedestrian-oriented development; removal of surface parking; creation of public/civic gathering spaces; and shopping, entertainment, and restaurant uses within the form of an urban neighborhood incorporating residential development as an integral use. These projects promote the economic and redevelopment goals of the village, and the village has created these planned unit development (PUD) provisions to facilitate these goals. The development regulations applicable within the PUD are not permitted or allowed by right and shall only apply if the village council determines that each of the threshold criteria is met. Properties located in the C-3 zoning district that do not meet the threshold criteria set forth below may utilize the general PUD provisions of section 45-35.1 of this code as set forth in section 45-35.1(D). Properties located in the C-3 zoning district that do meet each of the threshold criteria below may, at the option of the property owner, utilize the following special PUD regulations:

a. The threshold criteria for use of these special provisions are as follows:

1. The development parcel includes a minimum of at least five (5) contiguous acres of land that will be initially reviewed and approved as one (1) overall development project. Any subsequent amendments to such plan or individual phases of such plan shall also be subject to these special provisions.

2. The project provides a minimum of one-half (½) acre for a civic space within the project site. "Civic space" shall be defined as an open space that is dedicated for public use including all adjacent pedestrian amenities. The civic space may include, parks, plazas, courtyards, playgrounds, or similar uses. The civic space may be owned, maintained and/or operated either publicly or privately. The civic space may be reconfigured or relocated from the orientation shown on the regulating plan. Civic space provided pursuant to this subsection shall be credited towards the public sites and open spaces requirements of section 36-23 of this Code.

3. To achieve a mixed-use project, a minimum of fifty thousand (50,000) square feet of the total project development shall be allocated to non-residential uses.

4. The project provides additional public benefits in the form of enhanced landscaping over and above code requirements; enhanced pedestrian amenities (such as awnings canopies, outdoor art, or seating areas); the creation of functional living, shopping and/or working environments; or innovative architectural design. The village council reserves the right to approve alternate public benefits.

b. *Allowable changes to existing regulations*: No PUD approval can permit any development that is inconsistent with the comprehensive plan. Subject to this limitation, the village council may grant waivers to the applicable regulations set forth in this section and as otherwise provided in this chapter subject to the following:

1. A waiver request in the C-3 zoning district cannot be used to:

   i. Add uses that are not allowable under this Code;

   ii. Increase the allowable floor area ratio; or

   iii. Increase the allowable building height.

2. When evaluating waiver requests, the village will consider the following factors and any additional criteria set forth in the relevant zoning district:

   i. The extent to which the alternate standard proposed by the applicant differs from the code's standard that would be waived;

   ii. Whether the granting of the waiver will lead to innovative design in which other minimum standards are exceeded;

   iii. Whether the request clearly demonstrates sufficient public benefits;

   iv. Whether the request furthers the goals of the village master plan, and exemplifies the architectural, building, and site design techniques desired within the village's appearance plan;

   v. Whether the requested waiver can be granted in the zoning district;

   vi. Any unusual circumstances regarding the property or immediate area, including the location of power lines, specimen trees, or shade trees; and

   vii. The effect of approving or denying the waiver on the development project and on the surrounding area.

c. *Unified control*: All parcels submitted in a single PUD application must be contiguous and must be owned by or be under the unified control of the applicant. All common areas shall be subject to joint maintenance by all of the property owners within the PUD, and the unified control documents shall provide for reciprocal easements over all streets, driveways, parking areas, pedestrian areas and civic space in favor of all properties within the PUD. While the village shall always treat the PUD as one (1) project, portions of the PUD may be conveyed to third parties by metes and bounds once the unified control documents have been approved by the village attorney and recorded in the county public records.

d. *Application procedures:* PUD applications made under this section shall be accompanied by the applicable fee and shall contain the following:

1.

Satisfactory evidence of unified control of the entire area within the proposed PUD; agreement to abide by the conditions of approval, if granted; and ability to bind successors in title to these conditions if the proposed development is built.

2. A proposed master site development plan in sufficient detail to show the approximate locations of buildings, parking areas, and stormwater management facilities. This plan shall also show the exact locations of all access points to public streets and to any abutting land zoned C-3, whether in Lake Park or North Palm Beach. The master plan shall also include intensity of each use, maximum floor area ratio (FAR), and building heights. The master plan may include phased development.

3. An application and justification statement describing the proposed land uses, identifying requested waivers, demonstrating compliance with all code requirements, and setting for any volunteered limited conditions furthering the intent of the C-3 zoning district.

4. Vehicular circulation plan and traffic impact study completed by a certified transportation engineer.

5. Conceptual drainage plan and statement prepared by a certified civil engineer.

6. Conceptual landscape design completed by a registered landscape architect.

7. Preliminary plat.

8. Conceptual architecture elevations and/or renderings and any other information requested by the community development director.

e. *Approval process:* PUD applications under this section shall be forwarded along with recommendations from staff to the planning commission, which after holding a public hearing shall make a formal recommendation to the village council. The village council shall also hold a public hearing to take final action on the application. The applicant may then proceed to obtain final site plan and appearance approval for specific phases of the project (if applicable) as indicated in the approved master plan.

f. *Application review procedure:* Regardless of the final governing body approving the project, joint municipal staff review and a joint meeting of the North Palm Beach planning commission and the Lake Park planning and zoning board shall be required for approval. Both municipalities shall review the master plan and subsequent site plan and appearance approvals, unless otherwise provided for as part of the master plan approval process. For projects proposed within the jurisdictional boundaries of both Lake Park and North Palm Beach, the project shall be reviewed in accordance with the governing standards of whichever jurisdiction contains eighty (80) percent or more of the project area. The governing body of the same jurisdiction, instead of both governing bodies, shall make final approval, with recommendations from both advisory planning boards.

g. *Regulating Plan.* Figure 1, Regulating Plan, identifies the properties, frontage types and street locations for properties developing under the special PUD regulations.

**Figure 1 - Regulating Plan**



h. *Building frontage types.*

1. *Setbacks.* The following setbacks shall apply to development parcels approved through the site and appearance review process:

i. *Perimeter setbacks*: All buildings fronting public rights-of-way shall meet the front setbacks as indicated in the regulating plan and further described in Table 2.

ii. *Additional setbacks to internal property lines, parcel lines or private internal streets, drives or alleys*: All internal buildings shall meet the building frontages as indicated on the regulating plan and described in Table 2.

iii. *Spacing between buildings*: The minimum spacing between individual buildings on the same property, same parcel or adjoining C-3 properties shall be determined by applicable fire and building codes.

## Table 2 - Building Frontage Types

*The following frontage configurations shall be used within the properties designated on the regulating plan. See Figure 1 for permitted frontage locations.*

### Frontage A1



### Frontage A2



Frontage B



Frontage C



Frontage D



i.  *Building frontage percentage*: The building frontage percentage is calculated by dividing the width of the building by the width of the lot along the same street frontage. All buildings shall have a minimum frontage of seventy (70) percent for internal streets and eighty (80) percent along Palmetto Drive, U.S. Highway One and Northlake Boulevard.

j.  *Development Intensities*: Master site development plans proposed through this process, and meeting the minimum development thresholds, shall have a maximum floor area ratio (FAR) of 2.75. The FAR is calculated by the total gross area of the property, including existing and proposed easements and proposed public and private streets and alleys multiplied by the FAR. The maximum building area is limited by the maximum allowable FAR. "Building area" means the total air-conditioned leasable or saleable floor area of a building, including hallways, stairs, elevators and storage spaces. The building area does not include: non-habitable enclosed areas on the rooftop; external unenclosed circulation areas; parking areas and parking garages; unenclosed colonnades, porches and balconies; and un-air-conditioned storage spaces.

k.  *Building height.*

    1.  Buildings meeting each of the criteria of these special PUD provisions set forth in subsection (10)(a) are subject to the following height restrictions:

        a.  For master site development plans of at least five (5) acres and with at least fifty thousand (50,000) square feet of non-residential uses, buildings may have up to six (6) stories and a maximum height of seventy-five (75) feet, not including roof-top amenities;

        b.  For master site development plans of at least seven and one-half (7½) acres and with at least seventy thousand (70,000) square feet of non-residential uses, buildings may have up to ten (10) stories and a maximum of one hundred and twenty-five (125) feet, not including roof-top amenities; and

c. For master site development plans of at least ten (10) acres and with at least ninety thousand (90,000) square feet of non-residential uses, buildings may have up to fourteen (14) stories and a maximum height of one hundred seventy-five (175) feet, not including roof-top amenities.

In no event shall buildings fronting U.S. Highway One, Northlake Boulevard and Palmetto Drive exceed nine (9) stories or one hundred twenty (120) feet in height within fifty (50) feet of the right-of-way.

2. For the purposes of calculating the number of stories in a building, stories shall be defined as the space between the finished floor and the top of the structural slab and adjusted as follows:

a. Each level devoted to parking is considered as an individual story when calculating the number of stories in a building, except where parking levels are screened by a liner building that is a minimum of twenty (20) feet deep and at least two (2) stories tall or an enhanced and aesthetically pleasing architectural feature that screens the parking.

b. When parking levels are constructed on a slope or are connected by sloping or circular ramps, the number of stories will be based on the non-sloped areas. If there are no non-sloped areas, the number of stories will be counted as the highest parking level plus each parking level below.

c. A mezzanine will not count towards the number of stories provided the total area of the mezzanine level is less than forty (40) percent of the floor area of the main story below.

d. Rooftop amenities shall not count as a story so long as no more than forty (40) percent of the rooftop shall be fully enclosed, air-conditioned space. None of the rooftop space is habitable for residential purposes.

l. *Floor to floor heights*: Development may use the following standards for the elevation of ground-floors and minimum/ maximum dimensions for floor heights. These standards are measured as follows in Table 3.

**Table 3 - Floor to Floor Standards**

|  | Max. |
|---|---|
| Height of ground-story: | 25' |
| Height of upper-story: | 14' |

Exceptions: The maximum floor to floor height standards in Table 3 do not apply in the following circumstances:

1. A story in or under a building that is devoted to parking is counted as a story when calculating the number of stories in a building, but does not need to comply with the maximum floor to floor heights in Table 3.

2. When the total area of mezzanine level is less than forty (40) percent of the floor area of the story below, the mezzanine level does not need to comply with the maximum floor to floor heights in Table 3.

3. Any story that exceeds the height limitation of Table 3 will count as an additional story.

m. *Architectural features*:

1. Main entrances:

   i. The main entrance for all buildings in these special provisions is its principal point of access for pedestrians. Main entrances must face a street, alley, or civic space.

   ii. Buildings fronting on two (2) streets may have a pedestrian entrance on both streets.

2. Facade transparency:

   i. Transparency means the amount of transparent window glass or other openings in a building's façade along a street frontage. The transparency ratio requirement is expressed as the percentage of the transparent area divided by the entire façade area. It is calculated separately for the ground story of a façade and all upper story floors above the first floor.

   ii. A minimum of sixty (60) percent transparency shall be provided for all ground floor non-residential building frontage and all non-residential uses above the ground floor, with the exception of garage structures and floors above the ground floor that are part of a parking structure which are exempt from this requirement.

   iii. Glazed windows and doors with tinted glass or applied films will be considered transparent if they transmit at least fifty (50) percent of visible daylight.

   iv. The transparent area of windows and doors include rails and stiles as well as muntin bars and other separators within primarily glazed areas; however, the transparent area excludes outer solid areas such as jambs, sills and trim.

n. *Street and sidewalk standards:*

1.

Streets and blocks are indicated on the regulating plan, Figure 1. Final development plans may deviate from the alignment of those streets provided the modification provides equivalent functionality to intersections with U.S. Highway One and roads within the Town of Lake Park. Modifications shall be requested through the PUD application process.

2. Streets shall be designed in accordance with Figure 2 and shall be built concurrently with the development or a phasing plan approved by the village.

3. To encourage pedestrian circulation, minor streets may be designed primarily for pedestrian use with the ability to accommodate service and emergency vehicles when required.

4. All streets within the C-3 zoning district shall be owned and maintained privately unless otherwise approved by the village.

5. Alleys may be proposed between streets shown on the regulating plan.

6. Sidewalks adjacent to the U.S. Highway One and Northlake Boulevard rights-of-way shall be a minimum of eight (8) feet in width. All other sidewalks shall be a minimum of six (6) feet in width.

7. One-way streets shall only be permitted adjacent to a civic space, following the lane width, parking and planter dimensions shown in Figure 2. All one-way streets shall be in addition to the proposed streets shown on the regulating plan. A traffic circulation plan shall be included with the master plan application to ensure anticipated connections are maintained.

**Figure 2**



| Description: | Details: | Key: |
|---|---|---|
| Width of right-of-way | 60' min. | A |
| Movement type | Slow | |

| Target speed | 25 mph | |
| --- | --- | --- |
| Width of pavement | 36' min. | B |
| Travel lanes | 10' min. travel lanes | C |
| Bicycle facilities | shared travel lanes | C |
| On-street parking | 8' min parallel parking | D |
| Pedestrian facilities | 12' min. | E |
| Furnishing strip: | | |
| Tree spacing | 30' average | F |

o. *Landscape standards*. All landscaping shall meet the requirements of the Article VIII (Landscaping) of this chapter unless a waiver is requested through the PUD process.

p. *Parking standards.* Parking shall meet the requirements of this subsection. Dimensions and specifications for parking shall meet section 45-36.J of this Code.

1. Parking space ratios: Table 4 provides parking space ratios for various uses on a site within the PUD. These ratios establish the minimum number of on-site parking spaces. Ratios based on square feet refer to the gross floor area.

**Table 4 - Parking Space Ratios**

| Proposed Use | Parking Spaces |
| --- | --- |
| **Residential Uses** | |
| Dwelling, all other dwelling types | |
| Efficiency | 1 per unit |
| 1 bedroom | 1.25 per unit |
| 2 or more bedrooms | 1.75 per unit |

| Live/work unit | 1 per 1,000 sq. feet |
|---|---|
| Assisted living facility | 0.5 per resident |
| Community residential home | 0.5 per resident |
| **Lodging Uses** | |
| Bed-and-breakfast establishment | 1 per guest room |
| Hotel | 1 per guest room |
| Motel | 1 per guest room |
| Time-share unit | 1.25 per unit |
| **Business Uses** | |
| Offices, general | 2 per 1,000 sq. feet |
| Office or clinic, medical or dental | 3 per 1,000 sq. feet |
| Stores & services, general | 2 per 1,000 sq. feet |
| Stores & services, large format | 3 per 1,000 sq. feet |
| Convenience store with fuel | 5 per 1,000 sq. feet |
| Dog daycare | 3 per 1,000 sq. feet |
| Drive-through facility (for any use) | — |
| Garage, parking | — |
| Restaurant or cocktail lounge | 10 per 1,000 sq. feet |
| Telecommunications antennas | — |

| Civic & Education Uses | |
|---|---|
| Child care facility | 1 per 12 students |
| Church or place of worship | 1 per 4 peak attendees |
| Civic space | — |
| Family day care | (no additional parking) |
| Government building | 2 per 1,000 sq. feet |
| Public space | — |
| School, public or private | 1 per 12 students |

2. *Parking space adjustments.* The number of on-site parking spaces calculated in accordance with Table 4 shall be adjusted under any one (1) or more of the following circumstances:

   i. Mixed-use developments qualify for the shared-parking percentage reductions specified in Table 5 provided the development includes at least ten (10) percent of its gross floor area in a second category of Figure 4 (residential, lodging, office, business, and civic/education uses).

   ii. Required spaces may be located up to five hundred (500) feet off-site in a dedicated or joint-use parking lot provided that permission to use those spaces is specified in a binding agreement that is reviewed and approved during the site plan and appearance review process.

   iii. Golf cart parking spaces may be provided with minimum dimensions of five (5) feet wide by ten (10) feet long. However, none of the development's required parking spaces may be met by golf cart parking spaces.

**Table 5 - Shared Parking Reductions**



3. A deferred parking plan may be approved by the village if a parking study is provided that demonstrates the need for parking is less than what is required by code, or the owner has demonstrated that an alternative means of access to the uses on the site justifies the deferral of the construction of a portion of the required parking spaces. The deferred parking plan shall:

   i. Be designed to contain sufficient space to meet the full parking requirements of the code. The plan shall illustrate the layout for the full number of parking spaces, and shall designate which parking spaces are to be deferred and the timetable for construction.

   ii. Be designed so that the deferred parking spaces are not located in areas required for landscaping, buffer zones, or areas that would otherwise be unsuitable for parking spaces because of the physical characteristics of the land or other requirements of this code.

4. Physical standards for parking lots, driveways, and loading: Physical standards for outdoor parking lots, driveways and loading are contained herein or as modified by a request through the PUD process. No parking shall be located within the building frontage setback.

5. Standards for parking garages: Parking spaces may be provided under or in buildings or in dedicated parking garages instead of being provided in uncovered surface parking lots. Such parking spaces need not comply with the minimum setbacks for surface parking lots. These parking spaces must be screened from view from all streets. Screening may be provided by rooms in the same building or with a liner building that is at least two (2) stories tall with space at least twenty (20) feet deep or an enhanced and aesthetically-pleasing architectural feature screening the same two (2) stories.

q. *Sign standards:* All projects shall provide a sign plan that shall be reviewed and approved by the village during site plan and appearance approval. Pedestrian oriented signs are strongly encouraged and no ground signs shall be permitted as part of the PUD.

r.

*Lighting standards:* A photometric plan shall be provided during site plan and appearance review. The plan shall include all luminaire specifications, pole locations, and foot-candle levels on directly adjacent properties. Light trespass shall be limited to the largest extent possible.

(Ord. No. 8-95, § 1(Exh. A), 3-23-95; Ord. No. 18-95, §§ 1, 2, 7-13-95; Ord. No. 1-96, § 1, 1-11-96; Ord. No. 35-96, § 1, 8-22-96; Ord. No. 1-97, § 1, 1-9-97; Ord. No. 2023-06, § 2, 7-13-23)



CFN 20220168118
OR BK 33484 PG 699
RECORDED 04/19/2022 12:40:22
Palm Beach County, Florida
AMT 19,000,000.00
DEED DOC 133,000.00
Joseph Abruzzo
Clerk
Pgs 0699-0704; (6Pgs)

**PREPARED BY AND**
**AFTER RECORDING RETURN TO:**
Charles J. Abrams, Esq.
Greenberg Traurig, P.A.
777 S. Flagler Drive, Suite 300 East
West Palm Beach, Florida 33401

Parcel ID Numbers: 68-43-42-21-00-001-0010;
36-43-42-21-00-000-3040; 36-43-42-21-29-007-0030;
68-43-42-21-29-007-0020; 68-43-42-21-29-001-0020

## SPECIAL WARRANTY DEED

This Special Warranty Deed is made this _12th_ day of April, 2022, between **JS 133 US ONE, LLC**, a Florida limited liability company, and **VILLAGE SHOPPES AT U.S. 1, LLC**, a Florida limited liability company (collectively, "**Grantor**"), whose address is 133 US Highway One, North Palm Beach, Florida 33408, and **NP-DEVLAND HOLDINGS, LLC**, a Delaware limited liability company ("**Grantee**"), whose address is 1601 South Mopac, Suite 150, Austin, Texas 78746.

## W I T N E S S E T H:

**THAT** the Grantor, for and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration to Grantor in hand paid by Grantee, the receipt whereof is hereby acknowledged, has **GRANTED, BARGAINED, SOLD,** and **CONVEYED** and by these presents does **GRANT, BARGAIN, SELL, AND CONVEY** unto Grantee and Grantee's heirs, successors and assigns forever, the land, situate, lying and being in Palm Beach County, State of Florida, and described in **Exhibit "A"** attached hereto (the "**Land**").

**TOGETHER WITH** (a) all improvements thereon of every kind and description, including infrastructure that may be located thereon or thereunder; (b) all of the rights, privileges, appurtenances, hereditaments, easements, air rights, reversions, and remainders pertaining to or used in connection therewith (including, without limitation and to the extent the same exist, all easements, rights-of-way, privileges, licenses and other rights and benefits belonging to, and running with the owner of, or in any way relating to the Land); (c) all right, title and interest, if any, of Grantor in and to gaps, strips or gores pertaining to the Land or any land lying in the bed of any street, road, highway, avenue or alley (opened or unopened, existing or proposed, now vacated or hereafter to be vacated) in front of or adjoining the Land; (d) all oil, gas and other hydrocarbon substances, geothermal resources and mineral rights, on, under, over, in, under or that may be produced from the Land; and (e) all water rights appurtenant to or used in connection with the Land and any non-appurtenant water rights of any kind owned by from all sources, whether surface water, ground water or spring water, and all claims for any and all water rights of any kind whatsoever relating to the Land (all of the foregoing, together with the Land, the "**Property**").

**TO HAVE AND TO HOLD**, the same in fee simple forever.

**EXHIBIT C**

CFN 20220168118
BOOK 33484 PAGE 700
2 OF 6

Without reimposing the same, this conveyance is subject to taxes for the year 2022, and all existing easements, covenants, restrictions and other recorded exceptions to title to the Property, if any (but not including any mortgage, monetary encumbrance or lien).

And Grantor hereby covenants with Grantee and Grantee's successors and assigns that Grantor is lawfully seized of the Property in fee simple; that Grantor has good right and lawful authority to sell and convey the Property; that Grantor hereby fully WARRANTS the title to said Property and will FOREVER DEFEND the same against the lawful claims of all persons claiming by, through or under Grantor, but against no other.

[Signature Page to Follow]

NOT A CERTIFIED COPY

2

CFN 20220168118
BOOK 33484 PAGE 701
3 OF 6

**IN WITNESS WHEREOF**, Grantor has hereunto executed this deed the day and year first above written.

Witnesses:

VILLAGE SHOPPES AT U.S. 1, LLC, a Florida limited liability company

Print Name: **LAWRENCE W. SMITH**

By: _____
John Staluppi, Manager

Print Name: Courtney Sarafian

Witnesses:

JS 133 US ONE, LLC, a Florida limited liability company

Print Name: **LAWRENCE W. SMITH**

By: _____
John Staluppi, Manager

Print Name: Courtney Sarafian

STATE FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me by means of [X] physical presence or [__] online notarization this 11 day of April, 2022, by John Staluppi, as Manager of each of **VILLAGE SHOPPES AT U.S. 1, LLC**, a Florida limited liability company, and **JS 133 US ONE, LLC**, a Florida limited liability company, on behalf of said companies. He is [✓] personally known to be or [__] produced _____ as identification.

{Notary Seal must be affixed}

_____
(Signature of Notary) LAWRENCE W. SMITH

LAWRENCE W. SMITH
MY COMMISSION # GG 334274
EXPIRES: September 5, 2023
Bonded Thru Notary Public Underwriters

(Print Name of Notary Public)
Notary Public, State of _____
My Commission Expires: _____
Commission No.: _____

3

CFN 20220168118
BOOK 33484 PAGE 702
4 OF 6

**Exhibit "A"**
Legal Description of the Land

PARCEL A: (Fee Simple)

PARCEL I:

A certain parcel of land in Section 21, Township 42 South, Range 43 East, Palm Beach County, Florida, being more particularly described as follows:

Beginning at the intersection of the Westerly right-of-way line of State Road No. 5 as described in a deed from Tesdem, Inc. to the State of Florida as same is recorded in Deed Book 838, Page 25, Public Records of Palm Beach County, Florida with the Northerly right-of-way of Palmetto Road as shown on the Plat of Kelsey City (now Lake Park) as same is recorded in Plat Book 8, Page 35, Public Records of Palm Beach County, Florida, and from said point of intersection run (for convenience the said Northerly right-of-way line of Palmetto Road is assumed to bear North 89°57'15" West and all other bearings mentioned herein are relative thereto), North 89°57'15" West running along the said Northerly right-of-way line a distance of 468.28 feet; thence North 7°27'45" West, a distance of 247.44 feet; thence South 88°43'22" West a distance of 249.34 feet to a point in a line parallel with and one foot Westerly from (measured at right angles to) the Westerly wall of the Truck Well so called at the Westerly end of the J.M. Fields Store Building, so called; thence North 01°19'04" West, along said parallel line, a distance of 152.45 feet, more or less, to a point in the Westerly extension of the North face of the South wall of the Garden Shop so called, said Garden Shop located in the Northwesterly corner of the said J.M. Fields Store Building; thence North 88°40'56" East along the just said Westerly extension and along the just said North face of the South wall a distance of 41 feet, more or less, to a point in the West face of the East wall of said Garden Shop; thence North 01°19'04" West running along the just said West face of the East wall and the Northerly extension thereof a distance of 120.27 feet, more or less, to a point in the face of the curb, said curb being 20.26 feet Northerly from and parallel with the face of the North wall of said building; thence North 88°40'56" East running along the said face of the curb and its Easterly extension of a distance of 637.31 feet, more or less, to a point in the said Westerly right-of-way line of State Road No.5, said point being also a point on a curve concave to the West, having a radius of 11394.22 feet and whose tangent passing through said point bears South 10°13'29" East; thence Southerly running along the arc of the just described curve and along the said Westerly right-of-way line subtending a central angle of 01°48'07", a distance of 358.34 feet, more or less, to the end of said curve; thence South 81°34'38", West running along a line radial to the just described curve and radial to the next described curve and continuing along said Westerly right-of-way line a distance of 5 feet to a point in a curve concave to the West, being concentric with the last described curve and having a radius of 11389.22 feet; thence Southerly running along the arc of the just described curve and continuing along the said Westerly right-of-way line; subtending a central angle of 00°25'22", a distance of 84.04 feet to the end of said curve; thence South 08°00'00" East along said Westerly right-of-way line distance of 91.77 feet, more or less, to the POINT OF BEGINNING.

PARCEL II:

A parcel of land lying in Section 21, Township 42 South, Range 43 East, Palm Beach County, Florida, being more particularly described as follows:

Commence at the intersection of Westerly right-of-way line of State Road No. 5, as described in deed from Tesdem, Incorporated to the State of Florida, recorded in Deed Book 838, Page 25, Public Records of Palm Beach County, Florida, with the Northerly right-of-way line of Palmetto Road, as shown on the Plat of Kelsey City (now Lake Park), recorded in Plat Book 8, Page 35, Public Records of Palm Beach County, Florida; thence Westerly, along said Northerly right-of-way line, a distance of 468.28 feet to a point on a

NOT A CERTIFIED COPY

4

CFN 20220168118
BOOK 33484 PAGE 703
5 OF 6

portion of the Westerly boundary of that certain parcel of land described in Official Record Book 3343, Page 1786, Public Records of Palm Beach County, Florida, and the point of beginning of the hereinafter described parcel; thence Northerly along said Westerly boundary, making an angle with the preceding course, measured from East to North of 97°30'30", a distance of 247.44 feet to a point; thence Westerly, making an angle with the preceding course, measured from South to West of 96°11'07", a distance of 208.80 feet to the point of the Easterly boundary of that certain parcel of land described in Official Record Book 3259, Page 276, Public Records of Palm Beach County, Florida; thence Southerly, along said Easterly boundary, making an angle with the preceding course, measured from East to South of 89°58'58", a distance of 240.56 feet to a point on said Northerly right-of-way line, making an angle with the preceding course, measured from North to East of 91°20'25", a distance of 235.45 feet to the POINT OF BEGINNING.

PARCEL B: (Fee Simple)

A parcel of land being all of Parcel 1B and a portion of Parcel 7 according to the plat of NORTHLAKE PROMENADE SHOPPES, A PUD, as shown in Plat Book 102, Pages 130 and 131, of the Palm Beach County, Florida Public Records. Said plat also being a portion of Section 21, Township 42 South, Range 43 East, Town of Lake Park and Village of North Palm Beach, Palm Beach County, Florida, being more particularly described as follows:

Begin at the Southeast corner of said Parcel 1B; thence S 89°59'30" W along the South line of said Parcel 1B, with all bearings contained within relative thereto, a distance of 637.68 feet; thence S 00°00'25" E along the East line of said plat, a distance of 119.95 feet to the intersection with the North face of a building wall described in Official Records Book 3343, Page 1787; thence S 89°59'35" W, a distance of 41.00 feet; thence departing said East line continue S 89°59'35" W, a distance of 30.65 feet; thence N 00°09'32" E, a distance of 429.19 feet to the intersection with the South line of Parcel R-1 of said plat; thence N 90°00'00" E along said South line, a distance of 175.42 feet; thence N 00°00'00" E along the East line of Parcel R- 1, a distance of 155.65 feet to the Northeast corner of said Parcel R-1; thence N 90°00'00" E along a line 35.50 feet South of and parallel with the South line of Parcel 5 of said plat, a distance of 117.06 feet; to a curve to the right having a radial bearing of S 00°00'00" E, a radius of 80.00 feet, and a central angle of 34°25'35"; thence proceed along the arc of said curve, a distance of 48.07 feet to the end of said curve; thence S 55°34'25" E, a distance of 100.26 feet; to a curve to the right having a radial bearing of S 34°25'35" W, a radius of 80.00 feet, and a central angle of 46°43'50"; thence proceed along the arc of said curve, a distance of 65.25 feet to the end of said curve; thence S 08°50'35" E along a line 35.50 feet West of and parallel with the West line of Parcel 6 of said plat, a distance of 249.82 feet to a point on the prolongation of the North line of aforesaid Parcel 1-B; thence N 84°09'54" E along said prolongation, a distance of 30.18 feet to a Northwest corner of Parcel 1-B; thence continue N 84°09'54" E along the North line of Parcel 1-B, a distance of 167.65 feet to a point of intersection with the East line of said plat, said point also lying on the West right-of-way line of U.S. Highway No. 1; said point also being the Northeast corner of said Parcel 1-B, said point also being the beginning of a curve having a radial bearing of S 80°22'21" W, a radius of 11394.22 feet, and a central angle of 00°34'45"; thence proceed Southerly along the arc of said curve, a distance of 115.19 feet to the end of said curve and the POINT OF BEGINNING of the herein described parcel.

PARCEL C: (Easements)

PARCEL I:

Non-exclusive easements, for the benefit of Parcel A and Parcel B herein described above, as created in Fourth Amendment to Declaration of Restrictions, Covenants and Conditions and Grant of Easement by and between Twin Cities Investors, Inc. and Developers of Northlake, Inc. as recorded in Official Records Book Official Records Book 21438, Page 1886 as corrected in Official Records Book 22831, Page 89 for

CFN 20220168118
BOOK 33484 PAGE 704
6 OF 6

purposes of Ingress and Egress Easement in Article 6.1; Utility Easement in Article 7.1 and Drainage Easement in Article 8.1 over and across the lands described in said Easement.

PARCEL II:

Non-exclusive easement(s), created by and described in that certain Declaration of Restrictions, Covenants and Conditions and Grant of Easements recorded in Official Records Book 11923, Page 861, as amended in Official Records Book 13154, Page 1892; Official Records Book 17516, Page 1987; Official Records Book 17595, Page 1781; and Official Records Book 21438, Page 1886 as re-recorded in Official Records Book 22831, Page 89; less and except those lands conveyed to the State of Florida Department of Transportation by Quit-Claim Deeds recorded June 9, 2004 in Official Records Book 17093, Page 214 and recorded June 1, 2004 in official records book 17062, Page 1971, of the Public Records of Palm Beach County, Florida.

PARCEL III:

Non-exclusive easement(s), created by and described in Declaration of Reciprocal Easements recorded in Official Records Book 17344, Page 1311, of the Public Records of Palm Beach County, Florida.

PARCEL IV:

Non-exclusive easement(s), created by and described in Access, Parking and Landscape Easement by and between Twin Cities Investors, Inc., a Florida corporation, Developers of Northlake, Inc., a Florida corporation and Village Shoppes At U.S. 1, LLC, a Florida limited liability company, dated February 21, 2007 and recorded February 22, 2007 in Official Records Book 21438, Page 1917, of the Public Records of Palm Beach County, Florida.

6



**Village of North Palm Beach**

**Universal Planning and Zoning Application**

---

**Instructions to Applicant**

This application shall be submitted with the required items identified in the Application Matrix.

Separate Applications must be submitted when multiple applications are associated with the same request.

Contact Community Development Department at 561-841-3365 for a pre-application submittal meeting.

---

**Please check each relevant application box below:**

| | | |
|---|---|---|
| ☐ Annexation | ☐ PUD  Amendment Major | ☐ Variance (Sign) |
| ☐ Comprehensive Plan | ☐ Plat Preliminary | ☐ Variance |
| ☐ Master Sign Plan Program | ☐ Plat Final | ☐ Waiver |
| ☑ Planned Unit Development | ☐ Similar Use | ☐ Zoning Map Amendment |
| ☐ PUD Amendment Minor | ☐ Special Exception | ☐ Zoning Text Amendment |

---

**Other:**

| | |
|---|---|
| ☐ Appeal of Administrative Decision | ☐ Postponement & Decision Withdrawal |
| ☐ Extension of Time | ☐ Pre-application meeting |

---

**Project Name** Village Place

**Agent's Name** George G. Gentile - President of 2GHO, Inc.

**Address** 1907 Commerce Lane, Suite 101

**City** Jupiter      **State** FL      **Zip** 33458

**Phone** 561-575-9557      **Fax** 561-575-5260

**Email** george@2gho.com/alec@2gho.com

---

**EXHIBIT D**

Owner's Name NP Devland Holdings, LLC

Address 1601 S. MOPAC EXPY, Suite 150

City Austin                          State TX                          Zip 78746

Phone _____ Fax _____

Email Salour@cypressrealtyfl.com

**Correspondence Address:** *(If different than agent or owner)*

Address _____

City _____ State _____ Zip _____

Phone _____ Fax _____

Email _____

**This is the address to which all agendas, letters and other materials will be forwarded.**

Project Location & Address At the intersection of US Highway 1, and Palmetto Drive

Parcel Identification Number(s) See attached Sheet

Property Size (Square feet/Acres) 573,037/13.155 acres

Existing Use of Property Portion of Former Twin City Mall (Village Shoppes)

Proposed Use of Property Redevelopment of Planned Mixed Use Development

Existing Future Land Use Designation Commercial

Proposed Future Land Use Designation N/A

Existing Zoning of Property C3; Regional Business District

Proposed Zoning of Property N/A

2

# VILLAGE PLACE
# NORTH PALM BEACH
# PROJECT PARCEL CONTROL NUMBERS:

68-43-42-21-29-007-0020

36-43-42-21-29-007-0030

68-43-42-21-29-001-0020

68-43-42-21-00-001-0010

36-43-42-21-00-000-3040



**Village of North Palm Beach**

**Planned Unit Development Submittal Checklist**

---

**Instructions to Applicant:**

Answer all questions completely.

A filing fee in the amount of $2,500.00, advertising fees in the amount of $1500.00 and special services fees in the amount of $2,000 must accompany this application. **Since advertising and special services costs vary, the final amount will be reconciled upon receipt of invoices from the newspaper and consultants.**

Provide required attachments (warranty deed, survey and plans) as shown on the attached checklist.

---

**Petitioner's Statement: (Explanation and reason for the request).**

**Use attachments as necessary.**

> The Owner proposed a mixed use Planned Unit Development on a portion of the former Twin City Mall site.  Included in this Application is a Justification Statement detailing the Owner's proposal.

**Applicant's Statement of Justification (Attach additional sheets as necessary).**

The applicant is to explain how the request conforms to the following findings:

A.  That the proposed change would not be contrary to the Village's Future Land Use Element and would not have an adverse effect on the Comprehensive Plan.

> Please see included Justification Statement

B.  That the proposed use or uses shall be of such location, size and character as to be in harmony with the appropriate and orderly development of the zoning district in which situated.

Please see included Justification Statement

C.  That the proposed use or uses shall not be detrimental to the orderly development of adjacent zoning districts.

Please see included Justification Statement

D.  That the location and size of the proposed use or uses, the nature and intensity of the principal use and all accessory uses, the site layout and its relation to streets giving access to it, shall be such that traffic to and from the use or uses, and the assembly of persons in connection therewith, will not be hazardous or inconvenient to the neighborhood nor conflict with the normal traffic of the neighborhood.

Please see included Justification Statement

E.  That the location and height of buildings, the location, nature and height of walls and fences, and the nature and extent of landscaping of the site shall be such that they will not hinder or discourage the proper development and use of adjacent land and buildings nor impair the value thereof.

Please see included Justification Statement

F.  That the standards of density and required open space in the proposed project are at least equal to those required by this ordinance in the zoning district in which the proposed project is to be located, except as may be permitted for key redevelopment sites through subsection 45-35.1. VIII.

Please see included Justification Statement

G.  That there shall be no uses within the proposed project which are not permitted uses in the zoning district in which the proposed project is to be located.

Please see included Justification Statement

Note: Additional attachments may be added to provide more information in answering questions.



### Planned Unit Development Submittal Checklist

**General Requirements**

1. Application Review Fee and Advertising Fee.
2. Completed application signed by owner and applicant. **Agent's authorization or power of attorney must be attached if applicant is other than owner.**
3. Copy of the Warranty Deed including property control number or folio number and legal description of property.
4. A list of all property owners within a five hundred (500) foot radius of boundary lines of the subject property from the most recent tax roll information as provided by the Palm Beach County Appraiser's Office.
5. Executed affidavit signed by the person responsible for completing the property owner list.
6. Two (2) sets of STAMPED (meter stamps not acceptable), plain envelopes with the typed names of the owners within a five hundred (500) foot radius of the boundary lines of the subject property. No return address. Executed affidavit signed by the person responsible for completing the property owner's list.
7. Proof of ownership by one entity or submittal of unified control document.

**Survey**

8. Survey (to include):
   a. Submit five (5) copies 24" x 36", one (1) set 11" x 17", and one (1) Electronic Digital Copy.
   b. Survey, signed and sealed, (not more than a year old) and legal description of the property, including any and all easements of record (referenced by Official Records (OR) Book and page) prepared by a surveyor registered in the State of Florida.

**Development Concept Plan**

9. Development Concept Plan (to include):
   a. Submit five (5) copies 24" x 36", one (1) set 11" x 17", and one (1) Electronic Digital Copy.
   b. The boundaries and dimensions of the property and its relationships to the surrounding road system including the width of the existing travelway.

c.  The location and dimension of existing manmade features such as existing roads and structures with indication as to which are to be removed, renovated or altered.

d.  The location of existing easements, watercourses, section lines, water and sewer lines, well and septic tank location, and other existing important physical features in and adjoining the project.

e.  Identification of surrounding land use, future land use designation and zoning within 100 feet of the site as well as for the petitioned site.

f.  A layout of the proposed lots and/or building sites including the following: common open areas, generalized landscaping and buffer zones, internal circulation patterns including off-street parking and loading facilities, total project density, percentage of building lot coverage, floor area square footage, percentage of impervious surface coverage, percentage of open space areas, the shape, size, location and height of all structures.

g.  Proposed phasing of construction for the project, if applicable.

h.  Estimated square footage of the structures, the number of employees, estimated seating, and the estimated number of users of the facility, such as members, students and patients, if uses other than residential proposed.

i.  Proposed hours of operation for commercial uses.

j.  A drainage statement (or drainage plan if required).

k.  Size, location and orientation of signs.

l.  Proposed lighting of the premises.

m. Traffic Impact Analysis addressing at a minimum: Distribution and assignment of traffic, intersection improvements, additional roadway needs (travel lanes and turn lanes), traffic control devices, future right-of-way dedications and compliance with Palm Beach County Traffic Performance Standards Ordinance.

n.  Address additional standards as outlined in Section 45-35.1 VIII.



**Agent Authorization Form**

I hereby give AUTHORIZATION to George G. Gentile, PLA and 2GHO, Inc.
to act on my behalf, to submit or have submitted this application and all required material and documents, and to attend and represent me at all meetings and public hearings pertaining to the application(s) indicated above. Furthermore, I hereby give consent to the party designated above to agree to all terms and conditions, which may arise as part of the approval of this application for the proposed use of

**Applicant Information** NP-Devland Holdings, LLC; NP-Devland East, LLC; NP-Devland North, LLC

Signature _____ Print Name Nader Salour, Vice President

Address 3910 RCA Blvd, Ste. 1015 City Palm Beach Gardens State FL Zip 33410

**Agent Information:**

Signature _____ Print Name George G. Gentile

Address 1907 Commerce Lane, Suite 101 City Jupiter State FL Zip 33458

**Notary Public Information:**

The foregoing instrument was acknowledged before me this 6th day

of March 20 24 by Nader Salour Name of person acknowledging. He or she is personally

known to me, or who has produced _____ as identification (type of identification

and did or did not take an oath (circle correct response).

Signature of Notary Public _____ Print Name Patricia Y. Lentini

Notary Public State of Florida County of Palm Beach

Commission Number HH 191720 Commission Expires 10/27/2025

Notary Seal or Stamp _____

PATRICIA Y LENTINI
Notary Public - State of Florida
Commission # HH 191720
My Comm. Expires Oct 27, 2025
Bonded through National Notary Assn.

VILLAGE OF
NORTH PALM BEACH
MAR 15 2024
COMMUNITY DEVELOPMENT
RECEIVED

LA-0000530

**2GHO** INC.

Landscape Architects ■ Planners ■ Environmental Consultants

George G. Gentile FASLA
M. Troy Holloway ASLA
Emily M. O'Mahoney FASLA, PLA, LEED®AP, BD&C

## VILLAGE PLACE
## AKA: VILLAGE SHOPPES
## PLANNED UNIT DEVELOPMENT
## NORTH PALM BEACH, FLORIDA
## JUSTIFICATION STATEMENT
## AUGUST 21, 2023
## REV. MARCH 5, 2024

### Introduction

2GHO, Inc., on behalf of the Owner(s), NP-Devland Holdings, LLC, NP-Devland North, LLC, and NP-Devland East, LLC; respectfully requests the Village's review and approval of an infill redevelopment mixed-use proposal for the Village Shoppes.  Located at the intersection US Highway 1, and Palmetto Drive, the total site area is approximately 13.155 acres, and has a future land use designation of Commercial, and zoning designation of C-3; Regional Business District. Note, over the course of the past year, the Owner has diligently worked with the staff, Village Council, and stakeholders to present a project that will not only be a marquee development within the Village of North Palm Beach, but also adhere to the goals, policies, and objectives of the adopted Comprehensive Plan, Zoning Code, and the newly adopted C-3 Regional Business District Code.

Pursuant to the recently adopted Planned Unit Development provisions for the C-3 Regional Business District, the development team has provided a Master Plan that provides for Retail/Commercial, Civic Open Space, Apartments, Senior Living, Condominiums, and hotel.

The uses indicated above will foster a transformative development for the Village that will be seen as an asset for the residents, and the end users. The old Twin City Mall site has been an eyesore on the prime corner of the Village and this new plan will bring this inactive site into a destination location for the Village.

### Site History

The proposed redevelopment will replace what was once known as the Twin City Mall.  Twin City Mall, which opened in 1971, was an enclosed shopping mall that was located in North Palm Beach and Lake Park.

Twin City Mall was first proposed in early 1969. The mall, which landed in both North Palm Beach and Lake Park would connect an existing J.M. Fields and Food Fair with a new Sears store.  The mall had its grand opening on July 21, 1971, with 35 stores ready for opening day. Other major tenants included a Fountain's department store, a G. C. Murphy, and a theater operated by Budco Theatres noted as the first in the Palm Beach area with an automated projection system.

Village Place – Mixed Use PUD
August 21, 2023
Page **2** of **9**

J.M. Fields would close with the chain in 1978, leaving the Twin City Mall location to be taken over by Jefferson Stores.

During the 1980's, the mall saw the exodus of several stores, and the center started to be met with "mixed" reaction.  With the opening of the Gardens Mall in 1988, the last of the notable stores began to vacate, leaving the mall with a high vacancy rate.

Initiatives to redevelop this site started as soon as the early 90s, with plans for a temporary campus for FAU, or as a mixed-use site with offices and retail.  Plans were also submitted in 1995 to demolish the building, and redevelop as a traditional shopping center.  None of these development approaches came to fruition.

More recently (within the last 20 years), a portion (Lake Park side) of the site was redeveloped into Northlake Promenade Shoppes, and the subject site area (North Palm Beach side) was redeveloped as Village Shoppes.

**Infill Redevelopment**
The Owners, and project team have taken the task of carefully designing a logical plan that can utilize existing services, while staying sensitive to the surrounding community, and proposing uses that are in high demand, which accomplishes some of the basic tenants of infill redevelopment.

As South Florida's real estate market has matured, it faces a challenge similar to other mature markets: the increasing scarcity of developable land. Already faced with limited availability of vacant land due to geographic constraints, the rapid and dynamic growth of the South Florida counties (including Palm Beach) over the past several years has left developers with fewer greenfield development options, particularly in suburban areas, such as North Plam Beach.

The proposed mix of uses is logical, due to the fact of when a wide variety of uses are located in close proximity to each other, walking and cycling can now become practical means of travel. For mixed use development to succeed, varied land uses should be within convenient walking distance of each other (one quarter mile, 5-10 minutes) and there must be direct, safe, and convenient connections between the uses, which this proposal intends to provide.

Residents in mixed use developments can take care of many daily needs without having to drive elsewhere, and can contribute vitality and interest for residents, additional customers for neighborhood businesses, and a variety of housing choices.

Last, the Owners appreciate North Palm Beach's commitment to strategize for, and promote redevelopment/revitalization initiatives within the Village. As evidenced with the recent upgrades to the North Palm Beach Country club, the Village has set the stage for more improvements within the area.  The Owner's looks forward to approval of their proposal which will provide for reinvestment back into the existing community.

Village Place – Mixed Use PUD
August 21, 2023
Page **3** of **9**

**Proposed Master Site Plan**
The portion of this justification statement will provide a brief overview of the proposed master plan as well as conceptual information regarding drainage, traffic impacts, architectural style, landscape design, and a phasing schedule.

The 13.155-acre Master Plan is divided into 4 parcels, and proposes maximum F.A.R for the parcels.  The total F.A.R for the development will not exceed 2.75, consistent with recently updated Comprehensive Plan and zoning code provisions.

The chart below highlights the Owner's proposal:

*Proposed Development Parcels*

| Parcel | Acreage | Proposed Development Parameters |
|---|---|---|
| Parcel 1 | 2.70 ac | Max Height – 14 stories |
| Parcel 2 | 5.27 ac | Max Height – 14 stories |
| Parcel 3 | 1.34 ac | Max Height – 9 stories |
| Parcel 4 | 1.61 ac | Max Height – 9 stories |
| Civic Open Space | 1.08 ac | N/A |
| Road ROW | 1.155 ac | Roadway for project |
| Total | 13.155 ac | |

*Proposed F.A.R. for Development*

| | |
|---|---|
| Retail/Commercial/Public Service | .229 |
| Apartments | 1.596 |
| Senior Living | .347 |
| Condominiums | .344 |
| Hotel | .234 |
| **Total** | **2.75 (MAX) = 1,575,851 sf** |

The buildings are situated such that the proposed 9-story buildings are along the eastern perimeter of the property, with the taller 14-story buildings interior to the site that will provide views to the water. Further, the development area exceeds the minimum required 5 acres, and will be developed as a cohesive project. The project includes 1.08 acres of Civic /Open Space (which exceeds the code minimum of ½ acre for a development). While the exact form and function of the civic space has yet to be finalized, it has the potential to include a park, plaza area, courtyard, playground, or any combination of the same.

**Drainage**
The project stormwater management system will be designed to retain onsite the entire runoff volume of any storm event up to and including the 25-year, 3-day storm event in accordance with the Master South Florida Water Management District Permit No. 50-04324-P.  The existing South Florida Water Management District Permit will be modified to include Parcels 2, 4 and a portion of Parcel 3.  Water quality for each parcel will be provided for via exfiltration trench. Water quantity will be provided in existing lakes and proposed storm chambers.  Project grading

Village Place – Mixed Use PUD
August 21, 2023
Page **4** of **9**

will match previously permitted elevations with the South Florida Water Management Permit No. 50-04324-P

**Traffic**

With this submittal, a traffic statement has been provided that analyzes the proposed development's impact on the surrounding major throughfares within the project's radius of development influence in accordance with the Palm Beach County Unified Land Development Code (ULDC).  Based on the existing and project traffic characteristics and distribution, as well as the existing and future roadway network geometry and traffic volumes, the overall project meets the Link/Build-Out Test, and Five-Year analysis test, as required by Plam Beach County Traffic Performance Standards. For more information, please refer to the included traffic statement.

**Architecture**

Village Place stands as a transformative urban project, skillfully interweaving residential, retail, and hospitality. At its heart, an expansive central park serves as the bustling focal point, its vibrant energy mirrored in activated retail spaces surrounding its periphery.

This development emphasizes a pedestrian-oriented approach, connecting urban activity with natural settings. A lush, immersive landscape flourishes, inviting residents and visitors to explore and interact. On the ground level, the design creates spaces for activation and relaxation, supported by natural finishes that complement the surroundings. Exterior pedestrian paver sidewalks and outdoor furnishings enhance the outdoor experience and connect the user with the natural habitat.

As the structure rises above the retail podium, a shift in architectural style becomes evident. A timeless contemporary design aesthetic takes precedence, featuring clean lines and skillful use of materials. Balconies become private retreats, capturing ample natural light and expansive views. The design palette balances light finishes with natural textures, cultivating a sense of refined luxury.

Architectural diversity is achieved through a thoughtful interplay between solid and void, fostering a dialogue between mass and space. Balconies vary in design, blending recessed and protruding elements, while a sequence of punched openings, ranging from large to small, evokes the spirit of tropical modernism, spanning both past and present inspirations.

Atop the structure, activated rooftop podiums offer residents a dynamic space. The building's massing is responsive and resilient, catering to the demands of the urban environment while maintaining a landscape-forward and human-scaled approach.

In summary, this architectural narrative captures a synthesis of urbanity and nature. The interplay of materials, spatial arrangements, and purpose converge to redefine urban living, resulting in a project that is both timeless and contemporary.

Village Place – Mixed Use PUD
August 21, 2023
Page **5** of **9**

**Landscape Design**

The goal of the landscape design for this project is to enhance the daily life of its users, as well as the neighboring residents. The proposed conceptual landscape design seeks to establish perimeter landscape buffers for the project by suggesting a variety of buffer trees/palms, complete with recommended buffer understory plantings.  This project will propose perimeter trees for all specified buffers that exceed the current minimum landscape code requirement. The end result will spur the ability to create pleasing spaces that will have immediate social and environmental benefits for the surrounding areas.  With this submittal, the project team has provided a conceptual landscape plan, that detail the proposed buffers for the project.

**Phasing Schedule**

It is the Owner's intent to place the infrastructure for the entirety of the project, as well as the public/civic open space within the first phase of this project.  All future phases for the proposed parcels will occur based on market demand.

**Consistency with North Palm Beach Adopted Policies**

This subject application is a culmination of numerous months of coordination with staff members, Village Council, and stakeholders to arrive at a Master Plan that recognizes the importance of this property, by capturing the true essence of redevelopment. In this quest, the team has focused its efforts around proposing a design, and programmatic function that aligns with several of the Village's adopted plans. This portion of the narrative will provide analysis on how the proposed master plan meets the established visions, goals, and policies.

<u>*Consistency with the Comprehensive Plan*</u>

**3.2 Village Goal Statement:**

It is also the intention of the Village to provide mechanisms and processes to promote the redevelopment of obsolete, underutilized, and underproductive areas of the Village. The Village shall provide flexibility in the land development regulations to promote such redevelopment, including but not limited to encouraging mixed-use development, connectivity, pedestrian-oriented development, reduction of dependence on vehicles, creation of open/public/civic gathering spaces, and otherwise promoting the economic, development, housing, and other public policy goals of the Village.

*Response: The Owner's Master Plan proposal is directly consistent with the above goal. It is taking advantage of a newly adopted mechanism that promotes the upgrading of a site that has long been underutilized.*

*The plan will in fact enhance connectivity, and provide for substantial civic/public spaces which will further add to the economic viability of this area.*

**Table 3-1 Land Use Classification System:**

**Commercial:** Land uses and activities within land areas which are predominantly related to the sale, rental and distribution of products and the provision or performance of services. Within the Commercial classification, residential and other uses may also be permitted in accordance with the mixed-use policies of the Comprehensive Plan and the Village's land development

Village Place – Mixed Use PUD
August 21, 2023
Page **6** of **9**

regulations.

*Response: The Commercial land use designation of this property is consistent with the proposed master plan, as all uses are not in conflict with any of the adopted policies of the Comprehensive Plan.*

<u>*Citizens' Master Plan*</u>

In August of 2015, the Palm Beach MPO, partnered with the Treasure Coast Regional Planning Council (TCRPC) to study ways to improve mobility, quality of life, and economic vitality for the Village.

One of the key recommendations of the Master Plan was to prioritize redevelopment areas, and the subject property was one of the main sites that were targeted.  The Plan goes on to describe the potential redevelopment that could be supported on the subject site.

*"The site is large enough to accommodate a significant project. Buildings tall enough to afford water views could be incorporated without impacting existing residences. Currently, the project turns its back to adjacent houses, negatively impacting physical and economic potential, particularly for the residential uses. Since half of the site is located within the boundary of Lake Park, a clear vision that both municipalities support is a crucial tool to encourage investment."*

*Response: The proposed uses of the Master Plan are in line with the majority of uses identified in the market analysis done for the Village by TCRPC. The property Owner has used the Citizen's Master Plan and the newly adopted C-3 Regional Business District Code as a guide to program the proposed development, and was successful in achieving the vision for the Twin City mall site, which incorporates residential as an integral use of the project.*

**<u>Housing</u>** – The residential housing market in North Palm Beach has fully recovered from the 2007 recession.  While population growth has remained modest within the Village, entitlements granted for the 2014 Water Club project (which quickly sold out) resulted in 172 multi-family starts, indicating a clear market demand. Additionally, it should be noted that with no new inventory being produced in the Village of North Palm Beach in the last several years, there is not a significant opportunity to increase the tax base within the Village.  The residential units proposed in this development will provide for the opportunity to; a) provide additional residential units to help meet current market demand, and add to the economic vitality of the Village by increasing the tax base.

**<u>Hotel Market</u>** – A recent study suggests a demand for additional rooms within the Village.  As such, a proposed hotel use will help to fill that demand, as the intent will be to seek a well-qualified hotel developer/operator.

**<u>Senior Living</u>** – While it was not an area of focus in the market study, additional senior living opportunities are becoming more important in Palm Beach County. With 25% of the population now over the age of 65 (***2022 Census Data estimates***), opportunities for senior living communities should be welcomed.

Village Place – Mixed Use PUD
August 21, 2023
Page **7** of **9**

<u>*Consistency with the Village Zoning Code*</u>

**Sec. 45-34.1 C-3; Regional Business District**
The C-3 Regional Business District is designed for the re-use and/or redevelopment of commercial property. It contains special regulations and procedures that are integrated with those of the Town of Lake Park to avoid conflicts that could otherwise be created by the location of the town/village boundary.  Below is a table demonstrating that all proposed uses are permitted by code.

*Village Place – Proposed Uses*

| Use | Uses Permitted | By PUD Only |
|---|---|---|
| Retail/Commercial | ✓ | |
| Apartments/Condos | ✓ | |
| Hotel | ✓ | |
| Senior Living | | ✓ |
| Civic / Public Space | ✓ | |

Section 45-34.1 (10) states that the Village's intent us to provide a mechanism and process to promote the redevelopment of the obsolete and underutilized areas of the C-3 Regional Business district with large scale, master-planned projects that promote a mix of uses; connectivity; pedestrian-oriented development; removal of surface parking; creation of public/civic gathering spaces; and shopping, entertainment, and restaurant uses within the form of an urban neighborhood incorporating residential development as an integral use.

*Response:  The proposed Master Plan accomplished a mix of uses, public/open space, and provides for the ability of an urban type development.  By utilizing the allowed PUD process, the Owner will be able to properly facilitate redevelopment and accomplish the goals of the Village, as described throughout this justification statement.*

Further, the proposed master plan meets the following thresholds, established by Section 45-34.1(a)

- Exceeds the minimum required 5 contiguous acres, and will be developed as one overall development project;
- Under unified control of a Master Property Owner's Association, which will consist of two sub-associations (one for the residential component, and one for the non-residential component)
- Exceeds the ½ acre Civic/Open Space requirement, by providing 1.08 Acres;
- Exceeds the minimum of 90,000 sf of non-residential uses;
- Will provide for public benefits in the form of innovative architectural features, enhanced quantity and sizes of landscape materials along the Pubic Right of Ways where they can be accommodated, pedestrian connections and amenities and an increased Civic/Open Space element that will provide an unprecedented public space for the users and residents of the project and the Village of North Palm Beach.

Village Place – Mixed Use PUD
August 21, 2023
Page **8** of **9**

<u>*Consistency with PUD policies*</u>

*Per the Village of North Palm Beach's Planned Unit Development Submittal Checklist, the Owner will demonstrate how the subject proposal conforms to the established standards set forth below:*

A. *That the proposed change would not be contrary to the Village's Future Land Use Element and would not have an adverse effect on the Comprehensive Plan.*

   *Response: To the contrary, the Owner's proposal is directly consistent with the Village's Goal within the Future Land Use Element, as described in a previous section within this document.  All facets of the proposed development will be aligned with the adopted goals, policies, and objectives of the Comprehensive Plan.*

B. *That the proposed use or uses shall be of such location, size and character as to be in harmony with the appropriate and orderly development of the zoning district in which situated.*
   *Response: As described in a previous section in this justification statement, the master plan is consistent with the PUD requirements stipulated in the C-3 Regional Business Zoning District.*

C. *That the proposed use or uses shall not be detrimental to the orderly development of adjacent zoning districts.*

   *Response:  There will be no adverse impact to adjacent zoning districts, as the proposed uses have been suggested by a previous market analysis for the Village of North Palm Beach. In fact, the proposed project will bring users into the area and provide a stimulus for other business, offices and restaurants throughout the US Highway One and Northlake Boulevard corridors.*

D. *That the location and size of the proposed use or uses, the nature and intensity of the principal use and all accessory uses, the site layout and its relation to streets giving access to it, shall be such that traffic to and from the use or uses, and the assembly of persons in connection therewith, will not be hazardous or inconvenient to the neighborhood nor conflict with the normal traffic of the neighborhood.*

   *Response: With this application submittal, the Owner has submitted a traffic statement which concludes that the traffic generated for this project will not conflict with the normal established traffic patterns and meets the County Traffic Performance Standards as adopted by the Village of North Palm Beach.*

E. *That the location and height of buildings, the location, nature and height of walls and fences, and the nature and extent of landscaping of the site shall be such that they will not hinder or discourage the proper development and use of adjacent land and buildings nor impair the value thereof.*

Village Place – Mixed Use PUD
August 21, 2023
Page **9** of **9**

> *Response:  It is the Owner's intent to ensure that this standard is upheld with the proposed development.  Through the site plan review process, these items will be adequately site planned in a way that will not hinder any development possibilities for adjacent parcels.*

F.  *That the standards of density and required open space in the proposed project are at least equal to those required by this ordinance in the zoning district in which the proposed project is to be located, except as may be permitted for key redevelopment sites through subsection 45-35.1. VIII.*

> *Response: The proposed Master Plan is based on maximum FAR, which is consistent with the requirements listed in the Comprehensive Plan and zoning code. The FAR proposed is also consistent with the requirements of the Town of Lake Park, Florida.*

G.  *That there shall be no uses within the proposed project which are not permitted uses in the zoning district in which the proposed project is to be located.*
> *Response: All proposed uses are either permitted by right, or through the PUD process.*

**Conclusion**

In closing, the Owner proposes a Planned Unit Development mixed-use project that will redevelop the North Palm Beach portion of the Twin City mall site; an area that has been long contemplated for redevelopment.  The developer has taken extreme care in listening to the concerns and wishes of staff, councilmembers, and stakeholders to propose a mix of uses that are logical, and reinvest into the local economy. This proposal is directly consistent with the Village's Goals stated in the Comprehensive Plan, and will be an asset to not only North Palm Beach, but the greater Palm Beach County area, furthering health, safety, welfare ideals.  With this, 2GHO, Inc. respectfully requests review and approval of this submitted PUD Application.



Village Place

Mixed-Use Development

© Copyright 2023 All Rights Reserved





**Village Place**
Mixed-Use Development

PARCEL 1

PARCEL 2

PARCEL 2

PARCEL 3

CIVIC SPACE

CIVIC SPACE

PARCEL 2

PARCEL 4

US-1

PALMETTO DR.
PALMETTO DRIVE

**LOCATION MAP**
NOT TO SCALE

SITE

NORTHLAKE BLVD
PARK AVE

N

40  20  0        40        80
SCALE IN FEET
1"=40'

32.00

8.67   17.04

Fire Truck - NPB

| | feet |
|---|---|
| Width | : 8.00 |
| Track | : 8.00 |
| Lock to Lock Time | : 6.0 |
| Steering Angle | : 40.4 |

RED = VEHICLE BODY
BLUE = FRONT TIRE PATH
GREEN = REAR TIRE PATH

VILLAGE OF
NORTH PALM BEACH
DEC 19 2023
COMMUNITY DEVELOPMENT
RECEIVED

11/13/2023

SIMMONS & WHITE

REVISIONS

| DESIGN B.K. | DRAWN D.B. | CHECKED | APPROVED | DATE |
|---|---|---|---|---|

| JOB NO. 21-191 | DRAWING NO. 21191AT01 | SHEET 1 OF 1 |
|---|---|---|

**VILLAGE PLACE**
SECTION 16&21, TOWNSHIP 42S., RANGE 43E.
VILLAGE OF NORTH PALM BEACH, FLORIDA
**FIRE TRUCK AUTOTURN ANALYSIS**

Y:\AUTOCAD_FILES\2021\21-191\EXHIBITS\AUTOTURN ANALYSIS\2023-11-13 Fire.dwg 11/13/2023 12:00 PM Brandon Longo



VILLAGE OF
NORTH PALM BEACH
DEC 19 2023
COMMUNITY DEVELOPMENT
RECEIVED

VILLAGE PLACE

Renderings are conceptual and subject to modification. For illustrative purposes only.

Gensler

# VILLAGE PLACE



Renderings are conceptual and subject to modification. For illustrative purposes only.

**Gensler**





VILLAGE OF
NORTH PALM BEACH
DEC 19 2023
COMMUNITY DEVELOPMENT
RECEIVED

VILLAGE PLACE

Gensler

Renderings are conceptual and subject to modification. For illustrative purposes only.

# VILLAGE PLACE

Case 9:26-cv-80304-AMC   Document 1-3   Entered on FLSD Docket 03/20/2026   Page 426 of 429



Renderings are conceptual and subject to modification. For illustrative purposes only.

Gensler

# VILLAGE PLACE



VILLAGE OF
NORTH PALM BEACH
DEC 19 2023
COMMUNITY DEVELOPMENT
RECEIVED

Renderings are conceptual and subject to modification. For illustrative purposes only.

Gensler



VILLAGE OF
NORTH PALM BEACH
**DEC 19 2023**
COMMUNITY DEVELOPMENT
**RECEIVED**

August 18, 2023
Job No. 21-191B

## DRAINAGE STATEMENT

Village Place
Village of North Palm Beach, Florida

## SITE DATA

The subject parcel is located in the southwest corner of US Highway One and Northlake Boulevard in Village of North Palm Beach, Florida and contains approximately 13.16 acres.  The parcel contains a 126,330 SF shopping plaza, 9790 SF pharmacy, 5000 SF bank, 3098 SF fast food restaurant and 2410 SF gas station with convenience store.  The 126,330 SF shopping plaza will be demolished along with the existing parking lot.  The proposed plan of development will consist of 947 multi-family dwelling units, 206 age restricted multi-family dwelling units, 222-room hotel, 131,100 SF retail, 9790 SF pharmacy, 5000 SF bank, 3028 SF fast food and gas station with convenience store.  For additional information regarding site location and layout, please refer to the site plan prepared by Gentile Holloway O'Mahoney & Associates.

## SITE DRAINAGE

The site is located within the boundaries of the South Florida Water Management District Intracoastal Basin.   The existing South Florida Water Management District Permit No. 50-04324-P will be modified to include Parcel 4, Parcel 2 and a portion of Parcel 3.   It is proposed that runoff be directed to on-site water management areas by means of paved or grass swales and/or inlets and storm sewer. Each parcel will provide water quality in exfiltration trench.   Water quantity to be obtained in existing onsite lakes and proposed storm chambers.   Site grading to match existing permitted grades. The site will retain the entire runoff volume up to and including the 25-year, 3-day storm per South Florida Water Management District Permit No. 50-04324-P.   Drainage design is to address the following:

1.     On-site retention of the runoff from the 25-year, 3 day rainfall event.

2.     Off-site discharge will occur at the 100-year, 3-day event.

2581 Metrocentre Boulevard West      Suite 3     West Palm Beach     Florida     33407
T:   561.478.7848      F: 561.478.338     www.simmonsandwhite.com
Certificate of Authorization Number 3452

Drainage Statement
Job No. 21-191
August 18, 2023 – Page 2

<u>SITE DRAINAGE (Cont.)</u>

3. Building floor elevations to be set at or above the level produced by the 100 year - 3 day rainfall event.

4. Roads to be protected from flooding during the 3 year - 24 hour event.

5. Due consideration to water quality.

Required Permits/Approvals:

1. South Florida Water Management District Environmental Resource Permit

2. Florida Department of Transportation Drainage Permit

3. Village of North Palm Beach Engineering Approval

Erik R. Cooper, P.E.
FL Reg. No. 56934

Erik R. Cooper, P.E., State of Florida, Professional
Engineer, License No. 56934

This item has been digitally signed and
sealed by Erik R. Cooper, P.E., on 08/21/2023.

Printed copies of this document are not considered signed
and sealed and the signature must be verified on
any electronic copies.

ERC/sa        x:/docs/trafficdrainage/dr.21191b